# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## AT LAW AND IN ADMIRALTY

CASE No. **04 - 20499**
**CIV-MOORE**

MAGISTRATE JUDGE
O'SULLIVAN

RCI-DINNER KEY, INC., a Florida
corporation

and

MIAMI BEACH MARINA
ASSOCIATES, LTD, a Florida
Limited Partnership,

       Plaintiffs,

v.

M.V. "THE ATLANTIC", f/k/a "MAX
I", her boilers, engines, tackle,
equipment, freight, appliances,
apparel, appurtenances, etc., In
Rem,
MLA CRUISES, INC., a Delaware
Corporation; and
MAJESTY ENTERPRISES OF
FLORIDA, LLC. a Florida Limited
Liability Company",

       Defendants.

**VERIFIED COMPLAINT**

COMES NOW the Plaintiffs, RCI-Dinner Key, Inc., (hereinafter referred to as the "RCI"), and Miami Beach Marina Associates, Ltd, hereinafter referred to as "MBMA" as and for its complaint In rem pursuant to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims and Local Admiralty Rule C, to enforce a maritime lien, to foreclose a First Preferred Ship Mortgage, (hereinafter referred to as the "First Mortgage"), recorded with the National Vessel Documentation Center in Book 03-45, page 415 on May 2, 2003; to foreclose the second Preferred Ship Mortgage and Security Agreement (hereinafter referred to as the "Second Mortgage"), recorded with the National Vessel Documentation Center in Book 03-45, page 416 on May 2, 2003; and to foreclose the Marine Note and Security Agreement ( hereinafter referred to as the "Marine Note") in the amount of Two million dollars ($2,000.000.00), individually, and by and through their undersigned counsel and hereby sues the Defendants, the Motor Vessel "The Atlantic", f/k/a "MAX I", her boilers, engines, tackle, equipment, freight, appurtenances, etc., *in rem*; MLA Cruises, Inc., a Delaware Corporation (hereinafter referred to as "MLA"); and Majesty Enterprises Of Florida, LLC., a Florida Limited Liability Company"

(hereinafter referred to as "Majesty"), and in support of their claim would allege as follows:

## GENERAL ALLEGATIONS

1.     The Court has jurisdiction pursuant to 28 USC §1333 as this is a case cognizable within the Court's admiralty and maritime jurisdiction.  This is an admiralty and maritime claim within the meaning of Rule 9(h) Fed.R.Civ.P.

2.     Pursuant to Article II, Section 14 of the First Mortgage and the Second Mortgage, Defendant MLA has submitted itself to the exclusive jurisdiction of the United States District Court, Southern District of Florida, Miami-Dade division, if the vessel is located in the Southern District of Florida.

3.     At all material times, Plaintiff, RCI-Dinner Key, Inc. was and now is a Florida corporation authorized to do business and is doing business in the State of Florida with a place of business in Miami-Dade County, Florida.

4.     At all material times, Plaintiff, Miami Beach Marina Associates, Ltd was and now is a Florida Limited Partnership,

authorized to do business and is doing business in the State of Florida with a place of business in Miami-Dade County, Florida.

5.    RCI and MBMA are affiliated entities.

6.    The Defendant Motor Vessel "The Atlantic" is a seagoing Vessel which is presently docked at the Miami Beach Marina, located at 300 Alton Road, Miami Beach, Florida, which is within the jurisdiction of this Court, and is one hundred and ninety six and three-tenths feet (196.3) in length and its official registration number is 634676.

7.    At all times material hereto Defendant, MLA Cruises, Inc, a Delaware Corporation, properly registered to conduct business in the State of Florida, was and now is the registered owner of Defendant vessel, The Atlantic.

8.    Majesty Enterprises Of Florida, LLC., a Florida Limited Liability Company, and MLA are affiliates with common principals and shareholders and at all times material hereto, Majesty acted as the agent for Defendant vessel, The Atlantic.

9.    Plaintiffs have hired the undersigned counsel and are obligated to pay a reasonable fee for said services.

10.    All conditions precedent to the bringing of this action have been satisfied or waived.

## COUNT ONE
## BREACH OF LEASE AND FORECLOSURE OF PREFERRED SHIP MORTGAGE AND SECURITY AGREEMENT

11.    Plaintiffs incorporate and re-allege paragraphs 1 through 10 as if fully set forth herein.

12.    On or about January 31, 2002, MBMA, as Landlord, entered into a Marina Lease agreement (hereinafter referred to as the "Lease") with Majesty, as Tenant, for office space and dock space for the M/V "Majesty". A copy of the Lease is attached hereto as Exhibit "A." Pursuant to Article 34 of the Lease, Majesty acknowledged that MBMA shall have a maritime lien on the vessel, her appurtenances and content for any unpaid sums due to the Landlord for the use of its facilities and other services.

13.    On or about April 22, 2003, Majesty and MBMA entered into a letter agreement to substitute M/V Max I, Official Number 634678, for the Majesty and entitling MBMA to a Second Mortgage on the vessel as security for the Lease.

14.    On May 5, 2003, a Certificate of Documentation was issued by the National Vessel Documentation Center to MLA for

the M/V The Atlantic with same official number as had been previously issued to the M/V Max I, attached hereto as Exhibit "B".

15.    On or about July 1, 2003, the MBMA and Majesty entered into a Lease amendment, to substitute the M/V "The Atlantic" for the M/V Majesty and reaffirming all other terms and conditions of the Lease.  A copy of the Letter Agreement and Lease Amendment are attached hereto as composite Exhibit "C."

16.    On or about April 22, 2003, MLA, as Mortgagor, and MBMA, as Mortgagee, entered into the "Second Mortgage" for the purposes of securing the Defendant Majesty's obligations under this Lease, including the payment of rent and common area maintenance (hereinafter CAM).  A copy of the Second Mortgage is attached hereto as Exhibit "D."

17.    During the approximate period from November 15, 2003 through March 1, 2004, MBMA furnished necessaries to The Atlantic at the request of her agents, masters and owners in the form of dockage, office space, and other services.

18.    The Atlantic, Majesty and MLA are in breach of the Lease and Second mortgage as a result of their failure to pay for said necessaries.  As a direct and proximate result of such breach,

Plaintiffs have been damaged.

19.    The balance which remains due for these services as nearly as can presently be ascertained is $412,439.76, as shown by the summary of charges attached hereto as Exhibit "E".

20.    All necessaries, services and other benefits provided inured directly to the benefit of The Atlantic and were provided directly to the vessel and/or on behalf of the vessel for its direct use and benefit.

21.    By virtue of the foregoing, MBMA claims a maritime lien in the amount of $412,439.76 against The Atlantic pursuant to 46 USC § 31342 and the express terms of the Lease and Second Mortgage and brings this action to enforce its lien.

22.    Plaintiff MBMA also seeks to foreclose the Second Mortgage and to have The Atlantic arrested, sold and to be paid the claimed amount from the proceeds of the sale.

23.    Additionally, paragraph (c) of Section 12 of Article I of the Second Mortgage provides that after an event of default, the Defendant shall immediately provide MBNA any charter fees or other earnings made by operating The Atlantic.  Defendants have failed to do so.

WHEREFORE, the Plaintiff prays that:

a.     The Court takes jurisdiction of this claim.

b.     The Court issue process in rem in accordance with the rules and practices of this Court in causes of maritime and admiralty jurisdiction against The Atlantic, her boilers, engines, tackle, equipment, freight, appliances, apparel, appurtenances, etc., citing all persons claiming any interest therein to appear and answer on oath all and singular the matters aforesaid or suffer the entry of default;

c.     The Plaintiff MBMA be adjudged to have a valid maritime lien against The Atlantic in the amount of $412,439.76, plus interest and attorneys fees and costs and that the Court foreclose the maritime lien and the Second Mortgage.

d.     Said vessel, The Atlantic, be arrested and sold to satisfy the Plaintiff's, MBMA's, lien claim and foreclosure of the Second Mortgage.

e.     Plaintiff MBMA be awarded damages from all Defendants, jointly and severally, in an amount to be determined at time of trial together with pre-judgment interest, costs, attorneys' fees pursuant to the terms of the lease and Second Mortgage, and any applicable general relief, and for

such other and further relief that this Court deems just and proper in the premises.

f.   The Court impose a constructive trust on the charter fees and other earnings of The Atlantic for the benefit of the Plaintiff MBMA.

g.   Grant such other and further relief as may be just and proper.

## COUNT TWO
## BREACH OF MARITIME NOTE AND SECURITY AGREEMENT AND FORECLOSURE OF FIRST PREFERRED SHIP MORTGAGE

24.   Plaintiffs incorporate and re-allege paragraphs 1 through 10 as if fully set forth herein.

25.   On or about April 22, 2003, MLA, as Mortgagor, entered into a First Preferred Ship Mortgage with RCI, as Mortgagee (the "First Mortgage") wherein RCI loaned MLA two million dollars ($2,000,000.00), in exchange for a mortgage on the Defendant vessel.  A copy of the First Mortgage is attached hereto as Exhibit "F."

26.   Simultaneously, MLA as Borrower entered into a Marine Note and Security Agreement with RCI (the "Marine Note"), as

Lender to secure the two million dollar loan.  A copy of the Marine Note is attached as Exhibit "G."

27.    According to the terms of the First Mortgage and the Marine Note, MLA was to timely make equal monthly installments commencing May 15, 2003 through April 21, 2006.

28.    Majesty failed to timely make the payment due and owing on November 15, 2003 and is currently in arrears on this First Mortgage in the amount of $26,446.88, plus interest and is in default of the Marine Note.

29.    Paragraph (a) of Section 1 of Article II of the First Mortgage and paragraph 38 (a) of the Marine Note provide any payment which is not received by RCI within 10 days of its due date shall be a default.

30.    Additionally, pursuant to Article II, Section 1, Paragraph (e) (1) of the First Mortgage and Paragraph 39(a) of the Marine Loan, RCI may accelerate the loan and declare all unpaid indebtedness secured under the First Mortgage to be due and payable immediately in the event of a default.

31.    Plaintiff desires to and does hereby accelerate the First Mortgage and calls the entire principal sum in the amount of

$2,000.000.00 due and owing immediately, plus interest accruing thereunder.

32.    Furthermore, paragraph 11 of the Marine Note grants RCI a lien in the Vessel, together with her boilers, engines, tackle, equipment, freight, appliances, apparel, appurtenances, etc.

33.    Paragraph 14 (b) therein further provided RCI with a security interest in all charter hire, freights, revenue, and any other moneys of whatsoever nature earned from The Atlantic.

34.    The Defendants are in breach of the First Mortgage and Marine Note and as a direct and proximate result of such breach, Plaintiffs have been damaged.

WHEREFORE, the Plaintiff prays that:

a.    The Court takes jurisdiction of this claim.

b.    The Court issue process in rem in accordance with the rules and practices of this Court in causes of maritime and admiralty jurisdiction against The Atlantic, her boilers, engines, tackle, equipment, freight, appliances, apparel, appurtenances, etc., citing all persons claiming any interest therein to appear and answer on oath all and singular the matters aforesaid or suffer the entry of default;

c.    The Plaintiff RCI be adjudged to have a valid maritime lien against The Atlantic for all amounts due and owing under the Marine Note and First Mortgage, plus interest and attorneys fees and costs and that the Court foreclose the maritime lien and the First Mortgage.

d.    Said vessel, The Atlantic, be arrested and sold to satisfy the RCI's lien claim and foreclosure of the First Mortgage.

e.    Plaintiff RCI be awarded damages from all Defendants, jointly and severally, in an amount to be determined at time of trial together with pre-judgment interest, costs, attorneys' fees pursuant to the terms of the Marine Note and First Mortgage, general relief, and for such other and further relief that this Court deems just and proper for the breach of the Lease.

f.    The Court impose a constructive trust on the charter fees and other earnings of The Atlantic for the benefit of the Plaintiff RCI.

g.    Grant such other and further relief as may be just and proper.

## **VERIFICATION**

BEFORE ME, the undersigned authority, personally came and appeared:

ROBERT W. CHRISTOPH, President of RCI-DINNER KEY, INC. and President of So Be Marina, Inc., the sole general partner of MIAMI BEACH MARINA ASSOCIATES, LTD, who, AFTER BEING DULY SWORN, did depose and stated that he has read in its entirety the foregoing Complaint and based upon his personal knowledge, the allegations contained therein are true and correct.

ROBERT W. CHRISTOPH
President,
RCI-Dinner Key, Inc.
And
President, So Be Marina, Inc., sole general partner of
Miami Beach Marina Associates, Ltd.


SUBSCRIBED AND SWORN to before me in the City of Fort Lauderdale, County of Miami-Dade, State of Florida, to take acknowledgments, personally appeared ROBERT W. CHRISTOPH, President of RCI-DINNER KEY, INC., and President of So Be Marina, Inc. sole general partner of MIAMI BEACH MARINA ASSOCIATES, LTD, who is personally known to me or who has produced _____as identification and who did take an oath and who executed the foregoing instrument and he/she acknowledged before me that he/she executed the same.

13

**WITNESS** my hand and official seal in the County and State last aforesaid this 2nd day of <u>March</u>, A.D., 2004.



*Sandra C. Ovando*

Print Name *Sandra C. Ovando*
Notary Public - State of Florida
My Commission Expires
Commission Number **DD 269 175**

Respectfully submitted this **3** day of March, 2004.

Stuart R. Michelson
FBN: 286982
LAW OFFICE OF STUART R. MICHELSON
200 SE 13th Street
Fort Lauderdale, Florida 33316
954-463-6100
Facsimile: 954-463-5599

<u>MARINA LEASE</u>

THIS LEASE is made this 31st day of January, 2002 ("Effective Date"), by and between the parties named below.

W I T N E S S E T H :

ARTICLE 1 - BASIC PROVISIONS AND DEFINED TERMS

(a)   Landlord:
Miami Beach Marina Associates, Ltd.

(b)   Landlord's Address:
300 Alton Road - Suite 303
Miami Beach, Florida 33139
Attention: Robert W. Christoph

(c)   Tenant:
Majesty Enterprises of Florida, LLC, a Florida limited liability company

(d)   Tenant's Address:
1290 5th Street, Miami Beach, Florida 33139

(e)   Tenant's Trade Name: "Majesty," "Majesty Cruises"

(f)   Premises: The office space located in the 1290 5th Street building (the "Building") of the Marina (defined below) having a floor area of approximately 900 square feet (the "Office Space") (measured from the exterior surface or lease line of store fronts, outside walls or wall fronting on service corridors and the center of any common walls, and 220 linear feet of dock space (the "Dock Space"), being outlined in red on Exhibit "A-1" attached hereto and made a part hereof. The Office Space and the Dock Space are located on the land ("Land") and improvements thereon commonly known as the Miami Beach Marina, which is legally described on Exhibit "A" attached hereto and made a part hereof.

(g)   Lease Term: Commencing on the later of the approval of this Lease by the City of Miami ("City") or February 15, 2002 (the "Commencement Date") and continuing until December 31, 2022, unless terminated earlier as provided herein. Provided the Tenant is not in default hereunder, Tenant shall have the right to extend the Lease Term as provided in Article 33 below.

(h)   Minimum Rent: In respect of each full year during the Lease Term, a minimum guaranteed rental equal to $360,000 ($300,000 for the Office Space and $60,000 for the Dock Space) payable in advance in equal monthly installments of $30,000 commencing on the Commencement Date.

The Minimum Rent shall be increased over the amount payable in the immediately preceding Lease Year in the following manner (the "CPI Increase"): The base for computing the adjustment shall be the most recent applicable base year Consumer Price Index ("CPI"), as determined by Landlord for the greater Miami-Dade County, Florida area as published by the United States Department of Labor which is published for the month nearest the first day of the immediately preceding Lease Year (the "Beginning CPI"). If the CPI published for the month nearest the commencement of the applicable Lease Year (the "Current CPI") has increased over the Beginning CPI, then the annual Minimum Rent for that Lease Year shall be increased by a fraction, the numerator of which is the Current CPI and the denominator of which is the Beginning CPI. Notwithstanding anything contained herein to the contrary, at a minimum the annual CPI Increase shall equal 2%.

In the event the CPI is changed so that the base year differs from that contemplated herein, the CPI shall be converted in accordance with the conversation factor published by the United States Department of Labor. If the CPI is discontinued or substantially revised, another government index or computation or the index with which the CPI is replaced shall be used in

Exhibit "A"

V3339\16468\\# 538330 v 3
1/29/02 2:54 PM

order to obtain essentially the same result as would have been obtained if the CPI had not been discontinued or revised.

Additional Minimum Rent in the amount of $180,000 ("Additional Minimum Rent") shall be due for the first full month of the first Lease Year, as provided in Section 4a, but shall not be due and payable for any other month during the Lease Term.

(i)      Percentage Rent:  $3.00 per passenger that boards the Vessel in excess of the Passenger Minimum for any Lease Year.

(j)      Passenger Minimum:  120,000 passengers that board the Vessel, which may be adjusted as provided in Section 6 (h) below.

(k)      Intentionally deleted.

(l)      Permitted Use:  Ancillary ticketing facility, office space and dockage for the Vessel provided the Vessel is able to safely dock in 220 linear feet of space. The Vessel shall provide day and evening cruises including dining, dancing, entertainment, special events and casino gaming in international waters. Tenant may also operate a small gift shop selling cruise related items containing the Tenant's trade name or logo such as hats, T-shirts, glasses, playing cards, etc. provided the sale of such items does not violate any of the restrictions set forth in Section 6(b) below.

(m)      Operating Hours: The Vessel shall have at least two cruises daily and twelve cruises per week (weather and seas permitting), exclusive of the days Vessel is out of service for repairs or in dry dock, which number of days for repair and service shall not exceed 30 days in any Lease Year (the "Repair Period"). There shall be a minimum of two (2) hours between debarkation and embarkation of  subsequent cruises scheduled between the hours of 9:00 a.m. and 9:00 p.m. A shorter turnaround time shall be permitted for late evening cruises provided the debarkation and embarkation of passengers are operated safely taking into account the needs of passengers and other tenants at the Marina.  A shorter turnaround time may be permitted for special events planned by Tenant with the Landlord's prior written approval.

(n)      Common Area Maintenance Charges: $3,000.00 per month for the first Lease Year. After the first Lease Year, the charge shall be increased as of the first day of each successive Lease Year by the CPI Increase.

(o)      "Building Facilities" shall mean and include all equipment, machinery, facilities and other personal property located in the Building and/or used or utilized wholly or partially in or in connection with the operations and/or maintenance of the Marina or any part thereof.

(p)      "Land" shall mean the real estate described on Exhibit A-1 attached hereto and made a part hereof.

(q)      "Rent" shall mean Minimum Rent,  Tax payments, Common Area Maintenance Charges, utility charges and all other amounts due from Tenant hereunder.

(r)      "Marina" shall mean the Miami Beach Marina facility, including but not limited to the Building, Land, Common Areas, Building Facilities, piers and dock master's office located at 300 Alton Way, Miami Beach, Florida.

(s)      "Vessel"  shall mean the "Majesty" of  United  States  registry,  which  is approximately 165 feet in length and will be licensed with the United States Coast Guard to carry at least 450 passengers plus crew or such other vessel of at least the same size and capacity as the Majesty and otherwise reasonably acceptable to Landlord.  Vessel shall also mean any other vessel or vessels owned, managed or operated by Tenant which uses the Miami Beach Marina for any of the Permitted Uses hereunder.

Each of the foregoing basic provisions and defined terms shall be construed in conjunction with and limited by the references thereto in the other provisions of this Lease.

V7333/PL04488\# 338320 v 3
1/29/02 2:54 PM

2

A. V.

ARTICLE 2 - GRANTING CLAUSE

Landlord, in consideration of the obligation of Tenant to pay Rent as herein provided and in consideration of the other terms, covenants and conditions hereof, hereby demises and leases to Tenant and Tenant hereby rents and takes from Landlord the Premises, TO HAVE AND TO HOLD the Premises for the term specified in paragraph (g) of Article 1, unless sooner terminated as herein provided, all upon the terms and conditions and subject to the limitations restrictions and reservations herein provided.

The purpose of attaching composite Exhibit "A" to this Lease is to show the approximate location of the Premises and other improvements constituting a part of the Marina, but Landlord reserves the unrestricted right at any time to relocate the Common Areas (as defined in Article 8), expand areas within the Marina and to otherwise alter or modify the Marina. Notwithstanding the relocation of the Common Areas or other alteration or modification of the Marina, Landlord shall provide pedestrian access to the Premises and the number of Parking Spaces required in Article 29.

Tenant shall receive by virtue of this Lease only the rights and privileges herein specifically granted and/or leased to Tenant, and Landlord specifically reserves and excepts unto itself, without limiting the generality of the foregoing, (i) the exclusive use of the roof of the Building (including, without limitation, the installation of antennae, signs, displays, equipment and/or other objects, as well as the right to construct additional stories if Landlord so elects, exterior walls, and the area above and below the Premises and (ii) the right to place in the Premises (above ceilings, below floors or next to columns and in such manner as to reduce to a reasonable minimum the interference with Tenant's use of the Premises), utility lines, pipes and the like to serve premises other than the Premises and to replace and maintain and repair such utility lines, pipes and the like in, over and upon the Premises as may have been installed therein.

Notwithstanding anything contained in this Article to the contrary, the Tenant acknowledges that two residential condominium buildings are in the process of being constructed (or are contemplated to be constructed) at the Marina or adjacent thereto (the "Construction"). Tenant further acknowledges that in connection with the Construction the Building will be demolished. Prior to the demolition of the Building, the Office Space may be re-located to a temporary location and upon completion of all of the Construction, the Tenant may be relocated again to permanent Office Space on the first floor of the parking facility for the last of the two newly constructed condominium buildings at the north end of the Marina. Prior to each relocation, Landlord shall provide written notice thereof to Tenant (the "Relocation Notice") at least 90 days prior to Tenant's required relocation date. All references in this Lease to "Building," "Office Space" and "Premises" shall, to the extent applicable, refer to the Office Space and the Building then being occupied by Tenant and shall also, where applicable, refer to the Building and the Office Space previously occupied by Tenant. Tenant shall not be entitled to any Rent reduction or other concession in connection with the anticipated relocations; Tenant expressly acknowledges that the relocations are a required condition of this Lease and that Landlord would not have entered into this Lease but for Tenant's agreement to relocate as provided herein. Any relocation space for the Office Space shall be at least 850 square feet. The Minimum Rent for the Office Space shall not be increased unless the size of the Office Space is in excess of 950 square feet and then it will be increased on a per square foot basis for any square feet in excess of 950, at the rate of $35.00 per square foot as Minimum Rent and $4.50 per square foot for Common Area Maintenance Charges, each sum as increased by the CPI Index from and after the first Lease Year of the Lease Term of this Lease. Furthermore, for each new space that the Tenant is relocated to, Landlord shall only be obligated to deliver to Tenant a "vanilla box" space (and not necessarily in the same condition as the original Premises is delivered to Tenant) and Tenant shall, at its sole cost and expense, be responsible for constructing any desired improvements or alterations to such space, in accordance to the terms and conditions of Article 3. For all purposes hereof a "vanilla box" shall mean that the building shell for the Office Space has been completed (walls and floor), electric and phone transmission mains and conduits have been brought to the Office Space for distribution throughout the space by Tenant, and air conditioning and fire sprinklers are installed in the Building to serve the Office Space in compliance with the minimum requirements of applicable law. The Building in which the "vanilla box" will be located shall also contain a common bathroom facility which meets the minimum requirements of applicable law.

V73335\MI64\BB\# 538320 v 3
1/29/02 2:54 PM

3

A. V.

ARTICLE 3 - ACCEPTANCE AND CONSTRUCTION OF PREMISES

(a)     Landlord's Work.  Tenant acknowledges that Landlord is only required to deliver to tenant a "vanilla box" space and that Tenant is solely responsible for making any required improvements thereto.  Landlord shall have no obligation to repair, alter, improve or perform any work in or to the Premises prior to delivery thereof to Tenant.  Tenant acknowledges that the Premises are ready for delivery to Tenant for the completion of Tenant's Work (as defined in paragraph (b) below) and Tenant accepts the Premises in its existing condition without any representation or warranty as to the condition of the Premises.

(b)     Completion of Tenant's Work.  Except as set forth in Section 3(c) below, all improvements within the Premises (collectively, the "Tenant's Work") shall be completed by Tenant or Tenant's designated contractor in accordance with plans and specifications that have received the prior written approval of Landlord and the City.  The approval by Landlord of plans and specifications shall not constitute the assumption of liability by Landlord or its agents or employees for their compliance or conformity with applicable building codes and the requirements of this Lease, and Tenant shall be solely responsible for such plans and specifications.  In addition, the approval by Landlord of any plans and specifications shall not constitute a waiver by Landlord of the right thereafter to require Tenant to amend them to provide for any corrections or omissions by Tenant of items required by building codes or regulatory or governmental authorities or the Lease which are later discovered by Landlord.  Landlord's consent may be predicated upon Tenant using contractors acceptable to Landlord, and upon Tenant's furnishing of acceptable payment and performance bonds.  Tenant shall "bear" the cost of all Tenant Work including the cost and expense of filing such plans and specifications with the appropriate governmental agencies.  Included within Tenant's Work shall be all utility hook-ups and street lighting upgrades necessary for Tenant to conduct is business from the Premises or dock the Vessel in the Dock Space as well as other improvements or modifications to the Premises and any fees paid to any contractor or subcontractor, mechanical, electrical or HVAC engineering consultants, decorating or special design consultants shall be borne by Tenant.  Tenant shall be required to obtain all appropriate governmental permits and approvals at Tenant's expense prior to commencement of Tenant's Work.  Once Tenant has commenced Tenant's Work, Tenant shall diligently pursue such work to completion and, in any event, shall complete Tenant's Work within 90 days after the Commencement Date or the date of relocation of the Office Space, as applicable.  Failure to timely complete Tenant's Work shall be deemed a default by Tenant under the terms of this Lease.  Tenant's Work shall generally consist of: painting, carpeting, installation of a phone reservation system and computers, and construction of non-structural demising walls.

(c)     Electrical Power Source Near Dock Space.  To the extent permitted by law and the City, Landlord shall, at Tenant's sole cost and expense, install a 150 amp, 240 volt, 3 phase electrical box (the "Dock Electrical Box") in or adjacent to the Dock Space.  Prior to the commencement of construction of the Dock Electrical Box, Landlord shall provide Tenant with an estimate for the cost of the same.  If the estimate is acceptable to Tenant, it will authorize Landlord to commence construction of the Dock Electrical Box.  If the estimate is not acceptable to Tenant, Landlord shall not be required to construct and install the Dock Electrical Box as provided herein.  Within 10 days after the Landlord provides Tenant with a written invoice for the costs and expenses incurred by Landlord to obtain and install the Dock Electrical Box, Tenant shall reimburse Landlord the cost of the same, even if the actual cost is in excess of the estimate, and such sum shall be deemed Additional Rent due hereunder.  Tenant shall contract directly with the utility provider for the electrical power service to the Dock Electrical Box and shall pay to have the Dock Electrical Box separately metered.

(d)     Delivery of Premises.  Tenant shall have no right to enter or occupy the Premises until the same are tendered by Landlord.

ARTICLE 4 - RENT

(a)     Minimum Rent.  Tenant shall pay to Landlord, at such place as shall be designated from time to time for notices to Landlord without any prior demand therefore and without any deduction or set-off whatsoever, monthly Minimum Rent due in advance on the first day of each month during the Lease Term.  If the Commencement Date does not start on the first of the month, the Minimum Rent shall be prorated on a per diem basis.  For the first full month of the

V/33339/164884 # 538320 v 3
1/29/02 2:54 PM

4

A. V.

first Lease Year Tenant shall pay to Landlord Minimum Rent in the total amount of $210,000 (the $180,000 Additional Minimum Rent and the 30,0000 monthly Minimum Rent). The Minimum Rent and Additional Minimum Rent shall be payable to Landlord within one business day after approval of this Lease by the City.   For the purposes of calculating the CPI Increase for any Lease Year the Additional Minimum Rent of $180,000 shall not be included in such calculation. For example, for the Second Lease Year the annual Minimum Rent shall equal $360,000 multiplied by the greater of the CPI Increase or 2%.

(b)     Percentage Rent.   Tenant shall pay to Landlord for each Lease Year $3.00 for each passenger in excess of the Passenger Minimum (the "Base Amount") for each Lease Year, payable monthly on the first day of each month when the Base Amount for the applicable Lease Year is exceeded.   For purposes of calculating the Passenger Minimum, employees and crew of Tenant shall not be counted as "passengers."

(c)     Additional Rent.   Any other sums payable by Tenant to Landlord hereunder shall be payable as "Additional Rent" hereunder.

(d)     Sales and Use Tax.   Each payment of Rent due hereunder shall be accompanied by a payment of any and all applicable Rent tax in the amount required by Miami-Dade County, the State of Florida, or any other applicable governmental authority. At the time of execution of this Lease the sales tax is equal to six and one half percent (6.5%) of the amount of each payment of Rent. This amount is subject to change by Miami-Dade County, the State of Florida or any other applicable governmental authority, and Landlord shall notify Tenant and Tenant shall be liable for any change in this percentage amount.

(e)     Delinquent Rent. In the event any Rent is not received within ten (10) days after its due date for any reason whatsoever (including, without limitation, the payment of Minimum Rent and the payment of Percentage Rent), it is agreed that the amount thus due shall bear interest at the lesser of 18% per annum or the highest lawful rate, such interest to accrue continuously on any unpaid balance due to Landlord by Tenant until Tenant shall have paid all of such unpaid balance plus the interest that has accrued thereon. Any such interest shall be payable as Additional Rent hereunder, shall not be considered as a deduction from any other payments of Rent and shall be payable immediately on demand.

If Tenant fails in two consecutive months to make Rent payments within ten (10) days after due, Landlord in order to reduce its administrative costs, may require, by giving written notice to Tenant (and in addition to any interest accruing and any other rights and remedies of Landlord) Minimum Rent be paid quarterly in advance instead of monthly and that all future Rent payments are to be made on or before the due date by cash, cashier's check or money order, and that the delivery of Tenant's personal or corporate check will no longer constitute a payment of Rent as provided in this Lease. Any acceptance of a monthly Rent payment or of a personal or corporate check thereafter by Landlord shall not be construed as a subsequent waiver of said rights. Tenant shall pay to Landlord an administrative fee of $250.00 for any check made by Tenant and returned by Landlord's bank whether for "insufficient funds", "stop payment" or otherwise.

(f)     Definition of Lease Year. Lease Year means the period from the Commencement Date through the last day of the 12th full month after the Commencement Date and thereafter each successive twelve (12) month period. The last Lease Year of the Lease Term shall end as of December 31, 2002.

(g)     Minimum Rent Abatement.   Notwithstanding anything herein to the contrary, provided Tenant is not otherwise in default under this Lease, Tenant shall not be obligated to pay any Minimum Rent for the "last six months of this Lease", which "last six months of this Lease" shall mean the last six months of the last Option Term exercised by Tenant or if Tenant fails to exercise any Options to Extend as provided in Article 33 hereof, July 1, 2022 through and including December 31, 2002.  In the event Tenant defaults hereunder and Landlord incurs any cost or expense incurred in connection therewith, and Tenant fails to timely reimburse Landlord for the same, Tenant shall be obligated to pay all Rent due hereunder for the "last six months of the Lease".

*A. V.*

ARTICLE 5 - RECORDS AND STATEMENTS

(a)     Passenger Records.  Each day Tenant shall provide Landlord with a copy of the passenger manifests for all cruises the prior day and copies of all reports pertaining to passengers that board the Vessel filed with any governmental agency or entity, (e.g. United States Coast Guard, United States Customs) (collectively, the "Passenger Records") which Passenger Records shall be certified as being true and correct by the captain of the Vessel or other officer of Tenant reasonably acceptable to Landlord.  All Passenger Records shall be retained and preserved by Tenant for at least 24 months after the end of the Lease Year to which they relate, and shall be subject to inspection of audit by Landlord and its agents at all reasonable times.

(b)     Quarterly and Annual Financial Statements.  Within 30 days after the end of each calendar quarter and 90 days after the end of each year, Tenant shall furnish to Landlord the financial statements of Tenant for such quarter or year, which Financial Statements shall be maintained in accordance with generally accepted accounting principles.  The annual financial statements must be audited by a certified public accountant.

(c)     Failure to Submit Statements.  If Tenant omits to prepare and/or deliver promptly any statements or other information required to be delivered under this Article or Landlord has reason to believe that Tenant is violating the radius restriction contained in Section 6(i) below, Landlord may, in addition to exercising any of the remedies provided to Landlord under this Lease audit all of Tenant's books and records relating to its business operations.  Such audit shall be made and such statement or statements shall be prepared by a public accountant to be selected by Landlord.  Tenant shall pay all expenses of the audit and other services.  If Landlord's purpose of the audit is because Landlord believes that Tenant is violating the radius restriction (and not because of Tenant's failure to timely prepare or deliver said information), Tenant shall not be obligated to reimburse Landlord the cost of the audit if the audit does not reveal any violation or improper information submitted by Tenant.

(d)     Confidentiality of Tenant Financial Records.  Except for any copies of already disseminated information, Landlord shall use commercially reasonable efforts to keep confidential any information concerning Tenant's business and affairs that Landlord may receive pursuant to this Lease and will not disclose any such information to the public or any competitor of Tenant; provided, however, Landlord may utilize the information for the following purposes: (i) Landlord's financing, (ii) furnishing such information to any governmental entity, agency or organization or to any holder of a ground lease related to the Marina, (iii) furnishing such information to any court, person, agency or organization as a result of litigation, (iv) furnishing such information to any prospective bona-fide purchaser of Landlord's interest in the Marina, (v) furnishing such information to any attorney, accountant, or professional consultant of Landlord and (vi) as required by law.

ARTICLE 6 - USE AND CARE OF PREMISES

(a)     Use.  The Premises shall be occupied and used only for the purposes set forth in Article 1 and for no other purpose whatsoever.  Without limiting the generality of the foregoing, Tenant shall not use the Premises, nor permit same to be used, for the manufacture, sale, barter or trade of beer, wine, alcohol or other intoxicating liquors of any nature whatsoever, as the same shall be defined under the statutes of the United States or the State of Florida unless and except as specifically stated herein.  Tenant shall not conduct or permit to be conducted within the Premises any fire, auction, "going out of business", bankruptcy sale or similar sales or operate or permit to be operated with the Premises a "wholesale" or "factory outlet" store, a cooperate store, a "secondhand" store, a "surplus" store, a store commonly referred to as a "discount house" or a store in which customers purchase memberships.  Tenant shall not advertise that it sells its products or services at "discount", "cut-price" or "cut-rate" prices.  Tenant shall comply with all applicable laws, ordinances, rules and regulations of any governmental entity or agency having jurisdiction over the Premises.  Notwithstanding the foregoing, provided Tenant complies with all applicable laws, Tenant may sell food and beverages on the Vessel for consumption by passengers on the Vessel and Landlord shall not have the right to restrict any menu items.

(b)     Restrictions on Use of Premises.  Tenant shall not:

\\73339\164481\# 538320 v 3
1/25/02 2:54 PM

6

*A. V.*

(i)   permit any unlawful or immoral practice to be carried on or committed on the Premises;

(ii)   make any use or allow the Premises to be used in any manner or for any purpose that might invalidate or increase the rate of insurance on any policy maintained by Landlord;

(iii)   keep or use or permit to be kept or used in the Premises any inflammable fluids, explosives or other materials deemed dangerous by Landlord or Landlord's insurance carrier without obtaining the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion;

(iv)   use the Premises for any purpose which might create a nuisance or injure the reputation of the Premises, Landlord or the Marina;

(v)   deface or injure the Premises or any part the Marina;

(vi)   overload the floors in the Premises;

(vii)   commit or suffer any waste in or about the Premises;

(viii)   permit any objectionable or unpleasant odors to emanate from the Premises;

(ix)   place or permit any radio or television antennae, loud speakers, sound broadcasting equipment or amplifiers on the outside of the Premises or where the same can be heard or seen outside the Premises without Landlord's consent, which consent may be withheld in Landlord's sole discretion;

(x)   place any awning or other projection on the exterior of the Premises except as specifically approved in writing by Landlord. Tenant further agrees that if Landlord permits it to install awnings, said awnings shall only be of the same design, color and quality of material as specified by the Landlord for the Building; and further agrees to maintain and keep said awnings in such state of repair and renew same at intervals not greater than three years each, so that they present a first-class appearance at all times. If Tenant neglects and does not maintain or replace awnings as deemed necessary by the Landlord, it is agreed by both parties hereto that Landlord shall have the right, but not the obligation, after giving Tenant five days' written notice, to order awnings repaired, replaced or renovated, as is deemed necessary by Landlord, and to charge the cost of same to the Tenant, said cost shall be added to and considered additional Rent, due and payable together with the next monthly installment of Minimum Rent. Tenant agrees it shall not install equipment of any kind on the exterior of the Premises without the prior written approval of Landlord and that Tenant shall assume and agree to pay for any and all damage resulting from said installation, removal or maintenance or lack of maintenance thereof;

(xi)   use any parts of the Marina other than the Premises for sale or display of any merchandise or for any other business purpose or for public meetings or for entertainment, without the previous written consent of Landlord which consent may be withheld in Landlord's sole discretion;

(xii)   display or sell merchandise or allow carts, portable signs or devices or any other objects to be stored or to remain outside the defined exterior walls and permanent doorways or storefront of the Premises, and Tenant shall not solicit in any manner in any of the automobile parking facilities or Common Area.

