UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

AT LAW AND IN ADMIRALTY

CASE NO.  04-20499 CIV-MOORE

RCI-DINNER KEY, INC., a Florida
corporation

and

MIAMI BEACH MARINA
ASSOCIATES, LTD., A Florida
Limited Partnership,

      Plaintiffs,

vs.

M.V. "THE ATLANTIC", f/k/a
"MAX I", her boilers, engines, tackle,
equipment, freight, appliances,
apparel, appurtenances, etc., In
Rem, MLA CRUISES, INC., a
Delaware corporation; and
MAJESTY ENTERPRISES OF
FLORIDA, LLC., a Florida Limited
Liability Company",

      Defendants.

/

**VERIFIED MOTION TO SHOW CAUSE AND FOR EMERGENCY
RELIEF FROM THE WARRANT FOR ARREST IN REM**

COME NOW the Defendants, M.V. "THE ATLANTIC," f/k/a "MAX I," her boilers,

engines, tackle, equipment, freight, appliances, apparel, appurtenances, etc., In Rem, MLA

CRUISES, INC., a Delaware corporation; and MAJESTY ENTERPRISES OF FLORIDA, LLC.,

a Florida Limited Liability Company," by and through their undersigned counsel, and files this their

Verified Motion to Show Cause and for Emergency Relief from the Warrant for Arrest in Rem,

based on the following:

1.  That Robert Christoph, the principal of the herein Plaintiffs, came to the Defendants and stated: "If you sign the Assets Purchase Agreement with MB Cruises, LLC. and you agree not to file Chapter 11, I agree not to arrest the Vessel (referring to M.V. "THE ATLANTIC")." The parties orally agreed to the above, and on March 1, 2004, the Defendants executed the Addendum to and Asset Purchase Agreement with MB Cruises, LLC., Exhibit "A" attached hereto and made a part hereof for a $6,000,000.00 sales price and presently undersigned counsel has $300,000.00 in escrow pending the sale.

2.  The Plaintiffs' principal, Robert Christoph, has now breached said oral agreement entered into between the parties by filing and pursuing the herein action.

3.  The closing, pursuant to Exhibit "A" supra., was scheduled to take place on March 31, 2004, at which time the Plaintiffs were to be made whole.

4.  The action of the Plaintiff's smacks of some nefarious or devious reason for presently interfering with the contract for sale, Exhibit "A" supra..

5.  That the principal of Plaintiffs, Robert Christoph, was intimately familiar with the terms and conditions of the Asset Purchase Agreement, Exhibit "A" supra., and in fact negotiated the terms of the Exhibit "A" supra. on behalf of both sides and acted as a mediator in some instances.

6.  The Defendants detrimentally relied on Robert Christoph's promises and representations and the oral agreement as described in Paragraph 1 above that he made with the Defendants on behalf of the Plaintiffs.

*Rci-Dinner Key, Inc., etc. v. M.V. "The Atlantic," etc., et al.*
*USDC CASE NO. : 04-20499 CIV-MOORE*
*Page 3*

7. The actions of the Plaintiffs have shut down an ongoing business, and put approximately 150 people on the street without jobs and now has jeopardized the Asset Purchase Agreement, Exhibit "A" supra..

WHEREFORE, the Defendants request that the Plaintiffs be Ordered to Show Cause why Emergency Relief from the Warrant for Arrest In Rem should not be granted; that this Honorable Court determine that the Asset Purchase Agreement, Exhibit "A" supra., is sufficient collateral to serve as a bond in order to secure the Plaintiffs; and award attorney's fees and costs and other expenses to the Defendants for the necessity of filing this motion.

Majesty Enterprises of Florida, LLC

By: Leonid Tatarchuk, Managing Member

MLA Cruises, Inc.

By: Leonid Tatarchuk, Vice President

STATE OF FLORIDA )
)SS.
COUNTY OF MIAMI-DADE )

BEFORE ME the undersigned authority personally appeared LEONID TATARCHUK, Managing Member of Majesty Enterprises of Florida, LLC, who, is personally known to me or who produced as identification ____N/A____, and who did take an oath that the matters set forth herein are true and correct to the best of his knowledge and belief

Notary Public, State of Florida

Commission Number:

My commission expires:



*Rci-Dinner Key, Inc., etc. v. M.V. "The Atlantic," etc., et al.*
*USDC CASE NO. : 04-20499 CIV-MOORE*
*Page 4*

STATE OF FLORIDA      )
                      )SS.
COUNTY OF MIAMI-DADE )

    BEFORE ME the undersigned authority personally appeared LEONID TATARCHUK, Vice President of MLA Cruises, Inc., who, is personally known to me or who produced as identification _____, and who did take an oath that the matters set forth herein are true and correct to the best of her knowledge and belief.



_____
Notary Public, State of Florida

My commission expires: _____        Commission Number: _____

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed and faxed this 8th day of March, 2004 to:   Stuart R. Michelson, Esq., Law Office of Stuart R. Michelson, 200 S.E. 13th Street, Fort Lauderdale, FL 33316.

DAVID M. GOLDSTEIN, Esq.
Attorney for Defendants
Wachovia Financial Center
200 S. Biscayne Boulevard, Suite 1880
Miami, FL 33131
(305) 372-3535
FAX: (305) 577-8232

By: _____
        DAVID M. GOLDSTEIN

# AMENDMENT TO ASSET PURCHASE AGREEMENT

This **AMENDMENT TO ASSET PURCHASE AGREEMENT** (this "Amendment") is made and entered into this 1st day of March 2004, by and among **MLA CRUISES, INC.**, a Delaware corporation ("MLA") and **MAJESTY ENTERPRISES OF FLORIDA, LLC.**, a Florida limited liability company, ("Majesty") (MLA and Majesty are collectively referred to as, the "Seller"), and all the Members holding collectively, 100% of the issued and outstanding Membership Interests of Majesty, whose names appear at the bottom of this Amendment (hereinafter referred to as the "Majesty Members"), on the one hand, and **MB CRUISES, LLC.**, a Delaware limited liability company ("Buyer"), and **SOUTHEAST CRUISE HOLDINGS, LLC.**, a Delaware limited liability company ("SCH") on the other hand. Each of MLA, Majesty and Buyer are individually referred to as a "Party" and collectively, as the "Parties."

## RECITALS

**WHEREAS**, the Parties have entered into that certain Asset Purchase Agreement dated February 19, 2004, a copy of which is attached hereto as Exhibit A (the "APA"); and

**WHEREAS**, the Parties now desire to amend the APA as hereinafter provided.

## AMENDMENT

**NOW, THEREFORE**, the Parties hereby agree as follows:

1   All capitalized terms used in this Amendment and not otherwise defined herein shall have the respective meanings assigned thereto in the APA.

__OPTION A:__

2.  Section 3 1 "Closing" of the APA is hereby amended to replace March 5, 2004 for March 31, 2004, as the new Closing Date (the "New Closing Date"), unless otherwise extended in writing by all the parties hereto. The New Closing Date is conditioned upon Buyer's receiving from Seller this Amendment executed by or before 5:00 pm (Eastern Time) on March 1, 2004. If this Agreement is executed by Seller after the March 1st deadline, the New Closing Date shall be extended to April 5th, 2004.

3   Section 3.2 (a) is hereby amended and restated to read:

"(a) An earnest money deposit in the amount of Three Hundred Thousand Dollars ($300,000) (the "Deposit") to be wired to Goldstein & Goldstein, P.A. Trust Account No. 40-5100-7710, ABA No.: 066010377, Commercial Bank of Florida, 12255 NE 16th Avenue, N. Miami, Fl 33161, Attention: Robert Singleton (the "Escrow Agent"), upon the full execution of this Agreement. The Deposit shall only be disbursed upon joint written instructions from Buyer and Seller delivered to the Escrow Agent.; except on default of Buyer, terms pursuant to paragraph 9 1(a) or Closing of the transaction. Also, upon full execution of this Amendment, Seller will deposit in escrow with Buyer, all the certificates representing 100% of the issued and outstanding membership interests of Majesty (the "Majesty Shares"). At Closing, all the Members of Majesty, will assign,

transfer and convey to Buyer, all of their title and interest, in and to the Majesty Shares free and clear of any Encumbrances (except for those to be cleared with the Hold-Back Amount), and Majesty shall covenant to fully indemnify, defend and hold harmless the Buyer Indemnified Parties, for any Damages or claims relating to the Majesty Shares. The Majesty Members hereby agree to execute and deliver to Buyer, all the documents of conveyance, reasonably necessary to perfect such transfer of the Majesty Shares; and"

A new subsection (c) is hereby added to Section 3.2 to state:

"(c) If the New Closing Date does not take place for any reason, other than Seller's Breach of this Agreement, Seller shall be entitled in addition to retaining the Deposit, to an additional payment of Three Hundred Thousand Dollars ($300,000), which together with the Deposit shall constitute liquidated damages, and not a penalty, and shall serve as the exclusive remedy of Seller and the Majesty Members against Buyer."

4.    Section 9.1 (e) is hereby amended and restated to read:

"e. **Due Diligence.** (A) Delivery by Seller of all the due diligence documents listed in Appendix A (the "Due Diligence Documentation"); and (B) acceptance by Vanquish and Buyer of the final results of the financial, and legal due diligence investigation on Seller and the technical inspection of the Vessel (as provided in Section 6.1 above); provided, however, that Buyer will give written notice to Seller of any results of technical inspection and due diligence investigation that are not acceptable to Buyer (the "Repairs") on or before March 18, 2004 (the "Notification Date"). If the Buyer fails to deliver to Seller such written notice on the Notification Date, the Deposit (as defined in Section 3.2 (a)) shall become non-refundable and shall be disbursed to Seller as provided in Section 3.2 (c) above. Seller must address at Buyer's reasonable satisfaction before or on the New Closing Date, the Repairs."

5.    Section 10.1 (b) of the APA is hereby amended to replace March 5, 2004 for April 5, 2004, as the new Upset Date.

**OPTION B**

If Seller and the Majesty Members accept the following terms constituting this Option B, the Option A terms contained in Sections 2 through 5 above shall not have any legal effect):

1.    Section 3.1 "**Closing**" of the APA is hereby amended to replace March 5, 2004 for March 22, 2004, as the new Closing Date (the "New Closing Date"), unless otherwise extended in writing by all the parties hereto. The New Closing Date is conditioned upon Buyer's receiving from Seller this Amendment executed by or before 5:00 pm (Eastern Time) on February 28, 2004. If this Agreement is executed by Seller after the February 28 deadline, the New Closing Date shall be extended to March 31, 2004.

2.    Section 3.2 (a) is hereby amended and restated to read:



2

"(a) An earnest money deposit in the amount of Three Hundred Thousand Dollars ($300,000) (the "Deposit") to be wired to Goldstein & Goldstein, P.A. Trust Account No. 40-5100-7710, ABA No.: 066010377, Commercial Bank of Florida, 12255 NE 16th Avenue, N. Miami, Fl 33161, Attention: Robert Singleton (the "Escrow Agent"), upon the full execution of this Agreement. The Deposit shall only be disbursed upon joint written instructions from Buyer and Seller delivered to the Escrow Agent. Also, upon full execution of this Amendment, Seller will deposit in escrow with Buyer, all the certificates representing 100% of the issued and outstanding membership interests of Majesty (the "Majesty Shares"). At Closing, all the Members of Majesty, will assign, transfer and convey to Buyer, all of their title and interest, in and to the Majesty Shares free and clear of any Encumbrances (except for those to be cleared with the Hold-Back Amount), and shall covenant to fully indemnify, defend and hold harmless the Buyer Indemnified Parties, for any Damages or claims relating to the Majesty Shares. The Majesty Members hereby agree to execute and deliver to Buyer, all the documents of conveyance, reasonably necessary to perfect such transfer of the Majesty Shares; and"

8. Section 3.2 (b) is hereby amended and restated to read:

"The balance of the Closing Consideration shall be paid as follows: (1) a cash payment in the amount of Two Million Seven Hundred Thousand Dollars ($2,700,000). Out of this cash amount the sum of Three Hundred Thousand Dollars ($300,000) (the "Hold-Back Amount") shall be used for the sole purpose of paying any Excluded Liabilities outstanding on the Closing Date. Seller shall within a reasonable time provide to Buyer with written evidence of payment of such Excluded Liabilities. Nothing herein shall prevent Seller from negotiating a lesser amount of the Excluded Liabilities. (2) the amount of Three Million Three Hundred Thousand Dollars ($3,300,000) shall be paid with an unsecured non-recourse Promissory Note made by Buyer and guaranteed by SCH in favor of Seller (the "Note"), with a simple interest rate of 11%, payable forty-five (45) days after the Closing. The Note shall contain a provision allowing the Buyer to offset the amount of up to Four Hundred Thousand Dollars ($400,000) against the principal balance of the Note, for any Outstanding Liabilities at Closing (after the Hold-Back has been duly spent) or to pay for material repairs of the Vessel."