Tenant shall pay to Landlord, as additional Rent, any increase in the cost of insurance on the Building, the Marina, or any improvements located therein as a result of any unauthorized use of the Premises by Tenant, but such payment shall not constitute in any manner a waiver by Landlord of its right to enforce all of the covenants and provisions of this Lease, including, but not limited to, the provisions of this Lease requiring that the Premises be used only for the purpose set forth in Article 1.

*A. V.*

(c)     Compliance with Laws. Tenant shall promptly comply with all laws, ordinances, orders and regulations affecting the Premises and the cleanliness, safety, operation and use thereof and with the recommendations of any insurance company, inspection or rating bureau or similar agency, public or private, pertaining to the use and occupancy of the Premises or insurance rates applicable to the Premises. Tenant shall maintain all required licenses, permits and governmental approvals for the operation of Tenant's business and upon request of Landlord, deliver true and correct copies thereof to Landlord. Tenant shall pay particular attention to any applicable noise ordinances and while the Vessel is docked in the Dock Space Tenant's use of the Premises shall not unreasonably interfere with the use of the Marina by other Marina tenants, especially at night. Landlord acknowledges that Tenant intends to have a live band or other music on the Vessel while in the Dock Space; however Tenant shall not be permitted to play amplified music outside the Vessel after 9:00 p.m. while the Vessel is in the Dock Space.

(d)     Exclusive Use. Provided Tenant is not in default hereunder during the Lease Term and any Options to Extend exercised by Tenant, Tenant shall have the exclusive right to operate a Vessel at the Marina for the purposes of dinner cruises and casino gambling in international waters.

(e)     Signs and Advertisements; Display Windows. No sign, advertisement, display, notice or other lettering shall be exhibited, inscribed, painted or affixed on any part of the outside of the Premises or inside, if visible from the outside (including but not limited to, signs, affixed to the exterior or interior surface of the plate glass in the store front of the Premises), the Building, or the Marina except with the prior written approval of Landlord, which consent may be withheld in Landlord's sole discretion. All such signs, displays, advertisements and notices of Tenant so approved by Landlord shall be maintained by Tenant in good and attractive condition at Tenant's expense and risk. Tenant, at its sole cost and expense, shall be required to obtain any necessary governmental approvals, permits or the like in connection with such signage, including but not limited to, the City. Tenant shall include the address and identity of its business activities in the Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned and shall not divert from the Premises any business which normally would be transacted there. Use by Tenant in advertising, letterheads or otherwise of the name of the Marina or pictures or drawings of the Marina or the Building, or any distinctive trade name or trademark used by Landlord shall be subject to such restrictions and regulations as Landlord may prescribe from time to time, in its sole discretion.

Subject to: (i) compliance with all applicable laws and regulations and (ii) Tenant obtaining all necessary approvals, permits and consents from the City, all applicable governmental authorities and any other interested persons, Tenant, at its sole cost and expense, shall have the right to install one sign on the exterior of the Building (and any building to which Tenant is relocated during the Lease Term and any extensions hereof (the "Exterior Sign"). The size of the Exterior Sign shall be in proportion to the rentable square footage of the Office Space compared to the rentable square footage of the entire Building in which the Office Space is located and the Tenant's right to the Exterior Sign provided herein shall not diminish the right of an other existing tenant or future tenant in the Building to obtain an exterior sign on the Building. The design, construction and placement of the Exterior Sign by Tenant must be uniform in nature with other exterior signs on the Building and be aesthetically pleasing. Landlord shall have the right to reasonably review and approve the plans and specifications for the Exterior Sign prior to submission to any governmental authority and shall also have the right to approve any changes to the plans and specifications required by such governmental authority. Tenant shall be responsible for maintaining, repairing and insuring the Exterior Sign throughout the Lease Term and any extension hereof. Tenant shall, at its sole cost and expense, also be responsible for removing the Exterior Sign and the end of the Lease Term or any Option Term, if exercised by Tenant (or any early termination hereof) and restoring any damage caused by the removal of the same. If Tenant fails to timely remove the Exterior Sign, Landlord shall have the right, but not the obligation to remove the same, restore any damage caused thereby, and charge Tenant, as Additional Rent hereunder, the cost of the removal and the restoration plus a 10% administrative fee. Tenant's inability to obtain the necessary permits, approvals or consents for the Exterior Sign shall not entitle Tenant to terminate this Lease, seek a reduction in Minimum Rent or obtain any other concessions from Landlord. The parties acknowledge that the Tenant's ability to install the Exterior Sign is at Tenant's sole risk. The obligations of Tenant under this Article of the Lease shall survive any expiration or termination hereof.

*A. V.* [signature]

Without limiting or otherwise affecting the other provisions of this Lease whereby Tenant agrees not to perform certain acts without the prior written consent of Landlord, Tenant specifically covenants and agrees that, except for signs and lighting permitted in accordance with Landlord's regulations and pursuant to the requirements set forth in the preceding paragraph, Tenant shall not (i) paint, decorate or make any other changes to the exterior of the Premises or (ii) install any exterior lighting or awnings, or any exterior signs, advertising matter, decoration or painting in or upon the Premises, (iii) install any drapes, blinds, shades, screens or other coverings on the exterior windows and/or doors of the Premises, (iv) affix any window or door lettering, sign, decoration or advertising matter on any window or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior or the Premises, without the written consent of Landlord first had and obtained in each case. Tenant shall keep all signs installed in or on the Premises in good condition and in proper operating order at all times.

Recognizing that it is in the interest of both Landlord and Tenant to have regulated hours of business for the retail areas, Tenant shall keep any display windows of the Premises electrically lighted for such periods of time as (i) at least until midnight each day, including Sundays and holidays or (ii) during such business hours as Landlord shall set by notice to Tenant, whichever is the latest; provided, however, that Tenant shall keep such windows lighted during such shorter periods as Landlord shall designate in keeping with any energy conservation methods or such time periods as may be designated by applicable governmental regulations.

(f)     Care of Premises. Tenant shall take good care of the Premises and keep the same free from waste, rodents and insects at all times. Tenant shall participate at its expense in any joint or coordinated extermination efforts of Landlord with respect to the Marina or the Common Areas and/or other tenants or occupants of the Marina and, in any event, Tenant shall keep the Premises free of pests and rodents and employ extermination services for the Premises at least once per year. Tenant shall keep the Premises, and sidewalks, serviceways, loading areas (if any) adjacent thereto neat, clean and free of dirt and rubbish at all times, and shall carefully store in an orderly manner all trash and garbage within the Premises. Tenant shall arrange for regular pickup of Tenant's trash and garbage, in accordance with the rules and regulations promulgated by Landlord as in effect from time to time, at Tenant's expense.

Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas prescribed by Landlord, and at times prescribed by Landlord. Tenant specifically agrees not to use any loading areas specifically designated for use by any other tenants or occupants of the Marina. Tenant shall not operate an incinerator or burn trash or garbage within the Marina. In the event Landlord provides or causes to be provided pickup service for trash and garbage for all or some of the tenants in the Marina, Tenant agrees to utilize such service. The cost of Tenant's use of such service shall be borne by Tenant.  Tenant acknowledges that Landlord currently provides a trash pickup service for the Premises and the Vessel and  that Tenant shall pay Landlord, as Additional Rent, the sum of $2,800 per month, plus applicable sales or use tax due thereon, on the 1st day of each month during the Term. Tenant agrees to pay any increase in such cost of such service upon receipt of notice from Landlord.  Tenant acknowledges that trash pickup service provided by Landlord is at Landlord's sole election and may be discontinued by Landlord at any time upon written notice to Tenant.

(g)     Electrical Equipment. Tenant shall not install any electrical equipment which overloads lines in or to the Premises or the Vessel at the Marina. In connection with the installation or use of any electrical equipment, Tenant shall at Tenant's own expense make from time to time whatever changes are necessary to comply with the requirements of the insurance underwriters or insurance inspectors designated by Landlord or Landlord's insurance carriers or governmental authorities having jurisdiction over the Premises or the Vessel. Tenant agrees not to use any electrical equipment containing a heating element unless same is connected and operated in compliance with the underwriters, specifications.

(h)     Operation. Tenant shall keep the Premises open for business and diligently operate the business conducted therein at least during the Operating Hours as specified in Section 1 (m). Tenant shall conduct Tenant's business at all times in a first class, high-grade manner consistent with reputable business standards and practices in good faith. Tenant shall operate the Premises under the trade name designated in Article 1 unless Landlord consents in writing to the use of another trade name in connection with such business.  In the event the Tenant fails to

*A.V.*

provide the number of cruises for any period of time in excess of the Annual Repair Period as provided in Section 1(m), the Passenger Minimum shall be decreased by 5,000 passengers for each fifteen days the Tenant fails to operate its business. For example, if the Tenant has otherwise used the Annual Repair Period for a particular Lease Year and the Tenant fails to operate cruises from June 15-July 15, the Passenger Minimum shall be reduced to 110,000 for that Lease Year. If the Tenant has not used any of the days in the Annual Repair Period and Tenant fails to operate cruises from April 15-August 1, the Passenger Minimum shall be reduced to 95,0000 for that Lease Year (5,000 for each of the five 15 day periods after the application of the Annual Repair Period).

(i)     Radius. Except for such operations in existence as of the date hereof, Tenant shall not directly or indirectly engage in or own or operate any business similar to that authorized to be conducted hereunder, or use the same or similar trade name in connection with the charter or operation of any other vessel or vessels in Miami-Dade County, Florida during the Lease Term and any extension of renewal thereof; provided, however, that nothing herein shall be construed to prevent the continued operation of Tenant's business within such radius existing on the date hereof. In the event Tenant shall engage in any such business in breach of this section of the Lease, Landlord shall have the right to elect to include the number of passengers carried by any vessel owned or operated by Tenant in such area in the number of passengers used to calculate Percentage Rent due hereunder as though such passengers had been on the Vessel.

(j)     Promotional Activities. Tenant may elect to participate with other tenants of the Marina in promoting the use of trade names and slogans as may be adopted for the Marina and in promotional and advertising campaigns. If Tenant so elects, Landlord will establish an advertising and promotional service to provide from time to time professional advertising and sales promotions which, in Landlord's judgment, will benefit the tenants of the Marina. In conjunction with such service, Landlord shall have the exclusive right to hire a marketing director and such staff as Landlord deems necessary to carry out the purposes of the service. If Tenant elects to participate, Tenant agrees to make pro rata contributions toward the promotional and advertising service which amounts shall be deemed Additional Rent for purposes of this Lease.

(k)     Rules and Regulations. Tenant shall comply with all of the rules and regulations pertaining to the Marina and businesses operated therein promulgated by Landlord from time to time. The rules and regulations in effect on the date of execution of this Lease, if any, are set forth in Exhibit "B" attached hereto and made a part hereof. Landlord may amend, modify, delete or add additional reasonable rules and regulations and Tenant shall comply with all such amended, modified, or additional rules and regulations upon notice to Tenant from Landlord or upon the posting of same in such place with the Marina as Landlord may designate. In the event of any breach of any rules and regulations herein set forth or any amendments or additions thereto, Landlord shall have all remedies in this Lease provided for default of Tenant.

(l)     Marina Name. Landlord reserves the right at any time to designate a name for the Marina, change the name of the Marina and to change the address or designation of the Premises.

ARTICLE 7 - UTILITIES

(a)     Utility Service Lines. Landlord agrees to cause to be provided the necessary mains, conduits and other facilities necessary to supply water, (and any relocated office space), electricity, telephone service and sewage service to the Premises in accordance with and subject to the provisions of this Lease.

(b)     Utility Service Charges. Tenant shall promptly pay all charges for electricity, water, gas (if provided), telephone service, sewage service and other utilities furnished to the Premises. Tenant, at its sole cost or expense shall have the Premises separately metered for all utilities and shall pay all such charges directly to the appropriate utility provider.

(c)     Interruption of Utility Services. Landlord shall not be liable for any interruption whatsoever in utility services, nor for interruptions in utility services which are due to fire, accident, strike, acts of God or other causes beyond the reasonable control of Landlord, or in order to make alterations, repairs or improvements to the Premises or other parts of the Marina.

ARTICLE 8 - OPERATION AND MAINTENANCE OF COMMON AREAS

(a)     Definition of Common Area. The term "Common Area" shall mean the improvements and portions of the Marina which have been designated in this Lease or which are hereafter so designated by Landlord and provided for common use by or for the benefit of more than one occupant of the Marina including, without limitation entrances and exists to and from the Marina and to and from the public streets abutting the Marina; parking areas and driveways; truck passageways, loading courts, loading platforms, truck docks and truck maneuvering areas; service corridors and stairways and/or loading facilities; landscaped areas; on-site or off-site signs identifying or advertising the Marina; exterior walks, sidewalks and arcades; stairs, stairways, elevators, ramps and any other pedestrian direction and control measures; interior corridors, arcades and balconies; directory signs and equipment, underground storm and sanitary sewers, utility lines and the link to any junction box, and any of the foregoing which services the Common Area; sprinkler systems, fire protection and security alarm systems; wash rooms, comfort rooms, drinking fountains, toilets; maintenance areas, and custodial facilities.

(b)     Nonexclusive Use. Landlord hereby grants to Tenant, its employees, agents, customers and invitees, the nonexclusive right to use during the Lease Term and any permitted extension thereof, of the Common Area from time to time constituted, in common with Landlord, other tenants in the Marina and their employees, agents, customers and invitees and other persons permitted by Landlord to use all or part of the Common Area by Landlord, other tenants in the Marina or any other persons having the right to use the Common Area.

(c)     Management of Common Area. Landlord agrees to manage, operate and maintain the Common Area during the Lease Term. The manner in which such areas and facilities shall be maintained and the expenditures therefor shall be at the sole discretion of Landlord, who shall have the right to adopt and promulgate reasonable rules and regulations, from time to time, including the right to designate parking areas for the use of employees of tenants of the Marina, to restrict such employees from parking areas designated exclusively for customers and to relocate the parking areas to off-site locations provided such off-site locations are in walking distance to the Marina or some form of shuttle service is provided. Tenant shall cause its agents, employees, contractors, licensees, concessionaires and subtenants to comply with all rules and regulations pertaining to the use of the Common Area and the parking of cars therein.

(d)     Common Area Maintenance Charges. Tenant hereby agrees to pay Landlord as Additional Rent due hereunder, on the first day of each month during the Term, its share of Common Area Maintenance Charges plus any sales or use tax due thereon.  During the first Lease Year, the monthly Common Area Maintenance Charge shall be $3,000.  The Common Area Maintenance charge shall increase each year by the CPI Increase.

ARTICLE 9 - TAXES

(a)     Tenant's Share of Real and Personal Property Taxes. Real estate and personal property taxes, including, but not limited to, ad valorem taxes, both general and special, levied or assessed against the Land, all improvements situated on the Land (including, but not limited to, the Building) and Building Facilities (collectively, "Taxes") shall be apportioned to the Marina in accordance with the provisions of this paragraph, and Tenant's share of such apportioned sum shall be payable by Tenant as Additional Rent under this Lease. Landlord may change the method of allocating the Land or improvements to tenants at the Marina at any time. Tenant's share of the Taxes in respect of any year shall be the greater of : $24,000 per year or 10% of the annual Taxes for the Marina.

Tenant's share of the Taxes shall be paid in advance in monthly installments, based upon Landlord's estimates of the Taxes. Landlord may estimate such Taxes for an entire Lease Year or other period and may revise any such estimates at anytime and from time to time. Within 90 days of the receipt of the actual Tax bill(s) or at such time as determined by Landlord, Landlord shall furnish to Tenant a statement setting forth the actual amount of Tenant's pro rata share of such Taxes and the amount paid by Tenant together with copies of the applicable Tax bills(s). In the event the annual statement shall reflect that Taxes due in respect of the period covered by such statement are less than the amount actually paid by Tenant, Landlord shall apply such amount to the next payment of Rent. Provided, however, if no further payments will be due as a result of the termination of the Lease, Landlord shall refund the excess to Tenant within 30 days after the

V7339\16488\#538320 v 3
1/29/02 2:54 PM

11

date of receipt of such statement. In the event the annual statement shall reflect that Taxes in respect of the period actually covered by such statement are greater than actually paid by Tenant, Tenant shall pay such excess to Landlord within 30 days after the date of receipt of such statement.

(b)     Taxes on Additions to Premises. Tenant shall pay, as Additional Rent, any and all increases in the Taxes levied on the Land and/or building by reason of any addition or improvements to the Premises made by Tenant or any subtenant or other occupant of the Premises, whether or not such alterations or improvements have been made with the written consent of Landlord. The amount of such additional Taxes levied against the Marina by reason of such additions or improvements shall be determined by the assessor of the taxing authority.

(c)     Taxes on Leasehold Improvements and Personal Property of Tenant. Tenant shall render to the applicable taxing authority any assessment for leasehold improvements to the Premises or Tenant's personal property located therein and shall provide any information relating to such leasehold improvements or personal property requested by such authority. Tenant shall pay all taxes levied or assessed by reason of such leasehold improvements and personal property (including, but not limited to, special assessments), prior to the time such taxes become delinquent. Tenant shall, upon request from Landlord, furnish to Landlord proof of payment of such taxes. In the event any leasehold improvements shall be deemed to be real estate, Tenant shall reimburse Landlord on demand the amount of any taxes levied as against Landlord's property by reason thereof.

(d)     Other Taxes. Any excise, transaction, sales or privilege tax (except for income tax) now or hereafter levied or imposed upon Landlord by any government or governmental agency on account of, attributed to or measured by rent or other charges or prorations payable under this Lease shall be paid by Tenant to Landlord, upon demand, along with the rent and other sums payable under this Lease.

ARTICLE 10 - REPAIR AND MAINTENANCE OF PREMISES

(a)     Landlord's Repairs. Landlord shall keep the roof, foundation and structural portion of the exterior walls of the Premises (specifically excluding the store front) in good repair. In the event the Premises should become in need of repairs required to be made by Landlord hereunder, Tenant shall give immediate written notice thereof to Landlord, and Landlord shall not be responsible in any way for failure to make any such repairs until a reasonable time shall have elapsed after delivery of such written notice. If any repairs required to be made by Landlord under this paragraph are occasioned by any alterations or additions made by or through Tenant or the act or negligence of Tenant, its employees, subtenants, licensees or concessionaires, Tenant shall, upon demand from Landlord, reimburse Landlord for all costs incurred by Landlord in making such repairs. In the event any repairs are required to be made by Landlord, Tenant shall, at Tenant's sole cost and expense, promptly remove Tenant's fixtures, equipment, inventory and other personal property to the extent required to enable Landlord to make such repairs.

(b)     Tenant's Repairs. Tenant shall keep the Premises in good, clean condition and shall, at Tenant's sole cost and expense, make all needed repairs and replacements, including, but not limited to, repair and replacement of all heating and air conditioning equipment or systems within the Premises, the Dock Electrical Box and replacement of cracked or broken glass, repair and replacement of all plumbing and electrical service lines within the Premises, repair and replacement of fixtures, nonstructural portion of exterior walls (including the storefront), interior walls, floors, ceilings, signs (including exterior signs if permitted), sprinkler system, interior building appliances and the like, and any repair, replacements and/or alterations required by any governmental authority. If any repairs required to be made by Tenant hereunder are not made within 30 days after delivery of written notice to Tenant by Landlord, Landlord may, at its option, make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs, and Tenant shall pay to Landlord upon demand as Additional Rent the cost of such repairs, plus interest at the lesser of 18% per annum or the maximum rate allowed by law.

Tenant, at Tenant's sole cost and expense, shall repaint, repair and remodel (subject, however, to the limitations contained in Article 12) the Premises, or a part thereof as may be required from

\733359\16488\# 538320 v 3
1/29/02 2:54 PM

12

time to time to assure that the same are kept in a first-class, tenantable and attractive condition throughout the Lease Term. At the expiration of this Lease, Tenant shall surrender the Premises in good condition, reasonable wear and tear and loss by fire or other casualty covered by Landlord's insurance excepted.

ARTICLE 11 - DAMAGE AND DESTRUCTION

In the event (i) the Premises are damaged by fire, explosion or other casualty insured under Landlord's fire and extended coverage insurance policy (herein called an "Insured Casualty") to the extent of 25% or more of the insurable value thereof immediately preceding the casualty, (ii) the Building is damaged by an Insured Casualty to the extent of 25% or more of the insurable value thereof immediately preceding the casualty, (iii) the Premises are damaged by a casualty or occurrence other than an Insured Casualty, (iv) 25% or more of the pier on which the Dock Space is located is damaged, or (v) Landlord's lender requires that any insurance proceeds be paid to it rather than used to reconstruct the Premises, Landlord may terminate this Lease by giving Tenant written notice of termination within 90 days after the happening of the event causing the damage. In the event Landlord cannot or does not elect to terminate this Lease as provided above, Landlord shall promptly repair and replace the improvements furnished as a part of Landlord's Work which existed at the time of such damage or destruction, to the condition existing immediately preceding such fire, explosion or other casualty. Upon completion of such repairs and replacement by Landlord, Tenant shall promptly repair or replace all portions of the Premises not repaired or replaced by Landlord and repair or replace all furniture, fixtures and equipment to the condition existing immediately preceding such fire, explosion or other casualty. Notwithstanding anything contained herein to the contrary, Landlord's obligation to repair shall be limited to the extent of any insurance proceeds actually received by it.

During any period of reconstruction or repair of the Premises, Tenant shall operate its business in the Premises to the extent practicable. Landlord shall have the right, in its sole discretion, to relocate the damaged Office Space and/or Dock Space to space comparable to that initially required to be delivered by Landlord hereunder. If this casualty or the repairing or rebuilding shall render the Premises untenantable in whole or in part, such casualty or damage was not caused by Tenant and Landlord elects not to temporarily relocate Tenant until such damage is repaired, a proportionate abatement of the Rent shall be allowed from the date on which the damage occurred until the date on which the Premises are again made tenantable. The abatement shall be equal to the ratio that the number of square feet of the space rendered untenantable bears to the total area of the Premises. Landlord shall not be liable to Tenant for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from such casualty, damage or repair thereof.

If the Vessel, or any portion thereof, shall be damaged or destroyed at any time or times during the Lease Term by fire, explosion or any other casualty, Tenant, at no expense or risk to Landlord, shall repair, rebuild or replace the Vessel (such repairing, rebuilding or replacing being herein called "Restoration") within six months after the casualty so that after such Restoration the Vessel shall be substantially the same as prior to such damage or destruction. Tenant shall not be entitled to any abatement of Rent in connection with the damage or destruction of the Vessel, unless such damage or destruction was proximately caused by the gross negligence or willful misconduct of Landlord.

ARTICLE 12 - ALTERATIONS

(a)     Tenant shall not attach any fixtures or articles to the Premises, or make any substantial, material or structural alteration, addition, improvement or change whatsoever in the Premises without in each instance securing the written consent of Landlord. All improvements and equipment installed as a part of Tenant's Work and all alterations, additional, improvements and changes in the Premises shall become upon completion the property of Landlord and, at the expiration or earlier termination of this Lease, the same shall be surrendered to Landlord as a part of the Premises without disturbance, molestation or injury. Landlord may, however, require Tenant to remove such alterations at the end of the Lease Term and restore any damage caused by said removal, at Tenant's sole cost and expense.

(b)     All construction work done by Tenant within the Premises shall be performed in a good and workmanlike manner, in compliance with all governmental requirements and at such

A. V.

times and in such a manner as to cause the minimum of interference with other construction in progress and with the transaction of business in the Marina. During any period of such work Tenant shall have adequate fire extinguishers within the Premises. All costs of such work shall be paid promptly so as to prevent the assertion of any liens for labor or materials. Tenant agrees to indemnify Landlord and hold Landlord harmless against any claims, expense, loss, liability or damage resulting from such work, and Tenant shall, if requested by Landlord, furnish bond or other security satisfactory to Landlord against any such claims, expense, loss, liability or damage. Whenever Tenant proposes to do any construction work within the Premises, Tenant shall first furnish to Landlord plans and specifications in such detail as Landlord may request covering all such work. Such plans and specifications shall be reasonably received and approved by Landlord and shall comply with such requirements as Landlord may from time to time prescribe for construction within the Marina and with all applicable laws. In no event shall any construction work be commenced within the Premises without Landlord's written approval of such plans and specifications.

ARTICLE 13 - TRADE FIXTURES

Tenant shall, at Tenant's expense, install all trade fixtures in accordance with Landlord's requirements and all applicable laws. All unattached movable trade fixtures installed by Tenant which may be installed and removed without drilling, cutting or otherwise defacing the Premises shall remain the property of Tenant. All other fixtures shall be the property of Landlord.

ARTICLE 14 - LIENS

Tenant shall promptly pay for any work done or material furnished in or about the Premises and will not permit or suffer any lien to attach to the Premises, any portion of the Marina or Land or Tenant's interest in this Lease. Nothing in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any person for the performance of any labor or the furnishing of any materials to the Premises or any part thereof, nor as giving Tenant any right, power, or authority to contract for or permit the rendering of any services or the furnishing of any materials that would give rise to any mechanic's or other liens against the Premises, the Land the Building or the Marina. In the event any lien is placed upon the Premises, the Land, the Building or the Marina that is not discharged or bonded off within 15 days after Tenant first becomes aware of such lien, Tenant shall be in default hereunder and shall not have any opportunity to cure such default. In the event any such lien is attached to the Premises, the Land, the Building or the Marina, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, cause the same to be discharged (including the advancement of monies for such purpose). Any monies advanced or costs incurred by Landlord for any of the aforesaid purposes shall be paid by Tenant to Landlord on demand as Additional Rent.

ARTICLE 15 - INSURANCE

(a)    Casualty Insurance.  Tenant agrees at all times at its expense to keep its merchandise, fixtures, equipment, leasehold improvements and other property situated within the Premises insured against fire, with extended coverage, to the extent of 100% of the replacement value thereof. Tenant further agrees that, at all times, when a "boiler", as that term is defined for the purposes of boiler insurance, is located within the Premises, it will carry at its expense boiler insurance with policy limits of not less than $500,000, insuring both Landlord and Tenant against loss or liability caused by the operating or malfunction of such boiler. Such insurance shall be carried with companies authorized to transact business in the State of Florida which are satisfactory to Landlord, and shall be in form satisfactory to Landlord. Tenant shall obtain a written obligation of each insurance company to notify Landlord in writing at least 30 days' prior to cancellation of such insurance. Such policies or duly executed certificates of insurance shall be delivered to Landlord prior to the commencement of Tenant's occupancy hereunder and renewals thereof as required shall be delivered to Landlord at least 30 days prior to the expiration of the respective policy terms. The proceeds to Tenant of such insurance shall not be used, except with the consent of Landlord, for any purpose other than the repair or replacement of merchandise, fixtures, equipment, leasehold improvements and other property situated within the Premises.

(b)   Liability Insurance. Tenant agrees to carry Comprehensive General Liability Insurance, with Contractual Liability Protection of not less than Five Million Dollars ($5,000,000), with Bodily Injury Limits of not less than Five Million Dollars ($5,000,000) per occurrence. Such Liability Insurance shall be written by an insurance carrier acceptable to Landlord with a capital and/or surplus of not less than One Hundred Million Dollars ($100,000,000), and shall name the Landlord Insured Parties (defined below). Landlord may from time to time, but not more frequently than once every three (3) years, require that the amount of public liability insurance to be maintained by Tenant under this paragraph be increased, so that the amount thereof adequately protects Landlord's interest.

(c)   Workman's Compensation Insurance. Throughout the Term of this Lease, Tenant shall maintain in full force and effect a policy or policies of workmen's compensation insurance in the minimum amount required by law, issued by an insurance company authorized to transact business in the State of Florida which is acceptable to Landlord.

(d)   Dram Shop Insurance. Throughout the Lease Term, Tenant shall maintain a policy or policies of insurance protecting the Landlord Insured Parties (defined below) from and against any and all damages, judgments, claims, liens, costs and expenses, including court costs and reasonable attorney's fees, arising out of or in any manner connected with any storage, sale, use, barter, trade or gift of alcoholic beverages on, from or about the Premises, including but not limited to, any and all liability arising out of or in any way connected with any local, state or federal liquor control act or any such legislation of any governmental authority having jurisdiction over the Premises, such policy or policies to be with companies reasonably satisfactory to Landlord with bodily injury fatal or non-fatal to any one period of $5,000,000 combined single limit coverage.

(e)   Builder's Risk Insurance. During any period when Tenant improvements or any other construction work is being performed within the Premises by or for Tenant, Tenant or its contractor(s) shall provide builder's risk insurance equal to the replacement cost of any improvements being constructed, naming Landlord as a loss payee, and owners and contractors protective liability insurance in an amount of not less than $1,000,000; and each contractor shall maintain worker's compensation insurance as required by law, and Landlord shall be provided with certificates evidencing same.

(f)   Certificates of Insurance. Tenant shall, prior to the commencement of the Lease Term and at least 15 days prior to any expiration of said policy, furnish to Landlord certificates of insurance evidencing the coverages required by this Article, which certificates shall state that such insurance is in full force and effect, stating the terms thereof coverage may not be changed or canceled without at least thirty (30) days prior written notice to Landlord and shall name as additional insured: (i) Landlord, its affiliates, partners, officers, directors, shareholders, agents and employees, including but not limited to RCI Marine, Inc. and SoBe Marina, Inc.; (ii) the City and (iii) such other persons as Landlord may from time to time designate (collectively "Landlord Insured Parties").

ARTICLE 16 - WAIVER OF CLAIMS

(a)   Limitation of Claims Against Landlord. Landlord and Landlord's agents and employees shall not be liable for, and Tenant waives all claims for injury to persons or damage to property sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises or in the Marina, including, but not limited to, such claims for damage resulting from (i) any equipment or appurtenances becoming out of repair, (ii) Landlord's failure to keep the Premises or other part of the Marina in repair, (iii) injury or damage done or occasioned by wind, water, flooding, freezing, fire, explosion, earthquake, excessive heat or cold, vandalism, riot or disorder or other casualty, (iv) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water, steam pipes, stairs, railings or walks, (v) broken glass, the backing up of any sewer pipe or downspouts, the bursting, leaking or running of any tank tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises or building in which the Premises are located, the escape of steam or hot water, it being agreed that all of the same are under the control of Tenant, (vi) water, snow or ice being upon or coming through the roof, skylight, trapdoor, stairs, walkers or any other place upon or near the Premises or otherwise, (vii) the falling of any fixture, plaster or stucco and (viii) any act, omission or negligence of Landlord

V33339\16488\#538320 v 3
1/29/02 2:54 PM

15

*A. V.*

or other tenants or occupants of any premises in the Marina or adjoining or contiguous buildings or owners of adjacent or contiguous property, except to the extent such claims arise as a result of Landlord's gross negligence.

(b)   Indemnity. Except to the extent liability of Tenant may be waived under paragraph (c) of this Article, Tenant shall indemnify, defend and hold harmless the Landlord Insured Parties from and against all fines, suits, claims, liabilities, losses, damages and expenses, including attorneys' fees and court costs, for injury to or death of any person or loss of or damage to property in or upon the Premises or the Marina and including the person and property of Tenant, its employees, agents, invitees, licensees or others, it being understood and agreed that all property kept, stored or maintained in or upon the Premises shall be at the risk of Tenant.

(c)   Mutual Waiver of Subrogation. Except as otherwise provided in Article 15, Landlord, Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by fire or other casualty or hazard covered or required hereunder to be covered in whole or in part by casualty insurance in respect of the Premises or in connection with property on or activities conducted on the Premises, and waive any right of subrogation which might otherwise, exist in or accrue to any person on account thereof (in the case of Landlord, insofar as and to the extend that the provisions of this paragraph will not invalidate any casualty insurance maintained by Landlord or cause the premiums therefor to be increased). Landlord and Tenant further agree that all fire and extended coverage insurance, boiler insurance and other casualty insurance carried by each covering losses arising out of destruction or damage to the Premises or its contents or to other portions of the Marina shall provide for a waiver of rights of subrogation against Landlord or Tenant, as the case may be, on the part of the insurance carrier.

ARTICLE 17 - CONDEMNATION

If any part of the Premises or more than 30% of the Marina shall be taken under eminent domain, or sale in lieu thereof, Landlord may, at Landlord's option, terminate this Lease as of the date when possession is taken by sending written notice of termination to Tenant. The entire compensation awarded in or by reason of any eminent domain proceedings or sale in lieu thereof shall belong to Landlord without any deduction therefrom for any present or future estate or interest of Tenant, and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all such compensation together with any and all rights, estate and interest of Tenant now existing or hereafter arising in and to the same or any part thereof except for such part of such amount which by law can only be paid to Tenant. Tenant shall have no claim against Landlord by reason of such taking or termination and shall not have any claim or right to any portion of the amount that may be awarded or paid to Landlord as a result of any such taking. Notwithstanding the foregoing, nothing contained herein shall prevent Tenant from bringing a separate cause of action for damages against the condemning authority for moving expenses and the unamortized cost of the Tenant Work or any alterations paid for by Tenant, provided any award sought by Tenant does not decrease any award made or to be made to Landlord.

ARTICLE 18 - ASSIGNMENT AND SUBLETTING

(a)   Tenant's Interest. Tenant shall not, without the prior written consent of Landlord, which shall not be unreasonably withheld, and the consent of the City: (i) sublet the Premises in whole or in part (or grant any concession or license in respect to all or part of the Premises), (ii) sell, assign, mortgage, pledge or in any manner transfer this Lease or any interest therein without in each case the consent in writing of Landlord first had and obtained, (iii) not permit any transfer of Tenant's interest created hereby or allow any lien upon Tenant's interest by operation of law, and/or (iv) permit the use or occupancy of the Premises or any part thereof by anyone other than Tenant. In the event Landlord does consent to an assignment or subletting, Landlord will release Tenant from its obligations under this Lease provided the proposed assignee or sublessee has a sound financial history and net worth acceptable to Landlord and a history of operating a similar business for at least five (5) years or hires an operator or management company acceptable to Landlord that has substantial experience in the dinner cruise and casino gaming business. In the event Landlord incurs any attorneys' fees, brokerage commissions, costs for redecorating the Premises or other costs or expenses in connection with any assignment or subletting, Tenant shall reimburse Landlord the full amount of such costs and expenses upon demand. All income payable to Tenant in connection with an assignment or sublease in excess

V5539N16498V#538330 v 3
1/29/02 2:34 PM
16

A.V.

of the Rent payable to Landlord hereunder with respect to such space shall be payable to Landlord; however, Landlord shall not have any right to any profit made by Tenant in connection with the sale of the assets of its business as opposed to the assignment of the Lease or sublet of the Premises. For all purposes hereof, a transfer of 50% or more of the ownership interest in Tenant to a person or entity that does not own an ownership interest in Tenant as of the Effective Date of this Lease shall be deemed an assignment of this Lease requiring the prior written consent of the Landlord and the City.

  (b) <u>Landlord's Interest</u>. In the event of the transfer and assignment by Landlord of its interest in this Lease to a person or other entity expressly assuming the Landlord's obligations under this Lease, Landlord shall thereby be released from any further responsibility hereunder, and Tenant agrees to look solely to such successor in interest of the Landlord for performance of such obligations. Any security given by Tenant to Landlord to secure performance of Tenant's obligations hereunder which have not previously been used by Landlord may be assigned and transferred to such successor in interest of Landlord and Landlord shall thereby be discharged of any further obligation relating thereto.