A new subsection (c) is hereby added to Section 3.2 to state:

"(c) If the New Closing Date does not take place for any reason, other than Seller's Breach of this Agreement, Seller shall be entitled retain the Deposit as liquidated damages, and not as a penalty, and shall serve as the exclusive remedy of Seller and the Majesty Members against Buyer."

9. Section 9.1 (e) is hereby amended and restated to read:

"e. Due Diligence. (A) Delivery by Seller of all the due diligence documents listed in Appendix A (the "Due Diligence Documentation"); and (B) acceptance by Vanquish and Buyer of the final results of the financial, and legal due diligence investigation on Seller and the technical inspection of the Vessel (as provided in Section 6.1 above); provided, however, that Buyer will give written notice to Seller of any results of technical

3

03-03-2004  13:07   From-FOLEY & LARNER                    +618 234 6374        7-308  P 006/047  F-454
Case 2:04-cv-20499-JJO  Document 1  Entered on FLSD Docket 03/09/2004  Page 8 of 49

03/01/2003  04:57   3865778232                   DAVID M GOLDSTEIN              PAGE  04
Mar 01 04 03:22p       EXECUTIVE OFFICE          561-405-5488                   p. 4

inspection and due diligence investigation that are not acceptable to Buyer (the "Repairs") on or before March 18, 2004 (the "Notification Date"). If the Buyer fails to deliver to Seller such written notice on the Notification Date, the Deposit (as defined in Section 3.2 (a)) shall become non-reimbursable and shall be disbursed to Seller as provided in Section 3.2 (e) above. Seller must address at Buyer's reasonable satisfaction before or on the New Closing Date, the Repairs."

10. Section 10.1 (b) of the APA is hereby amended to replace March 5, 2004 for March 31, as the new Upset Date.

## MISCELLANEOUS PROVISIONS

11. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument and each of which may be signed and transmitted via facsimile with the same validity as if it were an ink-signed document.

12. Upon full execution of this Amendment, Buyer shall be entitled to appoint a representative or representatives to oversee the Atlantic Business and Seller shall notify in writing Buyer of any actions taken in connection therewith.

13. Except as otherwise amended or restated by this Amendment, all of the terms and provisions of the APA shall remain in full force and effect.

*[Remainder of Page Intentionally Left Blank]*

4



IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

"Payer"

MB CRUISES, LLC,
a Delaware limited liability company

By: _____
Name: Joseph Del Valle
Title: DIRECTOR
Date: 3/2/04

SOUTHEAST CRUISE HOLDINGS, LLC,
a Delaware limited liability company

By: _____
Name: Joseph Del Valle
Title: CHAIRMAN
Date: 3/2/04

*[Signature Page 1 of 2 to Casino Atlantic Amendment to Asset Purchase Agreement]*

5

"Seller"

MLA CRUISES, INC.
a Delaware corporation

By: _____
Name: Michael Cohen, Esq.
Title: President
Date: _____2-6-04_____
Option accepted (check only one):

OPTION A ___X___ or OPTION B _____

MAJESTY ENTERPRISES OF FLORIDA, LLC
a Delaware limited liability company

By: _____
Name: LEONID TATARCHUCK
Title: MANAGING MEMBER
Date: _____

OPTION A ___X___ or OPTION B _____

Michael Cohen, MANAGING MEMBER

Leonid Tatarchuck, MANAGING MEMBER

Arkady Vaygensberg, MANAGING MEMBER

Option accepted jointly by all the Majesty Members (check only one).

OPTION A ___X___ or OPTION B _____
Date: _____

[Signature Page 3 of 3 to Casino Atlantic Amendment to Asset Purchase Agreement]

From-FOLEY & LAFFER

EXECUTIVE OFFICE          DAVID M GOLDSTEIN
                           561-495-3485

PAGE   06
p.7

## APPENDIX "A"

### Due Diligence Documentation

1.    Financial statements of Majesty and MLA for the year 2003 and year to date income statements and balance sheets.

2.    Capital expenditures for fiscal year 2003.

3.    Aging report on accounts payable.

4.    Asset summary.

5.    Copies of capital operating leases.

6.    Copies of all operating contracts to be assigned to Buyer.

7     Information on any pending litigation against including copies of any lawsuits filed against Seller.

8.    A list of priority tax payments.

Del Valle, Joseph.

To: REBECCA PEREZ
(619) 234-3510

ASSET PURCHASE AGREEMENT

by and among

MLA Cruises, Inc., a Delaware corporation and

Majesty Enterprises of Florida, LLC, a Florida limited liability company
(Seller)

and

MB Cruises, LLC, a Delaware limited liability company
(Buyer)

Dated February ___, 2004
20

# TABLE OF CONTENTS

ARTICLE 1. DEFINITIONS ............................................................. 1

ARTICLE 2. ASSET ACQUISITION ................................................. 6

   2.1   Asset Acquisition ........................................................... 6
   2.2   Excluded Assets .............................................................. 7
   2.3   Conveyance of Assets; Excluded Liabilities ................. 7
   2.4   Prorations ....................................................................... 8
   2.5   Non-Assignable Agreements ......................................... 9

ARTICLE 3. CLOSING ................................................................... 9

   3.1   Closing ........................................................................ 10
   3.2   Closing Consideration ................................................. 10
   3.3   Allocation .................................................................... 10
   3.4   Closing Obligations of Seller ..................................... 10
   3.5   Closing Obligations of Buyer ..................................... 11

ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF SELLER ....... 12

   4.1   Organization and Good Standing ................................ 12
   4.2   Authority; No Conflict ................................................ 12
   4.3   Title to Assets; Encumbrances .................................... 13
   4.4   Condition and Sufficiency of Assets .......................... 13
   4.5   Tax Matters .................................................................. 13
   4.6   Financial Statements .................................................... 13
   4.7   Employee Benefits ...................................................... 14
   4.8   Compliance with Legal Requirements; Governmental Authorizations ... 14
   4.9   Legal Proceedings; Orders .......................................... 14
   4.10  Contracts; No Defaults ................................................ 15
   4.11  Insurance ...................................................................... 15
   4.12  Compliance with Environmental Laws ...................... 15
   4.13  Intellectual Property .................................................... 16
   4.14  Brokers or Finders ...................................................... 16
   4.15  Certain Payments ........................................................ 16
   4.16  Relationships With Related Persons ........................... 16
   4.17  Labor Relations ........................................................... 16
   4.18  Full Disclosure ............................................................ 17

ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF BUYER ....... 17

   5.1   Organization and Seller Standing ............................... 17
   5.2   Consents ....................................................................... 17
   5.3   Authority ...................................................................... 17
   5.4   Brokers or Finders ...................................................... 18



ARTICLE 6. INSPECTIONS; DAMAGES TO VESSEL ........................................ 18
   6.1   Inspections ........................................................................ 18
   6.2   Risk of Loss ....................................................................... 18

ARTICLE 7. COVENANTS OF SELLER PRIOR TO CLOSING DATE ................ 19
   7.1   Access to Personnel, Books, Records and Properties ................... 19
   7.2   Operation of the Businesses of the Atlantic Business ................... 19
   7.3   Negative Covenant ............................................................. 19
   7.4   Notification ...................................................................... 19
   7.5   No Negotiation .................................................................. 20
   7.6   Best Efforts ...................................................................... 20
   7.7   Third-Party Consents .......................................................... 20
   7.8   No Inconsistent Action ........................................................ 20
   7.9   Sales and Transfer Taxes ...................................................... 20
   7.10  Post-Closing Covenants ....................................................... 20

ARTICLE 8. COVENANTS OF BUYER PRIOR TO CLOSING DATE ................ 21
   8.1   Best Efforts ...................................................................... 21
   8.2   Notification ...................................................................... 21
   8.3   No Inconsistent Action ........................................................ 21
   8.4   Employment with Buyer ...................................................... 21

ARTICLE 9. CONDITIONS PRECEDENT TO PARTIES' OBLIGATIONS TO CLOSE ....... 22
   9.1   Conditions Precedent to the Obligation of Buyer to Close ............ 22
   9.2   Conditions Precedent to the Obligation of Seller to Close ............ 23

ARTICLE 10. TERMINATION ................................................................. 24
   10.1  Termination Events ............................................................ 24
   10.2  Rights of Parties for Nonperformance or Upon Termination ......... 24

ARTICLE 11. INDEMNIFICATION; REMEDIES .......................................... 25
   11.1  Survival; Right to Indemnification Not Affected by Knowledge ..... 25
   11.2  Indemnification and Payment of Damages by Seller .................... 26
   11.3  Indemnification and Payment of Damages by Buyer ................... 26
   11.4  Procedure for Indemnification — Third-Party Claims ................. 26
   11.5  Procedure for Indemnification — Other Claims ........................ 27
   11.6  Limitation on Amount ......................................................... 27
   11.7  Maximum Indemnification ................................................... 2827
   11.8  Sole Remedy ................................................................... 28
   11.9  Material Inducement .......................................................... 28

ii



ARTICLE 12. GENERAL PROVISIONS ................................................................. 28

12.1  Expenses ................................................................................................. 28
12.2  Public Announcements ........................................................................... 28
12.3  Confidentiality ........................................................................................ 28
12.4  Notices .................................................................................................... 29
12.5  Further Assurances ................................................................................. 29
12.6  Waiver ..................................................................................................... 30
12.7  Entire Agreement and Modification ....................................................... 30
12.8  Exhibits; Schedules ................................................................................ 30
12.9  Assignment, Successors and No Third-Party Rights ............................. 30
12.10 Severability ............................................................................................ 31
12.11 Section Headings; Construction ............................................................. 31
12.12 Time of Essence ..................................................................................... 31
12.13 Attorneys' Fees ...................................................................................... 31
12.14 Governing Law; Waiver of Jury Trial .................................................... 31
12.15 Jurisdiction; Service of Process ............................................................. 32
12.16 Counterparts; Facsimile ......................................................................... 32
12.17 Compliance with Bulk Sale Laws .......................................................... 32

iii

03-03-2004   13:09   From-FOLEY & LARDNER
02/23/2004   13:09
02/28/2004   00:32   3055779232
FEB-19-2004   23:04        0000

DAVID M GOLDSTEIN        12125213000        PAGE   02

Case 1:04-cv-20499-JJO   Document 8-1   Entered on FLSD Docket 03/09/2004   Page 16 of 49

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into this _____ day of _____ February 2004 2004, by and among MLA CRUISES, INC., a Delaware corporation ("MLA") and MAJESTY ENTERPRISES OF FLORIDA, LLC, a Florida limited liability company, affiliates ("Majesty") (MLA and Majesty are collectively referred to as, the "Seller"), on the one hand, and MB CRUISES, LLC, a Delaware limited liability company ("Buyer"), on the other hand, with respect to the following facts:

WHEREAS, Buyer is a company wholly owned and controlled by Vanquish Acquisition Partners, LLC, a Delaware limited liability company ("Vanquish"). Buyer has been formed and organized for the purpose of acquiring and operating companies conducting business within the cruise and leisure industries;

WHEREAS, MLA is a company engaged in the operation of an offshore gaming vessel departing from Miami Beach Marina, Florida, (the "Atlantic Business");

WHEREAS, MLA is the sole owner of record of the vessel known as "M/V Atlantic" as more fully described on Exhibit "A" attached hereto and incorporated herein by this reference (the "Vessel");

WHEREAS, Seller desires to sell, transfer and assign to Buyer all of Seller's right, title and interest to all of the Assets (as defined in Section 2.1 below), used in the operation of the Atlantic Business, free and clear of any Encumbrances (as defined in Section 1.10 below) all for the consideration and on the terms set forth in this Agreement;

WHEREAS, the Board of Directors of Seller has approved the sale of the Assets to Buyer (the "Asset Acquisition"); and

WHEREAS, the parties hereto desire to make certain representations, warranties and agreements in connection with the Asset Acquisition and also to prescribe certain conditions with respect thereto.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each signatory hereto, the parties hereto covenant and agree as follows:

### ARTICLE 1.
### DEFINITIONS

For purposes of this Agreement, the following terms shall have the following meanings:

1.1   "Agreement" means this Asset Purchase Agreement.