ARTICLE 19 - ACCESS TO PREMISES

  Tenant agrees that Landlord, its agents, employees and servants and any other person authorized by Landlord, may enter the Premises for the purpose of inspecting and making such repairs (structural or otherwise), additions, improvements, changes or alterations to the Premises or the Building in which the Premises are located as may be required under this Lease or as Landlord may elect, and to exhibit the same to prospective purchasers or mortgagees of the Marina or part thereof, and to prospective tenants. Tenant grants to Landlord the right to place in and upon the Premises at such places as Landlord may determine "for rent" signs or notices, during the last 90 days of the term hereof and Tenant undertakes and agrees that neither Tenant nor any person within Tenant's control will remove or interfere with such signs or notices. Any entry into, inspection of or repairs, additions, improvements, changes or alterations to the Premises or of the Building in which the Premises are located by Landlord pursuant to this Article shall not constitute eviction of Tenant in whole or in part and the Rent shall not abate which such work is being done by reason of loss or interruption of business of Tenant or otherwise. Except in the case of an emergency, such entry by Landlord shall be limited to reasonable times and with reasonable notice where possible and Landlord shall use reasonable efforts practicable to minimize the interference with the operation of Tenant's business.

  In the event of any such repairs, additions, improvements, changes or alterations, Tenant shall, at Tenant's sole cost and expense, remove promptly Tenant's fixtures, equipment, inventory and other property to the extent required to enable Landlord to make such repairs, additions, improvements, changes or alterations. If Tenant or Tenant's agents or employees shall not be present to permit entry into the Premises at any time and for any reason entry therein shall be necessary or permissible under this Lease, Landlord or Landlord's agents or employees may enter the Premises by forcible entry without liability therefor and without terminating this Lease or in any manner affecting the obligations, covenants, terms or conditions herein contained provided that Landlord shall repair any damage caused by such forcible entry.

  Nothing herein contained, however, shall be deemed or construed to impose upon Landlord any obligation or liability whatsoever for care, supervision, repair, improvements, additions, change or alteration of the Premises or the Building or any part thereof other than as expressly provided in this Lease.

ARTICLE 20 - DEFAULT OF TENANT

  (a) <u>Event of Default</u>. An Event of Default shall be deemed to have occurred if:

    (1) Tenant shall fail to pay when due any installment of Rent or any other sum payable under this Lease, or

    (2) default shall be made in procuring or maintaining any policy of insurance required under this Lease to be procured and maintained by Tenant, or

    (3) default shall be made in the prompt and full performance of any covenant, condition or agreement of this Lease to be kept or performed by Tenant, or



(4)     the Premises shall be vacated or abandoned or shall cease to be used for the purpose permitted under this Lease during the hours and on the days specified in Article 1; or

(5)     Tenant notifies Landlord at any time prior to the Commencement Date, that Tenant does not intend to take occupancy of the Premises on the Commencement Date, or Tenant shall fail to promptly move into and take possession of the Premises when the Premises are ready for occupancy; or

(6)     Tenant (or any guarantor of this Lease) shall become insolvent or unable to pay its debts as they become due, or Tenant (or any guarantor of the Lease) notifies Landlord that it anticipates either condition; or

(7)     Tenant (or any guarantor of this Lease) takes any action to, or notifies Landlord that Tenant intends to file a petition under any section or chapter of the federal bankruptcy code, as amended from time to time, or under any similar law or statute of the United States or any state thereof, or a petition shall be filed against Tenant (or guarantor) under any such statute, or Tenant (or guarantor) or any creditor of Tenant (or guarantor) notifies Landlord that it knows such a petition will be filed, or Tenant (or guarantor) notifies Landlord that it expects such a petition to be filed; or

(8)     A receiver or trustee shall be appointed for Tenant's leasehold interest in the Premises or for all or a substantial part of the assets of Tenant (or guarantor); or

(9)     Tenant shall make any assignment of this Lease or sublease of all or any portion of the Premises without Landlord's prior consent; or

(10)    Tenant shall remove or permit the removal of any furniture, fixtures or equipment from the Premises other than in the normal course of business without replacing same with replacement furniture, fixtures or equipment of at least equivalent value; or

(11)    Tenant shall violate any of the rules and regulations of Landlord, as adopted from time to time; or

Upon the occurrence of an Event of Default, Landlord may, at its option, and in compliance with applicable law (including Chapter 83 of the Florida Statutes), exercise the following described remedies (in addition to all other legal or equitable remedies):

(1)     Landlord may enter the Premises, without terminating this Lease, and perform any covenant or agreement or satisfy or observe any condition creating or giving rise to a default under this Lease and Tenant agrees to pay to Landlord on demand, as Additional Rent, the amount expended by Landlord in performing such covenant or agreement or satisfying or observing such condition together with an amount equal to the Rent provided in this Lease to be paid by Tenant to Landlord for the balance of the stated term of this Lease. Landlord, its agents or employees, shall have the right to enter the Premises and such entry and such performance shall not terminate this Lease or constitute an eviction of Tenant in whole or in part, nor relieve Tenant from the continued performance of all covenants, conditions and agreements of this Lease, and Tenant further agrees that Landlord Insured Parties shall not be liable for any claims for loss or damage to Tenant or anyone claiming through or under Tenant.

(2)     Landlord may terminate this Lease and the term created hereby in which event Landlord forthwith may re-enter and repossess the Premises and Tenant shall pay at once to Landlord as liquidated damages a sum of money equal to the Rent provided in this Lease to be paid by Tenant to Landlord, for the balance of the stated term of this Lease, which sum shall be discounted to the then present value at the discount rate of the Federal Reserve Bank of the district in which the Marina is located.

(3)     Landlord may terminate Tenant's right of possession, without terminating this Lease, in which event Tenant agrees to surrender possession and vacate the Premises immediately and deliver possession thereof to Landlord and Tenant hereby grants to Landlord full and free license to enter into and upon the Premises, in whole or in part, with or without process of law and to repossess Landlord of the Premises or any part thereof and to expel or remove Tenant and any other person, firm or corporation who may be occupying or within the Premises or any part thereof and remove any and all property therefrom, using such force as may

\73335\01\6488\# 538320 v 3
1/29/02 2:54 PM

18

be necessary, without terminating this Lease or releasing Tenant in whole or in part from Tenant's obligation to pay Rent and perform any of the covenants, conditions and agreements to be performed by Tenant as provided in this Lease which do not pertain to the actual use of the Premises, without being deemed in any manner guilty of trespass, eviction or forcible entry or detainer, and without relinquishing Landlord's right to rental or any other notice of any election made by Landlord under this Article, demand for payment of Rent or for possession, including any and every form of demand and notice prescribed by any applicable statute or law.

(4)     Landlord may, in its sole and absolute discretion, refuse to permit the Vessel to enter or dock in the Marina.

Prior to exercising any of the foregoing remedies, Landlord shall provide Tenant with written notice specifying the default(s) in question and provide Tenant with a five (5) day period in which to cure said default(s). If the default cannot be reasonably cured within said five day period, Landlord agrees not to exercise its remedies set forth above provided that Tenant commences to cure such default within said five day period, diligently proceeds to cure the same and completes said cure within 60 days unless Landlord otherwise agrees to extend the cure period in writing. Any written notice provided by Landlord herein shall run concurrently with and be deemed notice required to be given by applicable law such that Landlord need not give the written notice provided above and then an additional notice if written notice is required by applicable law.

(b)     Reletting of Premises. Upon and after entry into possession, without terminating this Lease, Landlord may relet all or any part of the Premises for such rent and upon such terms and to such persons, firm or entity and for such period or periods as Landlord in Landlord's sole discretion shall determine. Landlord shall not be obligated to accept any tenant offered by Tenant, or to observe any instruction given by Tenant in respect of such reletting or to the mitigation of damages of Landlord. For the purpose of such reletting, Landlord may decorate or make repairs, changes, alterations or additions in or to the Premises to the extent deemed by Landlord desirable or convenient. If the consideration to be collected by Landlord for any such reletting for Tenant's account is not sufficient to pay the balance of Rent due under this Lease (including Percentage Rent) and the cost of repairs, changes, alterations or additions, Tenant agrees to pay to Landlord the amount of such deficiency upon demand.

(c)     No Waiver. The service of a notice to quit or vacate the Premises, demand for possession; notice that the tenancy hereby created be terminated on any date, institution of an action of forcible detainer or ejectment or entering of a judgment for possession of the Premises (as distinguished from termination of this Lease pursuant to an express notice from Landlord) shall not relieve Tenant from Tenant's obligation to pay the Rent hereunder during the balance of the Lease Term or any extension thereof, except as herein expressly provided. Institution by Landlord or Landlord's agents or attorneys of a forcible detainer or ejectment action to reenter the Premises shall not be construed to be an election of Landlord to terminate this Lease. Landlord may collect and receive any Rent due from Tenant and the payment thereof shall not constitute a waiver of or affect any notice or demand given, suit instituted or judgment obtained by Landlord, or to be held to waive, affect, change, modify or alter the rights or remedies which Landlord may have in equity or at law or by virtue of this Lease at the time of such payment.

(d)     [Intentionally Deleted]

(e)     Calculation of Rent Under Lease. In determining the amount of loss or damage which Landlord may suffer by reason of termination of this Lease or the deficiency arising by reason of any reletting of the Premises by Landlord, there shall be added to the Minimum Rent for each full year or partial lease year during (proportionately adjusted for partial Lease Years) the period from the date of an event of default until the end of the Term of this Lease, a sum equal to the average Percentage Rent required to be paid hereunder by Tenant in respect of the two full Lease Years immediately preceding the date of such termination or reletting°(or if two full Lease Years have not then elapsed, then the period between the Commencement Date of this Lease and the date of such termination or reletting with proportionate adjustment for partial years) multiplied by the number of Lease Years or portions thereof falling without such period.

(f)     Costs, Expenses, Attorneys' Fees. In case Landlord shall be made a party to any litigation commenced by or against Tenant or Landlord shall employ an attorney to enforce the

V23359\1648B\# 338320 v 3
1/29/02 2:54 PM

19

*A. V.* 

covenants and agreements of Tenant under this Lease, then Tenant shall pay all costs, expenses and reasonable attorneys' fees incurred or paid by Landlord in connection with such litigation (whether at trial, on any appeal or in bankruptcy) or enforcement of Tenant's covenants and agreements. The prevailing party in any litigation between Landlord and Tenant shall bear the cost of the other party's reasonable attorney fees and costs.

(g)     Subsequent Defaults. The failure of Landlord to insist upon strict performance by Tenant of any of the covenants, conditions and agreements contained in this Lease shall not be deemed a waiver of any subsequent breach or default by Tenant in any of the covenants, conditions and agreements of this Lease. No surrender of the Premises shall be effected by Landlord's acceptance of Rent or by any other means whatsoever unless the same be evidenced by Landlord's written acceptance of such a surrender.

(h)     Remedies Cumulative. All rights and remedies of Landlord herein created or reserved or otherwise existing at law or cumulative and the exercise of one or more rights or remedies shall not be taken to exclude or waive the right to the exercise of any other. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord shall deem desirable.

ARTICLE 21 - LANDLORD'S LIEN

In addition to any statutory Landlord's lien, Landlord shall have at all times a valid security interest to secure payment of all Rent and other sums of money becoming due hereunder from Tenant, and to secure payment of any damages or loss which Landlord may suffer by reason of the breach by Tenant of any covenant, agreement or condition contained herein, upon all goods, wares, equipment, fixtures (including trade fixtures), furniture, improvements and other personal property of Tenant presently, or which may hereafter be, situated in the Premises, and all proceeds from the sale or lease thereof, and such property shall not be removed therefrom without the consent of Landlord until all arrearages in rent as well as any and all other sums of money then due to Landlord hereunder shall first have been paid and discharged and all the covenants, agreements and conditions hereof have been fully complied with and performed by Tenant. Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein or by law, and in compliance with applicable law, enter upon the Premises and take possession of any and all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant situated in the Premises, without liability for trespass or conversion and sell the same at private or public sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made.

Unless otherwise required by law, and without intending to exclude any other manner of giving Tenant reasonable notice, the requirement of reasonable notice to Tenant of a private or public sale shall be met if such notice is given in the manner prescribed in Article 24 of this Lease at least 10 days before the time of sale, Tenant agreeing that such notice affords Tenant sufficient opportunity prior to sale to obtain a hearing if desired by Tenant. Any public sale made under this Article shall be deemed to have been conducted in a commercially reasonable manner if held in the Premises or where the Marina is located, after the time, place and method of sale and a general description of the types of property to be sold have been advertised in a daily newspaper published in the county in which the Premises are located, for five consecutive days before the date of the sale. Landlord or its assigns may purchase at a public sale and, unless prohibited by law, at a private sale. The proceeds from any disposition dealt with in this Article, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorneys, fees and legal expenses) shall be applied as a credit against the indebtedness secured by the security interest granted in this Article. Any surplus shall be paid to Tenant or as otherwise required by law. Tenant shall pay any deficiencies forthwith.

Upon the request by Landlord, Tenant shall execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Uniform Commercial Code in force in Florida. Any statutory lien for Rent is not hereby waived, the security interest herein granted being in addition and supplementary thereto.

ARTICLE 22 - MORTGAGES

(a)   Subordination. This Lease and all rights of Tenant hereunder are subject and subordinate to any mortgage or mortgages and any deed or deeds of trust, blanket or otherwise, which are now or may hereafter be placed on the real property upon which the Building is located and any and all increases, renewals, modifications, consolidations, replacements and extensions of any of such mortgages and deeds of trust, unless otherwise elected by Landlord, mortgagee or beneficiary of deed of trust; provided, however, in the case of any deed of trust or other lien which is not a first lien, such subordination shall be upon the express condition that Tenant's possession and enjoyment of the Premises during the term hereof shall not be disturbed in the event of any foreclosure thereof. This provision shall be self-operative and no further instrument shall be required to effect such subordination of this Lease. Tenant shall, however, upon demand at any time or times, execute, acknowledge and deliver to Landlord any, and all instruments and certificates that may be necessary or proper to more effectively document the subordination of this Lease and all rights of Tenant hereunder to any such mortgage or mortgages and/or deed or deeds of trust or to confirm or evidence such subordination.

In the event Tenant shall fail or neglect to execute, acknowledge and deliver any such subordination instrument or certificate, Landlord, in addition to any other remedies it may have, may, as the agent and attorney-in-fact of Tenant, execute, acknowledge and deliver the same and Tenant hereby irrevocably nominates, constitutes and appoints Landlord as Tenant's proper and legal agent and attorney-in-fact for such purposes. Tenant covenants and agrees, in the event any proceedings are brought for the foreclosure of any such mortgage or if the Building in which the Premises are located is sold pursuant to any such deed of trust, to attorn to the purchaser upon any such foreclosure sale or trustee's sale if so requested by such purchaser and to recognize such purchaser as the Landlord under this Lease. Tenant agrees to execute and deliver at any time from time to time upon the request of Landlord or of any holder(s) of any of the indebtedness or other obligations secured by any such mortgages and deeds of trust any instrument or certificate which, in the sole judgment of Landlord or of such holder (s), may be necessary or appropriate in any such foreclosure proceeding or otherwise to evidence such attornment.

Tenant hereby irrevocably appoints Landlord and the holder(s) of the indebtedness or other obligations secured by the aforesaid mortgages and/or deeds of trust jointly and severally the agent and attorney-in-fact of Tenant to secure and deliver for and on behalf of Tenant any such instrument or certificate. Tenant further waives the provisions of any statute or rule of law, now or hereafter in effect, which may adversely affect this Lease and the obligation of Tenant hereunder in the event any such foreclosure proceeding is brought or trustee's sale occurs and agrees that this Lease shall not be affected in any way whatsoever by any such foreclosure proceeding or trustee's sale unless the holder(s) of the indebtedness or other obligations secured by said mortgages and/or deeds of trust shall declare otherwise.

(b)   Notice to Mortgagee. In the event of any act or omission by Landlord which would give Tenant the right to terminate this Lease by reason of a constructive or actual partial or total eviction or otherwise, Tenant shall not exercise any such right (i) until it shall have given written notice of such act or omission to the holder(s) of the indebtedness or other obligations secured by any mortgage or deed of trust affecting the Premises, if the name and address of such holder(s) shall previously have been furnished to Tenant, and (ii) until a reasonable period of time for remedying such act or omission shall have elapsed following the giving of such notice during which Landlord and such holder(s), or either of them, their agents or employees, shall be entitled to enter upon the Premises and do therein whatever may be necessary to remedy such action or omission. During the period between the giving of such notice and the remedying of such act or omission, the Rent payable by Tenant for such period, as provided in this Lease, shall be abated and apportioned only to the extent that any part of the Premises shall be untenantable.

(c)   Estoppel Certificates. Tenant agrees to furnish to Landlord from time to time when requested by Landlord a certificate signed by Tenant to the effect that: (i) this Lease is then presently in full force and effect, (ii) Landlord is not then in default under this Lease and Tenant does not claim any right of set-off against its obligation to pay Rent hereunder, if such is the case, (iii) Tenant is not in default under this Lease, (iv) Tenant has not prepaid any of the Rent due hereunder except to the extent expressly provided herein and (v) stating any unexercised renewal options, expansion options, early termination provisions and other rights of Tenant hereunder as requested by Landlord. Tenant further agrees to furnish to Landlord from time to

U33336#1648R #.53R320 v 3
1/29/02 2:54 PM

21

time when requested by Landlord a letter of acceptance in conformity with any requirements made by any lenders which have or which may be conditionally obligated to make a loan secured in part by a lien against the Building in which the Premises are located. Tenant and/or estoppel certificates which may be required by any holder of indebtedness who has a lien on the Building.

(d)     Title Encumbrances. This Lease and all rights of Tenant hereunder are further subject and subordinate to the extent that the same relate to the Premises to all applicable ordinances of the City of Miami Beach, Miami-Dade County, Florida, the State of Florida and any other applicable government agency or authority, relating to easements, franchises and other interests or rights upon, across or appurtenant to the Building or any of the Land.

ARTICLE 23 - SURRENDER OF PREMISES

Upon expiration or termination of this Lease, either by lapse of time or otherwise, Tenant shall peaceably surrender to Landlord the Premises, including the alterations, additions, improvements, changes and fixtures, other than Tenant's unattached movable trade fixtures remaining the property of Tenant, in broom-clean condition and in good repair, except for acts of God and ordinary use and wear. Tenant agrees at Landlord's request to remove Tenant's trade fixtures upon any such expiration or termination and to repair all damage to the Premises caused or revealed by such removal.

ARTICLE 24 - NOTICES

Notices, statements and demands required or permitted to be given hereunder may be given by: (i) personal delivery to either party or any officer of the party to be notified, (ii) nationally recognized overnight courier service, or (iii) may be sent by certified mail, return receipt requested, addressed, postage prepaid, if to Landlord, to it at the address to which the last Rent payment was required to be made, and if to Tenant, addressed to Tenant at the Premises or the address specified under Article 1 or to such other address as may be specified by written notice actually received by Landlord. Notices and demands sent in accordance with this Article shall be deemed to have been delivered when mailed or if made by personal delivery, then upon such delivery.

ARTICLE 25 - REPRESENTATIONS

It is understood and agreed by Tenant that Landlord and Landlord's agent have made no representations or promises with respect to the Premises or the making or entry into this Lease except as in this Lease expressly set forth and that no claim or liability, or cause for termination shall be asserted by Tenant against Landlord for, and Landlord shall not be liable by reason of, breach of any representations or promises not expressly stated in this Lease. Tenant represents and warrants that Tenant has not dealt with any real estate agent or broker in connection with this Lease other than Landlord's agent. Tenant hereby agrees to indemnify, defend and hold Landlord harmless from and against any liability, cost, or expense incurred by Landlord in connection with any claim for a real estate or brokerage commission or other fee due in connection herewith by or through Tenant.

ARTICLE 26 - HOLDING OVER

In the event Tenant remains in possession of the Premises after the expiration or termination of this Lease without the execution of a new lease, or fails to promptly move into any relocation space in the time period required by Landlord in the Relocation Notice, Tenant shall be deemed to be occupying the Premises as a tenant from month to month and pay Rent equal to twice the amount of Rent specified in Article 4. Tenant hereby agrees to indemnify Landlord from and against any claim, loss, damage or liability incurred by Landlord as result of Tenant holding over in the Premises. This Article shall not constitute a waiver of Landlord's right of re-entry or any other right or interest reserved by or granted to Landlord under this Lease.

ARTICLE 27 - HAZARDOUS MATERIALS

Tenant shall never permit to be incorporated into, bring into, store at, or place at use at, or otherwise dispose of at, in or under the Premises, or the Building or the Land any Toxic or Hazardous Materials (as defined hereafter). If Tenant violates this provision or ever has

\73333\16488\# 538320 v3
1/26/02 2:54 PM

22

*A. V.*

knowledge of the presence of Toxic or Hazardous Materials in, at or under the Premises, or the Building or the Marina, Tenant shall notify Landlord in writing promptly after obtaining such knowledge. For purposes of this Lease, Hazardous or Toxic Materials shall mean hazardous or toxic chemicals or any materials containing hazardous or toxic chemicals at levels or content which cause such materials to be classified as hazardous or toxic as then prescribed by the highest industry standards or by the then current levels or content as set from time to time by the U. S. Environmental Protection Agency ("EPA") or the U.S. Occupational Safety and Health Administration ("OSHA") or as defined under 29 CFR 1910 or 20 CFR 1925 or other applicable governmental laws, rules or regulations.  Upon request of Landlord from time to time, Tenant shall cause to be performed, at Tenant's sole cost and expense, environmental tests and studies for the Premises and the portions of the Marina utilized by Tenant, to determine the existence of Hazardous or Toxic Materials.  Tenant shall remove and dispose of, in accordance with all applicable laws, rules and regulations as established from time to time by applicable authority, any Hazardous or Toxic Materials in, at or under the Premises, or the Building or the Marina which are located resulting from, introduced from, arising out of, or the damage from which is materially expanded as the direct result of Tenant's acts, negligence or the violation or breach by Tenant of this provision. Tenant shall notify Landlord of its methods, time and procedure for any clean-up or removal of Toxic or Hazardous Materials under this provision; and Landlord shall have the right to require reasonable changes in such methods, time or procedure or to require that the same be done after normal business hours or when the Building is otherwise closed (i.e. weekends or holidays).

ARTICLE 28 - PROHIBITED ITEMS

Throughout the Term of this Lease and any extension or renewal hereof, Tenant shall be prohibited from selling and/or any of the following goods or services at the Premises:

| | | |
|---|---|---|
| (i) | Marine hardware, paints or thinner; |
| (ii) | Marine cleaning and waxing supplies; |
| (iii) | Marine plumbing supplies and hose; |
| (iv) | Cordage and rope; |
| (v) | Pumps and pump parts; |
| (vi) | marine electronics; |
| (vii) | Emergency signals and flares; |
| (viii) | Marine charts and navigation supplies; |
| (ix) | Yacht and vessel brokerage, chartering and rentals; |
| (x) | Automobile, bicycle, scooter and moped rental and the rental of vehicles; |
| (xi) | Stone crabs; |
| (xii) | sale of food and/or beverages for consumption anywhere but on the Vessel; and |
| (xiii) | the sale or rental of any skin diving, snorkeling or scuba diving equipment. |

ARTICLE 29 - PARKING

Landlord agrees to use its reasonable efforts during the term of this Lease, to provide Tenant with the nonexclusive use of up to one hundred twenty-five (125) parking spaces on an as available basis at locations to be determined by Landlord in its reasonable discretion, upon the same terms and conditions as such spaces are offered to the public.  Subject to approval by the City, Tenant, at Tenant's option, may, at its sole cost and expense, provide electric golf cart or tram type vehicles, if the baywalk is to be utilized, or shuttle buses to facilitate the use parking

V733591644SR/#338320 v 3
1/29/02 2:54 PM

23

A.V. [signature]

by its patrons in accordance with rules and regulations promulgated by Landlord from time to time. Tenant further acknowledges that the Landlord has the right to establish and, from time to time, change rules and regulations governing the use and operation of parking at the Marina in its sole discretion. Landlord shall provide Tenant with a written copy of such rules and regulations and any changes thereof. Upon prior notice to Tenant, Landlord shall be permitted to relocate parking spaces for use by Tenant and its patrons. Landlord shall not be obligated to provide Tenant with any additional parking spaces if Tenant elects to operate any more than one Vessel from the Marina. Tenant acknowledges that it shall only be entitled to operate more than one Vessel from the Marina if Tenant is able to comply with the parking requirements and any other applicable laws and regulations of the City and any other applicable governmental authority.

ARTICLE 30 - MISCELLANEOUS

(a)     Interest. In the event Tenant fails to pay or reimburse to Landlord any sum of money payable under this Lease, Tenant shall be obligated to pay Landlord, as additional rent, interest on such sum equal to the lesser of 18% per annum or the highest lawful interest rate which may be charged to Tenant under the laws of the State of Florida. Landlord shall not be obligated to pay interest on the Security Deposit, Prepaid Rent or other sum held by Landlord subject to later adjustment.

(b)     Time is of the Essence. The time of the performance of all of the covenants, conditions and agreements of this Lease is of the essence of this agreement.

(c)     No Partnership. Nothing herein shall be construed so as to constitute a joint venture or partnership between Landlord and Tenant, it being agreed that the percentage basis for payment of rental hereunder is only for determining the amount of Rent to be paid.

(d)     Waiver or Consent. One or more waivers of any covenants, terms or conditions of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

(e)     Force Majeure. Whenever a period of time is herein prescribed for action to be taken by Landlord, Landlord shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, acts of terrorism, governmental laws, regulations, or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord. At any time when there is outstanding a mortgage, deed of trust or similar security instrument covering Landlord's interest in the premises, Tenant may not exercise any remedies for default by Landlord hereunder unless and until the holder, of the indebtedness secured by such mortgage, deed of trust or similar security instrument shall have received written notice of such default and a reasonable time for curing such default shall thereafter have elapsed after such holder shall have secured possession of the Premises from Landlord in order to cure such default.

(f)     Effect of Governmental Limitation on Rents and Other Charges. In the event that any law, decision, rule or regulation of any governmental body having jurisdiction shall have the effect of limiting for any period of time the amount of Rent or other charges payable by Tenant to any amount less than that otherwise provided pursuant to this Lease, the following amounts shall nevertheless be payable by Tenant; (i) throughout such period of limitation, Tenant shall remain liable for the maximum amount of Rent and other charges which are legally payable (without regard to any limitation to the amount thereof expressed in this Lease except that all amounts payable by reason of this paragraph (f) shall not in the aggregate exceed the total of all amounts which would otherwise be payable by Tenant pursuant to the terms of this Lease for the period of limitation), (ii) at the termination of such period of limitation, Tenant shall pay to Landlord, on demand but only to the extent legally collectible by Landlord, any amounts which would have been due from the Tenant during the period of limitation but which were not paid because of such limiting law, decision, rule or regulation, and (iii) for the remaining term of this Lease following the period of limitation, the term of this Lease in accordance with the terms hereof calculated as though there had been no intervening period of limitation.

\173339\16448\#538320 v 3
1/29/02 2:54 PM

24

*A.V.*

(g)     No Personal Liability of Landlord. Tenant specifically agrees to look solely to Landlord's interest in this Lease and the Marina for the recovery of any judgment from Landlord by reason of a default in the performance of Landlord's obligations under this Lease and that, in no event, shall Landlord or any partner or principal of Landlord, be personally liable for any such judgment.

(h)     Other Leases and Tenants. Landlord reserves the absolute right to effect such other tenancies in the Marina as Landlord, in the exercise of its sole business judgment, shall determine to best promote the interest of the Marina. Notwithstanding anything in this Lease to the contrary, Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or number of Tenants shall during the term of this Lease occupy any space or any particular space in the Marina; nor does Landlord represent or warrant that any particular space will be used for any particular purpose during the term of this Lease. This Lease is and shall be considered to be the only agreement between the parties hereto and their representatives and agents. All negotiations and oral agreements acceptable to both parties have been merged herein and are included herein. There are no other representations or warranties between the parties and all reliance with respect to representations is solely upon the representations and agreements contained in this document.

(i)     Memorandum of Lease. Neither this Lease nor any memorandum or short form hereof shall be recorded in any public records.

(j)     Quiet Enjoyment. Landlord hereby covenants and agrees that if Tenant shall perform all of the covenants, and agreements herein required to be performed on the part of Tenant, Tenant shall, subject to the terms of this Lease, at all times during the continuance of this Lease have the peaceable and quiet enjoyment and possession of the Premises.  Notwithstanding anything contained in this Lease to the contrary, should Landlord determine that an emergency exists that threatens the Marina, Building or any of the tenants or persons therein, or any of their property (e.g. an impending hurricane, a bomb threat to the Marina or Building), including but not limited to emergencies caused by persons or natural conditions outside of Landlord's control, Landlord shall have the right to close the Marina and/or the Building and require all tenants, including Tenant, to evacuate the Building and/or Marina until such emergency ceases to exist. Such closure shall not affect the payment of any Rent due hereunder or the Lease Term.

(k)     Entire Agreement and Amendments. This Lease and the Exhibits hereto contain the entire agreement between the parties, and no agreement shall be effective to change, modify or terminate this Lease in whole or in part unless such agreement is in writing and duly signed by the party against whom enforcement of such change, modification or termination is sought.

(l)     Interpretation. The necessary grammatical changes required to make the provision of this Lease, apply to the plural sense where there is more than one tenant and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed. The laws of the State of Florida shall govern the validity, performance and enforcement of this Lease. The submission of this Lease for examination does not constitute an offer to lease, or a reservation of or option for, the Premises, and this Lease becomes effective only upon execution and delivery thereof by Landlord and Tenant. The captions used herein are for convenience only and do not define, limit, describe or construe the terms of this Lease.

(m)     Severability. If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the terms of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provisions as may be possible and be legal, valid and enforceable.

(n)     Acknowledgments of Lease. Tenant agrees that it will from time to time upon request by Landlord execute and deliver to the Landlord a statement in recordable form setting forth the Commencement Date and certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so

*A. V.*

modified) and further stating the date to which rent and other charges payable under this Lease have been paid.

(o)   Radon Gas.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county public health unit.

(p)   Security.  Tenant acknowledges and agrees Landlord may, but will not be required to, adopt and provide security services for the Marina from time to time.  However, Landlord will not be required to provide any such services for the Premises or for the Marina, and any security services that are voluntarily undertaken by Landlord may be changed or discontinued from time to time in Landlord's sole and absolute discretion, without liability to Tenant, its employees, agents, customers and invitees.  Tenant waives any claims it may have against Landlord arising out of any security services provided by Landlord, or the inadequacy or absence thereof, specifically including Landlord's negligence with respect to the providing or failure to provide such services.

(q)   Governing Law.  This Lease and the rights and obligations of the parties hereto shall be interpreted, construed, and enforced in accordance with the laws of the State of Florida.

(r)   WAIVER OF TRIAL BY JURY.  IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THE RESPECTIVE PARTIES HERETO SHALL AND THEY DO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR  COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, AND TENANT'S USE OR OCCUPANCY OF THE PREMISES, WHETHER SUCH CLAIM IS IN CONTRACT, TORT OR OTHERWISE.  TENANT FURTHER AGREES THAT IT SHALL NOT INTERPOSE ANY NON-MANDATORY COUNTERCLAIM OR COUNTERCLAIMS IN A SUMMARY PROCEEDING OR IN ANY ACTION BASED UPON NONPAYMENT OF RENT OR ANY OTHER PAYMENT REQUIRED OF TENANT HEREUNDER.

(s)   Authority.  Landlord and Tenant each represents to the other that the person executing this Lease on its behalf has the full power and authority to execute this Lease and bind Landlord and Tenant, as the case may be.

(t)   Bankruptcy.  Landlord and Tenant understand that, notwithstanding certain provisions to the contrary contained herein, a trustee or debtor in possession under the federal bankruptcy code may have certain rights to assume or assign this Lease.  Landlord and Tenant further understand that, in any event, Landlord is entitled under the federal bankruptcy code to adequate assurances of future performance of the provisions of this Lease.  The parties agree that, with respect to any such assumption or assignment, the term "adequate assurance" shall include at least the following:

(i)   In order to assure Landlord that the proposed assignees will have the resources with which to pay all Minimum Rent and any Additional Rent payable pursuant to the provisions of this Lease, any proposed assignee must have, as demonstrated to Landlord's satisfaction, a net worth (as defined in accordance with generally accepted accounting principles consistently applied) of not less than the net worth of Tenant on the date this Lease became effective, increased by seven percent (7%), compounded annually, for each year from the Commencement Date through the date of the proposed assignment.  It is understood and agreed that the financial condition and resources of Tenant were a material inducement to Landlord in entering into this Lease.

(ii)   Any proposed assignee must have been engaged in the conduct of business for the five (5) years prior to any such proposed assignment, which business does not violate the Permitted Use, and such proposed assignee shall continue to engage in the Permitted Uses.  It is understood and agreed that Landlord's asset will be substantially impaired if the

trustee in bankruptcy or any assignee of this Lease makes any use of the Premises other than the Permitted Use.

(iii)   Any proposed assignee of this Lease must assume and agree to be personally bound by the provisions of this Lease.

(u)   Terms Binding.  All covenants, promises, conditions, representations and agreements herein contained shall be binding upon, apply and inure to the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

(v)   Reservations.  Landlord reserves to itself the right, from time to time, to grant, without the consent or joinder of Tenant, such easements, rights and dedications that Landlord deems necessary and to cause the recordation of easements, dedications, parcel maps/plats and restrictions so long as same do not adversely and materially: (a) interfere with the use of the Premises by Tenant; (b) increase Tenant's obligations hereunder; or (c) decrease Tenant's rights hereunder. Tenant agrees to promptly execute and deliver in recordable form any documents reasonably requested by Landlord to effectuate any such easements, rights, dedications, parcel maps/plats and or restrictions.

ARTICLE 31 - GROUND LEASE

This Lease is expressly subject to the terms and conditions of that certain Lease Agreement dated as of June 24, 1983 by and between the City and Carner-Mason Associates, Ltd. ("Carner") as amended by the First Amendment to Marina Lease Agreement dated as of October 23, 1991, Second Amendment to Marina Lease Agreement dated as of August 11, 1994, Third Amendment to Marina Lease Agreement dated as of May 27, 1997, and Fourth Amendment to Marina Lease Agreement dated as of April 15, 1998, and the Settlement Agreement among the City, Landlord and the "Portofino Entities" (collectively, the "Ground Lease"). Landlord is the successor in interest to Carner under the Ground Lease. In the event: (a) the Ground Lease is terminated by any reason with respect to the Premises, (b) Landlord's rights to the Premises are terminated pursuant to any provision in the Ground Lease, or (c) the Landlord fails to extend the Term of the Ground Lease, this Lease shall automatically terminate as of the end of the Term of the Ground Lease or the termination thereof and Tenant shall promptly vacate the Premises. Tenant acknowledges that Tenant has read and understood the Ground Lease, and agrees to be bound by all of the terms and conditions of the Ground Lease and any subsequent amendments or modifications thereto.  In the event the Tenant's use of the Premises violates any terms and conditions of the Ground Lease or limits the use of any portion of the premises demised under the Ground Lease, Landlord shall have the right to terminate this Lease.

ARTICLE 32 - FUEL CHARGE

Tenant shall pay to Landlord monthly, on the first of each month, a fuel charge in the amount of $500.00, plus any applicable sales, use or similar taxes or surcharges due thereon (the "Fuel Charge"), which Fuel Charge shall increase annually based upon the CPI Increase.  In consideration of Tenant's payment of the Fuel Charge, Tenant shall be entitled to purchase fuel from the fuel pumps located at the Marina at the price of $.02 per gallon over the cost of the fuel to Landlord. Upon Tenant's request, Landlord will provide Tenant with evidence of the cost of its fuel.  If Tenant purchases its fuel from Landlord, Landlord shall determine, in its reasonable discretion, time for fueling of the Vessel.