03-03-2004  13:10     From-FOLEY & LARDNER
02/23/2004                                                                    P.454
02/20/2004   00:32    3055778232         DAVID M GOLDSTEIN              PAGE  03
FEB-19-2004  23:04            0000

Case 1:04-cv-20499-JJO   Document 8-1   Entered on FLSD Docket 03/09/2004   Page 17 of 49

1.2    "Assets" as defined in Section 2.1 below.

1.3    "Assigned Contract" as defined in Section 2.1(c) below.

1.4    "Assumed Liabilities" as defined in Section 2.3 below.

1.5    "Best Efforts" means commercially reasonable efforts that a prudent Person (as defined below) desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible.

1.6    "Breach" means a breach of a representation, warranty, covenant, obligation or other provision of this Agreement or any instrument delivered pursuant to this Agreement and will be deemed to have occurred if there is or has been any material inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation or other provision in the Agreement.

1.7    "Cage Cash" as defined in Section 2.2 (a).

1.8    "Closing Date" means the date set forth in Section 3.1.

1.9    "Consent" means any approval, consent, ratification, waiver or other authorization from a Governmental Body (as defined below) and any other necessary Governmental Authorization (as defined below).

1.10    "Contemplated Transactions" means all of the transactions contemplated by this Agreement, including, without limitation, the sale of the Assets by Seller to Buyer pursuant to the Asset Acquisition and the performance by Buyer and Seller of their respective covenants and obligations under this Agreement.

1.11    "Contract(s)" means any agreement, contract, obligation, promise or undertaking including any license agreement (whether written or oral and whether express or implied) relating to the Atlantic Business that is legally binding on Seller.

1.12    "Employee Benefit Plan(s)" means any "employee benefit plan" as defined in Section 3(3) of ERISA (as defined below) and any other plan, policy, program, practice or arrangement providing compensation or other benefits to any current or former employee of Seller or any beneficiary or dependent thereof that is or was maintained by the Seller.

1.13    "Encumbrances" shall mean any claims, including any technical and regulatory recommendations, charters, mortgages, lien, pledge, option, charge, easement, security interest, deed of trust, restriction, rights in rem and maritime liens, or other rights, whether voluntarily incurred or arising by operation of law, and includes, without limitation, any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement, provided, however, that Encumbrances exclude maritime liens arising in the ordinary course of business, Tax liens for amounts not yet due.

1.14    "Environmental Law(s)" means all federal, state and local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative orders,

2

directives, requests, licenses, authorizations, permits and agreements issued or signed by any federal, state or local government authority, relating to environmental, health or safety matters, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Clean Water Act of 1977, the Clean Air Act, the Resource Conservation and Recovery Act of 1976, the Federal Insecticide, Fungicide and Rodenticide Act, the Toxic Substances Control Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Occupational Safety and Health Act of 1970 and the Safe Drinking Water Act, and state and local counterparts to such acts.

1.15    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor law, and the rules and regulations issued pursuant to that act or any successor law.

1.16    "Excluded Contracts" as defined in Section 2.2(c).

1.17    "Excluded Liabilities" as defined in Section 2.3.

1.18    "Facilities" means any real property, leaseholds or other interests currently owned or operated by Seller relating to the business and operations of the Atlantic Business.

1.19    "Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

1.20    "Governmental Body(ies)" means (i) any nation, state, county, city, town, village, district or other jurisdiction of any nature, (ii) any federal, state, local, municipal, foreign or other government, (iii) any governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal), (iv) any multi-national organization or body, or (v) any body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

1.21    "Hazardous Substance(s)" means (i) any substance, the presence of which requires investigation or remediation under any Environmental Law or under common law, (ii) any dangerous, toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous substance which is regulated by any Environmental Law, (iii) any substance, the presence of which causes or threatens to cause a nuisance upon property presently owned, leased or otherwise used by the Seller (or poses or threatens to pose a hazard to the health or safety of persons on or about the property or adjacent properties) and (iv) radon, urea-formaldehyde, polychlorinated biphenyls, asbestos or asbestos-containing materials, petroleum and petroleum products.

1.22    Intentionally deleted.

1.23    "IRC" means the Internal Revenue Code of 1986, as amended, or any successor law, and the rules and regulations issued by the IRS (as defined below) pursuant to the IRC or any successor law.

3

1.24   "IRS" means the United States Internal Revenue Service, or any successor agency, and, to the extent relevant, the United States Department of the Treasury.

1.25   "Knowledge" means an individual will be deemed to have "Knowledge" of a particular fact or other matter only if such individual is actually aware of such fact or other matter.

1.26   "Legal Requirement" means any federal, state, local, municipal, foreign, international, multinational or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

1.27   "Liabilities" means, as to any person or entity, all debts, adverse claims, liabilities and obligations, direct, indirect, absolute, contingent or otherwise, of such person or entity, whether accrued, vested or otherwise, whether in contract, tort, strict liability or otherwise and whether or not actually reflected, or required by the federal income tax method of accounting to be reflected, in such person's or entity's balance sheets or other books and records, including, without limitation: (i) obligations arising under any law, rule or regulation of any Governmental Body or imposed by any court or any arbitrator of any kind; (ii) obligations arising in connection with products sold by, or in connection with services provided by, or under, contracts, agreements (whether written or oral), leases, commitments or undertakings of, such person or entity; (iii) all indebtedness or liability of such person or entity for borrowed money, or for the purchase price of property or services (including trade agreement obligations); (iv) all obligations of such person or entity as lessee under leases, capital or other; (v) liabilities of such person or entity in respect of plans covered by Title IV of ERISA or otherwise arising in respect of plans for employees or former employees or their respective families or beneficiaries; (vi) reimbursement obligations of such person or entity in respect of letters of credit; (vii) all obligations of such person or entity arising under acceptance facilities; (viii) all liabilities of other person or entities directly or indirectly guaranteed, endorsed (other than for collection or deposit in the ordinary course of business) or discounted with recourse by such person or entity or with respect to which the person or entity in question is otherwise directly or indirectly liable; (ix) all obligations secured by any lien on property of such person or entity, whether or not obligations have been assumed; (x) all other items which have been or in accordance with the federal income tax method of accounting would be included in determining total liabilities on the liability side of the balance sheet of such person or entity; and (xi) any and all other obligations of such person or entity.

1.28   "Order" means any award, decision, injunction, judgment, order, ruling, subpoena or verdict entered, issued, made or rendered by any court, administrative agency or other Governmental Body or by any arbitrator.

1.29   "Organizational Documents" means (i) the articles or certificate of incorporation and the bylaws of a corporation, (ii) the partnership agreement and any statement of partnership of a general partnership, (iii) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (iv) the certificate of formation and operating agreement of a limited liability company, (v) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (vi) any amendment to any of the foregoing.

4

03-03-2004   13:11   From-FOLEY & LARDNER
02/20/2004   00:32   3055778232
FEB-19-2004   23:05   0000

DAVID M GOLDSTEIN

1.30   "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or other entity or Governmental Body.

1.31   "Proceeding" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

1.32   "Related Person" means an "affiliate" (as such term is defined in the rules promulgated under the Securities Exchange Act of 1934, as amended) of a Person, provided that when referring to Seller, Related Person means an officer or director of Seller and when referring to Buyer, Related Person means an officer or director of Buyer.

1.33   "Representative" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

1.34   "Schedules" means the schedules attached hereto and incorporated herein by this reference relating to the representations and warranties of the parties hereto.

1.35   "Tax(es)" means taxes of any kind, accrued or accruing, including any and all federal, state or local taxes, charges, fees, levies or other assessments of any nature whatsoever (including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, excise, estimated, severance, stamp, occupation, property or other taxes, customs, duties, fees, assessments or charges of any kind whatsoever) together with any interest and any penalties, additions to tax or additional amounts imposed by any taxing authority (domestic or foreign) upon the entity to which reference is being made or any affiliate thereof or upon any consolidated, combined or unitary group of which any such entity is or was a member, and any and all protest expenses (of any nature whatsoever) incurred in connection therewith.

1.36   "Tax Return" means any return (including any information return), report, statement, schedule, notice, form or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax.

1.37   "Threatened" means a claim, Proceeding, dispute, action or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action or other matter is likely to be asserted, commenced, taken or otherwise pursued in the future.

5



02/23/2004 16:31 FOM    From-FOLEY & LARNER
02/20/2004 08:32    3055778232
DAVID M GOLDSTEIN
FEB-19-2004  23:05    0000

# ARTICLE 2.
## ASSET ACQUISITION

2.1    Asset Acquisition. At the Closing (as defined in Section 3.1 below) and subject to the terms and conditions of this Agreement, Seller shall convey, transfer, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept all right, title and interest of Seller in and to the assets that are used or held for use in the operation of the Atlantic Business and the Vessel (collectively, the "Assets"), which Assets shall be free and clear of any and all Encumbrances and Liabilities at the Closing, except that the Vessel will remain encumbered by a Second Ship Mortgage securing the deposit in the amount of Five Hundred Thousand Dollars ($500,000) for the Port Lease (the "Port Deposit") which will be assumed by Buyer (the "Second Mortgage"). The Assets shall include, without limitation, all of Seller's right, title and interest in, to or under the following:

(a)    the Vessel, including any certificates, plans, technical drawings, operation and maintenance manuals pertaining to it;

(b)    the spare parts, bunkers, fuel, lubricating oils in storage tanks and inventory listed in Schedule 2.1(b) attached hereto;

(c)    the radio and navigational equipment listed in Schedule 2.1(c) attached hereto;

(d)    all furniture, fixtures and equipment, including gaming tables owned by Seller, and all other casino equipment listed in Schedule 2.1(d) attached hereto;

(e)    all dinning tables, food serving, cooking supplies, equipment, maintenance supplies and other consumables and inventory in the Vessel on the Closing Date (collectively, the "Inventory");

(f)    all of the trade names, trademarks, service marks, patents, copyrights, slogans, markings, whether registered or all applications for registration for any of the foregoing, and/or existing by common law, know-how and good will used or relating to the Vessel and/ or the Atlantic Business (collectively, the "Intellectual Property") listed in Schedule 2.1(f);

(g)    all computer software that is are integral to the technical or nautical operations or maintenance of the Vessel (e.g., stability and alarm programs), and Sellers' licenses to use such software and programs;

(h)    parking leases, and any all personal property leases, agreements and contracts with airlines, travel agencies, tour operators, insurance companies, medical staff, affiliates or unaffiliated third parties, concessionaires, including but not limited to: photography, bar, restaurants, on board entertainment, casino, port lecturer and art auctioneer, which Buyer elects to assume in its sole and absolute discretion, and which are listed in Schedule 2.1(h) attached hereto (the "Assigned Contracts");

(i)    dockage lease at Miami Beach Marina (the "Port Lease"), subject to the provisions set forth in Subsection 2.6 below, which Buyer acknowledges shall require the

6



installation of shore power and ramping within three (3) months from the execution of this Agreement;

        (j)     any and all financial, business, marketing and accounting records, files, data and materials, customer lists, promotional and marketing brochures and any other proprietary information used in or developed during the operation of the Atlantic Business; and

        (k)     advanced passenger deposits ("Passenger Deposits") and Accounts Receivables in Seller's books on the Closing Date.