ARTICLE 33 - OPTIONS TO EXTEND LEASE TERM

Provided Tenant is not otherwise in default under this Lease, and subject to the last sentence of this paragraph, Tenant shall have the right to extend the Lease Term (each an "Option to Extend") for three (3) periods of ten (10) years each (each, an "Option Term").  The Minimum Rent, Percentage Rent and Additional Rent for each Option Term shall be the then current market terms and conditions for the Premises, taking into account the Permitted Use of the Premises by Tenant, as reasonably determined by Landlord.  In no event shall the Minimum Rent, Percentage Rent and Additional Rent for any Option Term shall not be less than the amount paid by Tenant in the immediately preceding Lease Year.  Landlord shall not be required to make any improvements to the Premises in connection with Tenant exercising any Option to Extend.   Tenant shall exercise each Option to Extend by providing written notice thereof to

\733\9\16489\6 538320 v 3
1/29/02 2:54 PM

27

*A.V.*

Landlord on or before January 1st of the year immediately prior to the expiration of the Lease Term or then current Option Term. Within 30 days after receipt of Tenant's notice Landlord shall deliver to Tenant a written notice containing the Landlord's determination of the applicable Rent for the applicable Option Term (the "Rent Notice"). If Tenant disagrees with Landlord's determination of the Rent, Tenant's sole remedy shall be to terminate the exercise of Tenant's Option to Extend by providing written notice thereof to Landlord (the "Termination Notice") within 15 days after Tenant's receipt of the Rent Notice. If Landlord fails to receive the Termination Notice, the Rent Notice shall be deemed a part of this Lease and the parties shall not be required to execute any additional amendment to the Lease. If Tenant fails to timely and properly exercise any Option to Extend, all other Options to Extend shall automatically termination. If Landlord fails or otherwise elects, in its sole and absolute discretion, not to exercise any option to extend the term of the Ground Lease past December 31, 2022, (Landlord currently has three (3) ten (10) year options to extend the term of the Ground Lease past December 31, 2022), Tenant shall not have any right to extend this Lease past the expiration or termination of the Ground Lease. In the event Landlord is prevented from exercising its right to extend the term of the Ground Lease because of the use of the Premises by Tenant, Tenant's Options to Extend shall automatically terminate.

ARTICLE 34 - SPECIAL PROVISIONS REGARDING VESSEL

Tenant acknowledges that the Landlord has, and shall have a lien upon the Vessel, her apurtanances and content, for any unpaid sums due to the Landlord for the use of its facilities and other services, or for any damage to the Vessel caused in whole or in part by the Vessel or the Tenant. It is understood and agreed that this Lease does not constitute a bailment. The Tenant retains and has the exclusive care custody and control of the Vessel and its contents at all times, and the Tenant is solely responsible for the Vessel, its contents, and the maintenance of the Vessel. The Tenant acknowledges that the Landlord assumes no responsibility or liability for the safe dockage and maintenance of the Vessel. Tenant is solely responsible for the maintenance and tie up of the Vessel and Tenant shall be responsible for the proper operating condition of the Vessel's equipment and for the size and condition of the Dock Space. Tenant agrees to be liable for any damages caused to the docks, pilings, or any other damages, cost or expenses incurred by Landlord as a result of acts or omissions of the Tenant or the Vessel. Tenant acknowledges that it is solely responsible for preventing the entry of unauthorized persons onto the Vessel. While the Landlord may take reasonable efforts to control the entry of unauthorized persons onto the docks, Tenant understands and agrees that the Landlord does not assure the unauthorized persons will not board the Vessel and, accordingly the Tenant is solely responsible for the security of the Vessel.

Tenant has been informed of the firefighting, first aid and security provisions and equipment available at the Marina and Tenant hereby acknowledges same as being sufficient, reasonable and adequate and Tenant hereby agrees to and does hereby hold the Landlord harmless from any lawsuit or insufficiency in said provisions and equipment. Tenant holds harmless, indemnifies and releases the Landlord from any and all liability, loss, claim or damage to any property, person or persons occurring at the Landlord. The Tenant does hold harmless, indemnify and release the Landlord from any and all liability, loss, damage or claim to property or like arising out of fire, or any other casualty, theft or vandalism at the Landlord, even if such loss, damage or claim results from Landlord's negligence, including but not limited to Landlord's failure to have other additional firefighting, first aid and security provisions or equipment. Tenant is entering into this Lease with full knowledge and acceptance of the limitations on the Landlord's firefighting, first aid and security and other such provisions and equipment.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Lease Agreement on the day and year first above written.

WITNESSES:

Print Name: _RHODA RUBIN_

Print Name: _Robert Christoph Jr._

Print Name: _Igor Sorolovisky_

Print Name: _Arthur Raymer_

LANDLORD:

MIAMI BEACH MARINA ASSOCIATES LTD.

By:   SoBe Marine, Inc., its general partner
By: _____
        Robert W. Christoph, President

TENANT:

MAJESTY ENTERPRISES OF FLORIDA LLC

By: _____, Manager
Print Name: _Arkady Vaygensberg_
Title: Manager

EXHIBIT "A"

LEGAL DESCRIPTION

AREA 1

All of Lots 22 through 29, inclusive, and Lot 21, less the southerly 40 feet thereof, in Block 111, of OCEAN BEACH FLORIDA ADDITION NO. 3, according to the Plat thereof as recorded in Plat Book 2, page 81, of the Public Records of Dade County, Florida; together with a 40-foot right-of-way on the Bay side of the Hope and Rebecca Tower property, (being Lots 15 through 20 and the southerly 40 feet of Lot 21 in Block 111, of OCEAN BEACH FLORIDA ADDITION NO. 3); together with an easement over or under and upon the westerly 100 feet of Lots 30 and 31, all in Block 111, OCEAN BEACH FLORIDA ADDITION NO. 3, as recorded in Plat Book 2, page 81, of the Public Records of Dade County, Florida.

TOGETHER WITH:

The West 2 feet of Lots 15 through 20, inclusive, and the westerly 40 feet of the southerly 40 feet of Lot 21, in Block 111, of OCEAN BEACH FLORIDA ADDITION NO. 3, according to the Plat thereof as recorded in Plat Book 2, Page 81, of the Public Records of Dade County, Florida.

(Consisting of 4 Pages)

Page 1 of 4

**Area 2**

LEGAL DESCRIPTION
MIAMI BEACH MARINA

A portion of land lying West of and adjacent to Block 111 of OCEAN BEACH, FLA. ADDITION NO. 3 according to the Plat thereof as recorded in Plat Book 2, at Page 81 of the Public Records of Dade County, Florida, more particularly described as follows: Commence at the Northwest corner of Section 3, Township 54 South Range 42 East; thence run Easterly along the North line of said Section 3 for 1250.00 feet, more or less, to a point on the East line of Block 50 of the aforementioned Plat; thence run S00°00'00"E along the East line of Blocks 90, 89, 88, 87, 86, 85, 84, 83, 82, 81, 80, 79, and a portion of Block 111 and along their Southerly extensions for 5207 feet to the Southwest corner of Lot 1, Block 111 of said Subdivision; thence run S89°05'0"W along the South line of said Lot 1, Block 111 for 260.00 feet to a point on the East waterline of Biscayne Bay, said point also being the POINT OF BEGINNING of the Tract of land hereinafter described; thence run N32°00'00"W, along a line 300 feet West of and parallel to the Westerly Right of Way line of Alton Road for 2150.00 feet to a point; thence run N26°37'26"W for 335.62 feet to an intersection with a line that is 35.00 feet Northerly of and parallel to the South line of a Lot designated as B as shown on the AMENDED PLAT of LOTS 43 to 50, BLOCK 111, OCEAN BEACH, FLA., ADDITION No. 3 as recorded in Plat Book 14, at Page 70, of the Public Records of Dade County, Florida; thence run S58°00'00"E at right angles to said Alton Road for 600.35 feet to a point; thence run S32°00'00"E for 1114.00 feet to a point; thence run S52°00'00"E for 150.00 feet to a point; thence run. S32°00'00"E for 600.00 feet to a point; thence run S58°00'00"E for 150.00 feet to a point; thence run S32°00'00"E for 912.00 feet to a point; thence run S47°35'04"E for 600.35 feet to a point; thence run S58°00'00"W for 330.00 feet, more or less, to other lands of the City of Miami Beach; thence run N32°00'00"W for 35 feet, more or less, by other lands of the City of Miami Beach, to the POINT OF BEGINNING; containing 1,643,378 square feet (37.73 acres), more or less.

A.V.

Page 2 of 4

**AREA 3**

Lots 1 through 14 inclusive, Block 111, MIAMI BEACH, FLA., SUBDIVISION NO. 3, according to the Plat thereof, recorded in Plat Book 7 at Page 41 of the public records of Dade County, Florida; Together with the 30.00 foot Right-of-Way of Biscayne Street, lying South of Alton Road and East of the Shore Line of Biscayne Bay at said Street in shown on the above referenced Recorded Plat.

ALSO TOGETHER WITH:

All that part of the North 132.00 feet of Section 10, Township 54 South, Range 42 East, Dade County, Florida, described as follows:

Commence at a point on the Northerly line of said Section 10 ( said Northerly line being common with the Southerly line of Biscayne Street ), said point being the intersection of the Easterly line of Jefferson Avenue extended Southerly across Biscayne Street; Thence run S.1°58'28"E. along the extension Southerly of the Easterly line of Jefferson Avenue, a distance of 132.00 feet; Thence run S.87°36'07"W. along a line parallel to the Northerly line of Section 10, a distance of 101.00 feet to the Point of Beginning (P.O.B.) of that part of Parcel 3 hereinafter described. Thence continue S.87°36'07"W. along the last mentioned course, a distance of 65 feet, more or less, to the shore line of Biscayne Bay; Thence run Northerly, meandering the shore line of Biscayne Bay, a distance of 132 feet, more or less, to the intersection of the Northerly line of said Section 10; Thence run N.87°36'07"E. along the Northerly line of Section 10, a point 102.00 feet Westerly, as measured along the Northerly line of Section 10, from the intersection of the extension Southerly of the Easterly line of Jefferson Avenue. Thence run S.1°58'28"E.(c), a distance of 132.00 feet to the Point of Beginning (P.O.B.). Area described contains 10,000 square feet, more or less 0.233 acres, more or less.





AREA 4

Lots 30 through 42, inclusive, in Block 111, of OCEAN
BEACH FLORIDA ADDITION NO. 3, according to the Plat
thereof as recorded in Plat Book 2, page 81, of the
Public Records of Dade County, Florida; and all of DADE
COUNTY PROPERTY OF MIAMI BEACH, according to the Plat
thereof recorded in Plat Book 14, at page 70, of the
Public Records of Dade County, Florida, also described
as the amended Plat of Lots 43 through 50, inclusive,
in Block 111, of OCEAN BEACH FLORIDA ADDITION NO. 3,
according to the Plat thereof as recorded in Plat Book
2, page 81, of the Public Records of Dade County,
Florida.

CP:178CP1347D

Page 4 of 4                                A. V.



BOUNDARY SURVEY
MIAMI BEACH MARINA
INTERNATIONAL YACHT HARBOR

EXHIBIT "A-1"



EXHIBIT B

RULES AND REGULATIONS

1.      No sign, advertisement, display, notice or other lettering shall be exhibited, inscribed painted or affixed on any part of the outside of the Premises or inside, if visible from the outside, or the building of which they form a part, and no symbol design, mark, or insignia adopted by Landlord for the Marina or any portion thereof or the tenants therein shall be used in connection with the conduct of Tenant's business in the Premises or elsewhere without, in each instance, the prior written consent of Landlord. All signs, displays, advertisements and notices of Tenant so approved by Landlord shall be maintained by Tenant in good and attractive condition at Tenant's expense and risk.

2.      No awning or other projections shall be attached to the outside walls of the Premises or the building of which they form a part without, in each instance, the prior written consent of Landlord.

3.      All garbage and refuse shall be kept in the kind of container specified by Landlord, and shall be placed outside of the Premises, prepared for collection in the manner and at the times and places specified by Landlord. If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use the same at Tenant's cost, provided such cost shall be competitive to any similar service available to Tenant.

4.      No radio or television or other similar device shall be installed without, in each instance, Landlord's consent in writing. No aerial or antenna shall be erected on the roof or exterior walls of the Premises, or on the grounds without, in each instance, the prior written consent of Landlord. Any aerial so installed without such written consent shall be subject to removal without notice at any time.

5.      No loud speakers, television sets, phonographs, radios or other devices shall be used in a manner so as to be heard or seen outside of the Premises without the prior written consent of Landlord.

6.      No auction, fire or bankruptcy sales shall be conducted on or about the Premises without the prior written consent of Landlord.

7.      Tenant shall keep Tenant's display windows illuminated and the signs and exterior lights lighted each and every day of the terms hereof during the hours designated by Landlord.

8.      Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

9.      The outside areas immediately adjoining the Premises shall be kept clean by Tenant and Tenant shall not place or permit any obstructions or merchandise in such areas.

10.     Tenant and Tenant's employees shall park their cars only in those portions of the parking area designated for the purpose by Landlord. Tenant shall furnish Landlord the state automobile License numbers assigned to Tenant's car or cars and the cars of Tenant's employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord of any changes within five (5) days after such changes occur. Tenant has a non-exclusive right to offer parking to its customers throughout any of the parking areas in the Marina.

11.     Tenant shall use at Tenant's cost such pest extermination contractors as Landlord may require, provided the cost thereof is competitive to any similar service available to Tenant.

12.     Tenant shall not make or permit any noise or odor which Landlord deems objectionable to emanate from the Premises.

13.     All deliveries or shipments of any kind to and from the Premises, including loading and unloading of merchandise, supplies and other goods, shall be made only by way of the rear of the Premises (unless the Premises does not have a rear entrance) at a location designated by Landlord, and only at such times designated for such purpose by Landlord; trailers and/or trucks servicing the Premises may only park in portions of the Marina designated for such

V73330U64SN:# 535320 v 3
1/29/02 2:54 PM

31



purpose by Landlord, and only while actively loading/unloading. In no event may any trucks be parked in a manner which may interfere with the use of any Common Areas or any pedestrian or vehicular access; and Tenant shall complete or cause to be completed all deliveries, loading, unloading and services to the Premises prior to 10:00 am each day. There shall not be used in any space, or in the public halls of the Building, either by any Tenant or by jobbers or others, in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.

14.     Tenant shall not use, permit or suffer the use of any portion of the Premises as living, sleeping or lodging quarters.

15.     No load will be placed on any floor of the Premises which exceeds the floor load per square foot area which such floor area was designated to carry.

16.     All mechanical equipment and machinery in or serving the Premises will be kept free of vibration and noise which may be transmitted beyond the confines of the Premises.

17.     No live animals will be kept on or within the Premises, seeing eye dogs excepted.

18.     No additional locks shall be placed on any door or changes made to existing locks in Building without the prior written consent of Landlord. Landlord will furnish two keys to each lock on doors in the Premises and Landlord, upon request of Tenant, shall provide additional duplicate keys at Tenant's expense. Landlord may at all times keep a pass key to the Premises. All keys shall be returned to Landlord promptly upon termination of this Lease.

19.     Landlord reserve the right to close the Building during non-business hours of the Marina, subject, however, to Tenant's right to admittance under regulations prescribed by Landlord, and to require the persons entering the Building to identify themselves and establish their right to enter or to leave the Building.

20.     When a boat enters the Marina, the Tenant, Vessel, crew and its guests must comply with all rules and regulations set out herein or as amended by Landlord, from time to time.

21.     Only boats, in good condition, and under their own power, shall be admitted to berthing areas. In the event an emergency during Tenant's absence, e.g. breakdown of the bilge pump, leak, bad lines, the Landlord is authorized to make necessary repairs as economically as possible which will be charged to the Tenant.

22.     Pets shall be leashed within the confines of the Marina, and toileted on grass areas. Pets are permitted only if they do not disturb other guests.

23.     Boats leaving for an extended cruise will so notify the Dockmaster's office. The Landlord reserves the right to rent all docks when vacant, however transients will move for boats on seasonal contracts or on advance reservations.

24.     The Rules of the Road and the Navigation Laws of the United States apply to all vessels entering or leaving the marina.

25.     Refuse shall not be thrown overboard. Garbage shall be deposited in cans (garbins) or other receptacles supplied for that purpose. Tenant shall notify Landlord of anything that will not fit in these cans and Landlord shall dispose of same. No person shall discharge oil, fuel, spirits, inflammable substances or oily bilges into or near the Marina. Charcoal or gas fires will not be permitted on the docks.

26.     Noise shall be kept to a minimum at all times. Patrons shall use discretion in operating engines, generators, radios and television sets, so as not to cause a nuisance or disturbance. The use of mechanical tools (buffers, sanders, etc.) outside the boat is prohibited. All boats must have underwater exhaust in operation. See Rule 29.

*A. V.*

\7333\PU\648R\# 538320 v 3
1/20/02 2:54 PM



27. Except as expressly provided in the Lease, advertising and/or soliciting shall not be permitted on any boat within the Marina.

28. Swimming, diving or fishing shall not be permitted in the Marina.

29. Tenants shall not store supplies, materials, accessories or debris on walkway, docks or finger piers and shall not construct or place thereon any lockers, chests, cabinets, or similar structures, except with written approval from Landlord. Painting, scraping or repairing of gear of the board shall not be permitted on the walkways, docks, or finger piers. The extent of repairs and maintenance which shall be permitted shall be at the sole discretion of Landlord.

30. Subleasing of slips, transfer of boats between slips, or from one slip to another slip, shall not be allowed, except upon prior written approval of Landlord. Tenant agrees that in case of an emergency, Landlord may move the Vessel from the particular space rented to any other mooring place if the Vessel is not moved in accordance with the prior notice from the Landlord. Tenant acknowledges slip assignment is temporary and may be reassigned by Landlord for any reason Landlord deems valid and reasonable. Boats may be moved to another slip with 30 days notice to make room for special events at the Marina.

31. Laundry shall not be hung on boats, walkways, docks, or finger piers in the marina, nor shall "for sale" or "for hire" signs be put on boats.

32. Dockage day starts at 6:00 A.M. Any vessel docked prior to 6:00 A.M. will be charged dockage for the previous day. Check out time shall be 11:00 A.M. Any vessel that occupies berth after 11:00 A.M. will be charged dockage for the following day.

33. It is suggested that all owners leave a forwarding address in order to permit prompt handling in the event telephone calls or mail is received for them. However, in any event, Landlord assumes no responsibility whatsoever for forwarding mail or messages. All personal property must be removed from docks when dockage is terminated. Landlord assumes no responsibility for any personal property that may be remaining.

34. Motorcycles, bicycles, skateboards and roller blades will not be allowed to be ridden on any docks or piers and must be stored on the boat or in the parking lot. Dinghies must be berthed within the slip assigned to the boat and in such a manner as not to interfere with the adjoining slip.

35. All lines, rigging and halyards will be secured by the Vessel's owner in order to eliminate noise. Slotted masts must have noise protection devices.

36. The Tenant agrees not to permit any residence aboard his Vessel while at the Marina, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. If the Tenant's vessel contains a sanitation device aboard, it must comply with the most advanced state of the art requirements of the Coast Guard governing installation and the use of such device. The sanitation device must be properly functioning at all times while the Vessel is at its berth. No discharge of sanitation affluent or dumping of trash overboard shall be allowed at the marina.

37. Employees of the Marina may not be hired to perform work on any vessels at the Marina nor may they be hired to perform any other sort of personal task for or on behalf of any patrol or guest at the Marina.

38. Unauthorized use of Marina supplied fresh water is prohibited.

TENANT ACKNOWLEDGES HAVING READ AND UNDERSTOOD ALL OF THE RULES AND REGULATIONS OF THIS AGREEMENT AND AGREES TO ABIDE THEREBY.

*A. V.*

\I7339\16484\W 538330 v 3
1/29/02 2:54 PM

33

DEPT. OF TRANSP. USCG. CG-1270 (REV. 09-01)                    OMB APPROVED
2115/0110



# UNITED STATES OF AMERICA

## DEPARTMENT OF TRANSPORTATION
## UNITED STATES COAST GUARD

### NATIONAL VESSEL DOCUMENTATION CENTER

# *CERTIFICATE OF DOCUMENTATION*

| VESSEL NAME | | OFFICIAL NUMBER | IMO OR OTHER NUMBER | | YEAR COMPLETED |
|---|---|---|---|---|---|
| THE ATLANTIC | | 634676 | 101 | | 1981 |

| HAILING PORT | HULL MATERIAL | | | MECHANICAL PROPULSION |
|---|---|---|---|---|
| MIAMI BEACH, FL | ALUMINUM | | | YES |

| GROSS TONNAGE | NET TONNAGE | LENGTH | BREADTH | DEPTH |
|---|---|---|---|---|
| 3,834 GT ITC | 1,150 NT ITC | | | |
| 97 GRT | 66 NRT | 196.3 | 48.0 | 16.0 |

PLACE BUILT
NEW IBERIA, LA

| OWNERS | OPERATIONAL ENDORSEMENTS |
|---|---|
| MLA CRUISES INC | REGISTRY |

MANAGING OWNER
MLA CRUISES INC
1280 FIFTH ST
MIAMI BEACH, FL 33139

RESTRICTIONS
NONE

ENTITLEMENTS
NONE

REMARKS
NONE

ISSUE DATE
MAY 05, 2003

THIS CERTIFICATE EXPIRES
MAY 31, 2004                           WDR

DIRECTOR, NATIONAL VESSEL DOCUMENTATION CENTER

## LEASE AMENDMENT

The Lease Amendment is attached and made a part of that certain commercial Lease dated January 31, 2002 (the "Lease") by and between Miami Beach Marina Associates, Ltd., a Florida Limited Partnership, (the "Landlord"), and Majesty Enterprises of Florida, LLC, a Florida Limited Liability Company, (the "Tenant").

A1.    All terms used herein, unless otherwise specified shall have the same meaning assigned to them in the Lease.  In the event of a conflict between the terms and conditions of the Amendment and the terms and conditions of the Lease, the terms and conditions of this Amendment shall prevail.

A2.    The Office Space previously located in the 1290 5th Street building has been relocated temporarily to the northwest side of the parking pedestal for Murano Grande and will be ultimately located on the first floor in the northwest corner of the parking pedestal for the Icon Building pursuant to the agreed upon plans.

A3.    In addition to the relocation, the original Office Space has been expanded from approximately 900 square feet to approximately 2,568 square feet.  This will become your permanent square footage when the facility in the Icon Office Space is completed.

A4.    The vessel "Majesty" is being substituted with a new catamaran vessel "Atlantic," which is approximately 202 feet long at the waterline and licensed with the United States Coast Guard to carry up to 600 passengers.

A5.    Tenant acknowledges and accepts complete responsibility for all the costs of any improvements that may be required by Landlord to accommodate this vessel and/or its operation at the Miami Beach Marina. Tenant further acknowledges that the minimum requirements necessary will include a) equipping the vessel "Atlantic" with fully operational bow thrusters, b) providing a permanent ramping and railing system to safely accommodate Tenant's passengers and vessel securing, and c) providing for moving and upgrading the dockside electricity water connections as necessary to accommodate the demands of this larger vessel.

Composite Exhibit "C"

1

A6.   All other terms of the lease shall continue in full force and effect.  Tenant acknowledges that Tenant has no defense or offset to any amount due under the Lease.


IN  WITNESS  WHEREOF,  the  parties  hereto  have  executed  this Amendment as of ___*July 1*_____, 2003.

TENANT:   Majesty Enterprises of Florida, LLC


By: _____

Its: manager.
Name: Leonid Tatarchuk


LANDLORD:   Miami Beach Marina Associates, Ltd.


By _____
Its President of the General Partner SoBe Marina, Inc.
Name: Robert W. Christoph

2



# MIAMI BEACH MARINA

April 16, 2003

**VIA HAND DELIVERY**

Arkady Vaygensberg, Manager
Majesty Enterprises of Florida, LLC
1290 Fifth Street
Miami Beach, Florida 33139

Re:   Marina Lease dated January 31, 2002, between Miami Beach Marina Associates, Ltd. ("Landlord") and Majesty Enterprises of Florida, LLC ("Tenant")

Dear Arkady:

The Landlord has agreed to consent to your request to replace the "Majesty", as the "Vessel" defined in Article I of the Lease, with the M/V "Max I" Official Number 634676, US Coast Guard Registration ("Max I") provided the Tenant complies with the following two requirement:

1.    The Owner of Max I, MLA Cruises, Inc., must provide the Landlord with a mortgage securing $500,000 of the Tenant's obligations under the Lease, plus any costs to collect said sum (the "Mortgage") as additional security for the Tenant's obligations under the Lease. Landlord acknowledges that the Mortgage will be inferior to a first preferred ship's mortgage in favor of RCI-Dinner Key, Inc. which mortgage secures a principal indebtedness of $2,000,000.00 (the "First Mortgage"). In the event the First Mortgage is satisfied, Landlord will consent to subordinate its interest in the Second Mortgage in and to a replacement first mortgage holder provided that: (i) the replacement first mortgage is limited to the maximum liability of $2,000,000.00, (ii) the replacement first mortgage is not owned or controlled by an affiliate of MLA Cruises, Inc., (iii) the terms and conditions of the replacement first mortgage loan are substantially similar to the terms and conditions to the existing first mortgage loan in favor of RCI-Dinner Key, Inc. or otherwise acceptable to the Landlord in its sole and absolute discretion, (iv) the condition of Max I is in at least substantially the same condition as it is in on the date hereof, subject to ordinary wear and tear, and (v) MLA Cruises, Inc. is not otherwise in default under the Mortgage at the time of the subordination. In the alternative, Landlord will release the Mortgage if Tenant provides it with: (i) a Standby Letter of Credit in the amount of $500,000.00 (the issuing bank, place of presentment and the form and content of the letter of credit must be acceptable to Landlord, in its sole and absolute discretion) or (ii) $500,000.00 as an additional cash security deposit under the Lease.

\74183\18721\#620141 v 1
4/18/03 11:46 AM



April 16, 2003
Page -2-

2.     Tenant must agree to add to the Lease as an additional remedy in favor of Landlord under Article 20 that in the event that Tenant is in default under the Lease after the expiration of any applicable grace or cure periods the Landlord may complete the Effective Date (with a current date) and deliver the Assignment of Lease (previously executed by the Tenant, in the form attached hereto as Exhibit "A") to the Assignee, as one of Landlord's remedies, (but not its sole and exclusive remedy) for a default by Tenant under the Lease.

Please acknowledge your agreement and consent to the foregoing by having a duly authorized officer or manager of Tenant execute a counterpart of this letter where indicated below.

Should you have any questions please do not hesitate to contact me.

Very truly yours,

MIAMI BEACH MARINA ASSOCIATES, LTD.

By:     SoBe Marina, Inc., it general partner

By: _____
Robert W. Christoph,
President

RWC:SMA:lr
c:     David Goldstein, Esq.
       Suzanne M. Amaducci, Esq.

AGREED TO AND ACCEPTED AS OF THIS
22nd DAY OF APRIL, 2003.

MAJESTY ENTERPRISES OF FLORIDA, LLC,
a Florida limited liability company

By: _____
Name: Arkady Naygenskerg
Title: Manager

\74183\18721\# 620141 v 1
4/18/03 11:46 AM

## ASSIGNMENT OF LEASE

FOR AND IN CONSIDERATION of Ten Dollars ($10.00) in hand paid, Majesty Enterprises of Florida, LLC, a Florida limited liability company ("Majesty") as Tenant under that certain Marina Lease between Miami Beach Marina Associates, Ltd. ("Landlord") as Landlord, and Majesty, as Tenant dated January 31, 2002, as supplemented by that certain letter agreement dated as of April 22, 2003 and any other amendments, modification and changes thereto (Collectively, the "Lease") hereby assigns the Lease to Miami Beach Marina Associates, Ltd. (the "Assignee"). A true and correct copy of the Lease is attached hereto as Exhibit "A". Majesty hereby represents and warrants that it has full authority to execute and deliver this Assignment of Lease, that this Assignment of Lease is being executed as of April 22, 2003 with the express intention that it is not to be effective until the Effective Date (defined below), and that Majesty does not have the authority to nor will it revoke this Assignment prior to the Effective Date. Assignee hereby assumes the obligations of Majesty under the Lease arising from and after the Effective Date. The parties expressly acknowledge that the interest of Landlord and the Assignee under the Lease shall not merge due to the fact that the Landlord and Assignee are the same entity. In order for the Assignee's rights as tenant to merge into the Landlord's rights as Landlord, the Assignee and Landlord must execute a written acknowledgment of said merger. Majesty hereby agrees to indemnify and hold harmless Assignee from and against any and all obligations and liabilities of tenant under the Lease arising prior to the Effective Date. This Assignment of Lease is effective as of the ___ day of _____ 20__ (the "Effective Date").

Signed, sealed and delivered in
the presence of:

Print Name: DAVID M. GOLDSTEIN

Print Name: Suzann Amaducci

**MAJESTY ENTERPRISES OF FLORIDA, LLC,**
a Florida limited liability company

By: _____
Arkady Vaygensberg, Manager

**MIAMI BEACH MARINA ASSOCIATES, LTD.**

By:   SoBe Marina, Inc., its general partner

By: _____
Robert W. Christoph, President

Print Name: DAVID M. GOLDSTEIN

Print Name: Suzann Amaducci

EXHIBIT A TO
APRIL 16, 2003
LETTER BETWEEN MIAMI
BEACH MARINA & MAJESTY
ENTERPRISES OF FLORIDA LLC

620118v2

STATE OF FLORIDA          )
COUNTY OF MIAMI- DADE  )

The foregoing instrument was acknowledged before me this 21st day of April, 2003, by Arkady Vaygensberg as the Vice President of Majesty Enterprises of Florida, LLC, on behalf of said company. He is personally known to me or has produced a State of _____ driver's license as identification.

Sign Name: *Rhoda Rubin*
Print Name: RHODA RUBIN
NOTARY PUBLIC

My Commission Expires:
2/17/06

Serial No. (none, if blank): DD 089688

[NOTARY SEAL]

Rhoda Rubin
MY COMMISSION # DD089688 EXPIRES
February 17, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

STATE OF FLORIDA          )
COUNTY OF MIAMI- DADE  )

The foregoing instrument was acknowledged before me this 21st day of April, 2003, by Robert W. Christoph, as President of SoBe Marina, Inc., the general partner of MIAMI BEACH MARINA ASSOCIATES, LTD., on behalf of said corporation and limited partnership. He is personally known to me or has produced a State of _____ driver's license as identification.

Sign Name: *Rhoda Rubin*
Print Name: RHODA RUBIN
NOTARY PUBLIC

My Commission Expires:
2/17/06

Serial No. (none, if blank): DD089688

[NOTARY SEAL]

Rhoda Rubin
MY COMMISSION # DD089688 EXPIRES
February 17, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

VESSEL: MAX I
Official No.: 634676
Flag/Registration: U.S. Coast Guard
Home Port: To Be Miami Beach, Florida
Indebtedness: $500,000

## PREFERRED SHIP MORTGAGE AND SECURITY AGREEMENT

THIS PREFERRED SHIP MORTGAGE AND SECURITY AGREEMENT (the "Mortgage") is granted and made to be effective as of the 22nd day of April, 2003 by and between MLA CRUISES, INC., a Delaware company, with its principal place of business located at 1280 5th Street, Miami Beach, Florida 33139 (the "Shipowner"), in favor of MIAMI BEACH MARINA ASSOCIATES, LTD. or its assigns, with its principal place of business at 300 Alton Road, Suite 303, Miami Beach, Florida 33139 ("MBMA") on the whole (100%) of the Vessel as further identified above and further defined in this Mortgage.

### WHEREAS:

A.     The Shipowner is the sole owner of the whole of the United States documented vessel "MAX I", U.S. Official No. 634676 of 97 gross and 66 net tons, or thereabouts, duly documented in the name of the Shipowner, with her current home port at Key West, Florida, having been built in 1981 by Underwater Completion Team, Inc., and rebuilt and lengthened in 1997 by Network Marine, Pierre Port, LA.

B.     The Shipowner has chartered the Vessel to Majesty Enterprises of Florida LLC ("Majesty") pursuant to a Charter Agreement dated April 11, 2003 between Shipowner and Majesty.

C.     Majesty has leased from MBMA certain dock space and office space (collectively, the "Premises") pursuant to that certain Marina Lease dated January 31, 2002 (the "Lease"). Shipowner acknowledges its receipt of a copy of the Lease. Article 34 of the Lease specifically provides that MBMA shall have a lien on any vessel using the Premises. MBMA has agreed to modify the Lease to permit the Vessel owned by Shipowner and chartered to Majesty to use the Premises if, in connection with said amendment to Lease, Shipowner provides this Mortgage to MBMA to secure any obligations of Majesty under the Lease (including the payment of Rent and CAM charges due thereunder), and the performance and observance of and compliance with all the agreements, covenants and conditions contained herein or in the Lease.

D.     The Shipowner and Majesty are affiliates with common shareholders and Shipowner derives a benefit from making this Mortgage in favor of MBMA.

E.     RCI-Dinner Key, Inc. ("Lender"), an affiliate of MBMA made that certain Loan to Shipowner in the amount of $2,000,000 on even date herewith (the "Loan") and Lender would not have made such Loan or consent to the Charter to Majesty without Shipowner providing this Mortgage in favor of MBMA.

\74183\18721\# 620054 v 4
4/30/03 11:08 AM

Exhibit "D"

NOW, THEREFORE, in consideration of the Loan, the consent to the Charter and the amendment to the Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the payment of all sums due under the Lease, to secure the performance and observance of and compliance with all of the agreements, covenants and conditions contained herein or in the Lease, and the payment of all other sums that may hereafter be secured by this Mortgage in accordance with the terms hereof (all such principal, interest, and all other sums being hereinafter called "Sums hereby secured")the Shipowner has granted, conveyed, mortgaged, pledged, confirmed, assigned, transferred and set over and by these presents does grant, convey, mortgage, pledge, confirm, assign, transfer and set over, unto MBMA, and its successors and assigns the whole of the said vessel MAX I including, without being limited to, all of the engines, machinery, gaming equipment, boilers, furniture, auxiliary vessels, inventory, masts, spars, boats, anchors, cables, chains, rigging, tackle, capstans, outfit, tools, pumps and pumping equipment, drills, apparel, fittings, spare parts all other appurtenances thereunto appertaining or belonging, excluding household goods, whether now owned or hereafter acquired, and also any and all additions, improvements, renewals and replacements hereafter made in or to such vessel or any part thereof, including all items and appurtenances aforesaid (such vessel, together with all of the foregoing, being herein called the "Vessel"), and all present and future hire, freights and other earnings of the Vessel, if applicable.

TO HAVE AND TO HOLD all and singular the above mortgaged and described property unto MBMA and its successors and assigns, to its and to its successors' and assigns' own use, benefit and profit forever.

PROVIDED, and these presents are upon the condition, that, if Majesty or its successors or assigns shall pay or cause to be paid all Sums due under the Lease as and when the same shall become due and payable in accordance with the terms of the Lease and all other such sums as may hereafter become secured by this Mortgage in accordance with the terms hereof, and the Shipowner shall duly perform, observe and comply with or cause to be performed, observed, or complied with all the covenants, terms and conditions of this Mortgage, expressed or implied, to be performed, then this Mortgage and the estate and rights hereunder shall cease determine and be void, otherwise to remain in full force and effect.

The Shipowner represents, warrants and agrees with MBMA as follows:

## ARTICLE I
## Covenants of the Shipowner.

Section 1.     (a)     The Shipowner hereby agrees to pay the all sums due to MBMA under the Lease secured hereby and to observe, perform and comply with the covenants, terms and conditions herein, express or implied, on its part to be observed, performed or complied with. This Mortgage is intended to be a preferred ship mortgage under Chapter 313, Title 46 of the United States Code, as amended from time to time, and as such shall always be governed by U.S. federal law, however MBMA hereby expressly subordinates its rights hereunder to that certain first preferred ship's mortgage made by Shipowner in favor of Lender (the "First Mortgage"). However, in the event of any conflict between the substantive provisions of this

Mortgage and the Lease, the terms and provisions of Lease shall prevail, provided they are consistent with U.S. law or the laws of the State of Florida.

(b)     The obligation of the Sums hereby secured is an obligation in Dollars of the United States of America and the term "US" or "$" when used shall mean such Dollars. Notwithstanding fluctuations in the value or rate of United States Dollars in terms of gold or any other currency, all payments to be made in respect of the Sums hereby secured shall be made in United States Dollars, whether paid before or after the due date thereof.

Section 2.     (a)     The Shipowner is a corporation duly incorporated and existing under the laws of Delaware, and is authorized to legally transact business in the State of Florida and meets all of the requirements to transact business in Florida.

(b)     The Shipowner has full power and authority to own and mortgage the Vessel; all action necessary and required by law for the execution and delivery of this Mortgage, has been duly and effectively taken; and the Sums hereby secured is and will be the valid and enforceable obligation of the Shipowner in accordance with its terms.

Section 3.     The Shipowner lawfully owns and is lawfully possessed of the Vessel free from any lien or encumbrance whatsoever other than (a) liens for current wages of the Master, officers and crew, (b) liens covered by valid policies of insurance (except for permitted deductibles) and meeting the requirements of Section 15 below, (c) liens not covered by insurance incurred in the ordinary course of business and not more than thirty days past due, and (d) the First Mortgage, and shall defend the title and possession thereto and to every part thereof for the benefit of MBMA against the claims and demands of all persons whomsoever. ·

Section 4.     The Shipowner will cause this Mortgage to be duly recorded in accordance with the provisions of Chapter 313, Title 46 of the United States Code (as amended) and will otherwise comply with and satisfy all of the provisions of the Chapter 313, Title 46 of the United States Code in order to establish and maintain this Mortgage as a first preferred mortgage lien thereunder upon the Vessel, all of her engines, tackle, gaming equipment, inventory, furniture, auxiliary vessels, and/or appurtenances thereto, and upon all renewals, replacements and improvements made in or to the same for the amount of the Sums hereby secured.