        Seller shall identify in the various schedules which Assets are owned of record by MLA and which Assets are owned of record by Majesty.

    2.2    Excluded Assets.  Notwithstanding anything to the contrary herein, Seller shall not sell, transfer, assign, convey or deliver to Buyer, and Buyer will not purchase or accept, and the Assets shall not include:

        (a)     Cage cash or cash in the account ("Cage Cash");

        (b)     "Chip Liability" reflecting chips, coupons or similar items which are "on the street" in possession of third parties; and.

        (c)     Contracts which are not within the Assigned Contracts referred to as the "Excluded Contracts."

    2.3    Conveyance of Assets; Excluded Liabilities.  The Assets shall be sold and conveyed to Buyer free and clear of all Encumbrances and Liabilities as of the Closing Date.  On and after the Closing Date, Buyer will assume and discharge only those Liabilities of Seller (i) pursuant to the Assigned Contracts, or (ii) for which Buyer received credit in the proration process pursuant to Section 2.4 below (collectively, the "Assumed Liabilities").  Except for the Assigned Contracts, or except as specifically provided for in Section 2.4 below, Buyer will not assume or be obligated to pay or discharge any Liabilities of any kind, whether known or unknown, contingent or otherwise, accrued by Seller and relating to the time period prior to the Closing Date in connection with the Assets, the business and operation of the Atlantic Business and/or the Vessel.  The Liabilities of Seller which are not expressly assumed pursuant to this Agreement are hereinafter collectively referred to as the "Excluded Liabilities."  Without limiting the generality of the foregoing, the following will also constitute Excluded Liabilities which Buyer will not assume:

        (a)     any Liabilities of Seller arising from an indebtedness arising or accrued prior to the Closing Date;

        (b)     intercompany loans among principals and affiliates of Seller, if any, (the "Atlantic Intercompanies Loans").

        (c)     any Liabilities of Seller arising from, or in connection with, the conduct of the business and operation of the Vessel or the ownership for the Vessel or the Assets prior to the consummation for the Contemplated Transactions at the Closing, including, without limitation,

any such Liabilities arising by reason of any violation or claimed violation by Seller by acts or events or omissions arising or occurring prior to the Closing, of any federal, state, local or foreign law, rules, regulation, ordinance or any requirement of any Governmental Body;

(d) any Liabilities of Seller arising out of or related to any past, present, future or Threatened litigation and/or action involving the Vessel or the Assets, including but not limited to any crew and passenger claims for personal injuries, to the extent the facts on which the relevant action is based occurred in whole or in part before the Closing;

(e) any Liabilities of Seller in connection with environmental matters, including Liabilities arising from Seller's failure to comply with Environmental Laws;

(f) any Liabilities for accounts payable incurred by Seller in the ordinary course of business through the Closing Date except to the extent Buyer receives a credit pursuant to Section 2.4;

(g) any Liabilities of Seller for any Tax of any kind, accrued or accruing, with respect to the business conducted by Seller through the Cut-Off Date (as defined below) or for which Seller received credit in the proration process pursuant to Section 2.4 below;

(h) any Liabilities of Seller arising out of any Employee Benefit Plans relating to the Vessel or any Liabilities arising out of any termination thereof;

(i) any Liabilities for payments of any kind to any employee of the Seller with respect to claims or causes of action arising on or before the Closing Date or for any accrued regular pay, vacation pay, sick pay, bonus or similar arrangement; and

(j) any Liabilities in respect of any Contract or agreement to which Seller is a party or beneficiary which is not an Assigned Contract.

2.4 **Prorations.**

(a) All income and expenses arising from the operation of the Atlantic Business in the ordinary course of business shall be prorated between Buyer and Seller as of 12:01 a.m. (Eastern time) on the Closing Date (the "Cut-Off Date"). Such prorations shall be based upon the principle that Seller shall be entitled to all income earned and shall be responsible for all Liabilities, whether long-term, short-term or current, incurred or accruing in connection with the operation of the Vessel prior to the Cut-Off Date, and Buyer shall be entitled to all such income earned and shall be responsible for all such Liabilities, whether long-term, short term or current, incurred or accruing in connection with the operation of the Vessel on and after the Cut-Off Date.

(b) Within thirty (30) days following the Closing, Buyer shall deliver to Seller a schedule of any proposed proration adjustments (which shall set forth in reasonable detail the basis for those determinations) (the "Proration Adjustment Schedule"). The Proration Adjustment Schedule shall be conclusive and binding upon Seller unless Seller provides Buyer with written notice of objection (the "Notice of Disagreement") within thirty (30) days after Seller's receipt of the Proration Adjustment Schedule, which notice shall state the prorations of

8

expenses and income proposed by Seller (the "Seller Proration Amount"). Buyer shall have fifteen (15) days from receipt of a Notice of Disagreement to accept or reject the Seller Proration Amount. If Buyer rejects the Seller Proration Amount, the dispute shall be submitted within ten (10) days to a mutually acceptable accounting firm (the "Referee") for resolution of the dispute, such resolution to be made within thirty (30) days after submission to the Referee and to be final, conclusive and binding on Buyer and Seller. Payment by Buyer or Seller, as the case may be, of the proration amounts determined pursuant to this section shall be fifteen (15) days after the last to occur of (i) acceptance by Seller of the Proration Adjustment Schedule or the failure of Seller to give Buyer a timely Notice of Disagreement, (ii) acceptance by Buyer of the Seller Proration Amount or the failure of Buyer to reject the Seller Proration Amount within fifteen (15) days of receipt of a Notice of Disagreement or (iii) resolution of the proration amount by the Referee. If either Buyer or Seller fails to pay any amount due under this section, interest on such amount shall accrue from the date payment was due to the date such payment is made at a per annum rate equal to the prime rate set out in the Wall Street Journal, plus one percent (1%), and such interest shall be payable on demand.

2.5    Non-Assignable Agreements. This Agreement shall not constitute an agreement to assign any contract or other Assets if an assignment or attempted assignment of the same without the consent of the other party thereto would constitute a breach thereof or in any way impair the rights of Buyer thereunder.

2.6    Port Lease. It shall be a condition precedent to the Closing, that Buyer assume the Port Lease (as defined in Section 2.1 (i) above). Buyer shall reasonably cooperate with the Landlord under the Port Lease to provide the necessary information in order to consent to the assignment of the Lease, i.e., certification relating to no prior bankruptcy, financial information, evidence of management and operating experience. Seller shall obtain, at Seller's own expense, Landlord's (and if required, the City of Miami's Beach) consent to the assignment of the Port Lease and cure any outstanding defaults under the Post Port Lease prior to or on the Closing Date.

2.7    Second Mortgage. Buyer shall assume the Second Mortgage (as defined in Section 2.1 above) at Closing and shall execute an Assumption Agreement in the form and content reasonably acceptable to the holder of the Second Mortgage. At Closing, all liens against the Vessel shall be paid, discharged, bonded off or other remedied in a manner reasonably acceptable to the holder of the Second Mortgage. Any defaults existing under the Second Mortgage, if any, shall be cured prior to or simultaneously (at Seller's expense) with the assumption of the Second Mortgage by Buyer.

ARTICLE 3.
CLOSING

3.1    Closing. The closing of the Assets Acquisition (the "Closing") provided for in this Agreement will take place in Miami, Florida at 10:00 a.m. (Eastern time), at the address chosen by the parties hereto, on or prior to March 5, 2004, or at another place and date as may be mutually agreed in writing by the parties (the "Closing Date"). Subject to the provisions of Article 10 below, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this section will not result in the

ermination of this Agreement and will not relieve any party of any obligation under this Agreement.

   3.2   Closing Consideration. The purchase price to be paid by Buyer for the Assets shall be the amount of Six Million Dollars ($6,000,000) (the "Closing Consideration") payable by wire transfer of immediately available federal funds to Seller's bank account pursuant to wire instructions that Seller shall deliver to Buyer at least two (2) business days prior to the Closing Date. The Closing Consideration shall be paid as follows:

      (a)   An earnest money deposit in the amount of One Hundred Twenty-Five Thousand Dollars ($125,000) (the "Deposit") to be wired to Goldstein & Goldstein, P.A. Trust Account No. 40-5100-7710, ABA No.: 066010377, Commercial Bank of Florida, 12255 NE 16th Avenue, N. Miami, Fl 33161, Attention: Robert Singleton (the "Escrow Agent"), upon the full execution of this Agreement; and

      (b)   the balance of the Closing Consideration adjusted by any prorations pursuant to Section 2.4(a) below to be paid at Closing and after deduction of the Hold-Back Amount (as defined below).

      At Closing, out of the balance of the Closing Consideration to be paid to Seller, the Buyer shall deposit with the Escrow Agent, the amount of Seven Hundred Thousand Dollars ($ 700,000) (the "Hold-Back Amount") which shall serve as a hold-back amount and shall be used for the sole purpose of paying any Excluded Liabilities outstanding on the Closing Date. Seller shall promptly within a reasonable time provide to Buyer with written evidence of payment of such Excluded Liabilities. Nothing herein shall prevent Seller from negotiating a lesser amount for payment of the Excluded Liabilities.

   3.3   Allocation. The parties agree to allocate the Closing Consideration among the Assets in a manner as may be in each party's best interest for tax purposes.

   3.4   Closing Obligations of Seller. At the Closing, Seller will deliver or cause to be delivered to Buyer:

      (a)   Bill of sale and assignment, in form and substance reasonably satisfactory to Buyer and its counsel, as shall be necessary and effective to transfer and assign to, and vest in, Buyer all right, title and interest in and to the Assets;

      (b)   Current Certificate of Ownership issued by the United States Coast Guard ("USCG");

      (c)   Confirmation of Class for the Vessel issued within Seventy-Two (72) hours prior to delivery;

      (d)   Signed Protocol of Delivery and Acceptance (substantially in the form attached hereto as Exhibit "B" confirming the date and time of delivery of the Vessel from the Seller to the Buyer;

10

(e)      complete, accurate, updated and final Schedules to this Agreement, which shall be delivered to Buyer's counsel, at least fifteen (15) business days before the Closing. The final Schedules to this Agreement will be subject to Buyer's reasonable review and approval;

(f)      true and correct copies of the Assigned Contracts, which shall be delivered to Buyer's counsel, at least fifteen (15) business days before the Closing;

(g)      UCC-3 termination statements and other necessary releases signed by the appropriate parties releasing all Encumbrances against the Assets;

(h)      wire transfer instructions for the payment of the Closing Consideration, which shall be provided to Buyer in writing no later than two (2) business days prior to the Closing;

(i)      the closing certificate required by Section 9.1(d) below;

(j)      a certificate of each of the authorized officers of MLA and Majesty attesting to (i) the incumbency of their officers executing this Agreement and (ii) the authenticity of the Organizational Documents of MLA and Majesty, respectively;

(k)      resolutions of the Board of Directors of each of MLA and Majesty, authorizing the execution, delivery and performance of this Agreement, certified by the Secretary of Seller;

(l)      an affidavit to the effect that Seller is not a "foreign person" within the meaning of Section 1445 of the IRC;

(m)      a certificate of good standing for each of MLA and Majesty issued not more than ten (10) days prior to the Closing Date; and

(n)      such other documents as may be reasonably requested by counsel for Buyer as necessary to consummate the Contemplated Transactions.