Section 5.     The Shipowner will not cause or permit the Vessel to be operated in any manner contrary to law, and the Shipowner will not engage in any unlawful trade or violate any law or carry any cargo that will expose the Vessel to penalty, forfeiture or capture, and will not do, or suffer or permit to be done, anything which can or may injuriously affect the registration or enrollment of the Vessel under the laws and regulations of the United States of America and will at all times keep the Vessel duly documented thereunder. MBMA acknowledges that the Vessel will be operated as a casino gaming boat in accordance with all applicable laws and regulations. If required by applicable law, Shipowner shall deliver to MBMA evidence of its registration of all casino gaming equipment with the U.S. Department of Justice. If required by applicable law, such registration shall occur prior to the Vessel being operated as a casino gaming Vessel. Shipowner shall also deliver to MBMA for its approval a sample of all passenger tickets to be used in connection with the operation of the Vessel, which passenger

tickets must include language to limit rights of third parties to make claims or liens against the Vessel having priority over MBMA.

Section 6.    The Shipowner will pay and discharge when due and payable, from time to time, all taxes, assessments, governmental charges, fines and penalties lawfully imposed on the Vessel or any income therefrom; provided that the Shipowner shall not be required to pay any such tax, assessment or charge if the validity or amount thereof is being contested in good faith by appropriate proceedings and if the Shipowner shall have set aside on its books reserves in accordance with generally accepted accounting principles consistently applied by independent public or chartered accountants of international reputation deemed by it adequate with respect to such tax, assessment or charge; and provided further, however, that the Shipowner will pay or cause to be paid all such taxes, assessments or charges forthwith upon the commencement of proceedings to foreclose any lien which is attached as security therefor or provide an appropriate bond in order to remove the same as a lien against the Vessel within thirty (30) days after filing of said lien.

Additionally, Shipowner shall pay any and all fees, taxes, documentary stamps, recording fees and all other costs or expenses associated with the Vessel and with the preparation, execution and recordation of Mortgage or required to maintain the Vessel or the Mortgage in current standing with the appropriate authorities or government agency.

Section 7.    Neither the Shipowner, any charterer, the Master of the Vessel nor any other person has or shall have any right, power or authority to create, incur or permit to be placed or imposed or continued upon the Vessel any lien whatsoever other than for wages of the Master, officers and crew, salvage, and this Mortgage.

Section 8.    The Shipowner will place, and at all times and places will retain, a properly certified copy of this Mortgage on board the Vessel with her papers and will cause each such certified copy and the Vessel's marine document to be exhibited to any and all persons having business therewith which might give rise to any lien thereon other than liens for wages of the Master, officers and crew and salvage, and to any representative of MBMA; and will place and keep prominently displayed in the chart room and in the Master's cabin of the Vessel a framed printed notice in plain type reading as follows:

NOTICE OF MORTGAGE

This Vessel is covered by a Preferred Ship Mortgage in favor of Miami Beach Marina Associates, Ltd., under authority of Chapter 313 of Title 46 of the United States Code, as amended, and all other federal law.  Under the terms of said Mortgage, neither the Shipowner, any charterer, the Master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any other lien whatsoever except liens for wages of the Master, officers and crew and salvage.

Section 9.    Except for the liens of this Mortgage, the Shipowner will not suffer to be continued any lien, encumbrance or charge on the Vessel, and in due course and in any event

\74183\18721\# 620054 v 4
4/30/03 11:08 AM

4

within thirty (30) days after the same becomes due and payable or within ten (10) days after being requested to do so by MBMA will pay or cause to be discharged or make adequate provision for the satisfaction or discharge of all claims or demands, or will cause the Vessel to be released or discharged from any lien, encumbrance or charge therefor.

Section 10.   If a libel or complaint be filed against the Vessel or the Vessel be otherwise attached, levied upon or taken into custody by virtue of any legal proceeding in any court, the Shipowner will within forty-eight (48) hours of the filing of said libel or complaint, notify MBMA thereof by overnight courier or telefacsimile, confirmed by a letter sent via certified mail, at its address, as specified in this Mortgage, will immediately cause the Vessel to be released and all liens thereon other than this Mortgage to be discharged and will promptly notify MBMA thereof in the manner aforesaid.

Section 11.   (a)   The Shipowner will at all times and without cost or expense to MBMA maintain and preserve, or cause to be maintained and preserved, the Vessel and all its engines, equipment, inventory, outfit and appurtenances, tight, staunch, strong, in good condition, working order and repair and in all respects seaworthy and fit for its intended service, and will keep the Vessel, or cause her to be kept, in such condition as will entitle her to the highest classification and rating for vessels of the same age and type or other classification society of like standing approved by MBMA, which approval will not be unreasonably withheld. All repairs, refits, refurbishing and/or maintenance to the Vessel which exceed $25,000 must be approved, in writing, by MBMA, with said approval not to be unreasonably withheld as long as the Mortgagor is current with all aspects of the Loan. The Vessel shall, and the Shipowner covenants that she will, at all times comply with all applicable laws, treaties and conventions to which the United States of America is a party, and rules and regulations issued thereunder, and shall have on board as and when required thereby valid certificates showing compliance therewith. The Shipowner will not make, or permit to be made, any substantial change in the structure, type or speed of the Vessel or change in her rig, without first receiving the written approval thereof by MBMA, which approval will not be unreasonably withheld.

(b)   The Shipowner agrees, following request by MBMA, to give MBMA at least ten (10) days notice (or such lesser notice as may be practicable under the circumstances but in no event not less than three (3) days notice) of actual date and place of any drydocking or major survey in order that MBMA may have representatives present if desired. THE SHIPOWNER AGREES THAT AT MBMA'S REQUEST IT WILL SATISFY MBMA THAT THE EXPENSE OF SUCH SURVEY OR WORK TO BE DONE THEREAT IS WITHIN SHIPOWNER'S FINANCIAL ABILITY AND WILL NOT RESULT IN A CLAIM OR LIEN AGAINST THE VESSEL IN VIOLATION OF THE PROVISIONS OF THIS MORTGAGE.

Section 12.   (a)   The Shipowner will at all reasonable times afford MBMA or its authorized representatives full and complete access to the Vessel for the purpose of inspecting the Vessel and her equipment, inventory and papers at the request of MBMA, provided, however, that unless and until an Event of Default specified in Section 1 of Article II shall have occurred and be continuing, the exercise by MBMA of its rights under this Section 12(a) shall not in any way interfere with normal operation, sailing, navigation or scheduling of the Vessel.

(b)     The Shipowner will promptly upon request of MBMA (i) deliver copies of any and all contracts and documents relating to the Vessel, whether on board or not, including without limitation, all charter parties or contracts of affreightment and (ii) provide full information and details with respect to the Vessel and all such contracts and documents, including without limitation full details as to parties, times of delivery and the like related to any charter parties or contracts of affreightments. MBMA shall endeavor to keep such information confidential, however, notwithstanding the foregoing, MBMA may use all such contracts, documents, information and details as it deems necessary to maintain or enforce its rights under this Mortgage and the Lease or to meet the requirements or demands of any governmental authority.

(c)     After an Event of Default, the Shipowner agrees to immediately provide to MBMA any charter fees or other earnings made by operating the Vessel.

(d)     The Shipowner hereby appoints MBMA attorney-in-fact of the Shipowner, whether or not an Event of Default shall have occurred or is continuing, to appear before governmental bodies, classification societies and insurers and to demand and receive to the same extent that the Shipowner itself might, all information and certificates respecting (i) the corporate status of the Shipowner under the laws of its jurisdiction of incorporation or any other jurisdiction in which it may have qualified to do business, (ii) the status of the Vessel under the laws and regulations of its country of registration, and its compliance with the requirements thereof, (iii) the state of the records of the Vessel or of the Shipowner in respect of the Vessel in any classification society with which the Vessel may be classed or of any company, association or club by whom the Vessel or the Shipowner in respect of the Vessel may be insured and (iv) the status of the registration of any casino gaming equipment with the Department of Justice if such registration is required by applicable law; and the Shipowner hereby agrees that MBMA may execute its powers as attorney-in-fact as aforesaid through its agents, representatives and attorneys. This power of attorney is coupled with an interest and shall be irrevocable as long as any Sums hereby secured from the Shipowner to MBMA remains outstanding.

Section 13.     The Vessel's current home port is Key West, Florida.   However, Shipowner will change the Vessel's home port to Miami Beach, Florida, both on the Vessel and with the U.S. Coast Guard.  Shipowner will file the appropriate documentation to change the home port within thirty (30) days from the date of execution of this Mortgage, and will provide MBMA written proof of the home port change immediately upon receipt of the Certificate of Documentation from the U.S. Coast Guard.

The Shipowner will not transfer or change the name, flag or port of documentation of the Vessel without prior written consent of MBMA, and any such written consent with respect to any one transfer or change of the name, flag or port of documentation shall not be construed to be a waiver of this provision with respect to any subsequent proposed transfer or change of the name, flag or port of documentation.

Section 14.     The Shipowner will not sell, mortgage, demise charter, transfer or change the management of the Vessel without obtaining the prior written consent of MBMA and any such written consent to any one sale, mortgage, demise charter, transfer or change of management shall not be construed to be a waiver of this provision with respect to any

\74183\18721\ # 620054 v 4
4/30/03 11:08 AM

6

subsequent proposed sale, mortgage, demise charter, transfer or change of management. Any such sale, mortgage, demise charter, transfer or change of management of the Vessel shall be subject to the provisions of this Mortgage and the lien hereof. Shipowner will be permitted to charter the Vessel to Majesty Enterprises of Florida, LLC, after first providing written notice to MBMA, and only then after obtaining MBMA's consent.

Section 15. (a)   As long as this Mortgage is in effect, Shipowner shall, at its own expense, obtain and maintain with respect to the Vessel the following insurance: marine hull and machinery insurance, protection and indemnity insurance, war risk insurance, terrorism insurance, if applicable, pollution clean-up and third-party liability insurance, workers' compensation and U.S. Longshore and Harbor Workers' Compensation Act insurance as may be required by law, mortgagee's interest insurance, and insurance against such other risks or liabilities as may be reasonably specified from time to time by MBMA or as may be required by law. Shipowner shall carry no less than $5,000,000 of general liability insurance coverage and no less than $5,000,000 replacement value insurance due to damage to or destruction of the Vessel.

(b)   All policies of insurance (i) shall be obtained from insurers approved by MBMA, (ii) shall be in amounts and forms and with terms and conditions, including, without limitation, deductible and franchise clauses, mortgagee clauses and other endorsements acceptable to MBMA, and (iii) shall not be amended or terminated without MBMA's prior written consent.

(c)   All policies, amendments, endorsements, binders and other interim insurance contracts shall name MBMA as an additional assured and the sole loss payee (except that MBMA shall be the sole assured on all policies of mortgagee's interest insurance). No assureds or loss payees shall be added to any policy without the advance written consent of MBMA.

(d)   All policies, binders, and interim contracts of insurance shall provide for thirty (30) days' prior notice by certified letter to be delivered by insurers to MBMA at its address set forth on the first page, in the event of amendment, alteration or cancellation. Certified copies of the originals of all policies, amendments, endorsements, binders and other interim insurance contracts shall be deposited with MBMA.

(e)   MBMA shall have the exclusive right to tender abandonment of the Vessel to insurers as a total or constructive total loss. If Shipowner is not in default under this Mortgage at the time insurance proceeds are payable for an insured liability, such proceeds may be disbursed to Shipowner in reimbursement of Shipowner's discharge of such liability, or to the party to whom the insured liability is owed, in exchange for a full release of the liability. All other insurance proceeds payable as a result of loss of or damage to the Vessel, or for any liability, shall be applied, as directed by MBMA in its sole discretion, to the Debt and other amounts evidenced or secured by this Mortgage, and otherwise in accordance with Section 19 below. If Shipowner receives any insurance proceeds, Shipowner shall immediately turn over such proceeds to MBMA.

(f)     If Shipowner at any time fails to comply with any of the insurance requirements under this Mortgage, MBMA may, but is not obligated to, procure such insurance.

(g)     Shipowner shall not permit the Vessel to engage in any voyage or activity not permitted under the policies of insurance at the time in effect without first insuring the Vessel for such voyage or activity in the amount otherwise required in this Section 13. Shipowner shall not do or permit any act to be done whereby any insurance may be impaired or suspended.

(h)     Shipowner hereby assigns to MBMA all insurances required under this Mortgage (the "Insurances"), all rights of Shipowner under the Insurances, and all proceeds of the Insurances. Shipowner shall remain liable for all obligations assumed by it under the Insurances. MBMA shall have no obligations or liabilities under the Insurances, although MBMA may, without obligation, perform Shipowner's obligations under the Insurances. Shipowner hereby appoints MBMA, its successors and assigns as Shipowner's true and lawful attorney-in-fact, coupled with an interest, irrevocably, with full power (in Shipowner's name or otherwise) to (i) demand, receive, compound and give a release or discharge for any moneys and claims for any moneys due and to become due under, or arising out of, the insurances, (ii) endorse any checks or other instruments or orders in connection with the Insurances and (iii) file any and all claims, institute any proceedings, and take any other action which MBMA may deem to be necessary or advisable. Shipowner agrees to immediately deliver notice of this clause to all insurers with respect to the Insurances in effect from time to time, and shall obtain their prompt written consent to this Mortgage and the foregoing assignment. Shipowner agrees that MBMA may effect such notice by delivery of a copy of this Mortgage, and may independently seek such consents. Shipowner hereby irrevocably directs all such insurers to rely on any copy of this Mortgage for such purposes. Shipowner has not assigned, pledged, created any security interest in, or otherwise encumbered, the whole or any part of the rights and other property hereby assigned, nor has it agreed to do so, to anyone other than MBMA, and shall not do so without MBMA's prior written consent. Shipowner shall defend, at its own expense, MBMA's rights relating to and arising under the Insurances against the claims or demands of all third parties. MBMA shall, in addition to the rights hereby conferred, or otherwise existing or arising at law, in equity, in admiralty, or otherwise, be entitled to all the rights of a secured creditor as generally provided under the Uniform Commercial Code as enacted in the applicable jurisdiction, regardless of Section 9-104 of said Code. The acquiescence by MBMA in the placement of insurance contrary to the terms of this Mortgage in one or more instances shall not establish a consent or course of dealing with respect to such noncompliance in any other instances.

Section 16.     The Shipowner will reimburse MBMA promptly, with interest at the default rate described in Article 4(e) of the Lease from time to time, for any and all expenditures which MBMA may from time to time make, lay out or expend in providing such protection in respect of insurance, discharge or purchase of liens, taxes, dues, assessments, governmental charges, fines and penalties lawfully imposed, repairs, attorney's and paralegal's fees, and other matters as the Shipowner is obligated herein to provide, but fails to provide. MBMA, though privileged to do so, shall be under no obligation to the Shipowner to make any such expenditures, nor shall the making thereof relieve the Shipowner of any default in that respect.

Section 17.     The Shipowner will fully perform or cause to be performed, in all material respects, any and all charter parties which are, or may be, entered into with respect to the Vessel.

\74183\18721\# 620054 v 4
4/30/03 11:08 AM

8

Section 18.   The Shipowner further covenants and agrees with MBMA that, so long as any sums hereby secured remain unpaid, without the prior written consent of MBMA, there shall be no change in the ownership of the Vessel either through sale of the Vessel or through an unapproved charter or transfer of custody or control of the Vessel by any means without the prior written consent of MBMA.   There shall be no change in the shareholders of the Shipowner or transfer of its shares without prior written consent of MBMA.

Section 19.   (a)   In the event of an actual or constructive or arranged total loss or seizure or forfeiture or requisition of title to the Vessel, whether or not with the consent of MBMA, then and in each such case, the Shipowner shall forthwith on demand pay the Sums hereby secured in full, including accrued interest to the date of such payment.

(b)   This Mortgage shall extend to and constitute a lien upon, and the Shipowner hereby grants MBMA a security interest in, all proceeds resulting from any of the events mentioned in subsection (a) above as security for the Sums hereby secured.

(c)   The Shipowner hereby irrevocably authorizes MBMA to file and record financing statements under the Uniform Commercial Code in any jurisdiction where the same may be in force or under any legislation having similar effect for the purpose of perfecting or continuing the perfection of the security interests granted by the Shipowner to MBMA herein without obtaining the signature of the Shipowner thereto. The Shipowner hereby irrevocably authorizes MBMA to execute any such financing statement or similar document in the name of the Shipowner.

## ARTICLE II
## Events of Default and Remedies.

Section 1.   In case any one or more of the following events, herein termed "Events of Default", shall have occurred and be continuing:

(a)   any payment in respect of the sums hereby secured has not been received by MBMA within ten (10) days after the date on which the same shall become due and payable; or

(b)   the statements in Sections 2 and 3 of Article I shall prove to be untrue in a material way; or

(c)   a default shall have occurred in the due and punctual observance and performance of any of the provisions of Sections 4, 5, 6, 9, 10, 11, 13, 14, 15(g), 16, 18 or 19 of Article I hereof; or

(d)   a default by the Shipowner in the observance or performance of any other agreement under this Mortgage shall have occurred and shall remain unremedied for ten (10) days after written notice thereof shall have been given to the Shipowner by MBMA; or

(e)   any of the Events of Default (as defined in the Lease) shall occur and be continuing under Article 20 of the Lease;

\74183\18721\# 620054 v 4
4/30/03 11:08 AM

(f)     any Event of Default under the First Mortgage that remains uncured after the expiration of any applicable notice, cure or grace period set forth therein.

then, and in each and every such case, MBMA shall have the right to:

(1)     declare all the then unpaid sums hereby secured to be due and payable immediately, and upon such declaration the same, including interest to date of declaration, shall become and be immediately due and payable;

(2)     exercise all of the rights and remedies in foreclosure and otherwise given to mortgagees by the provisions of the law of the United States or of any other jurisdiction where the Vessel may be found;

(3)     bring suit at law, in equity or in admiralty, as it may be advised, to recover judgment for the Sums hereby secured, and collect the same out of any and all property of the Shipowner whether covered by this Mortgage or otherwise;

(4)     take and enter into possession of the Vessel, at any time, wherever the same may be, without legal process and without being responsible for loss or damage, and the Shipowner or other person in possession forthwith upon demand of MBMA shall surrender to MBMA possession of the Vessel and MBMA may, without being responsible for loss or damage, hold, lay up, lease, charter, operate or otherwise use such Vessel for such time and upon such terms as it may deem to be for its best advantage, and demand, collect and retain all hire, freights, earnings, issues, revenues, income, profits, return premiums, salvage awards or recoveries, recoveries in general average, and all other sums due or to become due in respect of such Vessel or in respect of any insurance thereon from any person whomsoever, accounting only for the net profits, if any, arising from such use of the Vessel and charging upon all receipts from the use of the Vessel or from the sale thereof by court proceedings or pursuant to Subsection (5) next following, all costs, expenses, charges, damages or losses by reason of such use; and if at any time MBMA shall avail itself of the right herein given it to take the Vessel, MBMA shall have the right to dock the Vessel, for a reasonable time at any dock, pier or other premises of the Shipowner without charge, or to dock her at any other place at the cost and expense of the Shipowner;

(5)     take and enter into possession of the Vessel, at any time, wherever the same may be, without legal process, and if it seems desirable to MBMA and without being responsible for loss or damage, sell such Vessel, at any place and at such time as MBMA may specify and in such manner as MBMA may deem advisable, free from any claim by the Shipowner in admiralty, in equity, at law or by statute, at public or private sale, by sealed bids or otherwise, and MBMA may become the purchaser at any sale. Any sale made in accordance with the terms of this subsection (5) shall be deemed made in a commercially reasonable manner insofar as the Shipowner is concerned.

Section 2.    Any sale of the Vessel made in pursuance of this Mortgage, whether under the power of sale hereby granted or any judicial proceedings, shall operate to divest all right, title and interest of any nature whatsoever of the Shipowner therein and thereto, and shall bar the Shipowner, its successors and assigns, and all persons claiming by, through or under them. No purchaser shall be bound to inquire whether notice has been given, or whether any default has occurred, or as to the propriety of the sale, or as to the application of the proceeds thereof. In case of any such sale, MBMA, if it is the purchaser, shall be entitled for the purpose of making settlement or payment for the property purchased to use and apply the sums hereby secured in order that there may be credited against the amount remaining due and unpaid thereon the sums payable out of the net proceeds of such sale to MBMA after allowing for the costs and expense of sale and other charges; and thereupon such purchaser shall be credited, on account of such purchase price, with the net proceeds that shall have been so credited upon the Sums hereby secured. At any such sale, MBMA may bid for and purchase such property and upon compliance with the terms of sale may hold, retain and dispose of such property without further accountability therefor.

Section 3.    MBMA is hereby appointed attorney-in-fact of the Shipowner, upon the happening of an Event of Default, to execute and deliver to any purchaser aforesaid, and is hereby vested with full power and authority to make, in the name and in behalf of the Shipowner, a good conveyance of the title to the Vessel so sold. In the event of any sale of the Vessel, under any power herein contained, the Shipowner will, if and when required by MBMA, execute such form of conveyance of the Vessel as MBMA may direct or approve.

Section 4.    MBMA is hereby appointed attorney-in-fact of the Shipowner upon the happening of any Event of Default, in the name of the Shipowner to demand, collect, receive, compromise and sue for, so far as may be permitted by law, all freight, hire, earnings, issues, revenues, income and profits of the Vessel and all amounts due from underwriters under any insurance thereon as payment of losses or as return premiums or otherwise, salvage awards and recoveries, recoveries in general average or otherwise, and all other sums due or to become due at the time of the happening of any Event of Default in respect of the Vessel, or in respect of any insurance thereon, from any person whomsoever, and to make, give and execute in the name of the Shipowner acquittance, receipts, releases or other discharges for the same, whether under seal or otherwise, and to endorse and accept in the name of the Shipowner all checks, notes, drafts, warrants, agreements and other instruments in writing with respect to the foregoing.

Section 5.    Whenever any right to enter and take possession of the Vessel accrues to MBMA, it may require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to MBMA the Vessel as demanded.

Section 6.    The Shipowner authorizes and empowers MBMA or its appointees or any of them to appear in the name of the Shipowner, its successors and assigns, in any court of any country or nation of the world where a suit is pending against the Vessel because of or on account of any alleged lien against the Vessel from which the Vessel has not been released and to take such proceedings as to them or any of them may seem proper towards the defense of such suit and the purchase or discharge of such lien, and all expenditures made or incurred by them or any of them for the purpose of such defense or purchase or discharge shall be a debt due from the

Shipowner, its successors and assigns, to MBMA, and shall be secured by the lien of this Mortgage in like manner and extent as if the amount and description thereof were written herein.

Section 7.   The Shipowner covenants that upon the happening of any one or more of the Events of Default, then, upon written demand of MBMA, the Shipowner will pay to MBMA the whole amount due and payable in respect of the Sums hereby secured; and in case the Shipowner shall fail to pay the same forthwith upon such demand, MBMA shall be entitled to recover judgment for the whole amount so due and unpaid, together with such further amounts as shall be sufficient to cover the reasonable compensation to MBMA's agents, attorneys, counsel and paralegals, and any necessary advances, expenses and liabilities made or incurred by it hereunder. All moneys collected by MBMA under this Section 7 shall be applied by MBMA in accordance with the provisions of Section 11 of this Article II.

Section 8.   Each and every power and remedy herein given to MBMA shall be cumulative and shall be in addition to every other power and remedy herein given or now or hereafter existing at law, in equity, in admiralty or by statute, and each and every power and remedy whether herein given or otherwise existing may be exercised from time to time and as often and in such order as may be deemed expedient by MBMA, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other power or remedy. No delay or omission by MBMA in the exercise of any right or power or in the pursuance of any remedy accruing upon any default as above defined shall impair any such right, power or remedy or be construed to be a waiver of any such Event of Default or to be an acquiescence therein; nor shall the acceptance by MBMA of any security or of any payment of or on account of the Sums hereby secured maturing after any Event of Default or of any payment on account of any past default be construed to be a waiver of any right to take advantage of any future Event of Default or of any past Event of Default not completely cured thereby. No consent, waiver or approval of MBMA shall be deemed to be effective unless in writing and duly signed by authorized signatories of MBMA. MBMA upon a complete discharge of the Sums hereby secured, shall deliver at the expense of the Shipowner a certificate of such discharge duly executed by MBMA in form satisfactory for recording with the National Vessel Documentation Center or its duly authorized agent.

Section 9.   If at any time after an Event of Default and prior to the actual sale of the Vessel by MBMA or prior to any enforcement or foreclosure proceedings the Shipowner offers completely to cure all outstanding Events of Default and to pay all expenses, advances and damages to MBMA consequent on such Events of Default, including default interest (but not all of the $500,000 of the outstanding liabilities of Majesty under the Lease) then MBMA may, but shall not be required to, accept such offer and payment and restore the Shipowner to its former position, but such action, if taken, shall not affect any subsequent Event of Default or impair any rights consequent thereon. If Shipowner satisfies $500,000 of Majesty's obligations under the Lease plus and cost of collection of the same or Majesty otherwise provides MBMA with the equivalent of a $500,000 Security Deposit, MBMA shall be required to accept such payment and terminate this Mortgage.

Section 10.   In case MBMA shall have proceeded to enforce any right, power or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have

\74183\\8721\\# 620054 v 4
4/30/03 11:08 AM

been discontinued or abandoned for any reason or shall have been determined adversely to MBMA, then and in every such case the Shipowner and MBMA shall be restored to their former positions and rights hereunder with respect to the property subject to or intended to be subject to this Mortgage, and all rights, remedies and powers of MBMA shall continue as if no such proceedings had been taken.

Section 11.   The proceeds of any sale of the Vessel and the net earnings of any charter operation or other use of the Vessel and any and all other moneys received by MBMA pursuant to or under the terms of this Mortgage or in any proceedings hereunder, the application of which has not elsewhere herein been specifically provided for, shall be applied as follows:

First:  To the payment of all expenses and charges, including but not limited to the fees and expenses of any sale, the expenses of any retaking, attorney's and paralegal's fees, marshal's fees, custodial expenses including dockage, arrest fees, insurance and all other custodial expenses, court costs, advertising costs, and any other expenses or advances made or incurred by MBMA in the protection of its rights or the pursuance of its remedies hereunder including against third parties, agencies of the United States government, and, at MBMA's option, to pay or provide adequate indemnity against liens known to MBMA that have or are claimed to have priority over the lien of this Mortgage;

Second:  To the payment of the sums hereby secured, whether due or not, including interest, late fees, penalties, costs of collection thereon to the date of such payment; and

Third:  To the payment of any surplus thereafter remaining to the Shipowner or to whomsoever may be entitled thereto.

Section 12.   Until one or more of the Events of Default hereinabove described shall happen, the Shipowner (a) shall be suffered and permitted to retain actual possession and use of the Vessel and (b) shall have the right, from time to time, in its discretion, and without application to MBMA, and without obtaining a release thereof by MBMA, to dispose of, free from the lien hereof, any engines, gaming equipment, inventory, furniture, equipment, machinery, auxiliary vessels, masts, spars, sails, rigging, boats, anchors, chains, tackle, apparel, boilers, fittings or spare parts, or any other appurtenances of the Vessel that are no longer useful, necessary, profitable or advantageous in the operation of the Vessel, first or simultaneously replacing the same by new engines, gaming equipment, inventory, furniture, equipment, machinery, auxiliary vessels, masts, spars, sails, rigging, boats, anchors, chains, tackle, apparel, boilers, fittings, or spare parts or other appurtenances of substantially equal value to the Shipowner, which shall forthwith become subject to the lien of this Mortgage as a preferred mortgage thereon.

Section 13.   (a)   If any provision of this Mortgage should be deemed invalid or shall be deemed to affect adversely the preferred status of this Mortgage under any applicable law, such provision shall cease to be a part of this Mortgage without affecting the remaining provisions, which shall remain in full force and effect.

   (b)  In the event that the Lease or this Mortgage or any of the documents or instruments which may from time to time be delivered hereunder or thereunder or any provision hereof or thereof shall be deemed invalidated by present or future law of any nation or by decision of any court, this shall not affect the validity and/or enforceability of all or any other parts of the Lease or the Mortgage or such documents or instruments and, in any such case, the Shipowner covenants and agrees that, on demand, it will execute and deliver such other and further agreements and/or documents and/or instruments and do such things as MBMA in its sole discretion may deem to be necessary to carry out the true intent of this Mortgage and of the Sums secured hereby.

   (c)  Anything herein to the contrary notwithstanding, it is intended that nothing herein shall waive the preferred status of this Mortgage and that, if any provision or portion thereof herein shall be construed to waive the preferred status of this Mortgage, then such provision to such extent shall be void and of no effect.

  Section 14.  In the event of any legal proceedings the Shipowner accepts for himself and subsequent owners of the Vessel, irrespective of domicile or residence, the exclusive jurisdiction of the United States District Court, Southern District of Florida, Miami division or the federal court where the Vessel may be located (if other than the Southern District of Florida), the venue to be Miami-Dade County, Florida if the Vessel is within the Southern District of Florida, with notice provided in the manner established for residents of the United States served on the Shipowner or on the Shipowner's manager or on the managing owner or the ship's master.

  Section 15.  SHIPOWNER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT EITHER MAY HAVE TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LEASE, MORTGAGE, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS, (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. SHIPOWNER ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO MBMA IN EXTENDING CREDIT TO THE BORROWER, THAT MBMA WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS JURY TRIAL WAIVER, AND THAT SHIPOWNER HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS JURY TRIAL WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER.

**ARTICLE III**
**Sundry Provisions.**

  Section 1.  All of the covenants, promises, stipulations and agreements of the Shipowner in this Mortgage contained shall bind the Shipowner and its successors and assigns and shall inure to the benefit of MBMA and its respective successors and assigns. In the event of any assignment or transfer of this Mortgage, the term "MBMA", as used in this Mortgage, shall be deemed to mean any such assignee or transferee.

Section 2.    Wherever and whenever herein any right, power or authority is granted or given to MBMA, such right, power or authority may be exercised in all cases by MBMA or such agent or agents as it may appoint, and the act or acts of such agent or agents when taken, shall constitute the act of MBMA hereunder.

Section 3.    This Mortgage may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

Section 4.    Any notice or other communication to be given pursuant hereto shall be by postage prepaid letter or by cable or telegram or telex confirmed by letter addressed:

If to MBMA to:

Miami Beach Marina Associates, Ltd.
c/o RCI Marine
300 Alton Road, Suite 303
Miami Beach, Florida 33139
Phone No.:    305-672-5588
Telefax No.:   305-673-5995

And if to the Shipowner to:

MLA Cruises Inc.
1280 5th Street
Miami Beach, Florida 33139
Phone No.: 917-685-4109
Telefax No.:   _____

or subject to such changes as either party may notify to the other in writing.

Section 5.    The maximum principal amount that may be outstanding under this Mortgage at any time is Five Hundred Thousand United States Dollars (US$500,000) and for the purpose of recording this Mortgage as required by Chapter 313 of Title 46 of the United States Code the total amount of this Mortgage is US$500,000 and interest and performance of mortgage covenants.

## ARTICLE IV
### Subordination.

Section 1.    In the event that the First Mortgage is timely satisfied in full without the lender thereunder having to exercise any of its remedies in order to satisfy the amounts due it, MBMA will subordinate its interests hereunder to a replacement first mortgage holder provided that (i) the replacement first mortgage is limited to a maximum liability $2,000,000, (ii) the replacement first mortgage is not owned or controlled by an affiliate of Shipowner, (iii) terms and conditions of the replacement first mortgage loan are substantially similar to the terms and conditions of the existing first mortgage loan or are otherwise acceptable to MBMA in its sole

and absolute discretion (iv) the condition of the Vessel is in at least substantially the same condition as it is on the date hereof, subject to ordinary wear and tear, and (v) the Shipowner is not otherwise in default under this Mortgage at the time of the MBMNA's subordination.

## ARTICLE V
## Security Agreement.

Section 1.   Security Interest in Vessel.  As security for the prompt payment and performance of the obligations of Majesty under the Lease, Shipowner hereby mortgages and grants to MBMA a security interest under the Uniform Commercial Code and a lien under any applicable title law in the Vessel and any trailer described below, together with all engines, machinery, auxiliary vessels, inventory, masts, spars, boats, anchors, cables, chains, rigging, tackle, capstans outfit, gaming equipment, boilers, furniture, fittings, tools, pumps, pumping equipment, drills, apparel, fittings, radar, radios, electronic instruments and equipment, navigation and communication and computing equipment, other equipment and supplies, fishing gear and equipment, spare parts and all other appurtenances, attachments and accessories whatsoever, and all additions, improvements, substitutions and replacements now or hereafter used in or on or belonging to the Vessel, including but not limited to later installed electronics and piping, whether or not removed from the Vessel, and all proceeds of any and all of the foregoing, all of which shall be deemed to be included in the term "Vessel."  Borrower owns a 100% interest in the Vessel.

Section 2.   Security Interest in Additional Collateral.  As additional security for the prompt payment and performance of the obligations ob Majesty under the Lease, Shipowner hereby mortgages and grants to Lender a security interest in, and collaterally assigns to MBMA, all of Shipowner's right, title and interest in and to the following types and items of property, collectively referred to herein as the "Additional Collateral:"

(a)   all insurances, including, without limitation, all hull and machinery and protection and indemnity and other insurance policies, binders or cover notes in respect of the Vessel, whether heretofore, now or hereafter effected, and all renewals of or replacements for the same (herein called the "Insurances"), and all claims and proceeds thereof, returns of premiums, and other monies and claims for monies which may be or become payable under or in respect of said Insurances, including amounts payable due to the partial loss or actual, constructive, agreed, arranged or compromised total loss of the Vessel, and all other rights of Shipowner in respect of said Insurances;

(b)   all charter hire, freights, revenue and any other monies of whatsoever nature, earned and to be earned, due or to become due, or paid or payable with respect to, the Vessel;

(c)   all monies and claims for monies due and to become due to Shipowner, and all claims for damages or compensation, arising out of the breach of or in any way connected with any and all present or future charter agreements, contracts and other engagements of every kind whatsoever of the Vessel, and any and all claims and causes of action for money, loss or damages that may accrue or belong to Shipowner, its successors or assigns, arising out of or in any way connected with the present or future use, operation or management of the Vessel;

\74183\18721\ # 620054 v 4
4/30/03 11:08 AM

(d)     all monies and claims which may be or become payable to Shipowner, and all claims for damages, in respect of the requisition for title or use, seizure, condemnation, confiscation, sequestration, compulsory acquisition, or other interference with Shipowner's ownership or use of the Vessel by act of any country or of any governmental authority or otherwise; and

(e)     all proceeds of any and all of the foregoing.

The Additional Collateral described above together with the Vessel constitute the "Collateral." If, in MBMA's opinion, Shipowner fails to properly or timely pursue any claims relating to any of the Collateral, Shipowner agrees that MBMA may, but is not obligated to, take over the pursuit or further handling of any or all of such claims and for this purpose MBMA and its employees and agents are hereby irrevocably appointed as Shipowner's true and lawful attorneys-in-fact with the powers to perform any act or to execute any document necessary or useful to exercise such rights, including, without limitation, to make all necessary transfers of the Vessel, to realize or liquidate the Additional Collateral, to pay, defend or obtain the release of all maritime liens, and to take all other actions in Shipowner's name and stead as may be necessary and appropriate to enforce MBMA's rights under this Agreement.  This power of attorney shall be irrevocable while this Agreement is in effect and shall not be affected by Shipowner's disability or incapacity except as otherwise provided by statute.  Shipowner shall, if MBMA so requests, ratify and confirm any sale of the Vessel by executing and delivering to the purchaser of the Vessel such bills of sale, conveyances, instruments of transfer and releases as Lender reasonably may request.  Shipowner agrees to cooperate with and provide all reasonable assistance to MBMA in asserting any claim or effecting any recovery.

Section 3.     **Additional Security.**  The security interests granted in this Agreement are given as additional security to secure the obligations of Majesty under the Lease and are in addition to other security interests the MBMA may have in the Vessel pursuant to the Mortgage or against Majesty under the Lease.