3.5      Closing Obligations of Buyer. At the Closing, Buyer will deliver or cause to be delivered to Seller:

(a)      the Closing Consideration, as adjusted in accordance with Section 2.4 above;

(b)      assumption agreements, in form and substance reasonably satisfactory to Seller and its counsel, as shall be necessary and effective for Buyer to assume and undertake to perform Seller's obligations under the Assigned Contracts on and after the Closing Date;

(c)      the closing certificate required by Section 9.2(d) below;

(d)      resolutions of the Manager of Buyer authorizing the execution, delivery and performance of this Agreement, certified by the Secretary of Buyer;

11



03-03-2004  13:13  From-FOLEY & LARDNER
02/20/2304  00:32  3855778232
DAVID M GOLDSTEIN.
T-309  P.025/047  F-454

FEB-19-2004  23:08

(e)     such other documents as may be reasonably requested by counsel for Seller as necessary to consummate the Contemplated Transactions.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

4.1     Organization and Good Standing.  Each of MLA and Majesty is duly organized, validly existing and in Seller standing under the laws of their respective jurisdiction. Each of MLA and Majesty has the full power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use and to perform all its obligations under all Assigned Contracts. Each MLA and Majesty is duly qualified to do business under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of its activities conducted by it, require such qualification. Seller has delivered to Buyer a copy of its Organizational Documents, as currently in effect.

4.2     Authority; No Conflict.

(a)     This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms. Seller has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement, and to perform its obligations thereunder.

(b)     Neither the execution and delivery of this Agreement by Seller nor the consummation or performance of any of the Contemplated Transactions by Seller will, directly or indirectly (with or without notice or lapse of time): (i) contravene, conflict with or result in a violation of any provision of the Organizational Documents of Seller or any resolution adopted by its officers; (ii) contravene, conflict with or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which Seller or any of the assets owned or used by Seller, may be subject; (iii) contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify any Governmental Authorization that is held by Seller or that otherwise relates to the business of, or any of the assets owned or used by, Seller; (iv) contravene, conflict with or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify any Assigned Contract; or (v) result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by Seller.  Except as set forth on Schedule 4.2, Seller will not be required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

12

4.3    **Title to Assets; Encumbrances.** Schedule 2.1(a) contains a complete and accurate list of all the gaming equipment that is used or held for use in the operation of the Casino in the Vessel. Schedule 2.1(b) contains a complete and accurate list of all material items of tangible personal property that are used or held for use in the operation of the Vessel. Seller owns clear and marketable title to the Assets (whether real, personal or mixed and whether tangible or intangible) that it purports to own, including the Vessel. Except as provided in Schedule 2.1(a) or Schedule 2.1(b) the Vessel and the Assets are free and clear of all Encumbrances. Such Encumbrances shall be cleared of record by the Seller at Closing.

4.4    **Condition and Sufficiency of Assets.** The Assets are in operating condition, and none of the Assets is in need of repairs which would prevent the Vessel from being able to conduct its present operations in the regular course of business or from being delivered in class pursuant to this Agreement. The Assets are sufficient for the continued conduct of the Atlantic Business after the Closing in substantially the same manner as conducted prior to the Closing.

4.5    **Tax Matters.** Except as disclosed in Schedule 4.5, Seller has timely paid (and after the Closing Date will timely pay) all Taxes for periods prior to and including the Closing Date that are due and payable, nonpayment of which would (i) result in an Encumbrance on any of the Assets, (ii) have a material adverse effect on Seller or (iii) result in Buyer becoming liable therefor. INCOME ...SHALL DELIVER... ...WITHIN ... FROM THE DATE STATEMENTS AND... HEREOF...

4.6    **Financial Statements.** Seller has delivered to Buyer a copy of Seller's unaudited balance sheet for the year ending on December 31, 2002 and December 31, 2003 (the "Financial Statements"). The Financial Statements fairly present the financial condition of Seller as at the date thereof. Seller has no Liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent or otherwise) except for Liabilities or obligations reflected in the Financial Statements and current Liabilities incurred in the ordinary course of business. Since the date of the Financial Statements and except as set forth on Schedule 4.6, there has not been any: (i) damage to or destruction or loss of any of the Assets, whether or not covered by insurance; (ii) sale (other than sales of inventory in the ordinary course of business), lease or other disposition of material Asset or imposition of any Encumbrance on any Asset, including the sale, lease or other disposition of any of the Intellectual Property; (iii) material change in the accounting methods used by Seller; or (iv) agreement, whether oral or written, by Seller to do any of the foregoing. All the accounts receivable ("A/Rs") and Passenger Deposits are materially complete and accurate as reflected in the Financial Statements of Seller. The A/Rs represent valid obligations arising from sales actually made by Seller in the ordinary course of business.

4.7    **Employee Benefits.** Except as disclosed in Schedule 4.7, there are no Employee Benefit Plans to which Seller contributes or is a party or is bound and under which it may have liability and under which employees or former employees of Seller (or their beneficiaries) are eligible to participate or derive a benefit. No Liability has been or is expected to be incurred by Seller under or pursuant to Title I or IV of ERISA where the penalty, excise tax or joint and several liability provisions of the IRC or ERISA relating to employee benefit plans and, no event, transaction or condition has occurred or exists that could result in any such Liability to Seller or, following the Closing, Buyer or the Assets.

13




4.8   **Compliance with Legal Requirements; Governmental Authorizations.** Seller is operating in full compliance with federal, state or local laws, statutes, rules, regulations or orders relating to the operation of the Atlantic Business and the Vessel. Schedule 4.8 contains a complete and accurate list of each material governmental authorization that is held by Seller relating to the operation of the Atlantic Business and the Vessel (the "Governmental Authorizations"). Each Governmental Authorization is valid and in full force and effect. Seller have not received any written notice or other communication from any governmental body or any other Person regarding any actual, alleged, possible or potential violation of or failure to comply with any term or requirement of any Governmental Authorization or any actual, proposed, possible or potential revocation, withdrawal, suspension, cancellation, termination of or modification to any Governmental Authorization. All applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed on Schedule 4.8 have been duly filed on a timely basis with the appropriate governmental authorities, and all other material filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate governmental authorities.

4.9   **Legal Proceedings; Orders.** There is no pending Proceeding (i) that has been commenced by or against the Vessel or that otherwise relates to or may affect any of the Assets (except as further provided in this Section 4.9) or (ii) that seeks to enjoin or prohibit, that questions the validity of, or that might materially hinder or impair Seller's performance of its obligations under this Agreement. As of the date of this Agreement, no such Proceeding has been Threatened and no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Proceeding. Seller has not received any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with, any term or requirement of any Order to which the Vessel or any of the Assets are subject. All the Proceedings are either covered by Seller's insurance and/or will be settled by seller with the Hold-Back Amount (as set forth in Section 3.2 above) at Closing or immediately thereafter.

4.10  **Contracts; No Defaults.** Schedule 2.1(h) contains a complete and accurate list, and Seller has delivered to Buyer, true and complete copies of the Assigned Contracts. Each of the Assigned Contracts is and is valid and enforceable in accordance with its terms. There are no renegotiations of, attempts to renegotiate or outstanding rights to renegotiate any material amounts paid or payable to the Vessel under current or completed Contracts with any Person and no such Person has made written demand for such renegotiation. No event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with or result in a violation or breach of, or give other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any Assigned Contract. Seller has not given to or received from any other Person any notice or other communication (whether oral or written) regarding any actual, alleged, possible or potential violation or breach of, or default under, any Assigned Contract.

4.11  **Insurance.** The Vessel is insured consistent with the policies delivered to Buyer which are listed on Schedule 4.11(a) and Seller agrees to maintain the Assets insured consistent with the policies until Closing. Seller has delivered to Buyer: (i) true and complete copies of all outstanding policies of insurance to which Seller is a party or under which the Assets are

14

covered; and (ii) true and complete copies of all pending applications for policies of insurance. Seller has paid all premiums due, and has otherwise performed all of its obligations required to be performed prior to the date hereof, under each policy to which Seller is a party. Schedule 4.11(b) contains a list of the insurance claims against the Seller for the past five (5) years.

4.12 <u>Compliance with Environmental Laws</u>. (i) Seller and the Atlantic Business' operations are in compliance with all Environmental Laws as currently in effect and Seller has not received any written notice or other communication from any governmental body relating to any violations to Environmental Laws. (ii) the Vessel has not used, released or disposed of any Hazardous Substance in any manner that could reasonably be expected to result in material liability, (iii) none of the property owned, leased or operated by the Vessel is contaminated by any Hazardous Substance, (iv) none of the property owned, leased or operated by the Vessel is affected by any condition that could reasonably be expected to result in liability under any Environmental Law as currently in effect and (v) there is no condition, activity or event respecting the Vessel or any of the properties owned, leased or operated by it that could reasonably be expected to subject Buyer to any material liability under any Environmental Law as currently in effect.

4.13 <u>Intellectual Property</u>. Seller has good title and/or is duly licensed to use the Intellectual Property listed in Schedule 3.1(l) necessary to operate the Atlantic Business as currently operated. The Intellectual Property is free and clear of any Encumbrances. No Intellectual Property is involved or Threatened to be involved in any opposition, invalidation, cancellation, nor has a Person asserted or Threatened in any way that Seller's use of any of the Intellectual Property violates any rights held by such Person.

4.14 <u>Brokers or Finders</u>. Except for fees owed to Stomar, Inc. (which fees shall be borne solely by Seller), neither Seller nor its agents have incurred any obligation or liability, contingent or otherwise, for brokerage or finder's fees or agents commissions or other similar payment in connection with this Agreement.

4.15 <u>Certain Payments</u>. Neither Seller nor any agent or employee of the Vessel, or any other Person associated with or acting for or on behalf of the Vessel, has directly or indirectly, (i) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, private or public, regardless of form, whether in money, property or services (a) to obtain favorable treatment in securing business, (b) to pay for favorable treatment for business secured, (c) to obtain special concessions or for special concessions already obtained, for or in respect of the Vessel or (d) in violation of any Legal Requirement, or (ii) established or maintained any fund or asset that has not been recorded on the books and records of the Vessel.

4.16 <u>Relationships With Related Persons</u>. Except as set forth in Schedule 4.16, no Person has any interest in any property (whether real, personal or mixed and whether tangible or intangible), used in or pertaining to the business and operation of the Atlantic Business. No Related Person of Seller has owned (of record or as a beneficial owner) an equity interest or any other financial or profit interest in, a Person that has (i) had business dealings or a material financial interest in any transaction with the Seller other than business dealings or transactions conducted in the ordinary course of business or (ii) engaged in competition with the Atlantic Business (a "Competing Business") in any manner where the Vessel operates, Dade County, Fla.

15

ownership of less than five percent (5%) of the outstanding capital stock of any Competing Business that is publicly traded on any recognized exchange or in the over-the-counter market and (b) except for a current operation of a vessel by a Related Person of Seller in Western Block Tampa Florida.

4.17    Labor Relations.  Seller is not a party to any collective bargaining or other labor Contract. There has not been as there is not presently pending, existing or Threatened (i) any strike, slowdown, picketing, work stoppage or employee grievance process relating to the Seller, (ii) any Proceeding against or affecting the Seller or the Assets pertaining to labor relations or employment matters, including any charge or complaint filed by an employee or union with the National Labor Relations Board, the Equal Employment Opportunity Commission or any comparable Governmental Body, organizational activity or other labor or employment dispute against or affecting the Seller or its Asset or (iii) any application for certification of a collective bargaining agent for the Seller. No event has occurred or circumstance exists that could provide the basis for any work stoppage or other labor dispute. Seller has complied in all respects with all Legal Requirements at the Vessel relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health and plant closing. Seller is not liable for the payment of any compensation, damages, taxes, fines, penalties or other amounts, however designated, for failure to comply with any of the foregoing Legal Requirements.