Section 4.     Upon an Event of Default under the Lease or this Mortgage, MBMA may exercise any remedies provided by applicable law in order to obtain title to any of the Additional Collateral.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Shipowner has caused this First Preferred Mortgage on the Vessel MAX I to be duly executed the day and year first above written.

Signed, sealed and delivered in the presence of:

Print Name: _Robert Christal Jr_

Print Name: _Leonid Tatarchuk_

MLA CRUISES, INC., a Florida corporation

By: _____
Arkady Vaygensberg, Vice President

STATE OF FLORIDA       )
                       ) ss.:
COUNTY OF MIAMI-DADE   )

On this 21st day of April, 2003, before me personally appeared Arkady Vaygensberg, known to me, and known to be the person who executed the foregoing instrument, who, being by me duly sworn, did depose and say that he is the Vice President of MLA Cruises, Inc., a Delaware corporation, the party described in and which executed the foregoing instrument; that he signed his name thereto by authority of a power of attorney of said corporation and as the free act and deed of such corporation.

_Rhoda Rubin_
Notary Public, State of _Florida_
Printed Name: _RHODA RUBIN_
My Commission Expires: _2-17-06_

Rhoda Rubin
MY COMMISSION # DD089688 EXPIRES
February 17, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

\74183\18721\ # 620054 v 4
4/30/03 11:08 AM

1.

## JOINDER BY MBMA

MBMA executes this Joinder to the Preferred Ship Mortgage to acknowledge its agreement to the terms specified in Article IV of the Preferred Ship Mortgage to which this Joinder is attached.

Signed, sealed and delivered in the
presence of:

**MIAMI BEACH MARINA
ASSOCIATES, LTD.**

By:   SoBe Marina, Inc., its general
Partner

By: _____

Print Name: _____

Robert W. Christoph, President

Print Name: _Leonid Tatarchux_

STATE OF _Florida_    )
                       ) ss.:
COUNTY OF _Miami-Dade_ )

On this 21st day of April, 2003, before me personally appeared Robert W. Christoph, known to me, and known to be the person who executed the foregoing instrument, who, being by me duly sworn, did depose and say that he is the President of SoBe Marina, Inc., the general partner of **MIAMI BEACH MARINA ASSOCIATES, LTD.**, the party described in and which executed the foregoing instrument; that he signed his name thereto by authority of a power of attorney of said corporation and as the free act and deed of such corporation.



Notary Public, State of _Florida_
Printed Name: _RHODA RUBIN_
My Commission Expires: _2-17-06_


Rhoda Rubin
MY COMMISSION # DD089688 EXPIRES
February 17, 2006
BONDED THRU TROY FAIN INSURANCE INC.

INTER RELATED RECEIVABLES FROM
MLA CRUISES, INC., AND MAJESTY ENTERPRISES OF FLORIDA, LLC

AS OF MARCH 1, 2004

DUE FROM:

| | | |
|---|---|---:|
| Majesty Enterprises of Florida, LLC - Rental Acct. | (see attached schedule) | $412,439.76 |
| | | |
| Majesty Enterprises of Florida, LLC - Advance due on 11-17-03 | | 165,000.00 |
| Add Interest from November 17, 2003 thru January 31, 2004 | | 6,187.50 |
| Add Interest for February 2004 | | 2,567.81 |
| Add Interest thru March 1, 2004 | | 86.88 |
| | | |
| Total Due Majesty Enterprises of Fl. - Advance | | 173,842.19 |
| Total Due From Majesty Enterprises of Florida (Rental and Advance) | | 586,281.95 |
| | | |
| MLA Cruises, Inc: | | |
| Returned Check Fee (October Interest Payment) | | 1,250.00 |
| November 15, 2003 Installment | | 25,000.00 |
| Interest thru December 1, 2003 | | 196.88 |
| | | |
| Delinquent Mortgage payments with interest, as of 12/1/03 | | 26,446.88 |
| | | |
| Loan acceleration, as per Note (Effective 12/1/03) | | 2,000,000.00 |
| | | |
| Interest thru January 31, 2004 | | 75,991.76 |
| Interest for February 2004 | | 31,536.58 |
| Add Interest thru March 1, 2004 | | 1,066.99 |
| | | |
| Total Due from MLA Cruises, Inc. | | 2,135,042.21 |
| | | |
| GRAND TOTAL DUE, as of March 1, 2004 | | $2,721,324.16 |

Exhibit "E"

| | | | MIAMI BEACH MARINA DUE FROM MAJESTY AS OF MARCH 1, 2004 | Page 2 of 2 | |
|---|---|---|---|---|---|
| **Balance foward ( May 31, 2003)** | | | | 193,063.88 | |
| | | | | | |
| **June Activity:** | | | | | |
| Interest for May | | 3,162.49 | | | |
| June Dockage Charges | 37,950.00 | | | | |
| Electricity-Upland | 195.13 | | | | |
| Payment - 06/13/03 | | (45,000.00) | | | |
| Payment - 06/18/03 | | (45,000.00) | | | |
| Total June Activity | 38,145.13 | (86,837.51) | | 144,371.50 | 2,863.07 |
| | | | | | |
| **July Activity:** | | | | | |
| Interest for June | | 2,863.07 | | | |
| July Dockage Charges (Incl. CPI increase) | 45,907.79 | | | | |
| CPI increase (Mar - June @ 907.79 mo.) | 3,631.16 | | | | |
| | 49,538.95 | 2,863.07 | | 196,773.52 | 2,951.60 |
| **August Activity:** | | | | | |
| Interest for July | | 2,951.60 | | | |
| August Dockage Charges | 45,907.79 | | | | |
| Payment on August 14th | | (45,257.30) | | | |
| Interest - August 15th - August 31st | | 0.00 | | | |
| | 45,907.79 | (42,305.70) | | 200,375.62 | 3,422.62 |
| **September Activity:** | | | | | |
| Interest for August | | 3,422.62 | | | |
| September Dockage Charges | 45,907.79 | | | | |
| Thomas Marine System (7/31/03) | 786.45 | | | | |
| Wards Marine Electric (7/31/03) | 576.00 | | | | |
| Payment on Account (9/10/03) | | (47,270.24) | | | |
| | | | | | |
| | 47,270.24 | (43,847.62) | | 203,798.24 | 3,395.22 |
| **October Activity:** | | | | | |
| Interest for September | | 3,395.22 | | | |
| October Dockage Charges | 45,907.79 | | | | |
| Payment of Account 10/10/03 | | (47,000.00) | | | |
| | 45,907.79 | (43,604.78) | | 206,101.25 | 3,429.57 |
| **November Activity:** | | | | | |
| Interest for October | | 3,429.57 | | | |
| November Dockage Charges | 45,907.79 | | | | |
| Payment of Account 11/17/03 | | (47,000.00) | | | |
| | 45,907.79 | (43,570.43) | | 208,438.61 | 3,630.30 |
| | | | | | |
| **December Activity:** | | | | | |
| Interest for November | | 3,630.30 | | | |
| December Dockage Charges | 45,907.79 | | | | |
| | 45,907.79 | 3,630.30 | | 257,976.70 | 3,869.65 |
| | | | | | |
| **January Activity:** | | | | | |
| Interest for December | | 3,869.65 | | | |
| Installation opf 6 GFI receptacles | 2,595.00 | | | | |
| January Dockage Charges | 45,907.79 | | | | |
| | 48,502.79 | 3,869.65 | | 310,349.14 | 4,655.24 |
| | | | | | |
| **February Activity:** | | | | | |
| Interest for January | | 4,655.24 | | | |
| February Dockage | 45,907.79 | | | | |
| Interest for February 04 | 5,413.68 | | | | |
| | 51,321.47 | 4,655.24 | | 366,325.85 | |
| | | | | | |
| **March Activity:** | | | | | |
| March Dockage | 45,907.79 | | | | |
| Interest thru March 1, 2004 | | 206.12 | | | |
| | 45,907.79 | 206.12 | | 412,439.76 | |
| | | | | | |
| TOTAL DUE AS OF MARCH 1, 2004 | | | | $412,439.76 | |

| | | Mo. Dockage | Paymt/Interest | Mo. End Balance | Mo. Interest Added |
|---|---|---|---|---|---|
| MIAMI BEACH MARINA | | | | | |
| DUE FROM MAJESTY | | | | | |
| AS OF MARCH 1, 2004 | | | | Page 1 of 2 | |
| | | | | | |
| BAL @ 12/25/02 | | | | 25,876.52 | |
| Interest, Dec 02 | | | 388.15 | | |
| Payment 12/30/02 | | | (25,000.00) | | |
| January Charges: | | | | | |
| | Upland Rent | 26,625.00 | | | |
| | Common Area | 3,195.00 | | | |
| | Water usage | 2,000.00 | | | |
| | Fuel usage | 500.00 | | | |
| | Electricity-Dock | 2,250.00 | | | |
| | Waste Removal | 2,800.00 | | | |
| | Real Estate Tax | 2,130.00 | | | |
| | Commercial Dockage | 5,325.00 | | | |
| | Electricity-Upland | 195.13 | | | |
| Total Jan. activity | | 45,020.13 | (24,611.85) | 46,284.80 | 694.27 |
| | | | | | |
| February Activity: | | | | | |
| Interest for Jan. | | | 694.27 | | |
| Payment on 2/6/03 | | | (45,000.00) | | |
| February Charges: | | | | | |
| | Upland Rent | 26,750.00 | | | |
| | Common Area | 3,210.00 | | | |
| | Water usage | 2,000.00 | | | |
| | Fuel usage | 500.00 | | | |
| | Electricity-Dock | 2,250.00 | | | |
| | Waste Removal | 2,800.00 | | | |
| | Real Estate Tax | 2,140.00 | | | |
| | Commercial Dockage | 5,350.00 | | | |
| | Electricity-Upland | 187.05 | | | |
| Total Feb. activity | | 45,187.05 | (44,305.73) | 47,166.12 | 707.49 |
| | | | | | |
| March Activity: | | | | | |
| Interest for Feb. | | | 707.49 | | |
| March Charges (Same as Feb) | | 45,000.00 | | | |
| | Returned Check | | 45,000.00 | | |
| | Returned Check Fee | | 29.00 | | |
| | Electricity-Upland | 195.13 | | | |
| Total Mar. activity | | 45,195.13 | 45,736.49 | 138,097.74 | 2,071.47 |
| | | | | | |
| April Activity: | | | | | |
| Interest for March | | | 2,071.47 | | |
| Payments | | | 0.00 | | |
| April Charges (same as Feb) | | 45,000.00 | | | |
| | Electricity-Add'l dockage use thru 4/03 | 6,673.84 | | | |
| | Electricity-Upland | 195.13 | | | |
| Total Apr. activity | | 51,868.97 | 2,071.47 | 192,038.18 | 2,880.57 |
| | | | | | |
| May Activity: | | | | | |
| Interest for April | | | 2,880.57 | | |
| May Charges | | 37,950.00 | | | |
| | Electricity-Upland | 195.13 | | | |
| Payments 05/02/03 | | | (20,000.00) | | |
| Payments 05/16/03 | | | (20,000.00) | | |
| Interest thru 5/31/03 | | | | | |
| Total May activity | | 38,145.13 | (37,119.43) | 193,063.88 | 3,162.49 |

VESSEL: MAX I
Official No.: 634676
Flag/Registration: U.S. Coast Guard
Home Port: To Be Miami Beach, Florida
Indebtedness: $2,000,000

## FIRST PREFERRED SHIP MORTGAGE

THIS FIRST PREFERRED SHIP MORTGAGE (the "Mortgage") is granted and made to be effective as of the 22nd day of April, 2003 by and between MLA CRUISES, INC., a Delaware corporation, with its principal place of business located at 1280 5th Street, Miami Beach, Florida 33139 the "Shipowner"), in favor of RCI-DINNER KEY, INC., a Florida corporation or its assigns, with its principal place of business at 300 Alton Road, Suite 303, Miami Beach, Florida 33139 (the "Mortgagee") on the whole (100%) of the Vessel as further identified above and further defined in this Mortgage.

### WHEREAS:

A.    The Shipowner is the sole owner of the whole of the United States documented vessel "MAX I", U.S. Official No. 634676 of 97 gross and 66 net tons, or thereabouts, duly documented in the name of the Shipowner, with her current home port at Key West, Florida, having been built in 1981 by Underwater Completion Team, Inc., and rebuilt and lengthened in 1997 by Network Marine, Pierre Port, LA.

B.    The Shipowner (referred to throughout as "Shipowner" or "Borrower") and the Mortgagee have entered into a Marine Note and Security Agreement dated as of April 22, 2003 (the "Note"), a copy of which together with exhibits thereto is attached hereto marked Exhibit A and made a part hereof, providing for a loan in the amount of Two Million United States Dollars and No/100 (US$2,000,000) (the "Loan").

C.    The Shipowner acknowledges that it is justly indebted to the Mortgagee in the principal amount of Two Million United States Dollars and No/100 (US$2,000,000). Consequently, the total amount of this Mortgage is US$2,000,000, plus interest, other amounts and performance of mortgage covenants.

D.    The Loan shall be due and payable in equal monthly installments of interest only commencing on May 15, 2003 with balance or principal sum and accrued interest maturing on April 21, 2006. Shipowner does not have any option to extend the maturity date.

E.    In order to secure the repayment of the Loan (including the principal of and interest thereon) according to the terms of the Note, and the payment of all other such sums that may hereinafter be secured by this Mortgage in accordance with the terms hereof, and to secure the performance and observance of and compliance with all the agreements, covenants and conditions contained herein or in the Note, the Shipowner has duly authorized the execution and delivery of this First Preferred Mortgage.

Exhibit "F"

NOW, THEREFORE, in consideration of the loan and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the payment of the Loan (including principal, interest, late fees and other charges) according to the terms of the Note, and the payment of all other sums that may hereafter be secured by this Mortgage in accordance with the terms hereof (all such principal, interest, and all other sums being hereinafter called "Indebtedness hereby secured") and to secure the performance and observance of and compliance with all of the agreements, covenants and conditions contained herein or in the Note, the Shipowner has granted, conveyed, mortgaged, pledged, confirmed, assigned, transferred and set over and by these presents does grant, convey, mortgage, pledge, confirm, assign, transfer and set over, unto the Mortgagee, and its successors and assigns the whole of the said vessel MAX I including, without being limited to, all of the engines, machinery, gaming equipment, boilers, furniture, auxiliary vessels, inventory, masts, spars, boats, anchors, cables, chains, rigging, tackle, capstans, outfit, tools, pumps and pumping equipment, drills, apparel, fittings, spare parts all other appurtenances thereunto appertaining or belonging, excluding household goods, whether now owned or hereafter acquired, and also any and all additions, improvements, renewals and replacements hereafter made in or to such vessel or any part thereof, including all items and appurtenances aforesaid (such vessel, together with all of the foregoing, being herein called the "Vessel"), and all present and future hire, freights and other earnings of the Vessel, if applicable.

TO HAVE AND TO HOLD all and singular the above mortgaged and described property unto the Mortgagee and its successors and assigns, to its and to its successors' and assigns' own use, benefit and profit forever.

PROVIDED, and these presents are upon the condition, that, if the Shipowner or its successors or assigns shall pay or cause to be paid the Indebtedness hereby secured as and when the same shall become due and payable in accordance with the terms of the Note and this Mortgage and all other such sums as may hereafter become secured by this Mortgage in accordance with the terms hereof, and the Shipowner shall duly perform, observe and comply with or cause to be performed, observed, or complied with all the covenants, terms and conditions of this Mortgage and the Note, expressed or implied, to be performed, then this Mortgage and the estate and rights hereunder shall cease determine and be void, otherwise to remain in full force and effect.

The Shipowner represents, warrants and agrees with the Mortgagee as follows:

## ARTICLE I
### Covenants of the Shipowner.

Section 1.   (a)   The Shipowner hereby agrees to pay the Indebtedness hereby secured and to observe, perform and comply with the covenants, terms and conditions herein, express or implied, on its part to be observed, performed or complied with. This Mortgage is intended to be a first preferred ship mortgage under Chapter 313, Title 46 of the United States Code, as amended from time to time, and as such shall always be governed by U.S. federal law. However, in the event of any conflict between the substantive provisions of this Mortgage and

2

the Note, the terms and provisions of the Note shall prevail, provided they are consistent with U.S. law or the laws of the State of Florida.

(b)     The obligation of the Indebtedness hereby secured is an obligation in Dollars of the United States of America and the term "US" or "$" when used shall mean such Dollars. Notwithstanding fluctuations in the value or rate of United States Dollars in terms of gold or any other currency, all payments to be made in respect of the Indebtedness hereby secured shall be made in United States Dollars, whether paid before or after the due date thereof.

(c)     In the event the Mortgagee shall further syndicate the Loan as described in Section 14.1 of the Note, the Shipowner agrees to enter into such amendments or supplements hereto, at the Shipowner's expense, as the Mortgagee reasonably may request.

Section 2.     (a)     The Shipowner is a corporation duly incorporated and existing under the laws of Delaware, and is authorized to legally transact business in the State of Florida and meets all of the requirements to transact business in Florida.

(b)     The Shipowner has full power and authority to own and mortgage the Vessel; all action necessary and required by law for the execution and delivery of this Mortgage, has been duly and effectively taken; and the Indebtedness hereby secured is and will be the valid and enforceable obligation of the Shipowner in accordance with its terms.

Section 3.     The Shipowner lawfully owns and is lawfully possessed of the Vessel free from any lien or encumbrance whatsoever other than (a) liens for current wages of the Master, officers and crew, (b) liens covered by valid policies of insurance (except for permitted deductibles) and meeting the requirements of Section 15 below, (c) liens not covered by insurance incurred in the ordinary course of business and not more than thirty days past due, and (d) that certain first preferred ship's mortgage (the "Second Mortgage") made by Borrower of even date herewith in favor of Miami Beach Marina Associates, Ltd. ("MBMA") and shall defend the title and possession thereto and to every part thereof for the benefit of the Mortgagee against the claims and demands of all persons whomsoever.

Section 4.     The Shipowner will cause this Mortgage to be duly recorded in accordance with the provisions of Chapter 313, Title 46 of the United States Code (as amended) and will otherwise comply with and satisfy all of the provisions of the Chapter 313, Title 46 of the United States Code in order to establish and maintain this Mortgage as a first preferred mortgage lien thereunder upon the Vessel, all of her engines, tackle, gaming equipment, inventory, furniture, auxiliary vessels, and/or appurtenances thereto, and upon all renewals, replacements and improvements made in or to the same for the amount of the Indebtedness hereby secured.

Section 5.     The Shipowner will not cause or permit the Vessel to be operated in any manner contrary to law, and the Shipowner will not engage in any unlawful trade or violate any law or carry any cargo that will expose the Vessel to penalty, forfeiture or capture, and will not do, or suffer or permit to be done, anything which can or may injuriously affect the registration or enrollment of the Vessel under the laws and regulations of the United States of America and will at all times keep the Vessel duly documented thereunder. Mortgagee acknowledges that the

3

Vessel will be operated as a casino gaming boat, in accordance with all applicable laws and regulations. If required by applicable law Shipowner shall deliver to Mortgagee evidence of its registration of all casino gaming equipment with the U.S. Department of Justice. If such registration is required by applicable law, it shall occur prior to the Vessel being operated as a casino gaming Vessel. Shipowner shall also deliver to Mortgagee for its approval a sample of all passenger tickets to be used in connection with the operation of the Vessel, which passenger tickets must include language to limit rights of third parties to make claims or liens against the Vessel having priority over Mortgagee.

Section 6. The Shipowner will pay and discharge when due and payable, from time to time, all taxes, assessments, governmental charges, fines and penalties lawfully imposed on the Vessel or any income therefrom; provided that the Shipowner shall not be required to pay any such tax, assessment or charge if the validity or amount thereof is being contested in good faith by appropriate proceedings and if the Shipowner shall have set aside on its books reserves in accordance with generally accepted accounting principles consistently applied by independent public or chartered accountants of international reputation deemed by it adequate with respect to such tax, assessment or charge; and provided further, however, that the Shipowner will pay or cause to be paid all such taxes, assessments or charges forthwith upon the commencement of proceedings to foreclose any lien which is attached as security therefor or provide an appropriate bond in order to remove the lien from the Vessel within thirty (30) days after filing of said lien.

Additionally, Shipowner shall pay any and all fees, taxes, documentary stamps, recording fees and all other costs or expenses associated with the Vessel and with the preparation, execution and recordation of the Note, the Mortgage and Loan Documents or required to maintain the Vessel or Loan Documents in current standing with the appropriate authorities or government agency.

Section 7. Neither the Shipowner, any charterer, the Master of the Vessel nor any other person has or shall have any right, power or authority to create, incur or permit to be placed or imposed or continued upon the Vessel any lien whatsoever other than for wages of the Master, officers and crew, salvage, and this Mortgage.

Section 8. The Shipowner will place, and at all times and places will retain, a properly certified copy of this Mortgage on board the Vessel with her papers and will cause each such certified copy and the Vessel's marine document to be exhibited to any and all persons having business therewith which might give rise to any lien thereon other than liens for wages of the Master, officers and crew and salvage, and to any representative of the Mortgagee; and will place and keep prominently displayed in the chart room and in the Master's cabin of the Vessel a framed printed notice in plain type reading as follows:

NOTICE OF MORTGAGE

This Vessel is covered by a First Preferred Ship Mortgage in favor of RCI-Dinner Key, Inc., as Mortgagee, under authority of Chapter 313 of Title 46 of the United States Code, as amended, and all other federal law. Under the terms of said Mortgage, neither the Owner, any charterer, the Master of this Vessel nor any other

4

person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any other lien whatsoever except liens for wages of the Master, officers and crew and salvage.

Section 9.    Except for the liens of this Mortgage, the Shipowner will not suffer to be continued any lien, encumbrance or charge on the Vessel, and in due course and in any event within thirty (30) days after the same becomes due and payable or within ten (10) days after being requested to do so by the Mortgagee will pay or cause to be discharged or make adequate provision for the satisfaction or discharge of all claims or demands, or will cause the Vessel to be released or discharged from any lien, encumbrance or charge therefor.

Section 10.    If a libel or complaint be filed against the Vessel or the Vessel be otherwise attached, levied upon or taken into custody by virtue of any legal proceeding in any court, the Shipowner will within forty-eight (48) hours of the filing of said libel or complaint, notify the Mortgagee thereof by overnight courier or telefacsimile, confirmed by a letter sent via certified mail, at its address, as specified in this Mortgage, will immediately cause the Vessel to be released and all liens thereon other than this Mortgage to be discharged and will promptly notify the Mortgagee thereof in the manner aforesaid.

Section 11.    (a)    The Shipowner will at all times and without cost or expense to the Mortgagee maintain and preserve, or cause to be maintained and preserved, the Vessel and all its engines, equipment, inventory, outfit and appurtenances, tight, staunch, strong, in good condition, working order and repair and in all respects seaworthy and fit for its intended service, and will keep the Vessel, or cause her to be kept, in such condition as will entitle her to the highest classification and rating for vessels of the same age and type or other classification society of like standing approved by the Mortgagee, which approval will not be unreasonably withheld. Shipowner shall place into a reserve an amount equal to $500.00 for each hour the engines are in use and said reserve shall be used for maintenance of the engines. On a monthly basis, Shipowner shall provide Mortgagee with a written summary of all deposits and withdrawals from said reserve. All repairs, refits, refurbishing and/or maintenance to the Vessel which exceed $25,000 must be approved, in writing, by the Mortgagee, with said approval not to be unreasonably withheld as long as the Mortgagor is current with all aspects of the Loan. The Vessel shall, and the Shipowner covenants that she will, at all times comply with all applicable laws, treaties and conventions to which the United States of America is a party, and rules and regulations issued thereunder, and shall have on board as and when required thereby valid certificates showing compliance therewith. The Shipowner will not make, or permit to be made, any substantial change in the structure, type or speed of the Vessel or change in her rig, without first receiving the written approval thereof by the Mortgagee, which approval will not be unreasonably withheld.

(b)    The Shipowner agrees, following request by the Mortgagee, to give the Mortgagee at least ten (10) days notice (or such lesser notice as may be practicable under the circumstances but in no event not less than three (3) days notice) of actual date and place of any drydocking or major survey in order that the Mortgagee may have representatives present if desired. THE SHIPOWNER AGREES THAT AT THE MORTGAGEE'S REQUEST IT WILL SATISFY THE MORTGAGEE THAT THE EXPENSE OF SUCH SURVEY OR WORK TO

\74183\18721\# 618987 v 5
4/30/03 11:07 AM

BE DONE THEREAT IS WITHIN SHIPOWNER'S FINANCIAL ABILITY AND WILL NOT RESULT IN A CLAIM OR LIEN AGAINST THE VESSEL IN VIOLATION OF THE PROVISIONS OF THIS MORTGAGE.

Section 12.   (a)   The Shipowner will at all reasonable times afford the Mortgagee or its authorized representatives full and complete access to the Vessel for the purpose of inspecting the Vessel and her equipment, inventory and papers at the request of the Mortgagee, provided, however, that unless and until an Event of Default specified in Section 1 of Article II shall have occurred and be continuing, the exercise by the Mortgagee of its rights under this Section 12(a) shall not in any way interfere with normal operation, sailing, navigation or scheduling of the Vessel.

(b)   The Shipowner will promptly upon request of the Mortgagee (i) deliver copies of any and all contracts and documents relating to the Vessel, whether on board or not, including without limitation, all charter parties or contracts of affreightment and (ii) provide full information and details with respect to the Vessel and all such contracts and documents, including without limitation full details as to parties, times of delivery and the like related to any charter parties or contracts of affreightments. The Mortgagee shall endeavor to keep such information confidential, however, notwithstanding the foregoing, the Mortgagee may use all such contracts, documents, information and details as it deems necessary to maintain or enforce its rights under this Mortgage and the Note or to meet the requirements or demands of any governmental authority.

(c)   After an Event of Default, the Shipowner agrees to immediately provide to the Mortgagee any charters or earnings generated from operation of the Vessel, and said assignments shall be in the form required by and be in all respects subject to the terms of the Note.

(d)   The Shipowner hereby appoints the Mortgagee attorney-in-fact of the Shipowner, whether or not an Event of Default shall have occurred or is continuing, to appear before governmental bodies, classification societies and insurers and to demand and receive to the same extent that the Shipowner itself might, all information and certificates respecting (i) the corporate status of the Shipowner under the laws of its jurisdiction of incorporation or any other jurisdiction in which it may have qualified to do business, (ii) the status of the Vessel under the laws and regulations of its country of registration, and its compliance with the requirements thereof, (iii) the state of the records of the Vessel or of the Shipowner in respect of the Vessel in any classification society with which the Vessel may be classed or of any company, association or club by whom the Vessel or the Shipowner in respect of the Vessel may be insured and (iv) the status of the registration of any casino gaming equipment with the U.S. Department of Justice if such registration is required by applicable law; and the Shipowner hereby agrees that the Mortgagee may execute its powers as attorney-in-fact as aforesaid through its agents, representatives and attorneys. This power of attorney is coupled with an interest and shall be irrevocable as long as any Indebtedness hereby secured from the Shipowner to the Mortgagee remains outstanding.

6

Section 13.   The Vessel's current home port is Key West, Florida.   However, Shipowner will change the Vessel's home port to Miami Beach, Florida, both on the Vessel and with the U.S. Coast Guard.  Shipowner will file the appropriate documentation to change the home port within thirty (30) days from the date of execution of this Mortgage, and will provide Mortgagee written proof of the home port change immediately upon receipt of the Certificate of Documentation from the U.S. Coast Guard.

The Shipowner will not transfer or change the name, flag or port of documentation of the Vessel without prior written consent of the Mortgagee, and any such written consent with respect to any one transfer or change of flag or port of documentation shall not be construed to be a waiver of this provision with respect to any subsequent proposed transfer or change of the name, flag or port of documentation.

Section 14.   The Shipowner will not sell, mortgage, demise charter, transfer or change the management of the Vessel without obtaining the prior written consent of the Mortgagee, and any such written consent with respect to any one sale, mortgage, demise charter, transfer or change of management shall not be construed to be a waiver of this provision with respect to any subsequent proposed sale, mortgage, demise charter, transfer or change of management.   Any such sale, mortgage, demise charter, transfer or change of management of the Vessel shall be subject to the provisions of this Mortgage and the lien hereof.  Shipowner will be permitted to charter the Vessel to Majesty Enterprises of Florida, LLC ("Majesty"), after first providing written notice to Mortgagee, and only then after obtaining Mortgagee's consent to the terms of said Charter Agreement (the "Charter").   Shipowner shall not amend, terminate or assign the Charter without the prior written consent of Mortgagee.

Section 15.   (a)   As long as this Mortgage is in effect, Owner shall, at its own expense, obtain and maintain with respect to the Vessel the following insurance: marine hull and machinery insurance, protection and indemnity insurance, war risk insurance, terrorism insurance, if applicable, pollution clean-up and third-party liability insurance, workers' compensation and U.S. Longshore and Harbor Workers' Compensation Act insurance as may be required by law, mortgagee's interest insurance, and insurance against such other risks or liabilities as may be reasonably specified from time to time by Mortgagee or as may be required by law.  Shipowner shall carry no less insurance than $5,000,000 of general liability insurance coverage and not less than $5,000,000 replacement value insurance due to damage to or destruction of the Vessel.

(b)   All policies of insurance (i) shall be obtained from insurers approved by Mortgagee, (ii) shall be in amounts and forms and with terms and conditions, including, without limitation, deductible and franchise clauses, mortgage clauses and other endorsements acceptable to Mortgagee, and (iii) shall not be amended or terminated without Mortgagee's prior written consent.

(c)   All policies, amendments, endorsements, binders and other interim insurance contracts shall name Mortgagee as an additional assured and the sole loss payee (except that Mortgagee shall be the sole assured on all policies of mortgagee's interest

7

insurance). No assureds or loss payees shall be added to any policy without the advance written consent of Mortgagee.

(d)     All policies, binders, and interim contracts of insurance shall provide for thirty (30) days' prior notice by certified letter to be delivered by insurers to Mortgagee at its address set forth on the first page, in the event of amendment, alteration or cancellation. Certified copies of the originals of all policies, amendments, endorsements, binders and other interim insurance contracts shall be deposited with Mortgagee.

(e)     Mortgagee shall have the exclusive right to tender abandonment of the Vessel to insurers as a total or constructive total loss. If Owner is not in default under this Mortgage at the time insurance proceeds are payable for an insured liability, such proceeds may be disbursed to Owner in reimbursement of Owner's discharge of such liability, or to the party to whom the insured liability is owed, in exchange for a full release of the liability. All other insurance proceeds payable as a result of loss of or damage to the Vessel, or for any liability, shall be applied, as directed by Mortgagee in its sole discretion, to the Debt and other amounts evidenced or secured by this Mortgage, and otherwise in accordance with Section 19 below. If Owner receives any insurance proceeds, Owner shall immediately turn over such proceeds to Mortgagee.

(f)     If Owner at any time fails to comply with any of the insurance requirements under this Mortgage, Mortgagee may, but is not obligated to, procure such insurance.

(g)     Owner shall not permit the Vessel to engage in any voyage or activity not permitted under the policies of insurance at the time in effect without first insuring the Vessel for such voyage or activity in the amount otherwise required in this Section 15. Owner shall not do or permit any act to be done whereby any insurance may be impaired or suspended.

(h)     Owner hereby assigns to Mortgagee all insurances required under this Mortgage (the "Insurances"), all rights of Owner under the Insurances, and all proceeds of the Insurances. Owner shall remain liable for all obligations assumed by it under the Insurances. Mortgagee shall have no obligations or liabilities under the Insurances, although Mortgagee may, without obligation, perform Owner's obligations under the Insurances. Owner hereby appoints Mortgagee, its successors and assigns as Owner's true and lawful attorney-in-fact, coupled with an interest, irrevocably, with full power (in Owner's name or otherwise) to (i) demand, receive, compound and give a release or discharge for any moneys and claims for any moneys due and to become due under, or arising out of, the insurances, (ii) endorse any checks or other instruments or orders in connection with the Insurances and (iii) file any and all claims, institute any proceedings, and take any other action which Mortgagee may deem to be necessary or advisable. Owner agrees to immediately deliver notice of this clause to all insurers with respect to the Insurances in effect from time to time, and shall obtain their prompt written consent to this Mortgage and the foregoing assignment. Owner agrees that Mortgagee may effect such notice by delivery of a copy of this Mortgage, and may independently seek such consents. Owner hereby irrevocably directs all such insurers to rely on any copy of this Mortgage for such purposes. Owner has not assigned, pledged, created any security interest in, or otherwise

8

encumbered, the whole or any part of the rights and other property hereby assigned, nor has it agreed to do so, to anyone other than Mortgagee, and shall not do so without the Mortgagee's prior written consent. Owner shall defend, at its own expense, Mortgagee's rights relating to and arising under the Insurances against the claims or demands of all third parties. Mortgagee shall, in addition to the rights hereby conferred, or otrwise existing or arising at law, in equity, in admiralty, or otherwise, be entitled to all the rights of a secured creditor as generally provided under the Uniform Commercial Code as enacted in the applicable jurisdiction, regardless of Section 9-104 of said Code. The acquiescence by Mortgagee in the placement of insurance contrary to the terms of this Mortgage in one or more instances shall not establish a consent or course of dealing with respect to such noncompliance in any other instances.

Section 16. The Shipowner will reimburse the Mortgagee promptly, with interest at the default rate described in Article 5 of the Note from time to time, for any and all expenditures which the Mortgagee may from time to time make, lay out or expend in providing such protection in respect of insurance, discharge or purchase of liens, taxes, dues, assessments, governmental charges, fines and penalties lawfully imposed, repairs, attorney's and paralegal's fees, and other matters as the Shipowner is obligated herein to provide, but fails to provide. Such obligation of the Shipowner to reimburse the Mortgagee shall be an additional indebtedness due from the Shipowner, secured by this Mortgage, and shall be payable by the Shipowner on demand. The Mortgagee, though privileged to do so, shall be under no obligation to the Shipowner to make any such expenditures, nor shall the making thereof relieve the Shipowner of any default in that respect.

Section 17. The Shipowner will fully perform or cause to be performed, in all material respects, any and all charter parties which are, or may be, entered into with respect to the Vessel.

Section 18. The Shipowner further covenants and agrees with the Mortgagee that, so long as any part of the Indebtedness hereby secured remains unpaid, without the prior written consent of the Mortgagee, there shall be no change in the ownership of the Vessel either through sale of the Vessel or through an unapproved charter or transfer of custody or control of the Vessel by any means without the prior written consent of the Mortgagee. There shall be no change in the shareholders of the Shipowner or transfer of its shares without prior written consent of the Mortgagee.

Section 19. (a) In the event of an actual or constructive or arranged total loss or seizure or forfeiture or requisition of title to the Vessel, whether or not with the consent of the Mortgagee, then and in each such case, the Shipowner shall forthwith on demand pay the Indebtedness hereby secured in full, including accrued interest to the date of such payment.

(b) This Mortgage shall extend to and constitute a lien upon, and the Shipowner hereby grants the Mortgagee a security interest in, all proceeds resulting from any of the events mentioned in subsection (a) above as security for the Indebtedness hereby secured.

(c) The Shipowner hereby irrevocably authorizes the Mortgagee to file and record financing statements under the Uniform Commercial Code in any jurisdiction where the same may be in force or under any legislation having similar effect for the purpose of perfecting or continuing the perfection of the security interests granted by the Shipowner to the Mortgagee

9

herein without obtaining the signature of the Shipowner thereto. The Shipowner hereby irrevocably authorizes the Mortgagee to execute any such financing statement or similar document in the name of the Shipowner.