4.18    Full Disclosure.  No representation or warranty of Seller in this Agreement and no content of the Exhibits or Schedules thereto, when taken as a whole with this Agreement, omits to state a material fact necessary to make the statements or contents herein or therein, in light of the circumstances in which they were made, not misleading. No documents, including the Exhibits and the Schedules attached hereto (when taken as a whole with this Agreement) delivered pursuant to this Agreement will contain any untrue statement or omit to state a material fact necessary to make the statements therein or in this Agreement not misleading.

## ARTICLE 5.
## REPRESENTATIONS AND WARRANTIES
## OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1    Organization and Seller Standing.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware.

5.2    Consents.  All consents, approvals, authorizations and other requirements prescribed by any law, rule or regulation which must be obtained or satisfied by Buyer to consummate the transactions contemplated by this Agreement have been obtained and satisfied.

5.3    Authority.  Buyer has all requisite power and authority to enter into this Agreement and to undertake the transactions contemplated herein. This Agreement has been duly executed and delivered and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other laws affecting the rights of creditors generally

16

and to the exercise of judicial discretion in accordance with general principles of equity, whether applied by a court of law or equity. Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the transactions contemplated herein will, directly or indirectly (with or without notice or lapse of time): (i) contravene, conflict with or result in a violation of any provision of the organizational documents of Buyer or any resolution adopted by its respective officers; (ii) to Buyer's Knowledge contravene, conflict with or result in a violation of, or give any governmental body or other Person the right to challenge any of transactions contemplated herein or to exercise any remedy or obtain any relief under; (iii) contravene any administrative regulation or any judicial, administrative or arbitration order, award, judgment, writ, injunction or decree applicable to or binding upon Buyer in any material respect.

     5.4    **Brokers or Finders.** Except as set forth on **Schedule 5.4** (which fees shall be borne solely by Buyer), neither Buyer nor its agents have incurred any obligation or liability, contingent or otherwise, for broker's or finder's fees or agents commissions or other similar payment in connection with this Agreement.

## ARTICLE 6.
## INSPECTIONS; DAMAGES TO VESSEL

     6.1    **Inspections.** Within a reasonable time before the Closing Date, Buyer shall have the right to perform an underwater and an on board inspection of the Vessel at Buyer's expense. Buyer's personnel shall inspect the Vessel's underwater parts below the deepest load line. If the rudder, propeller, bottom or other underwater parts below the deepest load line are found broken, damaged or defective, or any other material conditions are found during the on board inspection so as to affect the Vessel's class in a way that prevents the Vessel from currently being able to conduct its present operations, such defects shall be repaired by Seller at Seller's expense immediately after the conclusion of the correspondent inspection. If Seller fails to repair such defects, Buyer may undertake the repair of such defects (the "Repair Expenses"), except for minor repairs that do not disrupt the operations of the Vessel. Seller has advised Buyer of the need for 2 bough thrusters which are not affixed to the Vessel, which Buyer shall undertake at its own expense.

     6.2    **Risk of Loss.** If, prior to Closing, a loss of, damage to, or destruction of the Vessel, whether by fire or other casualty (any such event, a "Casualty") shall occur, the result of which is damage to the Vessel in excess of twenty-five thousand dollars ($25,000) or will be a delay in the timely delivery of the Vessel to Buyer, Seller shall promptly so notify Buyer. If a Casualty results in damage to the Vessel but the Vessel is not a total loss (actual, constructive, agreed, arranged or compromised) and Seller determines that the damage can be repaired so as to enable the Vessel to be delivered to Buyer in accordance with the provisions of this Agreement, then Seller shall repair such damage and Closing shall occur in accordance with this Agreement.

17

# ARTICLE 7.
## COVENANTS OF SELLER
## PRIOR TO CLOSING DATE

7.1    Access to Personnel, Books, Records and Properties.  Between the date of this Agreement and the Closing Date, Seller shall cause to be afforded to Buyer and its Representatives reasonable access to the Vessel, books and records, tangible assets, agreements and licenses of the Seller as may be reasonably requested by Buyer or its Representatives to take inventory of the Assets.  Buyer's inspections and other access shall be conducted at such times and under such conditions as Seller shall specifically determine in each instance so as to minimize any disruption to Seller's operations and to avoid any disclosure to Seller's employees (other than the general manager of the Vessel) of the existence of the Contemplated Transactions.

7.2    Intentionally Deleted Negative Covenant.  Between the date of this Agreement and the Closing Date, except as expressly permitted by the Management Agreement, neither party shall:

        (i)     terminate, modify or amend any Assigned Contract, other than in the ordinary course of business consistent with Seller's past practice;

        (ii)    take, or fail to take, any action which will cause a breach of, or default under, or termination of any Assigned Contract;

        (iii)   create, assume or permit to exist any Encumbrance on any of the Assets;

        (iv)    sell, assign, lease or otherwise transfer or dispose of any of the material Assets, except for assets consumed or disposed of in the ordinary course of business; or

        (v)     enter into a binding agreement to undertake any of the foregoing..

7.4    Notification.  Between the date of this Agreement and the Closing Date, Seller will promptly notify Buyer in writing if Seller becomes aware of any fact or condition that causes or constitutes a Breach of any of the representations and warranties of Seller in this Agreement, or if Seller becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition.  Should any such fact or condition require any change in the Schedules if the Schedules were dated the date of the occurrence or discovery of any such fact or condition between the date of this Agreement and the Closing Date, Seller will promptly (i) deliver to Buyer a supplement to the Schedules specifying such change and (ii) notify Buyer of the occurrence of any Breach of any covenant of Seller in this Article 7 or of the occurrence of any event that may make the satisfaction of the conditions in Article 9 impossible or unlikely; provided, however, that the parties hereto acknowledge and agree that any such change shall not create any Liabilities of any kind for Buyer.

7.5    No Negotiation.  Until the Closing Date, or such time, if any, as this Agreement is terminated pursuant to Article 10 below, Seller and each of its Representatives will not, directly

18



03-03-2004  13:16   From-FOLEY & LARDNER

Case 1:04-cv-20499-JJO   Document 8-1   Entered on FLSD Docket 03/09/2004   Page 34 of 49

02-19-2004  00:32   3055778232                                        T-308   P 032/047   F-454
FEB-19-2004  23:11        0000                  DAVID M GOLDSTEIN              PAGE  28
02/19/2004  23:35   3055730996                  RCI INC                       PAGE  84

or indirectly solicit, initiate or encourage any inquiries or proposals from, discuss or negotiate with, or provide any non-public information to any Person (other than Buyer or its Related Persons) relating to any transaction involving the sale of the Assets or Seller.

    7.6    Best Efforts. Between the date of this Agreement and the Closing Date, Seller will use its Best Efforts to cause the conditions in Article 9 below to be satisfied.

    7.7    Third-Party Consents. Seller will use its Best Efforts to obtain, or cause to be obtained prior to the Closing Date, the consents set forth in Schedule 4.2, to the assignment to or assumption by Buyer of all of the Assigned Contracts, and all other licenses, leases, Assigned Contracts, instruments and rights of Seller included in the Contemplated Transactions that require, by their express terms, the consent of any third-party (the "Required Third-Party Consents"), which consents shall provide that Buyer is only assuming obligations which arise on and after the Closing Date with respect thereto.

    7.8    No Inconsistent Action. Seller shall not take any action which is materially inconsistent with its obligations under this Agreement, or that would hinder or delay the consummation of the Contemplated Transactions. Seller will not take any action that would disqualify or impair Seller as an assignor of the Assets and operator of the Atlantic Business after the Closing.

    7.9    Sales and Transfer Taxes. All costs of transferring the Assets in accordance with this Agreement, including without limitation, recordation, transfer and documentary taxes and fees, and any excise, sales or use taxes, shall be borne by the respective party. The parties shall cooperate with each other in achieving the maximum tax efficiency and favorable tax treatment allowed under applicable law.

    7.10    Post-Closing Covenants. After the Closing, Seller will execute any further documents consistent with this Agreement, provide any further reasonably available information and take any other actions that are reasonably requested by Buyer to effectuate the purpose of this Agreement.

**ARTICLE 8.**
**COVENANTS OF BUYER**
**PRIOR TO CLOSING DATE**

    8.1    Best Efforts. Between the date of this Agreement and the Closing Date, Buyer will use its Best Efforts to cause the conditions in Article 9 below to be satisfied.

    8.2    Notification. Between the date of this Agreement and the Closing Date, Buyer will promptly notify Seller in writing if Buyer becomes aware of any fact or condition that causes or constitutes a Breach of any of the representations and warranties of Buyer in this Agreement, or if Buyer becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition. Should any such fact or condition require any change in the Schedules if the Schedules were dated the date of the

19

03-03-2004  13:17  From-FOLEY & LATTNER

Case 1:04-cv-20499-JJO  Document 8-1  Entered on FLSD Docket 03/09/2004  Page 35 of 49

02/20/2004  00:45  3055778232

DAVID M GOLDSTEIN

FEB-19-2004  23:11  0000

PAGE  01/18

occurrence or discovery of any such fact or condition between the date of this Agreement and the Closing Date, Buyer will promptly (i) deliver to Seller a supplement to the Schedules specifying such change and (ii) notify Seller of the occurrence of any Breach of any covenant of Buyer in this Article 8 or of the occurrence of any event that may make the satisfaction of the conditions in Article 9 impossible or unlikely.

8.3   **No Inconsistent Action.**  Buyer shall not take any action which is materially inconsistent with its obligations under this Agreement, or that would hinder or delay the consummation of the transactions contemplated by this Agreement.

8.4   **Employment with Buyer.**  Buyer may offer probational employment only to those employees of Seller that Buyer elects to do so in its sole and absolute discretion, and each such employee shall be asked to execute an acknowledgment of probational employment with Buyer, acknowledging, among other things, that: (i) the employee has no carry over rights with respect to any and all employee benefits relating to any former employment with Seller; (ii) upon execution of the appropriate documentation, such employee will be fully covered under the standard Buyer health insurance benefits; (iii) such employee shall be on a ninety (90) day probationary period, and that continued employment with Buyer is subject to the review and approval of Buyer in its sole and absolute discretion; (iv) demotion and transfer of such employee may occur in the sole and absolute discretion of Buyer at any time, with or without cause and/or notice; (v) employment with Buyer is "at-will;" and (vi) such employee has received a copy of the Buyer Employment Policy & Procedures Manual. Seller shall terminate employees of the Seller to which Buyer offers employment and shall not solicit such employees for employment by Seller.

## ARTICLE 9.
## CONDITIONS PRECEDENT TO PARTIES' OBLIGATIONS TO CLOSE

9.1   **Conditions Precedent to the Obligation of Buyer to Close.**  The obligation of Buyer to effect the Contemplated Transactions and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

(a)   **Accuracy of Representations and Warranties.**  All of the representations and warranties of Sellers in this Agreement, considered collectively, and each of such representations and warranties, considered individually, must be complete, accurate in all material respects when made, and as of the Closing Date as if made on the Closing Date (except to the extent they expressly relate to an earlier time, in which case they shall have been true and correct only as of such earlier time). Sellers shall provide Buyer the Schedules as provided under Section 3.4 (a) above.

(b)   **Performance.**  All of the covenants and obligations that Sellers are required to perform or to comply with pursuant to this Agreement, any of the Exhibits or Schedules thereto, at or prior to the Closing, considered collectively, and each of these covenants and obligations, considered individually, must have been duly performed and complied with in all material respects. Each item required to be delivered by Sellers pursuant to Section 3.4 above must have been delivered.