## ARTICLE II
### Events of Default and Remedies.

Section 1.    In case any one or more of the following events, herein termed "Events of Default", shall have occurred and be continuing:

(a)    any payment in respect of the Indebtedness hereby secured has not been received by the Mortgagee within ten (10) days after the date on which the same shall become due and payable; or

(b)    the statements in Sections 2 and 3 of Article I shall prove to be untrue in a material way; or

(c)    a default shall have occurred in the due and punctual observance and performance of any of the provisions of Sections 4, 5, 6, 9, 10, 11, 13, 14, 15(g), 16, 18 or 19 of Article I hereof; or

(d)    a default by the Shipowner in the observance or performance of any other agreement under this Mortgage shall have occurred and shall remain unremedied for ten (10) days after written notice thereof shall have been given to the Shipowner by the Mortgagee; or

(e)    any of the Events of Default (as defined in the Note) shall occur and be continuing under Article 38 of the Note;

then, and in each and every such case, the Mortgagee shall have the right to:

(1)    declare all the then unpaid Indebtedness hereby secured to be due and payable immediately, and upon such declaration the same, including interest to date of declaration, shall become and be immediately due and payable (provided no declaration shall be required if Mortgagee fails to timely pay all Principal Indebtedness and accrued interest in full on the Maturity Date;

(2)    exercise all of the rights and remedies in foreclosure and otherwise given to mortgagees by the provisions of the law of the United States or of any other jurisdiction where the Vessel may be found;

(3)    bring suit at law, in equity or in admiralty, as it may be advised, to recover judgment for the Indebtedness hereby secured, and collect the same out of any and all property of the Shipowner whether covered by this Mortgage or otherwise;

(4)    take and enter into possession of the Vessel, at any time, wherever the same may be, without legal process and without being responsible for loss or

10

damage, and the Shipowner or other person in possession forthwith upon demand of the Mortgagee shall surrender to the Mortgagee possession of the Vessel and the Mortgagee may, without being responsible for loss or damage, hold, lay up, lease, charter, operate or otherwise use such Vessel for such time and upon such terms as it may deem to be for its best advantage, and demand, collect and retain all hire, freights, earnings, issues, revenues, income, profits, return premiums, salvage awards or recoveries, recoveries in general average, and all other sums due or to become due in respect of such Vessel or in respect of any insurance thereon from any person whomsoever, accounting only for the net profits, if any, arising from such use of the Vessel and charging upon all receipts from the use of the Vessel or from the sale thereof by court proceedings or pursuant to Subsection (5) next following, all costs, expenses, charges, damages or losses by reason of such use; and if at any time the Mortgagee shall avail itself of the right herein given it to take the Vessel, the Mortgagee shall have the right to dock the Vessel, for a reasonable time at any dock, pier or other premises of the Shipowner without charge, or to dock her at any other place at the cost and expense of the Shipowner;

      (5)    take and enter into possession of the Vessel, at any time, wherever the same may be, without legal process, and if it seems desirable to the Mortgagee and without being responsible for loss or damage, sell such Vessel, at any place and at such time as the Mortgagee may specify and in such manner as the Mortgagee may deem advisable, free from any claim by the Shipowner in admiralty, in equity, at law or by statute, at public or private sale, by sealed bids or otherwise, and the Mortgagee may become the purchaser at any sale. Any sale made in accordance with the terms of this subsection (5) shall be deemed made in a commercially reasonable manner insofar as the Shipowner is concerned.

    __Section 2.__    Any sale of the Vessel made in pursuance of this Mortgage, whether under the power of sale hereby granted or any judicial proceedings, shall operate to divest all right, title and interest of any nature whatsoever of the Shipowner therein and thereto, and shall bar the Shipowner, its successors and assigns, and all persons claiming by, through or under them. No purchaser shall be bound to inquire whether notice has been given, or whether any default has occurred, or as to the propriety of the sale, or as to the application of the proceeds thereof. In case of any such sale, the Mortgagee, if it is the purchaser, shall be entitled for the purpose of making settlement or payment for the property purchased to use and apply the Indebtedness hereby secured in order that there may be credited against the amount remaining due and unpaid thereon the sums payable out of the net proceeds of such sale to the Mortgagee after allowing for the costs and expense of sale and other charges; and thereupon such purchaser shall be credited, on account of such purchase price, with the net proceeds that shall have been so credited upon the Indebtedness hereby secured. At any such sale, the Mortgagee may bid for and purchase such property and upon compliance with the terms of sale may hold, retain and dispose of such property without further accountability therefor.

    __Section 3.__    The Mortgagee is hereby appointed attorney-in-fact of the Shipowner, upon the happening of an Event of Default, to execute and deliver to any purchaser aforesaid, and is hereby vested with full power and authority to make, in the name and in behalf of the

11

Shipowner, a good conveyance of the title to the Vessel so sold. In the event of any sale of the Vessel, under any power herein contained, the Shipowner will, if and when required by the Mortgagee, execute such form of conveyance of the Vessel as the Mortgagee may direct or approve.

Section 4.    The Mortgagee is hereby appointed attorney-in-fact of the Shipowner upon the happening of any Event of Default, in the name of the Shipowner to demand, collect, receive, compromise and sue for, so far as may be permitted by law, all freight, hire, earnings, issues, revenues, income and profits of the Vessel and all amounts due from underwriters under any insurance thereon as payment of losses or as return premiums or otherwise, salvage awards and recoveries, recoveries in general average or otherwise, and all other sums due or to become due at the time of the happening of any Event of Default in respect of the Vessel, or in respect of any insurance thereon, from any person whomsoever, and to make, give and execute in the name of the Shipowner acquittance, receipts, releases or other discharges for the same, whether under seal or otherwise, and to endorse and accept in the name of the Shipowner all checks, notes, drafts, warrants, agreements and other instruments in writing with respect to the foregoing.

Section 5.    Whenever any right to enter and take possession of the Vessel accrues to the Mortgagee, it may require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to the Mortgagee the Vessel as demanded.

Section 6.    The Shipowner authorizes and empowers the Mortgagee or its appointees or any of them to appear in the name of the Shipowner, its successors and assigns, in any court of any country or nation of the world where a suit is pending against the Vessel because of or on account of any alleged lien against the Vessel from which the Vessel has not been released and to take such proceedings as to them or any of them may seem proper towards the defense of such suit and the purchase or discharge of such lien, and all expenditures made or incurred by them or any of them for the purpose of such defense or purchase or discharge shall be a debt due from the Shipowner, its successors and assigns, to the Mortgagee, and shall be secured by the lien of this Mortgage in like manner and extent as if the amount and description thereof were written herein.

Section 7.    The Shipowner covenants that upon the happening of any one or more of the Events of Default, then, upon written demand of the Mortgagee, the Shipowner will pay to the Mortgagee the whole amount due and payable in respect of the Indebtedness hereby secured; and in case the Shipowner shall fail to pay the same forthwith upon such demand, the Mortgagee shall be entitled to recover judgment for the whole amount so due and unpaid, together with such further amounts as shall be sufficient to cover the reasonable compensation to the Mortgagee's agents, attorneys, counsel and paralegals, and any necessary advances, expenses and liabilities made or incurred by it hereunder. All moneys collected by the Mortgagee under this Section 7 shall be applied by the Mortgagee in accordance with the provisions of Section 11 of this Article II.

Section 8.    Each and every power and remedy herein given to the Mortgagee shall be cumulative and shall be in addition to every other power and remedy herein given or now or hereafter existing at law, in equity, in admiralty or by statute, and each and every power and remedy whether herein given or otherwise existing may be exercised from time to time and as

12

often and in such order as may be deemed expedient by the Mortgagee, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other power or remedy. No delay or omission by the Mortgagee in the exercise of any right or power or in the pursuance of any remedy accruing upon any default as above defined shall impair any such right, power or remedy or be construed to be a waiver of any such Event of Default or to be an acquiescence therein; nor shall the acceptance by the Mortgagee of any security or of any payment of or on account of the Indebtedness hereby secured maturing after any Event of Default or of any payment on account of any past default be construed to be a waiver of any right to take advantage of any future Event of Default or of any past Event of Default not completely cured thereby. No consent, waiver or approval of the Mortgagee shall be deemed to be effective unless in writing and duly signed by authorized signatories of the Mortgagee. The Mortgagee upon a complete discharge of the Indebtedness hereby secured, shall deliver at the expense of the Shipowner a certificate of such discharge duly executed by the Mortgagee in form satisfactory for recording with the National Vessel Documentation Center or its duly authorized agent.

Section 9.   If at any time after an Event of Default and prior to the actual sale of the Vessel by the Mortgagee or prior to any enforcement or foreclosure proceedings the Shipowner offers completely to cure all outstanding Events of Default and to pay all expenses, advances and damages to the Mortgagee consequent on such Events of Default including default interest (but not satisfy the Indebtedness in full), then the Mortgagee may, but shall not be required to, accept such offer and payment and restore the Shipowner to its former position, but such action, if taken, shall not affect any subsequent Event of Default or impair any rights consequent thereon. If the Shipowner satisfies the Indebtedness in full (including all expenses, advances, etc.) the Mortgage shall be required to accept such payment from the Shipowner.

Section 10.   In case the Mortgagee shall have proceeded to enforce any right, power or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Mortgagee, then and in every such case the Shipowner and the Mortgagee shall be restored to their former positions and rights hereunder with respect to the property subject to or intended to be subject to this Mortgage, and all rights, remedies and powers of the Mortgagee shall continue as if no such proceedings had been taken.

Section 11.   The proceeds of any sale of the Vessel and the net earnings of any charter operation or other use of the Vessel and any and all other moneys received by the Mortgagee pursuant to or under the terms of this Mortgage or in any proceedings hereunder, the application of which has not elsewhere herein been specifically provided for, shall be applied as follows:

First: To the payment of all expenses and charges, including but not limited to the fees and expenses of any sale, the expenses of any retaking, attorney's and paralegal's fees, marshal's fees, custodial expenses including dockage, arrest fees, insurance and all other custodial expenses, court costs, advertising costs, and any other expenses or advances made or incurred by the Mortgagee in the protection of its rights or the pursuance of its remedies hereunder including against third parties, agencies of the United States government, and, at Mortgagee's option, to pay or provide adequate

indemnity against liens known to Mortgagee that have or are claimed to have priority over the lien of this Mortgage;

Second: To the payment of the Indebtedness hereby secured, whether due or not, including interest, late fees, penalties, costs of collection thereon to the date of such payment and, if applicable, compensatory interest or damages to the end of the then current Interest Period (as defined in the Note); and

Third: To the payment of any surplus thereafter remaining to the Shipowner or to whomsoever may be entitled thereto.

Section 12.    Until one or more of the Events of Default hereinabove described shall happen, the Shipowner (a) shall be suffered and permitted to retain actual possession and use of the Vessel and (b) shall have the right, from time to time, in its discretion, and without application to the Mortgagee, and without obtaining a release thereof by the Mortgagee, to dispose of, free from the lien hereof, any engines, gaming equipment, inventory, furniture, equipment, machinery, auxiliary vessels, masts, spars, sails, rigging, boats, anchors, chains, tackle, apparel, boilers, fittings or spare parts, or any other appurtenances of the Vessel that are no longer useful, necessary, profitable or advantageous in the operation of the Vessel, first or simultaneously replacing the same by new engines, gaming equipment, inventory, furniture, equipment, machinery, auxiliary vessels, masts, spars, sails, rigging, boats, anchors, chains, tackle, apparel, boilers, fittings, or spare parts or other appurtenances of substantially equal value to the Shipowner, which shall forthwith become subject to the lien of this Mortgage as a preferred mortgage thereon.

Section 13.    (a)    If any provision of this Mortgage should be deemed invalid or shall be deemed to affect adversely the preferred status of this Mortgage under any applicable law, such provision shall cease to be a part of this Mortgage without affecting the remaining provisions, which shall remain in full force and effect.

(b) ·    In the event that the Note or this Mortgage or any of the documents or instruments which may from time to time be delivered hereunder or thereunder or any provision hereof or thereof shall be deemed invalidated by present or future law of any nation or by decision of any court, this shall not affect the validity and/or enforceability of all or any other parts of the Note or the Mortgage or such documents or instruments and, in any such case, the Shipowner covenants and agrees that, on demand, it will execute and deliver such other and further agreements and/or documents and/or instruments and do such things as the Mortgagee in its sole discretion may deem to be necessary to carry out the true intent of this Mortgage and of the Indebtedness secured hereby.

(c)    Anything herein to the contrary notwithstanding, it is intended that nothing herein shall waive the preferred status of this Mortgage and that, if any provision or portion thereof herein shall be construed to waive the preferred status of this Mortgage, then such provision to such extent shall be void and of no effect.

Section 14.    In the event of any legal proceedings the Shipowner accepts for himself and subsequent owners of the Vessel, irrespective of domicile or residence, the exclusive

14

jurisdiction of the United States District Court, Southern District of Florida, Miami division or the federal court where the Vessel may be located (if other than the Southern District of Florida), the venue to be Miami-Dade County, Florida if the Vessel is within the Southern District of Florida, with notice provided in the manner established for residents of the United States served on the Shipowner or on the Shipowner's manager or on the managing owner or the ship's master.

Section 15.   SHIPOWNER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT EITHER MAY HAVE TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE NOTE, MORTGAGE, LOAN DOCUMENTS AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS, (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.   SHIPOWNER ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO THE MORTGAGEE IN EXTENDING CREDIT TO THE BORROWER, THAT THE MORTGAGEE WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS JURY TRIAL WAIVER, AND THAT SHIPOWNER HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS JURY TRIAL WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER.

## ARTICLE III
### Sundry Provisions.

Section 1.   All of the covenants, promises, stipulations and agreements of the Shipowner in this Mortgage contained shall bind the Shipowner and its successors and assigns and shall inure to the benefit of the Mortgagee and its respective successors and assigns. In the event of any assignment or transfer of this Mortgage, the term "Mortgagee", as used in this Mortgage, shall be deemed to mean any such assignee or transferee.

Section 2.   Wherever and whenever herein any right, power or authority is granted or given to the Mortgagee, such right, power or authority may be exercised in all cases by the Mortgagee or such agent or agents as it may appoint, and the act or acts of such agent or agents when taken, shall constitute the act of the Mortgagee hereunder.

Section 3.   This Mortgage may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

Section 4.   Any notice or other communication to be given pursuant hereto shall be by postage prepaid letter or by cable or telegram or telex confirmed by letter addressed:

If to the Mortgagee to:

RCI-Dinner Key, Inc.
c/o RCI Marine
300 Alton Road, Suite 303

15

\74183\18721\#618987 v 5
4/30/03 11:07 AM

Miami Beach, Florida 33139
Phone No.:    305-672-5588
Telefax No.:    305-673-5995

And if to the Shipowner to:

MLA Cruises, Inc.
1280 5th Street
Miami Beach, Florida 33139
Phone No.:  917-685-4109
Telefax No.:    _____

or subject to such changes as either party may notify to the other in writing.

Section 5.    The maximum principal amount that may be outstanding under this Mortgage at any time is Two Million United States Dollars (US$2,000,000) and for the purpose of recording this Mortgage as required by Chapter 313 of Title 46 of the United States Code the total amount of this Mortgage is US$2,000,000 and interest and performance of mortgage covenants.

## ARTICLE IV
### Second Mortgage

Lender hereby consents to the filing of the Second Mortgage given by Borrower in favor of MBMA, which Second Mortgage shall secure Majesty's obligations to MBMA under that certain Marina Lease between MBMA as Landlord and Majesty as Tenant dated as of January 31, 2002 (the "Lease"), which Second Mortgage shall at all times be inferior and subordinate to any security interest or right of Lender in and to the Vessel and any other collateral given by Borrower to Lender to secure the Loan. Borrower shall not amend, terminate, assign or modify any documents evidencing or securing the Second Mortgage in any manner without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion.

IN WITNESS WHEREOF, the Shipowner has caused this First Preferred Mortgage on the Vessel MAX I to be duly executed the day and year first above written.

Signed, sealed and delivered in the presence of:

MLA CRUISES, INC., a Florida corporation

Print Name: _____

By: _____
Arkady Vaygensberg, Vice President

Print Name: Leonid Tartachur

16

STATE OF FLORIDA            )
                           ) ss.:
COUNTY OF MIAMI-DADE        )

On this 21st day of April, 2003, before me personally appeared Arkady Vaygensberg, known to me, and known to be the person who executed the foregoing instrument, who, being by me duly sworn, did depose and say that he is the Vice President of MLA Cruises, Inc., a Delaware corporation, the party described in and which executed the foregoing instrument; that s/he signed her/his name thereto by authority of a power of attorney of said corporation and as the free act and deed of such corporation.



Notary Public, State of _Florida_
Printed Name: _RHODA RUBIN_
My Commission Expires: _2-17-06_

Rhoda Rubin
MY COMMISSION # DD089688 EXPIRES
February 17, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

17

## JOINDER BY LENDER

Mortgagee hereby executes this Joinder to acknowledge its agreement to the terms specified in Article IV of the First Preferred Ship's Mortgage to which this Joinder is attached.

Signed, sealed and delivered in the presence of:

Print Name: _____

Print Name: Leonid Tatarchuk

RCI-DINNER KEY, INC.,
a Florida corporation

By: _____
    Robert W. Christoph, President

STATE OF Florida      )
                      ) ss.:
COUNTY OF Miami-DADE )

On this 21st day of April, 2003, before me personally appeared Robert W. Christoph, known to me, and known to be the person who executed the foregoing instrument, who, being by me duly sworn, did depose and say that he is the President of **RCI-DINNER KEY, INC.**, a Florida corporation, the party described in and which executed the foregoing instrument; that he signed his name thereto by authority of a power of attorney of said corporation and as the free act and deed of such corporation.

Rhoda Rubin
MY COMMISSION # DD089668 EXPIRES
February 17, 2006
BONDED THRU TROY FAIN INSURANCE INC.

Notary Public, State of Florida
Printed Name: Rhoda Rubin
My Commission Expires: 2-17-06

\74183\1872\\# 618987 v 5
4/30/03 11:07 AM

EXHIBIT "A"

## MARINE NOTE AND SECURITY AGREEMENT

Loan Amount: $2,000,000.00                                Date: April 22, 2003

     **1.**     **Identification of Parties.**  This Marine Note and Security Agreement (the "Agreement") is made as of this 22nd day of April, 2003, by **MLA CRUISES, INC.**, a Delaware corporation located at 1280 5th Street, Miami Beach, FL 33139 (referred to herein as "Borrower" or "Grantor") in favor of **RCI-DINNER KEY, INC.**, a Florida corporation, with its principal office located at 300 Alton Road, Suite 303, Miami Beach, Florida 33139 (referred to herein as the "Lender" or the "Secured Party") and evidences and sets forth the terms of a loan as further described herein (the "Loan").

     **2.**     **Definitions.**  The word "Grantor" means each and all of the persons (individuals or entities) who sign this Agreement as Borrower.  The word "Borrower" means each and all of the persons who have signed this Agreement as a Borrower with full personal liability for payment of all indebtedness under this Agreement.  The word "Guarantor" means each and all of the persons or entities who have guaranteed to the Lender the payment and performance by any Grantor of any of the Obligations (as defined in Clause 10).  The word "Lender" means the Lender identified above and anyone who subsequently acquires Lender's rights under this Agreement by assignment or otherwise.  If this Agreement is signed by an entity other than an individual, the words "it" and "its" may also mean that entity.  The word "Agreement" means this Marine Note and Security Agreement as at any time amended.  The word "Vessel" means the Vessel described in Clauses 13 and 14.  The term "Preferred Mortgage" means the first preferred ship's mortgage in favor of the Lender covering the Vessel and Grantor's ownership interest in the Vessel, duly filed with the proper authorities in the jurisdiction where the Vessel is documented or registered.  The term "Second Mortgage" means the First preferred ship's mortgage in favor of Miami Beach Marina Associates, Ltd. covering the Vessel and Grantor's ownership interest in the Vessel, duly filed with the proper authorities in the jurisdiction where the Vessel is documented or registered.

     **3.**     **Multiple Grantors.**  If this Agreement is signed by more than one Grantor, each Grantor is responsible individually, severally and jointly for paying the full amount of the Obligations (as defined herein) and doing everything required of Grantor.  Lender may require any one Grantor to pay the entire amount of the Obligations without requiring any other Grantor to pay.  Lender does not have to notify one Grantor that another has defaulted under this Agreement.  Lender may, but does not commit to, at any time or from time to time give one Grantor extensions to pay, or change or release his or her responsibility without releasing any other Grantor or without treating any other Grantor in the same way.  Lender may sue one Grantor without joining or notifying any other Grantor.  Grantor's obligation to pay is absolute and unconditional.

     **4.**     **Promise to Pay/Loan Amount.**  Lender has loaned to Borrower and Borrower has received from Lender Two Million U.S. Dollars and No/100 ($2,000,000.00) (the "Principal Indebtedness").  Borrower (jointly and severally if more than one) unconditionally promises to pay to the order of Lender, the Principal Indebtedness plus interest thereon, and all fees, charges, expenses, advances and other amounts as may become due, all as provided below.

\74133\18721\ # 618986 v 5
4/21/03 2:41 PM                              Exhibit "G"

5.   **Interest and Payment Terms.** Interest shall accrue on the unpaid Principal Indebtedness from the date hereof at a rate per annum equal to fifteen percent (15%) ("Interest Rate"). Interest shall be computed and will continue to accrue at the Interest Rate on the unpaid portion of the Principal Indebtedness until the Principal Indebtedness has been paid in full. Interest will be calculated on the basis of a 360-day year for the actual number of days in the applicable period.

6.   **Payment Terms.** Commencing on May 15, 2003 and on the 15th day of each month thereafter until April 21, 2006 (the "Maturity Date"), Borrower shall make payments of interest only directly to the Lender at the address of the Lender set forth in Clause 1 above, or at such other place as Lender may from time to time designate. On the Maturity Date, Borrower shall make a final payment consisting of the outstanding Principal Indebtedness, all accrued interest, fees, charges and funds paid for on behalf of Borrower.

If Lender has advanced any funds or paid any expenses for or on behalf of Grantor or taken any action and incurred any expense to protect its security or to exercise or enforce its rights under this Agreement, and such amounts have become part of the Obligations (as defined in Clause 10) under the terms of this Agreement, the Preferred Mortgage, or any other Loan Documents, interest shall accrue on all such amounts at the lesser of: (i) 20% per annum or (ii) the maximum interest rate permitted by law (the "Default Rate") from the date advanced, paid or incurred until Lender has received payment of such amounts in full. Furthermore, if Lender has accelerated the Maturity Date of the Loan upon the occurrence of one or more Events of Default under this Agreement, interest shall also accrue on the entire unpaid portion of the Principal Indebtedness at the Default Rate from the date of such acceleration until Lender has received payment in full. The Default Rate shall also apply from acceleration until the Obligations or any judgment thereon is paid in full. In no case, however, shall the rate of interest applied to any of the Obligations exceed the highest rate otherwise permitted by applicable law, and any excess interest that has erroneously been paid or collected shall either be refunded or applied to reduce the Obligations other than interest.

Borrower shall pay Lender at the time of the initial funding of the Loan a loan fee in the amount of $20,000 (the "Loan Fee") .

7.   **Prepayment.** Borrower shall be entitled to make prepayments of the Principal Indebtedness at any time or times, however the following prepayment premium(s) (each a "Prepayment of Premium") shall be due and payable by the Borrower:

(a)   If Borrower pays the Loan in whole or in part during the first twelve months of the Loan (the "First Year") the Borrower shall pay to the Lender at the time of said payment an amount equal to: $300,000 less the interest (calculated at the Interest Rate) payable by Borrower during the First Year of this Agreement. For example, if the Borrower prepays $1,000,000 on the first day of the seventh month of the First Year, the Borrower shall pay the Lender a fee of $75,000 ($300,000 less $150,000 (total interest accrued on $2,000,000 principal in months 1-6) and less $75,000 interest to accrue on remaining $1,000,000 principal for months 7-12) .

2

(b)     If Borrower pays the Loan in part during months thirteen through twenty four of the Loan (the "Second Year") the Borrower shall pay to the Lender at the time of said payment an amount equal to: $150,000 less the interest (calculated at the Interest Rate) payable by Borrower during the Second Year of this Agreement. For example, if the Borrower makes its first prepayment of $1,500,000 on the first day of the third month of the Second Year, the Borrower shall pay the Lender a fee of $62, 500 ($150,000 less $50,00 (total interest accrued on $2,000,000 principal in months 13-14) and less $62,500 interest to accrue on remaining $500,000 principal for months 15-24).

(c)     If Borrower pays the Loan in whole during the Second Year the Borrower shall pay to the Lender at the time of said payment an amount equal to $0.

(d)     If Borrower pays the Loan in whole or in part during months twenty five through the Maturity Date Borrower shall pay to the Lender at the time of said payment an amount equal to: $0.

Each such prepayment must also include all interest accrued and unpaid to the date of payment. All prepayments of principal and accrued interest shall be made at the office of the Lender at the address stated in Clause 1, or at such other place as from time to time may be designated to Borrower by Lender. Any partial prepayment will be applied to the remaining principal installments in the inverse order of their maturities.

8.      **Late Charges.** If an installment is not paid in full within ten (10) or more days after it is due, Borrower will pay a late charge of the lesser of: (i) 1% of the each late payment past due for five (10) or more days or (ii) the maximum amount permitted by Florida law. The late charge represents partial reimbursement to Lender for the cost of processing and mailing delinquency notices, contacting Borrower and otherwise following up to see that delinquent payments are made.

9.      **Application of Payments.** Each payment by Borrower shall be applied, first to pay interest due on the date the payment is received; next, to any fees, charges, expenses, advances or other Obligations then due; and the balance, if any, to the unpaid Principal Indebtedness.

10.     **Obligations Secured.** This Agreement secures the prompt and unconditional payment and performance of all of the following, whether sole, joint or several, primary or secondary, direct or indirect, absolute or contingent, due or to become due, secured or not secured, now existing or hereafter arising, and all interest accrued thereon:

(a)     the outstanding Principal Indebtedness under this Agreement and interest accrued thereon;

(b)     all other obligations of Grantor under this Agreement;

(c)     any renewals, extensions or modifications of this Agreement;

3

(d)     any liability of Grantor to others relating to the Vessel which Lender may have obtained by assignment or otherwise, and any liability of Grantor to Lender pursuant to any other instrument or agreement;

(e)     all other existing and future debts, liabilities and obligations of Grantor to Lender of every kind and description, of any nature whatsoever and out of whatever transactions arising, whether or not evidenced by any note or other instrument, including any future advances;

(f)     all costs, fees, disbursements, expenses and charges relating to any of the foregoing (including, without limitation, attorneys' and paralegals' fees, whether prior to or at trial, mediation, arbitration, on appeal, in enforcing any judgment, or in any bankruptcy or civil or criminal forfeiture proceedings, or otherwise) incurred by Lender in the collection or enforcement of any of the foregoing obligations or in the preservation or protection or sale of the Vessel, or otherwise in preserving, asserting, exercising or enforcing Lender's interests or rights; and

(g)     any Prepayment Premium due hereunder.

All such payment and performance obligations of Grantor are collectively referred to in this Agreement as the "Obligations."

11.     **Security Interest in Vessel.**   As security for the prompt payment and performance of the Obligations, Grantor hereby mortgages and grants to Lender a security interest under the Uniform Commercial Code and a lien under any applicable title law in the Vessel and any trailer described below, together with all engines, machinery, auxiliary vessels, inventory, masts, spars, boats, anchors, cables, chains, rigging, tackle, capstans outfit, gaming equipment, boilers, furniture, fittings, tools, pumps, pumping equipment, drills, apparel, fittings, radar, radios, electronic instruments and equipment, navigation and communication and computing equipment, other equipment and supplies, fishing gear and equipment, spare parts and all other appurtenances, attachments and accessories whatsoever, and all additions, improvements, substitutions and replacements now or hereafter used in or on or belonging to the Vessel, including but not limited to later installed electronics and piping, whether or not removed from the Vessel, and all proceeds of any and all of the foregoing, all of which shall be deemed to be included in the term "Vessel." Borrower owns a 100% interest in the Vessel.

12.     **Description of Vessel.**

Name of Vessel: M/V Max I                              Flag:  United States
State Registration No.: None
U.S. Coast Guard Official No.  634676
Home Port:     currently Key West, Florida, to be transferred to
               Miami Beach, Florida

\74183\13721\ # 613986 v 5
4/21/03 2:41 PM

HULL: Used
Manufactured by: Underwater Completion Inc.
Year Built: 1981
Length: 196.3                    Beam: 48.0
Hull Identification No.: 101
Gross Tons: 97                              Net: 66
Rebuilt and lengthened in 1997 by Network Marine, Pierre Port, LA

ENGINE(S):   4 Detroit Diesel, Type 16V92N, 16 cylinder, model Number: MG527, 2.92:1 ratio; total horsepower: 2400.

13.    **Place of Principal Use.**  The principal place of use for the Vessel shall be in waters between the eastern coast of Florida and the immediately adjacent international waters. The Vessel may not be in international waters for more than 24 continuous hours and may not remain outside of the jurisdiction of the State of Florida for more than 24 hours.

14.    **Security Interest in Additional Collateral.**  As additional security for the prompt payment and performance of the Obligations, Grantor hereby mortgages and grants to Lender a security interest in, and collaterally assigns to Lender, all of Grantor's right, title and interest in and to the following types and items of property, collectively referred to herein as the "Additional Collateral:"

(a)    all insurances, including, without limitation, all hull and machinery and protection and indemnity and other insurance policies, binders or cover notes in respect of the Vessel, whether heretofore, now or hereafter effected, and all renewals of or replacements for the same (herein called the "Insurances"), and all claims and proceeds thereof, returns of premiums, and other monies and claims for monies which may be or become payable under or in respect of said Insurances, including amounts payable due to the partial loss or actual, constructive, agreed, arranged or compromised total loss of the Vessel, and all other rights of Grantor in respect of said Insurances;

(b)    all charter hire, freights, revenue and any other monies of whatsoever nature, earned and to be earned, due or to become due, or paid or payable with respect to, the Vessel;

(c)    all monies and claims for monies due and to become due to Grantor, and all claims for damages or compensation, arising out of the breach of or in any way connected with any and all present or future charter agreements, contracts and other engagements of every kind whatsoever of the Vessel, and any and all claims and causes of action for money, loss or damages that may accrue or belong to Grantor, its successors or assigns, arising out of or in any way connected with the present or future use, operation or management of the Vessel;

(d)    all monies and claims which may be or become payable to Grantor, and all claims for damages, in respect of the requisition for title or use, seizure, condemnation, confiscation, sequestration, compulsory acquisition, or other interference with Grantor's

5

ownership or use of the Vessel by act of any country or of any governmental authority or otherwise; and

(e)    all proceeds of any and all of the foregoing.

The Additional Collateral described above together with the Vessel constitute the "Collateral." If, in Lender's opinion, Grantor fails to properly or timely pursue any claims relating to any of the Additional Collateral, Grantor agrees that Lender may, but is not obligated to, take over the pursuit or further handling of any or all of such claims and for this purpose Lender and its employees and agents are hereby irrevocably appointed as Grantor's true and lawful attorneys-in-fact with the powers stated in Clause 42. Grantor agrees to cooperate with and provide all reasonable assistance to Lender in asserting any claim or effecting any recovery.

15.    **Documentation Relating to Security Interest.** At Lender's request Grantor will execute all such financing statements and other documents as may be useful or necessary in any jurisdiction to evidence, perfect, protect, continue, re-perfect or enforce Lender's interests in all or any of the Collateral. In any state where applicable law permits, Grantor authorizes Lender to file a copy of such financing statements or documents, or to file such financing statements or documents without Grantor's signature(s).

16.    **Additional Security.** The security interests granted in this Agreement are given as additional security to secure the Obligations and are in addition to other security interests the Lender may have in the Vessel pursuant to the Preferred Mortgage.

17.    **Documentation or Registration of Vessel.** Lender and Grantor agree that the Vessel shall be documented under United States Federal law with the United States Coast Guard.

(a)    **Citizenship.** Grantor represents and covenants that it is and shall at all times continue to be a citizen of the United States as required by the laws and regulations pertaining to the documentation and any trading privileges of the Vessel until this Agreement and the Preferred Mortgage are fully paid and performed. Grantor shall provide such proof of United States citizenship at such time(s) and in such form(s) as Lender may reasonably require, although Lender has no duty of inquiry in this regard.

(b)    **Right to Own and Operate Vessel.** The Vessel is or is to be documented in Grantor's name(s) under the laws of the United States, and Grantor represents and warrants that there is no impediment to the lawful federal documentation of the Vessel. If a state certificate of title has been issued for the Vessel and federal law requires the surrender of the certificate of title in order for the Vessel to become or continue to be federally documented, Lender is authorized to surrender the state certificate of title in the manner required by federal law or regulations. If such a certificate of title is in Grantor's possession, Grantor will surrender it to Lender for such purpose. Grantor is the sole owner of the whole of the Vessel and, when the Vessel is or becomes documented in Grantor's name, shall continue to own and operate the Vessel under her Certificate of Documentation. Grantor shall keep the Certificate of Documentation in full force and effect at all times.

6

(c)     Mortgaging of Vessel. To further secure the prompt and full payment and performance of the Obligations, Grantor will sign, acknowledge and deliver to Lender or its designee for filing a first priority preferred mortgage on the Vessel under U.S. federal law (the "Preferred Mortgage"), such Preferred Mortgage to be filed with the United States Coast Guard as required by Lender.

(d)     Command by U.S. Citizen. Grantor warrants that the Vessel shall be under the command of a citizen of the United States at all such times and under all such circumstances as are required for compliance with federal law.

18.     Possession and Use Absent Default. Until the occurrence of one or more Events of Default, Grantor shall be permitted to retain actual possession and use of the Vessel.

19.     Legal and Other Expenses of Loan. Grantor will pay all legal and other costs, charges and expenses incurred by Lender in connection with the preparation, execution, recording, and enforcement of this Agreement, the Preferred Mortgage and all other documents and instruments relating to this transaction, or any modification, amendment, extension, renewal or substitution thereof.

20.     Statement of Intended Use. The Vessel is to be used by Grantor for business, promotional and entertainment purposes, the carriage of passengers and pleasure use and casino gaming purposes only, and not for chartering or any other commercial use except as provided in Clause 33 unless Lender's prior written consent has been obtained. The Vessel is not intended to be a principal dwelling.

21.     Warranty of Title and No Liens. Grantor warrants title to the Vessel. This means that Grantor is the owner of the Vessel and lawfully owns and has possession of the whole (100%) of the Vessel free from all liens, security interests or encumbrances whatsoever except for the lien and security interest under this Agreement and the lien of the Preferred Mortgage. If Lender has to defend its lien or security interest or Preferred Mortgage lien, Grantor shall be responsible for all of Lender's expenses and losses including, without limitation, legal fees and expenses, and Grantor shall indemnify Lender if anyone other than Grantor or Lender claims an interest in the Vessel or any part of it. Grantor will keep the Vessel free of any liens or encumbrances except in favor of Lender.

22.     Prohibition Against Liens. Neither the Grantor nor any agent, master, or charterer of the Vessel nor any other person has or shall have any right, power or authority to create, incur or permit to be placed or imposed on the Vessel or any part thereof any lien whatsoever other than: (i) in favor of Lender, or (ii) for crew's wages or, (iii) in an emergency, for salvage or (iv) the Second Mortgage. This prohibition of lien clause shall be included in any charter agreement with respect to the Vessel.

23.     Displaying Notice and Exhibiting Preferred Mortgage. Grantor shall keep a proper copy of the Preferred Mortgage with the Vessel's papers and show the Preferred Mortgage to all persons having business with the Vessel, and to Lender on demand, and shall place and keep prominently displayed in the pilot house (if any), chart room, Master's cabin, or elsewhere on the Vessel as specified by Lender, a notice of the Preferred Mortgage reading as follows:

7

## NOTICE OF PREFERRED MORTGAGE

NOTICE IS HEREBY GIVEN THAT this Vessel is subject to: (i) a first preferred ship mortgage in favor of RCI-Dinner Key, Inc., and (ii) a preferred ship mortgage in favor of Miami Beach Marina Associates Ltd. which mortgages constitute "preferred mortgages" under the authority of the laws of the United States of America, Title 46, United States Code, Chapter 313, Sections 31301 and following. Under the terms of said preferred mortgages, neither the owner, agent, any charterer, nor the master of the Vessel, nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than for crew's wages or, in an emergency, for salvage.

If Grantor has received notice of any assignment of the Preferred Mortgage or the Second Mortgage, Grantor shall be obligated immediately to replace the original Notice of Preferred Mortgage with a new Notice of Preferred Mortgage in the form specified above, but substituting therein the name of the assignee of the Preferred Mortgage in place of the name of the original Mortgagee.

24. **Compliance with Laws and Regulations.** Grantor shall comply with and not permit the Vessel to be operated contrary to any applicable provision of the laws, treaties, conventions, rules, regulations or orders of the United States, or of any State or of any foreign country or other jurisdiction wherein registered or operated, or of any department or agency thereof. The illegal commerce in, or possession, carriage, or use of, any contraband or any controlled substance whatsoever on or about the Vessel is absolutely prohibited. Grantor shall do everything necessary to establish and maintain the Preferred Mortgage as a first priority lien and preferred mortgage on the Vessel.