20

Case 1:04-cv-20045-JJO   Document 8-1   Entered on FLSD Docket 03/09/2004   Page 37 of 49

(e)    **Consents.** Each of the Consents identified on Schedule 4.2 (b), must have been obtained and must be in full force and effect.

(d)    **Closing Certificate.** Buyer shall have received from Sellers a certificate, dated as of the Closing ("Bring Down Certificate"), certifying that the conditions specified in Sections 9.1(a) and 9.1(b) above have been fulfilled;

(e)    **Due Diligence.** Acceptance by ~~Mosquito, and SCH~~ VANOOION AND BYKE of the final results of the financial, legal and technical due diligence investigation on Seller and the Vessel; provided, however, that Buyer will give written notice to Seller of any results of such due diligence investigation that are not acceptable to Buyer on or before March 1, 2004, and Seller shall cure the matters not acceptable to Buyer on or before the Closing. ~~se~~ *SUCHABLE MATTERS WILL BE ADDRESSED* INCLUDED AS PART OF THE ~~SALE PRICE~~ *FIXED FUNDS AMOUNT. ($.2h)*   α.T

(f)    **Condition of the Vessel.** The Vessel shall be "in class" operating in the ordinary course of business consistent with past practice, and all the repairs provided for under Section 6.1 above, if any, must have been made. Furthermore, the Assets will be free and clear of any Encumbrances. The Vessel shall have all inventory, parts and appurtenances, ~~and shall meet all SOLAS class improvements applicable to the Vessel and in force at the time of the Closing.~~ *SUBJECT TO NORMAL USE PRESENTLY ON BOARD OR IN INVENTORY. VESSEL IS BEING SOLD AS IS. SUBJECT TO THE ABOVE PARAGRAPH OF THIS PARAGRAPH.*   α.T

(g)    [Intentionally Deleted].

(h)    **No Prohibition.** Absence of any order that seeks to enjoin or prohibit or question the validity of the transaction contemplated by this Agreement.

(i)    **Condition of the Assets.** Absence of material adverse changes in the Assets and Assumed Liabilities, financial condition, business prospects or operations, except for those changes resulting from terrorist acts or other acts outside of Seller's control that impact the offshore casino industry in general.

(j)    **No adverse Proceeding.** The absence of any pending or threatened Proceeding against Seller which is reasonably likely to have a material adverse effect or that seeks to enjoin o prohibit. or questions the validity of this Agreement or the transactions contemplated herein.

(k)    **Governmental Authorizations.** Seller shall have obtained all applicable domestic and foreign legal and other Governmental Authorizations including but not limited to those authorizations referred to under Section 4.2 above.

(l)    [Intentionally Deleted].

(m)    **Schedules.** Buyer shall have received complete, accurate and updated Schedules to this Agreement within the period set forth in section 3.4(a) above.

(n)    **Deliverables.** Buyer shall have received all the documents required under Section 3.4 above.

21

03-03-2004  13:17    From FOLEY & ...NER                    DAVID M GOLDSTEIN
02/28/2004  00:45    3055778232
FEB-19-2004  23:12                                                            PAGE  03/18

9.2  <u>Conditions Precedent to the Obligation of Seller to Close</u>.  The obligation of Seller to effect the Contemplated Transactions and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

(a)  <u>Accuracy of Representations and Warranties</u>.  All of the representations and warranties of Buyer in this Agreement, considered collectively, and each of such representations and warranties, considered individually, must be accurate and complete (without any omissions of material facts or statements), in all material respects when made, and as of the Closing Date as if made on the Closing Date (except to the extent they expressly relate to an earlier time, in which case they shall have been true and correct as such earlier time).

(b)  <u>Performance</u>.  All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing, considered collectively, and each of these covenants and obligations, considered individually, must have been performed and complied with in all material respects.  Each item required to be delivered by Buyer pursuant to Section 3.3 above must have been delivered, and each of the other covenants and obligations in this Agreement must have been performed and complied with in all respects.

# ARTICLE 10.
# TERMINATION

10.1  <u>Termination Events</u>.  This Agreement may, by written notice given prior to or at the Closing, be terminated:

(a)  by Buyer: (i) if there shall have been a material Breach by Seller of any representation, warranty, covenant or agreement set forth in this Agreement which Breach shall not have been cured within twenty (20) days following receipt by the breaching party of notice of such Breach or on the date immediately preceding the scheduled Closing Date, whichever is earlier, provided, however, that if the Breach cannot reasonably be cured within such period but can be cured, and if diligent efforts to cure promptly commence, then the cure period shall continue as long as such diligent efforts to cure continue, but not beyond the Upset Date (as defined below); or (ii) if there shall be any final decree or order that would prevent or make unlawful the Closing or the Atlantic Business; (iii) if the results of the due diligence on the Atlantic Business and the Vessel are not satisfactory to Buyer as provided in Section 9.1(e) above, in which case the Deposit shall be immediately returned to Buyer.

(b)  by Seller: (i) if there shall have been a material Breach by Buyer of any representation, warranty, covenant or agreement set forth in this Agreement which Breach shall not have been cured within twenty (20) days following receipt by the breaching party of notice of such Breach or on the date immediately preceding the scheduled Closing Date, whichever is earlier, provided, however, that if the Breach cannot reasonably be cured within such period but can be cured, and if diligent efforts to cure promptly commence, then the cure period shall continue as long as such diligent efforts to cure continue, but not beyond the Upset Date; or (ii) if there shall be any final decree or order that would prevent or make unlawful the Closing;

Case 1:04-cv-20499-JJO Document 8-1 Entered on FLSD Docket 03/09/2004 Page 38 of 49

... (AFTER THE BUYER HAS HAD AN
OPPORTUNITY TO REVIEW THE
RECORDS AND TAKE INVENTORY
OF ASSETS)...

(c)    by mutual consent of Buyer and Seller; or

(d)    by Buyer or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on the date that is March 5, 2004 after the date of this Agreement (the "Upset Date"), or such later date as the parties may agree upon in writing.

### 10.2    Rights of Parties for Nonperformance or Upon Termination.

(a)    If Seller does not have a right to terminate under Section 10.1 above, but Seller refuses to close the Contemplated Transactions or prevents the Closing due to Seller's Breach of this Agreement, Buyer shall have the right to waive any grounds it may have to terminate under Section 10.1 above and to obtain specific performance of the obligations of Seller to consummate the Contemplated Transactions. Seller acknowledges and agrees that the Assets (particularly the Vessel) are unique assets and Seller expressly agrees that monetary damages would be inadequate to compensate Buyer for the refusal of Seller to perform the obligations for which the remedy of specific performance is granted herein. Accordingly, Seller acknowledges and agrees that such refusal to perform will cause irreparable injury to Buyer and that Buyer shall be entitled to obtain injunctive relief for specific performance of the Seller's obligations hereunder.

(b)    If this Agreement is terminated for any reason other than as a result of Buyer's material Breach of this Agreement, and Buyer chooses not to seek specific performance against Seller as provided under Section 10.2 (a), the parties acknowledge and agree that Buyer will be entitled to recover liquidated damages from Seller as provided for under Section 10.2(c) below.

(c)    If this Agreement is terminated as a result of Seller's material Breach of this Agreement, and Buyer chooses not to seek specific performance or a court refuses to enforce the specific performance provision against Seller as provided under Section 10.2 (a) above, the parties acknowledge and agree that Buyer shall be entitled to liquidated damages in the amount of One Hundred Twenty-Five Thousand Dollars ($125,000). The parties acknowledge that the remedy provided to Buyer in this Section 10.2(c) will constitute liquidated damages for a Breach of this Agreement by Seller, the parties agreeing that such amount represents the parties' reasonable estimate of actual damages and does not constitute a penalty. Seller shall reimburse Buyer for all reasonable attorneys' fees, expenses and other costs, consultant's fees and expenses relating to the technical inspection of the Vessel, and other out of pocket expenses incurred by Buyer in connection with the financial, legal and technical due diligence investigation of the Seller and the Vessel and in enforcing its right to liquidated damages.

(d)    If this Agreement is terminated as a result of Buyer's material Breach of this Agreement, the parties acknowledge and agree that Seller shall ~~have the right to waive any grounds it may have to terminate under this Section 10.1 and (i) to obtain specific performance of the obligations of Buyer to consummate the Contemplated Transactions, or (ii)~~ Seller shall be entitled to liquidated damages in the amount of the Deposit (as defined in Section 3.2(a) above in satisfaction of Buyer's obligation to pay liquidated damages. The parties acknowledge and agree that such amount represents the parties' reasonable estimate of actual damages and does not

23

(c)   If this Agreement is terminated as provided in Section 10.1, the Contemplated Transactions shall be abandoned without further action, rights or obligations by the parties hereto to one another, and all filings, applications and other submissions made hereunder shall, to the extent practicable, be withdrawn from the persons to which they were made; provided, however, that nothing herein shall relieve any party from liability for any breach of any representation, warranty, covenant or agreement in this Agreement prior to such termination.

## ARTICLE 11.
## INDEMNIFICATION; REMEDIES

11.1   Survival; Right to Indemnification Not Affected by Knowledge.  All representations, warranties, covenants and obligations in this Agreement, the Schedules and any other certificate or document delivered pursuant to this Agreement will survive the Closing for a period of _____ from the Closing Date; provided, however, that the representations, warranties and covenants contained in Sections 4.5 (Tax Matters), 4.6 (Financial Statements) and 4.12 (Environmental) shall survive until the expiration of the applicable statute of limitations; provided, further, that, with respect to claims asserted by third-parties, all representations, warranties, covenants and obligations shall survive until the applicable statute of limitations.

11.2   Indemnification and Payment of Damages by Seller.  Seller hereby agrees to indemnify and hold harmless Buyer, and its respective Representatives, successors, assigns, stockholders, officers, directors, attorneys, controlling persons and Related Persons (collectively, the "Buyer Indemnified Parties") for, and will pay to the Buyer Indemnified Parties the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorney's fees) or diminution of value, whether or not involving a third-party claim (collectively, "Damages"), arising, directly or indirectly, from or in connection with any or all of the following:

(a)   any material Breach by Seller of any representation, warranty, covenant or obligation in this Agreement, the Schedules or any other certificate or document delivered by Seller pursuant to this Agreement; and

(b)   the Excluded Liabilities.

11.3   Indemnification and Payment of Damages by Buyer.  Buyer hereby agrees to indemnify and hold harmless Seller, and its respective Representatives, successors, assigns, stockholders, officers, directors, attorneys, controlling persons and Related Persons (collectively, the "Seller Indemnified Parties") for, and will pay to the Seller Indemnified Parties the amount of, any Damages arising, directly or indirectly, from or in connection with any or all of the following:

(a)   any material Breach by Buyer of any representation, warranty, covenant or obligation in this Agreement, the Schedules or any other certificate or document delivered by Buyer pursuant to this Agreement; or

(b)   the Assumed Liabilities.

24

(a)     any material Breach by Buyer of any representation, warranty, covenant or obligation in this Agreement, the Schedules or any other certificate or document delivered by Buyer pursuant to this Agreement; or

(b)     the Assumed Liabilities.

11.4    Procedure for Indemnification -- Third-Party Claims.

(a)     Promptly after receipt by an indemnified party in this Article 11 of notice of the commencement of any Proceeding against it, such indemnified party will, if a claim is to be made against an indemnifying party under such section, give notice to the indemnifying party of the commencement of such claim, but the failure to notify the indemnifying party will not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnifying party's failure to give such notice.