25. **Payment of Taxes, Fines, Bills, Etc.** Grantor shall pay when due all taxes (including sales or use taxes), assessments, governmental charges, fines and penalties lawfully imposed, and promptly pay all bills and expenses and discharge any and all liens whatsoever upon the Vessel. Lender may, but does not commit to, pay any of these liabilities if Grantor does not. If Lender pays any such liabilities, Grantor agrees to repay such liabilities in full to Lender on demand, with interest at the Default Rate specified in this Agreement. If Grantor fails to repay Lender such liabilities on demand, such unpaid amounts shall constitute an additional part of the Obligations and shall accrue interest at the Default Rate until paid in full.

26. **Seizure, Attachment, Arrest, Etc.** Grantor shall notify Lender promptly, and in any event within 48 hours, by telephone, confirmed in writing by telegraph, cable, facsimile or overnight courier service, if the Vessel is arrested, libeled, attached, detained, seized or levied upon or otherwise taken into custody, or if Grantor becomes aware that any notice of claim of lien upon the Vessel has been filed or prosecuted. Grantor shall immediately take steps to have the Vessel released or take such other steps as Lender may reasonably require, including payment of any lien or posting bond or security for the Vessel. In the event the Vessel has become subject to any legal process, Grantor authorizes Lender to disclose any information which Lender deems necessary to protect its interest in the Vessel, and Grantor further authorizes Lender and its employees and agents in Grantor's name and as Grantor's attorney-in-fact to (i) receive or take possession of the Vessel, (ii) defend any action or discharge any lien, and (iii)

\741831\87Z1\#618986 v 5
4/21/03 2:41 PM

refer the protection of Lender's interest in the Vessel under this Agreement to an attorney. Grantor shall pay all costs and expenses, including reasonable attorneys' fees and costs incurred by Lender.

27.     **Insurance Obligations.**  Grantor shall, at Grantor's own expense, keep the Vessel fully insured pursuant to the terms of Article I, Section 15 of the Preferred Mortgage.

28.     **Risk of Loss.**  At all times, Grantor bears the risk of damage to, or loss, theft or destruction of the Vessel.  Damage, destruction, theft or other loss of the Vessel will not release Grantor from its obligations to Lender.  Grantor agrees to notify Lender as soon as possible, and in any event within 48 hours, if the Vessel becomes damaged, is stolen or destroyed, or disappears.

29.     **Maintenance of Vessel.**  Grantor shall, at its own expense, maintain the Vessel at all times in good condition, working order and repair, in all respects seaworthy, and shall comply with all material recommendations of marine surveyors and make all proper renewals and replacements.  Grantor shall keep in a reserve account for repairs $500.00 for each hour the engines of the Vessel are used as more particularly set forth in the Preferred Mortgage.  Grantor shall notify Lender of any casualty or damage to the Vessel in an amount in excess of $25,000.00.

30.     **Alterations to Vessel.**  Grantor shall not, without Lender's prior written consent, make any substantial change or substantial alteration in the Vessel except as necessary for compliance with applicable laws and regulations and with the provisions of the Preferred Mortgage or this Agreement.  Such consent shall not be unreasonably withheld so long as the utility or value or marketability of the Vessel is not reduced.

31.     **Inspection of Vessel and Papers.**  Grantor shall at all times allow Lender to inspect the Vessel and everything in it or on it, and will let Lender examine its logs, journals and papers (including, but not limited to, any relevant documents of title, license, certificate of documentation or other vessel document, ship mortgage and policy of insurance) and related accounts, books and records.  Grantor will furnish to Lender copies of any surveys by marine surveyors, and will upon Lender's request from time to time cause the Vessel to be surveyed by a marine surveyor reasonably acceptable to Lender at Grantor's expense.

32.     **Certification of Payment of Expenses.**  Grantor shall, upon Lender's request, certify that all wages and expenses and all other claims whatsoever which might have given rise to a lien upon the Vessel have been paid.

33.     **Restrictions on Sale, Charter or Use.**  Grantor shall not, without the prior written consent of Lender, sell or mortgage the Vessel, pledge it as security for any other loan, give it away, lease or charter it.  Any such written consent by Lender shall not be construed as a waiver of this provision with respect to any subsequent proposed sale, mortgage, hypothecation, transfer, charter or use.  ANY SUCH PERMITTED SALE, MORTGAGE, HYPOTHECATION, TRANSFER, CHARTER OR USE OF THE VESSEL SHALL BE SUBJECT TO ALL THE PROVISIONS OF THIS AGREEMENT AND THE LIEN AND SECURITY INTEREST IT CREATES.  Grantor assigns to Lender all charter hire and all other payments received or

9

receivable in consideration for any charter or use as security for the Obligations. Any charter or use must be only to persons and for uses lawful under the Vessel's Certificate of Documentation or Registration, and must be fully covered under and not prohibited by the Vessel's insurance policies. Grantor shall, if required by Lender, provide a certificate of insurance showing full coverage for such charter or other usage.

Lender hereby consents to that certain charter agreement between Borrower and Majesty Enterprises of Florida, LLC, ("Majesty"), an affiliate of Borrower, dated April 11, 2003, a true and correct copy of which has been delivered to Lender (the "Majesty Charter"). Borrower shall not amend, terminate, assign or modify the Majesty Charter in any manner without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion. Lender further consents to the filing of the Second Mortgage, which Second Mortgage shall secure the Majesty's obligations under that certain Lease Agreement with Landlord dated January 31, 2002 which Lease provides for dockage space for the Vessel and certain office Space (the "Premises") which Second Mortgage shall secure a maximum of $500,000 due under the Lease plus the cost of collection of the same. The Second Mortgage shall at all times be inferior and subordinate to any security interest or right of Lender in and to the Vessel and any other collateral given by Borrower to Lender to secure the Loan. Borrower shall not amend, terminate, assign, or modify and documents evidencing or securing the Second Mortgage in any manner without the prior written consent of the Lender, which consent may be withheld in Lender's sole and absolute discretion.

34.   **Change of Address or Location of Vessel.** Grantor shall not, without Lender's prior written approval, move the Vessel from the Miami Beach Marina in Miami Beach, Florida, where it is customarily moored, or from the State of Florida, the state in which the Vessel is primarily used, other than for daily voyages into international waters with the intent of returning. Grantor shall inform Lender, within thirty (30) days, if Grantor changes its name, identity, ownership, membership or structure in any manner. Grantor shall notify Lender promptly if Grantor changes its principal residence or place of business.

35.   **Transfer of Name, Flag or Port of Registration.** Grantor shall not, without the prior written consent of Lender, transfer or change or attempt to transfer or change the name, Flag or the port of registration of the Vessel (other than to change the port of registration from Key West, Florida to Miami Beach, Florida which shall be completed within 30 days after the date of this Agreement) and any such written consent to any one transfer or change of name, Flag or port of registration shall not be construed to be a waiver of this provision with respect to any subsequent proposed transfer or change of name, Flag or port of registration. ANY SUCH PERMITTED TRANSFER OR CHANGE SHALL BE SUBJECT TO ALL THE PROVISIONS OF THIS AGREEMENT AND THE LIEN AND SECURITY INTEREST IT CREATES.

36.   **Further Assurances and Documents.** From time to time Grantor shall, upon Lender's request, sign and deliver to Lender any further documents, instruments, agreements and assurances, or complete any markings, that Lender may require to document or register and to maintain the documentation or registration of the Vessel, to obtain and maintain the perfection and first priority status of the security interests granted by this Agreement under applicable laws,

\74183\18721\ # 618986 v 5
4/21/03 2:41 PM

to correct any mathematical or other errors in this Agreement, to facilitate or carry out the true intent of this Agreement, to more fully perfect or enforce the security interests granted by Grantor in this Agreement, to operate the Vessel as provided herein, and to help Lender enforce its security interests in any of the Collateral or carry out a resale or other disposition of the Vessel in the event it becomes necessary for Lender to repossess and sell the Vessel or to judicially foreclose the Preferred Mortgage. Grantor hereby appoints Lender and its employees and agents as Grantor's attorney-in-fact for all of the foregoing purposes.

37.     **Financial Reporting.** If Grantor is a business entity, Grantor will give Lender any annual and other periodic financial reports Lender may reasonably request from time to time. All such information will be deemed to be warranted by the person providing it to be true and correct and to fairly represent the financial condition of Grantor as of the date(s) furnished.

In any event, Borrower shall deliver to Bank, within 30 days of filing, complete copies of federal and state tax returns, as applicable, together with all schedules thereto, each of which shall be signed and certified by Borrower to be true and complete copies of such returns. In the event an extension is filed, Borrower shall deliver a copy of the extension within 30 days of filing.

Borrower shall also deliver to Bank such information as Bank my reasonably request from time to time, including without limitation, financial statements and information pertaining to Borrower's financial condition. Such information shall be certified by Borrower to be true, complete and accurate copies of Borrower's financial condition.

38.     **Events of Default.** Grantor shall be in default under this Agreement if, prior to the time that the full amount of the Obligations is completely paid, any one or more of the following events ("Event of Default") occurs:

(a)     any payment of principal or interest or any other sum is not paid within ten (10) days after it is due under this Agreement or under the Preferred Mortgage;

(b)     Grantor shall, or shall attempt to, without Lender's prior written permission

(1)     remove or allow removal of the Vessel for any extended period from the location where it is customarily berthed or stored, or change the state of the Vessel's principal use as specified in this Agreement,

(2)     sell, mortgage, encumber or otherwise dispose of Grantor's rights or interests in the Vessel except for Second Mortgage,

(3)     charter, hire out or lease the Vessel except for the Majesty Charter,

(4)     use the Vessel for any commercial purpose other than business promotional or entertainment use or a purpose other than as stated in this Agreement;

(5)     amend any document evidencing or securing the Second Mortgage;

11

(c)     Grantor permits the Vessel to deteriorate and lessen in value or the Vessel becomes valueless other than through normal depreciation;

(d)     Grantor conceals, misuses or abuses the Vessel, or uses or allows the use, with or without Grantor's knowledge, of the Vessel in connection with any illegal undertaking, or in violation of any law or regulation of any jurisdiction which could result in the seizure or forfeiture of the Vessel, or in violation of U.S. Coast Guard or other applicable regulations, or for any purpose other than those permitted by any license or registration for the Vessel issued by the U.S. Coast Guard, any foreign maritime authority, or any other competent authority;

(e)     Grantor becomes insolvent;

(f)     any receivership, bankruptcy, insolvency or similar proceedings, or any assignment for the benefit of creditors, shall be instituted by or against Grantor for any involuntary action Grantor shall have 60 days from the filing to cause such action to be dismissed prior to it becoming an Event of Default hereunder.

(g)     the Vessel shall be arrested, attached, levied upon, seized, or made the subject of any legal proceedings, including any civil or criminal forfeiture proceedings, or held by virtue of any lien or distress, or any notice of claim of lien on the Vessel is filed with the U.S. Coast Guard or any other applicable authority which seizure is not released within 48 hours after arrest;

(h)     all taxes and assessments upon the Vessel or its use are not paid promptly; .

(i)     the Vessel is damaged such that the value of the Collateral is diminished and the Vessel is permitted to remain in a damaged condition for more than thirty (30) days after the occurrence or accident causing the damage;

(j)     the Vessel is not kept suitably insured pursuant to Lender's requirements;

(k)     without prior notification to Lender, Grantor changes the state of its residence, or, if a corporation, limited liability company, partnership, trust or other legal entity, without the prior written consent of Lender, there is a change in its name, ownership, control, membership or structure;

(l)     if the Vessel is documented with the United States Coast Guard, Grantor ceases to be a citizen of the United States as required by the laws and regulations pertaining to the documentation and any trading privileges of the Vessel, or the Vessel is placed under the command of a person not a citizen of the United States under circumstances that would violate U.S. law;

(m)     Grantor fails to permit Lender to inspect the Vessel and everything in or on the Vessel or any document referred to in this Agreement or otherwise pertinent to the Vessel within 24 hours after written notice to Grantor;

12

(n)    Grantor fails to fully cooperate with Lender and within ten (10) business days after a written request, to execute and deliver any documents, applications or affidavits, to complete all marking requirements, to surrender any documents, or to take any other action necessary or desired by Lender to:

(1)    document or register or title the Vessel or keep it documented, registered or titled under the laws specified in Clause 17,

(2)    achieve or maintain the first priority "preferred mortgage" status of the Preferred Mortgage under Chapter 313, Title 46, U.S. Code, as amended, and under any applicable foreign law or

(3)    create, perfect and maintain any other security interest in Lender's favor on the Vessel and the Additional Collateral;

(o)    the Vessel cannot be documented by Grantor under the law specified in Clause 17;

(p)    any security interest in Lender's favor on Collateral other than the Vessel is not perfected or does not remain perfected in each jurisdiction in which Lender requires its security interest to be perfected;

(q)    Grantor allows any maritime liens on the Vessel to remain unsatisfied for more than thirty (30) days after being incurred;

(r)    Grantor breaches any warranty or promise or violates any of the prohibitions or fails to meet any of its Obligations under this Agreement, the Preferred Mortgage or any other related instrument or security agreement effective now or in the future;

(s)    Grantor is in default under the Preferred Mortgage, the Charter or the Second Mortgage, which default remains uncured after any applicable notice, grace or cure period, if any;

(t)    Grantor has made any false or misleading statement about any fact in this Agreement, the Preferred Mortgage or the application for credit;

(u)    any other event occurs that Lender in good faith reasonably believes endangers Grantor's ability to timely pay any sum due under this Agreement or the Preferred Mortgage;

(v)    any other event occurs that Lender in good faith reasonably believes jeopardizes or impairs the value of the Collateral for Grantor's Obligations under this Agreement or Lender's ability to realize that value in a foreclosure;

(w)    failure to timely change the home port of the Vessel as required under Clause 35;

13

(x)     if, without the prior written consent of Lender, which Lender it is absolute discretion may withhold, shares of the entity's capital stock or other equity interests are issued or sold or transferred to anyone who was not the owner thereof at the time this Agreement was signed, or if the entity merges or consolidates with any other legal entity, or ceases doing business as a going concern, or liquidates all or substantially all of its assets, or files for dissolution, or is administratively dissolved, or if it ceases to maintain its good standing as a legal entity or its qualification to do business in any state in which it does business; or *if such registration is required by law* (AT)

(y)     failure to: (i) register the casino gaming equipment with the U.S. Department of Justice or obtain Mortgagee's prior approval of the disclaimer language on the passenger tickets prior to commencement of the operation of the Vessel as a casino gaming vessel; (ii) obtain Mortgagee's consent to any change in the disclaimer language on the passenger ticket; or (iii)  maintain any registrations of the U.S. Department of Justice of casino gaming equipment.

39.    **Remedies Upon Default.**  Grantor agrees that the occurrence of any one or more of the Events of Default described in Clause 38 is a material default, and is and shall be deemed to be a material breach of this Agreement.  If Grantor is in default under this Agreement, Lender may do any one or more of the following with or without previous notice or demand for performance:

(a)     declare the unpaid Principal Indebtedness, all accrued interest thereon and all other Obligations to be and they shall then become and be immediately due and payable, after which acceleration interest shall accrue at the Default Rate specified in this Agreement until all of the Obligations have been fully paid;

(b)     recover judgment for, and collect out of any property of Grantor, any amount thereby or otherwise due hereunder; and/or pursue all claims and collect all money recoverable with respect to the Additional Collateral, including, without limitation, all insurance claims and proceeds, unearned premiums, requisition compensation, earned charter hire, freight monies and other revenue relating to services performed by or damages to the Vessel, Grantor having assigned to Lender all such claims and monies;

(c)     set off Grantor's liability against deposits or other personal property of Grantor held by Lender;

(d)     demand that Grantor deliver the Vessel to Lender at such location as Lender may reasonably require, including, but not limited to, its home port or anchorage (however, delivery of the Vessel to Lender will not relieve Grantor of Grantor's obligation to satisfy any deficiency which may arise upon subsequent sale or other disposition of the Vessel);

(e)     require Grantor to assemble upon the Vessel any equipment which should be installed in or located on the Vessel;

\74183\18721\#618986 v 5
4/21/03 2:41 PM

(f)   lawfully enter any premises where the Vessel may be located and repossess the Vessel, or otherwise take possession or control of the Vessel, together with anything in or on the Vessel, with or without legal process or judicial decrees and with or without previous notice or demand for performance;

(g)   judicially foreclose the preferred mortgage lien on the Vessel or the security interest Lender has in the Collateral under any applicable law, including, but not limited to, the maritime laws of the United States or any other jurisdiction where the Vessel may be found;

(h)   pursue any other remedy available to Lender as a secured creditor under any applicable law, including, but not limited to, United States or foreign maritime law or the Uniform Commercial Code of any appropriate jurisdiction;

(i)   refer this Agreement to an attorney for collection or enforcement and collect from Grantor all reasonable attorneys' fees and expenses incurred in connection therewith;

(j)   sell or otherwise dispose of the Vessel or any other Collateral at private sale or public auction;

(k)   require Grantor to pay all collection, enforcement and court costs, including, but not limited to, all costs of preservation or protection of the rights and interests of the Lender, and of foreclosure, enforcement and collection of any amount due and payable under this Agreement or under the Preferred Mortgage, including all costs and expenses of retaking, maintaining, repairing or rehabilitating, advertising, cleaning, storing or selling the Vessel or any other Collateral, including Marshal's fees and commissions, to the extent permitted by law, and all attorneys' fees incurred by Lender, all of which are secured by this Agreement. All such costs and fees shall constitute an additional part of the Obligations and shall accrue interest at the Default Rate provided in this Agreement. In the case of a judgment, interest on the unpaid balance of the judgment will be payable at the applicable judgment rate or, if permitted by law, at the Default Rate provided in this Agreement, at Lender's discretion.

(l)   obtain and utilize any and all charter fees or other income generated by the Vessel under the Majesty Charter or any other agreement whether written or oral.

40.   **Disposition or Use of Repossessed Vessel.** If Lender repossesses or otherwise takes possession or control of the Vessel without judicial process, Lender may, without being responsible for loss or damage, do any one or more of the following:

(a)   hold and in Lender's or in Grantor's name lease, charter, operate, lay up or otherwise use the Vessel for such time and on such terms as Lender may deem advisable, being accountable to Grantor for net profits, if any, and with the right to dock the Vessel free of charge at Grantor's premises or elsewhere at Grantor's expense;

(b)   if deemed appropriate by Lender, render the Vessel temporarily unfit for use by removing or disabling certain parts or equipment;

(c)     sell the Vessel upon such terms and conditions as to Lender shall seem best, free from any claim by Grantor of any nature whatsoever, in the manner allowed by law, and to the extent permitted by law such sale may be public or private, at such place as Lender may specify and with such notice as may be required by law. Lender may from time to time adjourn any such sale by announcement at the time and place appointed for such sale or for such adjourned sale, and, without further notice or publication, Lender may make any such sale at the time and place to which the same shall be adjourned. Any such sale may be conducted without bringing the Vessel to the place designated for such sale and in such manner as the Lender deems to be for its best advantage, and the Lender may become the purchaser at any public sale, and shall have the right in lieu of actual payment of the purchase price to make a credit bid and set off against the amount of the purchase price any or all sums of money due to the Lender hereunder or under the Preferred Mortgage.

The proceeds of any sale or other disposition shall be applied in the manner provided in Clauses 48 and 49 unless otherwise required by applicable law. To the extent permitted by applicable law, all late charges, costs of taking the Vessel, costs of storage, costs of sale including, but not limited to, cleaning, repairing and maintenance expenses, auctioneer's fee, sales commission, if any, advertising, insurance, and all attorneys' fees, collection costs, court costs, and other necessary expenses will be paid from the proceeds of the sale or other disposition of the Vessel.

41.     **Remedies to be Cumulative.** Each and every power or remedy herein given to Lender shall be cumulative, and in addition to all powers or remedies now or hereafter existing in admiralty, in equity, at law or by statute, and may be exercised as often and at such time or times as may be deemed expedient by Lender. No action that Lender takes to protect its interest under this Agreement or the Preferred Mortgage shall cure Grantor's failure to keep the promises Grantor makes in this Agreement, nor shall it prohibit Lender from declaring the Obligations immediately due and payable.

42.     **Irrevocable Power of Attorney.** For the purpose of exercising its rights under Clauses 15, 25, 26, 27, 36, 39 and 40 of this Agreement (and any other applicable clause under this Agreement), and subject to any applicable requirements of law, Lender and its employees and agents are irrevocably appointed Grantor's true and lawful attorneys-in-fact to perform any act or to execute any document necessary or useful to exercise such rights, including, without limitation, to make all necessary transfers of the Vessel, to realize or liquidate the Additional Collateral, to pay, defend or obtain the release of all maritime liens, and to take all other actions in Grantor's name and stead as may be necessary and appropriate to enforce Lender's rights under this Agreement. This power of attorney shall be irrevocable while this Agreement is in effect and shall not be affected by Grantor's disability or incapacity except as otherwise provided by statute. Grantor shall, if Lender so requests, ratify and confirm any sale of the Vessel by executing and delivering to the purchaser of the Vessel such bills of sale, conveyances, instruments of transfer and releases as Lender reasonably may request.

43.     **Redemption.** If Lender has nonjudicially repossessed the Vessel, Grantor shall have the right to redeem it at any time before Lender has disposed of it or entered into a contract for its disposition by tendering payment and performance in full of all of Grantor's Obligations

16

under this Agreement, including, without limitation, the entire balance due upon acceleration, all costs and expenses incurred in retaking and dealing with the Vessel, all attorneys' fees and all other Obligations of Grantor pursuant to the terms of this Agreement.

Lender may, in its sole discretion, permit Grantor to redeem the Vessel by paying and performing:

 (a) all past due installments of principal and accrued interest,

 (b) any late charges,

 (c) all collection costs and expenses, including attorneys' fees,

 (d) Lender's cost of taking and dealing with the Vessel (including moving, storage, repair, cleanup, advertising and other such expenses as described in Clause 44(k)), and

 (e) any other unpaid or unperformed Obligations which Lender may specify.

In addition to the foregoing, Lender shall have full liberty, at its sole discretion, to insist that Grantor may only redeem the Vessel by timely tendering payment and performance in full of all of the Obligations under this Agreement.

 44. **Recovery of Personal Belongings.**  If this Agreement is enforced by nonjudicial repossession of the Vessel, Grantor may claim any nonperishable personal belongings not covered by this Agreement that were in or on the Vessel at the time of repossession and that are not otherwise within the definition of the Vessel in Clauses 13 and 14 only if Grantor sends Lender notice by registered or certified mail of Grantor's intent to claim such belongings within thirty (30) days after repossession.  Grantor agrees that once Lender notifies Grantor by mail where these belongings may be claimed, Grantor must pick them up within thirty (30) days after receipt of said notice, or else Grantor will have no further claim to them.  In any case, Lender shall not be liable for any such belongings or for any damage to them.

 45. **Nonwaiver of Rights by Lender.**  Lender may delay in enforcing or fail to enforce any of its rights under this Agreement without losing any of them.  Even if Lender does not enforce any right at one time, Lender may enforce it at a later time.  Lender may also waive some of its rights without waiving any others.  No waiver by Lender of any of its rights will be effective unless in writing and signed by Lender.

 46. **Appointment of Receiver.**  In any legal action, Lender may have a receiver appointed for the Vessel and its earnings.  Grantor waives any objections or defenses Grantor may have to the appointment of a receiver, and agrees that Lender may be appointed as the receiver.  Grantor agrees not to request, and expressly waives any otherwise applicable legal requirement for, the posting of any bond if Lender is appointed as the receiver.  Any receiver appointed shall have full rights and powers to use and operate the Vessel pending its disposition and to obtain a court decree ordering and directing the sale or other disposition of the Vessel.

\74183\18721\ # 618986 v 5
4/21/03 2:41 PM

47.    **Application of Proceeds of Collateral.**  The net proceeds of any judicial or other sale, of any charter, management, operation or other use of the Vessel by Lender, of any claim for damages, of any judgment, of any insurance received by Lender (except to the extent paid to Grantor or applied in payment of repairs or otherwise for Grantor's benefit), or of any other Collateral securing the Obligations shall be applied as follows:

FIRST:  To the payment of all attorneys' and paralegals' fees, court costs, costs of taking, costs of sale, and any other expenses, losses, charges or damages incurred or advances made by Lender in the protection or enforcement of its rights, or caused by Grantor's default under this Agreement or under the Preferred Mortgage, with interest on all such amounts at the Default Rate specified in this Agreement until paid; and to provide adequate indemnity against any liens or security interests for which priority is claimed (i) over the security interest granted by this Agreement, or (ii) over the lien of the Preferred Mortgage;

SECOND:  To the payment of all accrued interest to date of payment and any and all other sums (other than principal) due pursuant to the terms of this Agreement or the Preferred Mortgage;

THIRD:  To the payment next of any or all matured installments of principal, and then of any or all unmatured installments of principal in the inverse order of their maturity.

48.    **Deficiencies or Surplus.**  Lender shall be entitled to collect any deficiency from Grantor.  For the purpose of determining the amount of any deficiency, Grantor stipulates and agrees that if the Vessel is sold by judicial sale or under judicial supervision or approval, or by public or private sale in a commercially reasonable manner, the actual price at which it was sold shall conclusively be deemed to be the fair market value of the Vessel, and the deficiency shall be the difference between the total outstanding Obligations secured by this Agreement and the net sale proceeds remaining after deducting from the actual selling price of the Vessel all costs and expenses incurred. Grantor shall be entitled to any surplus to the extent that such surplus is not required by law to be paid to other persons with liens on the Vessel, subject to set-off in favor of Lender for any other indebtedness of Grantor.

49.    **Advances, Expenses, Damages and Attorneys' Fees.**  All advances, costs and expenditures which Lender in its discretion may make or incur for repairs, insurance, payment of liens or other claims, defense of suits, or for any other purpose whatsoever related hereto or to the Preferred Mortgage, including any and all attorneys' and paralegals' fees (whether prior to or at trial, mediation, arbitration, on appeal, in enforcing any judgment, in any bankruptcy or civil or criminal forfeiture proceeding, or otherwise) and all damages sustained by Lender because of defaults, shall be repaid by Grantor on demand with interest at the Default Rate specified in this Agreement, and until so paid shall be a debt due from Grantor to Lender secured by this Agreement.  Lender shall not be obligated to make any such advances or expenditures, nor shall the making thereof relieve Grantor of any obligations or default with respect thereto.

Grantor expressly agrees to defend, hold harmless and indemnify Lender against and from any and all claims against Lender by any person and any and all damages or liabilities

18

suffered or incurred by Lender arising out of or resulting from, either directly or indirectly, any default under or breach of this Agreement by Grantor.

50.   **Binding Effect.**  All covenants and agreements of Grantor herein contained shall bind Grantor, its successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

51.   **Governing Law.**  If the Vessel is documented in the United States and is subject to a preferred mortgage, federal law applicable to preferred mortgages and related promissory notes and other documents, including, but not limited to, Title 46, Subtitle III, Chapter 313 of the United States Code, "Commercial Instruments and Maritime Liens" (46 U.S.C. § 31301 and the sections following) shall govern this Agreement.  The interest rate and other finance charge provisions of this Agreement have been freely chosen by Lender and Grantor as permitted by 46 U.S.C. § 31322(b) and no state law is applicable thereto.  If there are substantive issues other than those relating to interest or finance charges on which there is no established federal law and which cannot be resolved without reference to some law other than federal law, then and to such extent, the law of the State of Florida shall be applicable to this transaction.

Notwithstanding the foregoing, to the extent that the remedies available to Lender under United States federal law are not exclusive, Lender reserves the right to exercise any of the remedies available to a secured lender under the laws of, including the Uniform Commercial Code or other laws of similar effect as adopted in, any state or country where the Vessel or any of the Collateral may be located, including, without limitation, the remedy of nonjudicial repossession and sale.

52.   **Time of the Essence.**  Time is of the essence of this Agreement.  This means that there is no grace period and all payments which are required from Grantor must be made on the day due and all promises to be performed by Grantor must be performed on time.

53.   **Invalid Provisions Separable.**  If any clause, provision or portion of this Agreement shall be invalidated by any statute or any decision of any court, the invalidity shall not affect other provisions, clauses, or terms hereof which can be given effect without the invalid provision.

54.   **Amendments to Agreement.**  Except as permitted by Clause 64, no amendment of this Agreement will be valid unless in writing and signed by both Grantor and Lender.

55.   **Assignment of Agreement.**  This Agreement may be assigned by Lender at any time without prior notice to Grantor.  If this Agreement is assigned, upon notice of such assignment Grantor will owe all of its Obligations under this Agreement to the assignee who will succeed to all of Lender's rights under the Agreement.

56.   **Notices.**  Any notice required or permitted to be given hereunder shall be deemed properly given:  (i) upon delivery, if delivered in person or by commercial courier, (ii) upon completion of transmission if sent by facsimile transmission (telefax), or (iii) ten (10) business days after mailing by first class or registered or certified mail, postage prepaid, addressed to the Borrower at the address specified in Clause 1 of this Agreement, or to such other address as Borrower may have designated by written notice (if approved by Borrower).  Any notice to

\74183\13721\ # 619986 v 5
4/21/03 2:41 PM

Lender shall be in writing and delivered to 300 Alton Road, Suite 303, Miami Beach, Florida 33139 or such other address as Lender may specify in writing from time to time.

57.   [Intentionally Deleted.]

58.   **Conflict or Inconsistency of Terms.**   This Agreement and the Preferred Mortgage shall be construed consistently with one another to the extent possible. In the event of any conflict between the terms of this Agreement and the terms of the Preferred Mortgage or any other document related to this transaction, the terms of the Preferred Mortgage shall control to the extent of the conflict.

59.   **Integrated Agreement.**   This Agreement, the Preferred Mortgage and any other documents required by Lender and executed and delivered by Grantor, constitute the entire agreement between Lender and Grantor with respect to the subject matter hereof. There are no oral representations, warranties or agreements between Lender and Grantor, nor do any prior negotiations or statements made constitute part of this Agreement unless reduced to writing and incorporated in the space for "Special Provisions" in Clause 70 below.

60.   **Waivers and Consents of Grantor.**   Grantor agrees to perform all Obligations under this Agreement whether Lender provides any notices or makes any demands.  To the extent permitted by applicable law, Grantor waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default, or enforcement of this Marine Note and Security Agreement, and assents to any extension or postponement of the time of payment or any other indulgence, to any addition or substitution, exchange or release of Collateral and to the addition, substitution or release of any other party or person primarily or secondarily liable hereunder.

61.   **Choice of Forum; Submission to Jurisdiction.**   Grantor hereby agrees that any legal action or proceeding with respect to this Agreement, or to enforce any judgment obtained against Grantor may be brought by Lender in the courts of any jurisdiction where Grantor or any of its/his/her assets may be found or located, or in the courts of the State of Florida or in the United States Federal courts in said State, or in the courts of any other appropriate jurisdiction, as Lender may elect. By execution and delivery of this Agreement, Grantor irrevocably submits to personal jurisdiction in each such jurisdiction and expressly waives any objection as to venue and any claim as to inconvenient forum in any action or proceeding relating to this Agreement brought in any such jurisdiction. Final judgment against Grantor (a certified or exemplified copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness of Grantor therein described) in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on such judgment.

62.   Intentionally Deleted.

63.   **Special Authorizations to Complete/Correct, Etc.**  Lender or anyone who holds this Agreement may: (a) date this Agreement as of the date when the Loan is made; (b) correct any patent errors in the Agreement; (c) fill in any blank spaces according to the terms on which Lender granted this Loan to Grantor; (d) make any investigation Lender thinks desirable about

20

Grantor, either before or after making this Loan; and (e) return this Agreement when paid in full to any Grantor making the final payment.

64.   **Authorization, Execution and Validity.**  Grantor (if this Agreement is made by a corporation or other legal entity, the Board of Directors or other governing body thereof) has signed or duly authorized and directed the signing of all papers and taken all actions necessary for the signing and delivery of this Agreement. This Agreement and the Preferred Mortgage are represented and warranted to be valid and enforceable against Grantor.

65.   **Corporate Organization and Good Standing.**  If this Agreement is given by a corporation or other legal entity, the corporation or other legal entity is properly incorporated or organized and exists in good standing under the laws of Florida and is qualified to do business (if required to do so by applicable law) in every jurisdiction in which it does business. Grantor shall provide such proof of its corporate or legal entity status and qualification to do business at such time(s) and in such form(s) as Lender may reasonably require, although Lender has no duty of inquiry in this regard.

66.   **Truth of Statements.**  Grantor warrants to Lender and to anyone to whom Lender assigns this Agreement that each statement made by any Grantor to Lender in, and in connection with, this Agreement is true.

67.   **Miscellaneous.**  Wherever necessary to properly construe this Agreement, the use of the singular includes the plural and the use of the masculine includes the feminine.

68.   **Waiver of Trial by Jury.**  **BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THIS NOTE, THIS NOTE, THE MORTGAGE OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.**

69.   **Other Waiver.**  Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, except for notices expressly provided for in this Note, the Mortgage or the other Loan Documents.  No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Mortgage or the other Loan Documents made by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of all or any part of the Debt, under this Note, the Mortgage or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Mortgage or the other Loan Documents.   Lender may, without notice and without releasing the liability of any Borrower (a) grant extensions, renewals and indulgences from time to time and for any term or terms; (b) permit additions to or

21

substitutions of Collateral given for the payment of this Note and (c) add or release one or more parties without releasing any other party to this Note.

EACH PERSON WHOSE SIGNATURE APPEARS BELOW AS A "BORROWER" IS A GRANTOR AND AGREES TO THE TERMS AND CONDITIONS OF THIS AGREEMENT AND GRANTS LENDER THE SECURITY INTERESTS DESCRIBED HEREIN:

GRANTOR/BORROWER:

MLA CRUISES, INC., a Delaware corporation

Witness:

Print Name: _NORMA M. CALASTEW_

By: _____

Arkady Vaygensberg, Vice President

Witness:

Print Name: _Dianne Imadicci_

## ACKNOWLEDGEMENT

STATE OF FLORIDA )
) ss.:
COUNTY OF MIAMI-DADE )

On this 21st day of April, 2003, before me personally appeared Arkady Vaygensberg, known to me, and known to be the person who executed the foregoing instrument, who, being by me duly sworn, did depose and say that he is the Vice President of MLA Cruises, Inc., a Delaware corporation, the party described in and which executed the foregoing instrument; that he signed his name thereto by authority of a power of attorney of said corporation and as the free act and deed of such corporation.

Rhoda Rubin
MY COMMISSION # DD089688 EXPIRES
February 17, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

Notary Public, State of _Florida_
Printed Name: _RHODA RUBIN_
My Commission Expires: _2-17-06_

22

JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

MAGISTRATE JUDGE
O'SULLIVAN

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** *RCI-DINNER KEY, INC., A FLORIDA CORPORATION AND MIAMI BEACH MARINA ASSOCIATES, LTD., A FLORIDA LIMITED PARTNERSHIP*

**DEFENDANTS** *M.V. "THE ATLANTIC" f/k/a "MAX 1" IN REM, MLA CRUISES, INC., A DELAWARE CORP. AND MAJESTY ENTERPRISES OF FL, LLC, A FLORIDA LIMIT LIABILITY COMPANY V.*

(b) County of Residence of First Listed Plaintiff ___Miami-Dade County___
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed ___Miami - Dade County___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

*County where action Dade*

(c) Attorney's (Firm Name, Address, and Telephone Number)
Stuart R. Michelson
200 SE 13th Street
Ft. Lauderdale, FL 33316  Telephone: 954-463-6100

Attorneys (If Known)

04-20499
CIV-MOORE

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

*1:04CV 20499 Moore - O'Sullivan*

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — ☐ 310 Airplane; ☐ 315 Airplane Product Liability; ☐ 320 Assault, Libel & Slander; ☐ 330 Federal Employers' Liability; ☐ 340 Marine; ☐ 345 Marine Product Liability; ☐ 350 Motor Vehicle; ☐ 355 Motor Vehicle Product Liability; ☐ 360 Other Personal Injury | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☒ 120 Marine | **PERSONAL INJURY** — ☐ 362 Personal Injury—Med. Malpractice; ☐ 365 Personal Injury—Product Liability; ☐ 368 Asbestos Personal Injury Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | **PERSONAL PROPERTY** — ☐ 370 Other Fraud; ☐ 371 Truth in Lending; ☐ 380 Other Personal Property Damage; ☐ 385 Property Damage Product Liability | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | **PRISONER PETITIONS** — ☐ 510 Motions to Vacate Sentence; Habeas Corpus: ☐ 530 General; ☐ 535 Death Penalty; ☐ 540 Mandamus & Other; ☐ 550 Civil Rights; ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

The Court has jurisdiction pursuant to 28 USC section 1333 as this is a case cognizable within the Court's admiralty and maritime jurisdiction.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION DEMAND UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE ___March 3, 2004___   SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

*5 30543*