(b)     If any Proceeding referred to in Section 11.4(a) above is brought against an indemnified party and it gives notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party will be entitled to participate in such Proceeding and, to the extent that it wishes (unless the indemnifying party is also a party to such Proceeding and the indemnified party determines in Seller faith that joint representation would be inappropriate or the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to defend such Proceeding and provide indemnification with respect to such Proceeding), to assume the defense of such Proceeding with counsel satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party under this section for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the indemnifying party assumes the defense of a Proceeding: (i) no compromise or settlement of such claims may be effected by the indemnifying party without the indemnified party's consent unless there is no finding or admission of any violation of Legal Requirements by the indemnified party and no effect on any other claims that may be made against the indemnified party and the sole relief provided is monetary damages that are paid in full by the indemnifying party, and (ii) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent.

(c)     Notwithstanding the foregoing, if an indemnified party determines in Seller faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise or settle such Proceeding, but the indemnifying party will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withhold).

25

11.5 Procedure for Indemnification — Other Claims. A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

11.6 Limitation on Amount. Notwithstanding the foregoing, the parties shall have no liability with respect to the indemnification obligations of this Article 11 unless and until the aggregate amount of Damages equals or exceeds Twenty-Five Thousand Dollars ($25,000) (the "Threshold Amount"). At such time as the aggregate Damages equal or exceed the Threshold Amount, the parties shall be indemnified to the full extent of all such Damages in excess of the Threshold Amount; provided, however, that the Threshold Amount shall not apply to: (i) any intentional or fraudulent breach by either party of any representation, warranty, covenant or obligation; or (ii) to Seller's indemnification obligations under Section 11.2(e) above; or (iii) to any claims or Proceedings relating to or arising from the Excluded Liabilities or the Assumed Liabilities.

11.7 Maximum Indemnification. The aggregate amount of all claims subject to indemnification hereunder by Seller, on one hand, and Buyer, on the other hand, shall not exceed the amount of the Closing Consideration; provided, however, that the amount of any Damages incurred by a party pursuant to this Article 11 shall be reduced by (i) the actual tax benefit realized with respect to payment of all or any portion of such Damages by the indemnified party and (ii) the amount of any insurance proceeds actually paid to such indemnified party as reimbursement for such Damages.

11.8 Sole Remedy. After the Closing, the right to indemnification under this Article 11 shall be the exclusive remedy of any party in connection with any breach or default by another party under this Agreement.

11.9 Material Inducement. All parties hereto acknowledge and agree that the indemnification obligations of the parties contained in this Article 11 are a material inducement for Buyer and Seller to enter into this Agreement.

## ARTICLE 12.
## GENERAL PROVISIONS

12.1 Expenses. Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, representatives, counsel and accountants.

12.2 Public Announcements. Other than those incidental to filings required to comply with Legal Requirements, and filings of MLA required by any governmental authority, neither party shall make any public announcement, press release or similar publicity with respect to this Agreement or the Contemplated Transactions, regardless of whether the Contemplated Transactions are consummated, without the prior written consent of the other party.

12.3 Confidentiality. Between the date of this Agreement and the Closing Date, the parties will maintain in confidence, and will cause the directors, officers, employees, agents and

26

advisors of Buyer and Seller to maintain in confidence, any written information stamped "Confidential" when originally furnished by another party in connection with this Agreement or the Contemplated Transactions, unless (i) such information is already known to such party or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of such party, (ii) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the Contemplated Transactions or (iii) the furnishing or use of such information is required by or necessary or appropriate in connection with legal proceedings. If the Contemplated Transactions are not consummated, each party will return as much of such written information as the other party may reasonably request.

    12.4    Notices. All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given when (i) delivered by hand (with written confirmation of receipt), (ii) sent by facsimile (with written confirmation of receipt), provided that a copy is sent by a nationally recognized overnight delivery service, return receipt requested, or (iii) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to the other parties):

If to Buyer:        Southeast Cruise Holdings, LLC
                    C/o Vanquish Acquisition Partners, LLC
                    590 Madison Avenue, 21st Floor
                    New York, New York 10002
                    Attention: Joseph Del Valle
                    Telephone: (212) 521-4372
                    Facsimile: (212) 521-4380

Copy to:            Foley & Lardner
                    402 West Broadway, Suite 2300
                    San Diego, California 92101
                    Attention: Kenneth D. Polin, Esq.
                    Telephone: (619) 685-4615
                    Facsimile: (619) 234-3510

If to the Seller:   MLA Cruises, Inc.
                    608 Fifth Avenue, Suite 300,
                    New York, New York 10020
                    Attention: Michael Cohen, Esq.
                    Telephone: (212) 582-9172
                    Facsimile: (212) 202-4464

Copy to:            Law Offices of David M. Goldstein, P.A.
                    200 South Biscayne Boulevard, Suite 1880
                    Miami, Florida 33131
                    Telephone: (305) 372-3535
                    Facsimile: (305) 577-8232

27

12.5  **Further Assurances.** The parties agree to furnish upon request to each other such further information, execute and deliver to each other such other documents and to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

12.6  **Waiver.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (i) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party, (ii) no waiver that may be given by a party will be applicable except in the specific instance for which it is given and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

12.7  **Entire Agreement and Modification.** This Agreement supersedes all prior agreements (oral or written) between the parties with respect to its subject matter, including, without limitation, that certain Letter of Intent dated January 9, 2004, and constitutes (along with the recitals hereto, and the exhibits, Schedules and documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

12.8  **Exhibits; Schedules.** The Exhibits and Schedules are hereby incorporated by reference into this Agreement in their entirety. In the event of any inconsistency between the statement in the body of this Agreement and those in the Exhibits or Schedules, the statements in the body of the Agreement will control.

12.9  **Assignment, Successors and No Third-Party Rights.** Neither party may assign any of its rights under this Agreement without the prior consent of the other party, which will not be unreasonably withheld or delayed, except that Buyer may assign any of its rights under this Agreement to any Related Person, provided that such assignment will not delay the Closing hereunder and will not relieve the assigning party of any of its obligations under this Agreement. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

28

12.10   Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

12.11   Section Headings; Construction.  The headings of sections in this Agreement are provided for convenience only and will not affect its construction or interpretation.  All references to "Section" or "Sections" refer to the corresponding section or sections of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

12.12   Time of Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

12.13   Attorneys' Fees.  The prevailing party in any litigation, arbitration, mediation, bankruptcy, insolvency or other Proceeding relating to the enforcement or interpretation of this Agreement may recover from the unsuccessful party(ies) all costs, expenses and actual attorneys' fees (including expert witness and other consultants fees and costs) relating to or arising out of (i) the Proceeding (whether or not the Proceeding proceeds to judgment) and (ii) any post-judgment or post-award proceeding including, without limitation, one to enforce or collect any judgment or award resulting from the Proceeding.  All such judgments and awards shall contain a specific provision for the recovery of all such subsequently incurred costs, expenses and actual attorney's fees.

12.14   Governing Law; Waiver of Jury Trial.  The construction and performance of this Agreement shall be governed by the laws of Florida without regard to its principles of conflict of law.  BUYER AND SELLER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING IN ANY WAY TO THIS AGREEMENT, INCLUDING WITH RESPECT TO ANY COUNTERCLAIM MADE IN SUCH ACTION OR PROCEEDING, AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE DECIDED SOLELY BY A JUDGE.  Buyer and Seller hereby acknowledge that they have each been represented by counsel in the negotiation, execution and delivery of this Agreement and that their lawyers have fully explained the meaning of the Agreement, including in particular the jury-trial waiver.  Any question of doubtful interpretation shall not be resolved by any rule providing for interpretation against the party who causes the uncertainty to exist or against the drafter of this Agreement.

12.15   Jurisdiction; Service of Process.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement must be brought against any of the parties in the state or federal courts located in Miami, Florida and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.  Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

12.16   Counterparts; Facsimile.  This Agreement may be executed in one or more counterparts, all of which when fully-executed and delivered by all parties hereto and taken

29



together shall constitute a single agreement, binding against each of the parties. To the maximum extent permitted by law or by any applicable governmental authority, any document may be signed and transmitted by facsimile with the same validity as if it were an ink-signed document. Each signatory below represents and warrants by his signature that he is duly authorized (on behalf of the respective entity for which such signatory has acted) to execute and deliver this instrument and any other document related to this transaction, thereby fully binding each such respective entity.

12.17 [Intentionally Deleted]

*[Remainder of Page Intentionally Left Blank]*

30

03-02-2004 18:47 From-FOLEY & LARDNER +619 234 6274 T-308 P.002/002 F-480
02/28/2004 04:45 3055778212 DAVID M GOLDSTEIN PAGE 12/15
FEB-19-2004 23:15

IN WITNESS WHEREOF, the parties have executed and delivered this Asset Purchase Agreement as of the date first written above.

"Buyer"

MB CRUISES, LLC,
a Delaware limited liability company

By: _____
Name: JOSEPH DEL VECCHIO
Title: CHAIRMAN

"Seller"

MLA CRUISES, INC.
a Delaware corporation

By: _____
Name: Michael Cohen, Esq.
Title: President

MAJESTY ENTERPRISES OF FLORIDA, LLC
a Delaware limited liability company

By: _____
Name: Leonid Tatarchuk
Title: President

[Signature Page to Casino Atlantic Asset Purchase Agreement]

31

EXHIBIT "A"

## M/V ATLANTIC

| | |
|---|---|
| USCG Registered Name: | |
| USCG Documentation Number: | |
| USCG Registered Owners: | |
| National Flag: | |
| Hailing Port: | Miami, Florida |
| Year Built: | |
| Where Built: | |
| Builder: | |
| LOA: | |
| Registered Dimensions: | |
| Classification Society: | |
| Load Line Assigned: | |
| Vessel's Captain | |
| Main Propulsion: | |
| Gross Tonnage: | |
| Net Tonnage: | |

32

EXHIBIT "B"
PROTOCOL OF DELIVERY AND ACCEPTANCE
FOR THE M/V ATLANTIC

**KNOW ALL PERSONS BY THESE PRESENTS** that pursuant to that certain asset purchase agreement (the "Purchase Agreement") dated February ____, 2004, by and between,

_____

has delivered the Vessel to the undersigned representative ("Purchaser's Representative"), and Purchaser's Representative does hereby accept delivery of the Vessel (the "Delivery"), lying at safe berth at _____ at _____ hours local time on the ____ day of _____, 2004 ("Date of Delivery") and Seller's Representative and Purchaser's Representative on behalf of the Seller and Purchaser, as the case may be, agree as follows:

1. The parties hereby confirm the following state of facts as to fuel oil, diesel oil, lubricating oil and water:

   _____ As of the Date of Delivery

   ____ Fuel Oil _____

   ____ Diesel Oil _____

   ____ Lubricating Oil _____

   ____ Water _____

2. The parties hereby confirm that Schedule 1 contains a true and correct list of all Inventory (as defined in the Purchase Agreement) on board the Vessel at delivery.

3. The parties hereby confirm that Schedule 2 contains a true and correct list of all material spare parts on board the Vessel at delivery.

4. The parties hereby confirm that all certificates, logs, plans, technical drawings, and operation and maintenance manuals pertaining to the Vessel were on board the Vessel at delivery.

5. The parties hereby confirm that Schedule 3 contains a true and correct list of all radio and navigational equipment on board the Vessel at delivery.

**IN WITNESS WHEREOF** the parties hereto have executed this Protocol of Delivery and Acceptance as of the Date of Delivery.

Case 1:04-cv-20499-JJO Document 8-1 Entered on FLSD Docket 03/09/2004 Page 49 of 49

**Document comparison done by DeltaView on Wednesday, February 18, 2004 17:30:55**

| | |
|---|---|
| Document 1 | iManageDeskSite://sdgdms1/SDCA/233721/4 |
| Document 2 | iManageDeskSite://sdgdms1/SDCA/233721/5 |
| Rendering set | Standard |

| | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| | Count |
|---|---|
| Insertions | 40 |
| Deletions | 15 |
| Moved from | 0 |
| Moved to | 0 |
| Format changed | 0 |
| Total changes | 55 |