UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
IN ADMIRALTY

RCI-DINNER KEY, INC.,
a Florida Corporation,

and

MIAMI BEACH MARINA
ASSOCIATES, LTD.,
a Florida Limited Partnership,

      Plaintiffs,

vs.

M.V. "THE ATLANTIC",
f/k/a "MAX I",
her boilers, engines, tackle,
equipment, freight, appliances,
apparel, appurtenances, etc.,
In Rem:
MLA CRUISES, INC.,
a Delaware Corporation,
and
MAJESTY ENTERPRISES
OF FLORIDA, LLC,
a Florida Limited Liability Company,

      Defendants.
_____/

Case. No. 04-20499
CIV-Moore/Magistrate Judge O'Sullivan

NIGHT BOX
FILED

MAR 2 6 2004

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## MOTION FOR PARTITION AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Supplemental Rule D and Local Admiralty Rule D, Claimant Valentin Laskov,

("Laskov") hereby files this Motion for Partition and Incorporated Memorandum of Law, ("Motion")

and in support of the Motion states as follows:

-1-



1.      The only asset owned by Defendant MLA Cruises, Inc. is the vessel named in this action, The Atlantic.  Defendant, Majesty Enterprises of Florida, LLC is the operator of The Atlantic.

2.      By virtue of having lent $400,000.00 to Defendants MLA Cruises, Inc., and Majesty Enterprises of Florida, LLC, Laskov is a creditor of Defendants.

3.      By virtue of having invested an additional $400,000.00 in Defendants MLA Cruises, Inc., and Majesty Enterprises of Florida, LLC, Laskov is a 10% shareholder in those entities and has a corresponding interest in The Atlantic.

4.      On November 8, 2003, Arkady Vaygensberg and Leonid Tatarchuk ("Guarantors") entered into a guarantee agreement ("Guarantee Agreement") in favor of Laskov.  A true and correct copy of the Guarantee Agreement is attached hereto as "Exhibit A."  Guarantors each own 30% of the shares of Defendants.  The remaining 30% of the shares of Defendants are owned by Michael Cohen.

5.      Pursuant to the Guarantee Agreement, in the event of a sale, transfer, or disposition of The Atlantic, Guarantors must jointly and severally promptly return Laskov his $400,000.00 investment and $400,000.00 loan, including interest at the rate of 12% per annum, retroactive from the date of investment through final payment.  Laskov's $400,000.00 investment together with Laskov's $400,000.00 loan, together with the 12% per annum interest, are hereafter collectively referred to as "Laskov's Interest."

6.      Pursuant to the shareholders agreement ("Shareholders Agreement") attached hereto as "Exhibit B," Defendants must obtain Laskov's consent to any transaction either Defendant contemplates that exceeds $100,000.00 in monthly expenses.

7.      On March 13, 2004, Plaintiffs and Defendants entered into a Stipulated Interim

-2-

Settlement Agreement, ("Interim Agreement") which they filed with the Court. *See* D.E. 16.

8.       On March 15, 2004, the Court entered an Order vacating the Warrant of Arrest and adopting the Interim Agreement ("Interim Agreement Order"). *See* D.E. 15.

9.       Pursuant to the Interim Agreement, Defendant MLA Cruises, Inc. is to sell The Atlantic for $6,000,000.00, with the closing scheduled to take place on March 31, 2004. Counsel for Defendants has since advised that this closing has been postponed until late in the month of April, 2004. This proposed transaction is hereafter referred to as "The Proposed Transaction."

10.      Pursuant to the Guarantee Agreement, Laskov's Interest is to be paid from the proceeds of the Proposed Transaction.

11.      Pursuant to the Shareholders Agreement, the Proposed Transaction cannot occur without Laskov's consent.

12.      To protect Laskov's Interest, Laskov moves this Court to partition the proceeds of the Proposed Transaction, to order that such proceeds be paid directly into the Court registry, and to order payment of Laskov's Interest directly from the Court registry.

WHEREFORE, Laskov respectfully requests that the Court enter an Order partitioning this action, ordering payment of the proceeds from the Proposed Transaction directly into the Court registry, and ordering payment of Laskov's Interest directly from the Court registry.

## MEMORANDUM OF LAW

Pursuant to Supplemental Rule D, this Court may partition the proceeds of the Proposed Transaction. *See* Supplemental Rule D, Advisory Committee Notes ("The Supreme Court has now removed any doubt as to the jurisdiction of the district courts to partition a vessel, and has held in addition that no fixed principle of federal admiralty law limits the remedy to the case of equal

shares.").

Pursuant to the Interim Agreement Order, the Court "maintain[ed] jurisdiction of this cause for all purposes, including but not limited to enforcement of the terms and conditions of the [Interim Agreement]." *See* D.E. 15, at p.5. Further, the Interim Agreement Order specifically adopted the terms of the Interim Agreement. *See* D.E. 15, at p.1. Pursuant to the Interim Agreement, if the Proposed Transaction fails to close, the parties may resume prosecution of this case. *See* Interim Agreement, D.E. 16, at p.7.

In accordance with the Interim Agreement Order, the Court should oversee performance of the Proposed Transaction. Pursuant to the Shareholders Agreement, the Proposed Transaction cannot occur without Laskov's consent. Laskov therefore respectfully requests that the Court enter an Order partitioning the proceeds of the Proposed Transaction, ordering the proceeds of the Proposed Transaction to be paid directly into the Court registry, and ordering payment of Laskov's Interest directly from the Court registry.

## CERTIFICATE OF COMPLIANCE WITH S.D. FLA. L.R. 26.1.I

Counsel for Laskov hereby certifies that he has attempted to confer with counsel for Plaintiffs and Defendants in a good faith effort to resolve the issues raised in the instant Motion, but has been unable to resolve such issues.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy hereof was furnished via facsimile and

U.S. Mail to: **Stuart R. Michelson**, Esquire, 200 S.E. 13th Street, Fort Lauderdale, Florida 33316,

Facsimile No. 954-463-5599, and **David Michael Goldstein**, Esquire, 200 S. Biscayne Blvd., Suite

1880, Miami, FL 33131, Facsimile No. 305-577-8232, this 26th day of March, 2004.

GUNSTER, YOAKLEY & STEWART, P.A.
Attorneys for Valentin Laskov
Phillips Point
777 South Flagler Drive
Suite 500 East
West Palm Beach, FL 33401
561-655-1980-Phone
561-655-5677-Facsimile


By: _____
JOHN F. MARIANI
Florida Bar No. 263524
jmariani@gunster.com
BRYAN S. MILLER
Florida Bar No. 0312230
bmiller@gunster.com

760197.1

-5-

## GUARANTY AGREEMENT

Date:                November 8th, 2003

"Debtors":           MLA Cruises, Inc.
                     1280 5th Street
                     Miami Beach, Florida 33139

                     Majesty Enterprises Of Florida, LLC
                     1280 5th Street
                     Miami Beach, Florida 33139

"Guarantors":        Arkady Vaygensberg
                     515 E 72nd Street #18D
                     New York, NY 10021

                     Leonid Tatarchuk
                     118 Whetman Dr.
                     Brooklyn, NY 11234


        THIS GUARANTY AGREEMENT (the "Agreement") is entered into by the above-named Guarantors in favor of Valentin Laskov ("Laskov"), a resident of the State of New York, and is made in reference to the following-recited facts:

        WHEREFORE, Laskov is a 10% shareholder and/or member of Debtors, having invested $800,000.00 to purchase said interest;

        WHEREFORE, Laskov currently has an option to purchase, in a time certain, an additional 15% share of Debtors for $1.2 million; and

        WHEREFORE, Debtors seek, through Laskov, additional capital for their ongoing business operations.

        NOW THEREFORE, to induce Laskov to facilitate the influx of capital which Debtors desire, and for such other good and valuable consideration, the Guarantors, jointly and severally with each other and with Debtors, do covenant and agree as follows:

        1. **Recitals.**  The statements contained in the recitals set forth above (the "Recitals") are true and correct and the Recitals by this reference are made a part of this Agreement.

2. **Guaranty.** In the event of (i) a sale, transfer, or disposition by any and all means possible, including bankruptcy, foreclosure or otherwise, of any or all of Debtors' assets, including but not limited to that certain sailing vessel, "Atlantic," (No. 634676); (ii) the insolvency or bankruptcy of Debtors; (iii) the consent of the Debtors to the appointment of a trustee or receiver for the Debtors or for a substantial part of their property; or (iv) the institution by or against the debtors of bankruptcy, reorganization, arrangement, or insolvency proceedings, Guarantors, jointly and severally, do hereby irrevocably and unconditionally personally guarantee to Laskov (a) the prompt payment in a sum equal to his investment in Debtors to the date of such disposition, including interest of 12% yearly due thereon, retroactive from the date of investment until final payment; and (b) the performance and observance by Debtors of the terms, conditions, covenants, stipulations and agreements of the Debtors contained in any promissory note guaranteed by Laskov on behalf of Debtors, instrument of security, or other document, including any extensions, modifications, renewals or amendments of any of the foregoing, all of the foregoing being herein called the "Debt". This guaranty shall survive the bankruptcy of either or all guarantors.

3. **Indemnity.** Guarantors agree to indemnify and save harmless Laskov from and against, and Debtor also agrees to pay, all reasonable costs, expenses and attorneys' fees that may be incurred by Laskov in connection with the collection or enforcement of this Guaranty Agreement, including but not limited to reasonable attorneys fees and costs, as well as such fees and costs in any pre-trial, trial, post-trial, appeal, and bankruptcy proceeding.

4. **Financial and Other Information.** Guarantors and Debtor shall deliver to Laskov and his representatives such income and expense statements, balance sheets, financial statements, and other personal and business financial information concerning Guarantors and Debtor, or any of them, as Laskov demands at any time and from time to time. The information shall, if Laskov requests, be prepared by an independent certified public accountant, who shall be paid by Debtor and Guarantors.

5. **Default; Acceleration; Liens.** A default in payment of any part of the Debt shall constitute a default under this Guaranty Agreement giving Laskov the right to compel Debtors and/or Guarantors pay the Debt in its entirety immediately and at once without notice or demand. Laskov is hereby granted a lien upon and a security interest in all property of Guarantors now or at any

2



time hereafter in the possession of Laskov in any capacity whatsoever as security for the payment of the Debt, and Laskov is hereby authorized to apply, on or after maturity (whether by acceleration or otherwise) to the payment of this debt any such funds or property in possession of Laskov belonging to Guarantors, in such order of application as Laskov may from time to time elect, without advance notice.

6. **Enforcement.** Laskov may enforce the provisions hereof from time to time as often as occasion therefor may arise. Laskov shall not be required to first exercise any rights against any other person or party primarily or secondarily liable in respect to the Debt or the obligations of Guarantors hereunder and shall not be required first to initiate, pursue or exhaust any remedies available to Laskov against any other person or party or to resort to or enforce any security in his possession or under his control. Guarantors are jointly and severally liable on this guarantee along with the Debtor. Guarantors' spouses (if any) are also guarantors of this loan Agreement so that this Guaranty Agreement shall be binding upon them both as individuals and as a married couple.

7. **Waiver.** No course of dealing, delay or omission on the part of Laskov in exercising or enforcing any of his rights or remedies regarding this Guaranty Agreement shall impair or be prejudicial to the rights and remedies of Laskov hereunder and the enforcement hereof. Laskov may extend, modify or postpone the time and manner of payment and performance of the Debt and this Agreement without notice to or consent by the Guarantors and without thereby releasing, discharging or diminishing Laskov's rights and remedies against the Guarantors hereunder. Guarantors waive each of the following: notice of acceptance of this Agreement; notice of the occurrence of any default; presentments; demands; protests; and notices of any and all action at any time taken or omitted by Laskov in connection with the Debt or this Agreement.

8. **No Obligation to Extend Credit.** Laskov is not obligated by this Guaranty Agreement to extend credit to Debtor or to Guarantors.

9. **Florida Law; Miscellaneous.** This Guaranty Agreement is delivered in the State of Florida and shall be construed according to the laws of Florida. This Guaranty Agreement shall inure to the benefit of and be enforceable by Laskov and his successors and assigns and shall be enforceable against and binding

3



upon Guarantors and Guarantors' representatives, successors and assigns.  Paragraph headings are for convenience only and are not intended to expand or restrict the scope or substance of the provisions of this Guaranty Agreement.  Wherever used herein, the singular shall include the plural, the plural shall include the singular, and pronouns shall be read as masculine, feminine or neuter as the context requires.  The State of Florida shall be the proper jurisdiction for any litigation involving the Debt or this Guaranty Agreement.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty Agreement on the day and year first above written.

GUARANTORS:

*VALENTIN LASKOV*

_____ (SEAL)
/Valentin Laskov/

Witnesses

_____ (SEAL)
/Leonid Tatarenliuk/

Witnesses

_____ (SEAL)
/Arkady Vayzensberg/

Witnesses

_____ (SEAL)

Witnesses

4

DEBTOR: MLA Cruises, Inc.

By: _____ (SEAL)

Witnesses

DEBTOR: Majesty Enterprises Of Florida, LLC

By: _____ (SEAL)

Witnesses

5

# STC 'HOLDERS* AGREEM 'T OF
# MLA CRUISES, INC.
## and
# MAJESTY ENTERPRISES OF FLORIDA, LLC.

As of the *11th* day of *June*, 2003, **ARKADY VAYGENSBERG** (hereinafter referred to as "**VAYGENSBERG**"), **LEONID TATARCHUK** (hereinafter referred to as "**TATARCHUK**"), **MICHAEL COHEN** (hereinafter referred to as "**COHEN**") and **VALENTIN LASKOV** (hereinafter referred to as "**LASKOV**"), entered into this Agreement among themselves and between themselves and **MLA CRUISES, INC.**, a Delaware corporation and **MAJESTY ENTERPRISES OF FLORIDA, LLC.**, a Florida limited liability corporation (hereinafter jointly referred to as "**CORPORATION**").

RECITALS:

A.    The Stockholders each own those shares of Corporation*s Common Stock indicated in Section 2.1 herein below; and

B.    The Stockholders wish to provide a market for their shares of the Stock on their deaths, on their disabilities, and upon the occurrence of various other events; and

C.    The Stockholders wish to restrict ownership of the Stock to the present Stockholders and to persons with whom they may comfortably and easily deal; and

D.    The Stockholders believe that they will be able to deal easily and comfortably with each other and that it is in their best interests and in the Corporation*s best interests that all corporate activities be controlled by persons who deal comfortably with each other; and

E.    The Stockholders and the Corporation, to accomplish these objectives, wish to arrange for certain restrictions on the Transfer of the Stockholders* shares of the Stock to persons other than the parties to this Agreement.

## AGREEMENTS:
## SECTION 1
## Definitions

1.1.    "Agreement." The "Agreement* is this contract and all modifications or amendments thereto.

1.2.    "Code." The "Code" is the Internal Revenue Code of 1986, as amended.

1.3.    "Days." Any reference in this Agreement to "days" means all calendar days, whether or not such days are legal holidays under the laws of the United States or any State.

Disabled Stock Stockholder is a "Disabled Stockholder" if he or she:

       1.4.1.  Is under a legal decree of incompetency (the date of such decree being deemed to be the date on which such disability occurred);

       1.4.2.  Submits any claim for disability insurance benefits or for early distribution of any amounts from a qualified pension or profit-sharing plan maintained by the Corporation on account of more than fifty percent (50%) disability (the date of the earliest of such claims shall be the date on which such disability shall be deemed to have occurred); or

       1.4.3.  Is subject to a medical determination that the Stockholder, because of a medically determinable disease, injury, or other mental or physical disability, is unable to perform substantially all of his or her regular duties as a Stockholder, officer, director and/or employee of the Corporation, and that such disability is determined or reasonably expected to last at least twelve (12) months, based on then available medical information.

       1.4.3.1.  A medical determination of disability will exist upon the receipt by the Corporation of the written opinion of a physician who has examined the Stockholder whose disability is in question.

       1.4.3.2.  If the Corporation disagrees with the opinion of such physician (the "First Physician"), it may engage at its own expense another physician (the "Second Physician") to examine the Stockholder whose disability is in question. The Second Physician shall confer with the First Physician and, if they together agree in writing that the Stockholder is or is not disabled, their written opinion shall be conclusive as to such disability. If the First and Second Physicians do not agree, they shall choose a third consulting physician (the expense of which shall be borne by the Corporation), and the written opinion of a majority of these three (3) physicians shall be conclusive as to such disability. The date of any written opinion that is conclusive as to such disability is the date on which such disability, if that is the conclusion, will be deemed to have occurred.

       1.4.3.3.  In signing this Agreement, each Stockholder consents to such examination, to furnish any medical information requested by any examining physician, and to waive any applicable physician-patient privilege that may arise because of such examination. All physicians except the First Physician selected hereunder must be board-certified in the specialty most closely related to the nature of the disability alleged to exist.

    1.5.   "Encumber" or "Encumbrance." "To Encumber" includes to pledge, hypothecate, or otherwise secure any type of debt or obligation with shares of the Stock, whether incurred voluntarily or involuntarily, and in any manner whatsoever. An "Encumbrance" is any type of security or surety interest created by such Encumbering.

    1.6.   "Escrow Agent." An "Escrow Agent" is any attorney or Accountant regularly employed by the Corporation, or any other person acceptable to all Stockholders, who shall hold checks and certificates of the Stock to effect a purchase or sale pursuant to this Agreement.

Family Members are the descendants (including those adopted) of the Initial Stockholders to this Agreement.

1.8.   "Offered Stock." The "Offered Stock" is all of the shares of the Stock that are deemed to have been offered for sale to the other Stockholders or to the Corporation pursuant to this Agreement.

1.9.   "Offering Stockholder." The "Offering Stockholder* is the Stockholder (or his or her Personal Representative) who offers to sell some or all of his or her shares of the Stock to the other Stockholders, pursuant to this Agreement.

1.10.  "Personal Representative." A Stockholder*s "Personal Representative" includes any administrator, executor, trustee, or other personal representative who is vested with the responsibility for administering the disposition of any Stock on account of a deceased Stockholders death, and equally any individual who holds such Stock as a legatee, distributee, or successor in interest, or trustee where no executor, administrator, or similar fiduciary is appointed or where any appointed executor, administrator, or fiduciary does not have control over any of the deceased Stockholder*s shares of the Stock.

1.11.  "Qualified Appraiser." A "Qualified Appraiser* is a professional appraiser or independent certified public accountant who is qualified by experience and ability to appraise the Offered Stock. The appointment of a Qualified Appraiser shall be made by a written instrument delivered to the Corporation.

1.12.  "S Election." An "S Election" is an election to have the net profits and losses of the Corporation taxed directly to its stockholders, under sub-chapter S of the Code.

1.13.  "Stock." The "Stock" is all of the issued and outstanding shares of the Corporation*s Common Stock and any additional shares of the Stock of the Corporation issued or sold by the Corporation to any person, including (but not limited to) shares issued as a stock dividend, stock split, reverse stock split, recapitalization or reorganization of any type. All such additional shares of the Stock shall be issued bearing the restrictive endorsement required by this Agreement.

1.14.  "Stockholders." The "Stockholders" include all owners of shares of the Stock (other than any shares of the Stock held as treasury stock by the Corporation), each of whom is a "Stockholder." The initial Stockholders *are* the parties named in the introductory paragraph of this Agreement.

1.15.  'Transfer." Etc. A "Transfer" is any sale, pledge, Encumbrance, gift, bequest or other transfer of any shares of the Stock, whether or not for value and whether or not made to another party to this Agreement. An "Involuntary Lifetime Transfer" is any Transfer made on account of a court order or otherwise by operation of law, including any Transfer incident to any divorce or marital property settlement or any Transfer pursuant to applicable community

Case 1:04-cv-2040 JG Document 21 Filed in LSDV Docket 02/30/2004 Page 14 of 36

property, quasi-community property or similar state law. "Lifetime Transfer" is any Transfer made during a Stc__nolder*s lifetime that is not an involuntary Lifetime Transfer. Unless the context indicates otherwise, "Transfer* includes both Voluntary and Involuntary Lifetime Transfers. A Transfer made to a trust that is wholly revocable by the Transferor shall not be a Transfer for purposes of this Agreement, but any subsequent Transfer by the trustee of such trust shall be deemed to have been made by the trust*s grantor.

## SECTION 2
## General Corporate Matters

2.1. <u>Formation of Corporation</u>. The Corporation was incorporated on December 20, 2002 (MLA) and on November 13, 2001 (MAJESTY). The Corporation (MLA) is authorized to issue 200 shares of its Stock. The Corporation (MAJESTY) is authorized to issue 200 shares of its Stock. As of the date of this Agreement, shares of the Corporation have been issued to Stockholders and in consideration for the following:

| Name | Stock MLA | Stock MAJESTY |
|------|-----------|---------------|
| **ARKADY VAYGENSBERG** | **30%** | **30%** |
| **LEONID TATARCHUK** | **30%** | **30%** |
| **MICHAEL COHEN** | **30%** | **30%** |
| **VALENTIN LASKOV** | **10%** | **10%** |

**VAYGENSBERG** and **TATARCHUK** will be responsible for the day-to-day management and activities of CORPORATION.

EACH PARTY HERETO agrees to provide funding to **CORPORATION** as follows:

A. **COHEN** agrees to secure financing for **CORPORATION** in the amount of ONE MILLION FIVE HUNDRED THOUSAND 00/100 DOLLARS U.S. ($1,500,000.00) due forthwith on the execution of this AGREEMENT from Paramount Global Holdings, Inc., a New York corporation, 608 5th Avenue, Suite 300, New York, N.Y. 10020.

4

B.   Each party to this Shareholders' Agreement agrees to contribute additional monies on a pro rata (equal) basis as needed.

C.   If one party contributes money and the other party does not contribute a like amount of money, the contributing shareholder shall have the option of 1) considering his contribution as a loan payable back to him at one (1%) percent over the daily libor rate as published in the Wall Street Journal, total principal and interest being payable on demand; or  2) the non-contributing shareholder has thirty (30) days to provide like monies as contributed by the contributing shareholder or the contributing shareholder can elect to take the non-contributing shareholder's stock in Corporation free and clear,  as satisfaction of any and all monies due to the corporation by the non-contributing shareholder.

On the happening of a "call" as described in Paragraph 2.1 (D), the non-contributing shareholder's stock in Corporation must be forthwith placed in escrow with corporate counsel until such time as the contributing shareholder makes his election hereunder.  The escrow agent is authorized to comply with the written instructions of the contributing shareholder as to his election under Paragraph 2.1 (D) and will incur no liability and will be held harmless and indemnified by Corporation and the contributing shareholder, by his actions in complying with said written instructions.

D.   **VAYGENSBERG** agrees to supply his expertise and experience in the casino business as described above in lieu of a monetary contribution and receive compensation for said services of ONE DOLLAR 00/100 U.S. ($1.00) per year.

E.     **TATARCH** agrees to supply his expertise and experience in the casino business as described above in lieu of a monetary contribution and receive compensation for said services of ONE DOLLAR 00/100 U.S. ($1.00) per year.

F.     **LASKOV** agrees to lend corporation FOUR HUNDRED THOUSAND 00/100 U.S. DOLLARS ($400,000.00), and invest in **CORPORATION**, FOUR HUNDRED THOUSAND 00/100 U.S. DOLLARS ($400,000.00). Additionally, **LASKOV** has the option to lend and/or invest up to ONE MILLION TWO HUNDRED THOUSAND 00/100 U.S. DOLLARS ($1,200,000.00) and receive an additional pro-rata percentage (not exceeding 15%) of issued and outstanding stock in INC based upon the amount of his loan and his investment.

2.2     Fiscal Year. The fiscal year of the Corporation shall be the calendar year.

2.3     Future Financial Needs Of The Corporation. No Stockholder shall be required to advance or contribute any additional funds to the Corporation.

2.4.     Directors of the Corporation. The parties hereto agree that the Board of Directors of the Corporation shall be composed of at least one (1) member, and that the members of the Board of Directors will meet at least once annually to appoint officers and to transact such other business as necessary.

2.5.     Stockholder and Director Voting.

2.5.1.     Notwithstanding anything contained elsewhere in this Agreement to the contrary (Excluding Paragraph 2.5.3), the approval of those Stockholders owning a majority of all issued and outstanding shares of Stock of the Corporation is expressly required with respect to the following decisions and/or actions:

2.5.1.1.     Determining the timing and amount of distributions of available cash of the Corporation and/or net proceeds from capital transactions of the Corporation;

2.5.1.2.     Investing and/or reinvesting in properties (real or personal), including, but not limited to, common and preferred stocks, options, secured and unsecured obligations, general and limited partnership interests, mortgages and notes receivable, loans, interests in investment trusts, business trusts of all types, mutual funds, leases, life insurance

policies, residential and commercial real estate, and other tangible and intangible assets, both domestic and international;

2.5.1.3.    Causing private annuities to be issued and paid from the Corporation property;

2.5.1.4.    Voting in person or by general or limited proxy, or refraining from voting, any securities owned by the Corporation for any purpose;

2.6.1.5.    Granting, assigning, transferring, leasing or letting all or any portion of any property of the Corporation, whether real or personal, in furtherance of the business of the Corporation and, in connection therewith, executing in the Corporation*s name, any and all deeds, documents, bills of sale, and other papers pertaining to the business of the Corporation;

2.5.1.6.    Selling at public or private sale, contracting to sell, conveying, exchanging, transferring and otherwise dealing with all or any portion of any property of the Corporation, real or personal, and any reinvestments thereof;

2.5.1.7.    Compromising, contesting, prosecuting or abandoning claims in favor of or against the Corporation and agreeing to any rescission or modification of any contract or agreement;

2.5.1.8.    Dealing with, purchasing assets from, or making loans to, the fiduciary of any trust or any business or investment organization created by a Stockholder, or of which a Stockholder owns any interest;

2.5.1.9.    Incurring any indebtedness for which the Corporation is liable, including, without limitation, any increase in or refinancing of existing debt of the Corporation or any new borrowing;

2.5.1.10   Creating or acquiescing in the imposition of a lien on any assets of the Corporation;

2.5.1.11.  The selling or merging of the Corporation with or into any other entity;

2.5.1.12.  Extending the Corporation*s credit, loaning any amount, guaranteeing any obligation or endorsing any instrument;

2.5.1.13.  Instituting any legal action for or on behalf of the Corporation or settling any claim for or on behalf of the Corporation;

2.5.1.14.  Settling any insurance or condemnation claim or proceeding for or on behalf of the Corporation;

7

2.5.1.15. Acquiring any land or real property interest for or on behalf of the Corporation;

2.5.1.16. Initiating, or acquiescing to, any bankruptcy event;

2.5.1.17. Hiring, retaining or employing, firing and coordinating the services of any employee of the Corporation who is also a Stockholder of the Corporation; and

2.5.1.18. Determining the salaries, if any, of (a) any or all of the Stockholders of the Corporation, (b) any or all of the Directors of the Corporation, © ) any employee of the Corporation who is also a Stockholder of the Corporation, and/or (d) any employee of the Corporation who is also a Director of the Corporation.

2.5.2. Except as otherwise provided herein above, the Board of Directors of the Corporation shall, in general, manage the day-to-day affairs of the Corporation and the business thereof. Unless otherwise provided in this Agreement, all action which may come before the Board of Directors of the Corporation shall require the majority consent of all Directors elected. Specifically, the Board of Directors shall be responsible for the following:

2.5.2.1. Keeping all books of accounts and other records required by the Corporation, keeping vouchers, statements, receipted bills, invoices and all other records, covering all collections, disbursements and other data in connection with the Corporations property;

2.5.2.2. To the extent that funds of the Corporation are available therefor, paying all debts and other obligations of the Company when due, including amounts due under loans to the Corporation; and

2.5.2.3. Hiring, retaining or employing, firing and coordinating the services of all attorneys, accountants, consultants, independent contractors, employees (other than any employee who is also a Stockholder of the Corporation) and other persons necessary or appropriate to carry out the business of the Corporation.

2.5.3. The approval of all the Stockholders of the Corporations is expressly required with respect to any transaction which will go over monthly operating expenses for ONE HUNDRED THOUSAND DOLLARS 00/100 ($100,000.00).

2.6. Resignation of Stockholder Each of the Stockholders agrees that upon the sale or other disposition of his or her shares of Stock of the Corporation pursuant to the provisions of this Agreement, he or she shall promptly submit to the Corporation his or her resignation as either a director and/or officer of the Corporation. The parties hereto agree that the failure of any

director or officer to resign upon the sale of his or her shares of Stock shall be deemed sufficient cause for his or her removal by the other Stockholders.

2.7.   Duty of Cooperation. Each of the parties hereto acknowledges and understands that the success of the Corporation*s operations depends upon the full performance of the others. Notwithstanding the fact that certain duties may be delegated to the various Stockholders or their nominees, each agrees to inform the others on a periodic basis of his or her actions taken on behalf of the Corporation and such actions that the other expects another party to perform in order that his or her specific duties may be carried out. In this respect each party who requires the assistance of another party agrees to inform the other specifically of what duties or requirements are necessary by the others in sufficient time for the others to comply with such request.

2.8.   Distribution Of Cash Flow - Return Of Capital. Each Stockholder hereto acknowledges and understands that he or she shall not be entitled to a distribution of corporate assets for any reason except as specifically provided for in this Section 2.8. The parties hereto agree that the cash flow of the Corporation shall be applied to or distributed in the following order of priorities:

2.8.1.   In payment of obligations to third party lenders (whether secured or unsecured) where there is a recourse to a party to this Agreement.

2.8.2.   In payment of obligations to third parties where there is not a recourse to a party to this Agreement;

2.8.3.   In payment of direct operating expenses, but other than compensation to any of the Stockholders, directors or officers of the Corporation;

2.8.4.   In payment of obligations of the Corporation to any Stockholder who has loaned monies to the Corporation, and for agreed upon salaries;

2.8.5.   In payment of compensation to any of the Stockholders, directors or officers performing services for or on behalf of the Corporation;

2.8.6.   Toward contributions to the working capital of the Corporation, prepayment of obligations of the Corporation, or for such other purposes related to the business of the Corporation as shall be decided by a those Stockholders owning a majority of all issued and outstanding shares of Stock of the Corporation;

2.8.7.   The balance (if any) to the Stockholders in proportion to their respective Stock ownership in the Corporation.

2.9.   Indemnification. The Corporation shall indemnify any director, officer, or Stockholder of the Corporation who is party to this Agreement for any costs, payments, expenses and damages incurred by said individual in connection with the defense of any action, suit, or proceeding in which he or she is made a part of by reason of being or having been such director,

9

officer or Stockholder, except for gross negligence or intentional wrongdoing on the part of the individual; provided, however, that in all events such individual shall indemnify and hold harmless the Corporation with respect to any action, suit, cost, claim, demand payment or liability arising by reason of any and all gross negligence and/or intentional wrongdoing on the part of such individual.

2.10.   Conflict with By-Laws and/or Articles of Incorporation. In the event that any provision in this Agreement conflicts with any provision in the By-Laws and/or Articles of Incorporation of the Corporation, the provisions in this Agreement shall supersede those provisions in the By-Laws and/or Articles of Incorporation, and the parties hereto shall take all steps necessary to amend said By-Laws and/or Articles of Incorporation in order to rectify said conflict.

## SECTION 3
## Stock Transfers

3.1.   General Restrictions. The parties do not want shares of the Stock to be made generally available to persons other than the present Stockholders. Therefore, the parties agree that no Stockholder will Encumber, Transfer, or permit to be Encumbered or Transferred all or any portion of his or her shares of the Stock, whether now or hereafter acquired, except in accordance with the terms of this Agreement. Any attempted Encumbrance or Transfer of any shares of the Stock in violation of the terms of this Agreement shall be null and void and shall not be reflected on the Corporation*s books.

3.2.   Encumbrance. Except as otherwise provided herein this Agreement, no Stockholder may Encumber any or all of his or her shares of the Stock in connection with any debt.

3.3.   Voluntary Lifetime Transfers. No Stockholder may make any Voluntary Lifetime Transfer except pursuant to this Section. No Stockholder may make any Voluntary Lifetime Transfer of any shares of his or her Stock, or any interest in the Corporation now held or hereafter acquired, without first giving written notice to the other Stockholders. The written notice C*Notice of Offered Stock") shall include the name of the proposed transferee, the number of shares of Stock proposed to be transferred (the "Offered Stock") and all material terms of the proposed Transfer, and shall be accompanied by a copy of the bona fide written offer to purchase such Stock. Subject to the provisions herein below, the non-selling Stockholder(s) receiving such an offer may purchase that part of the Offered Stock which bears the same relationship to all Offered Stock as the number of shares of Stock then owned by such Stockholder bears to the total number of shares of Stock held by all Stockholders entitled to purchase the Offered Stock other than the selling Stockholder. Such part is hereinafter referred to as a Stockholder*s "Proportionate Share". Any acceptance by a Stockholder must be in writing and must be received by the selling Stockholder within thirty (30) days of the selling Stockholders delivery of the Notice of Offered Stock. Any acceptance of the offer by a Stockholder may be made subject to obtaining any required governmental or regulatory approval or consents. Failure of a Stockholder to timely accept the offer shall be deemed a rejection. An acceptance by a Stockholder shall state the number of shares such Stockholder wishes to

10

purchase. A Stockholder may indicate that he or she wishes to purchase more than his or her Proportionate Share after those Stockholders electing to purchase less than their Proportionate Share have been allocated their share under the provisions herein below.

3.3.1.    Within ten (10) business days after the end of the period within which a Stockholder could have duly accepted the offer, the selling Stockholder shall determine the number of shares of Stock which each accepting Stockholder shall be permitted to purchase. Such determination shall be made as follows:

3.3.1.1.    Each Stockholder who elects to purchase no less than his or her Proportionate Share shall be permitted to purchase his or her Proportionate Share.

3.3.1.2.    Any shares then remaining unpurchased shall be allocated (up to any maximum desired by the Stockholder making such election) among those Stockholders who elect to purchase more than their Proportionate Share in proportion to the shares of Stock then owned by each Stockholder making such election.

3.3.2.    Within five (5) business days after the selling Stockholder makes the determination required to be made under Section 3.3.1., the selling Stockholder shall notify each accepting Stockholder of the number of shares of Offered Stock such Stockholder may purchase.

3.3.3.    If, after allocating the shares of Offered Stock in accordance with the provisions of this Section 3.3., the shares of Stock so allocated for purchase do not aggregate the total number of shares of Offered Stock, the selling Stockholder may retain any of such remaining shares of the Offered Stock, subject to all the terms and conditions of this Agreement, or he or she may Transfer all or part of such shares to the original proposed transferee within a period of thirty (30) days following the end of the period during which the other Stockholders may elect to purchase the Offered Stock, provided: (I) the transferee agrees to deliver, and delivers an instrument in form and substance satisfactory to the Corporation binding the transferee to the provisions of this Agreement; and (ii) the total consideration per share is the same as the consideration at which such shares were offered to the other Stockholders and is paid in the manner and on the same terms and conditions as set forth in the Notice of Offered Stock.

3.3.4.    At such time as Stock becomes Offered Stock, in accordance with this Section 3.3., any offer made shall be irrevocable during the period in which it may be accepted by the Stockholders.

3.3.5. Any payment for shares of Stock purchased pursuant to this Section 3.3. by the Corporation or any Stockholder shall, at the election of the purchaser, be on the same terms and conditions of such third party offer or by delivery in cash at the closing of the full purchase price for the shares of Stock purchased, provided, however, if the third party offer provides for the payment of non-cash consideration, purchases by any Stockholder may be made for cash consideration that constitutes the reasonable economic equivalent of the non-cash consideration of the third party offer.

3.3.6.    The closing for any purchase pursuant to this Section 3.3. shall take place at the Corporation*s primary place of business, or at any other place to which the parties may agree, and on such date as the parties may agree, but not sooner than twenty (20) days and not

11

later than sixty (60) days after the date on which all of the Offered Stock has been accepted or all applicable time periods have expired or been waived.

The provisions of this Section 3.3. shall not apply to, and, notwithstanding anything contained in this Section 3.3. to the contrary, there shall be no restriction(s) on, the transfer of Stock to a Stockholder•s Family Member(s) or to trusts the entire beneficial interests of which are held by such Stockholder and/or one or more of his Family Members; provided, however, that any such transfer of stock shall be null and void unless the transferee executes and delivers to the Corporation an instrument in form and substance satisfactory to the Corporation binding the transferee to the provisions of this Agreement.

3.4. **Involuntary Lifetime Transfers**. All Involuntary Lifetime Transfers are hereby prohibited. However, in the event a court of competent jurisdiction shall issue an order requiring such an Involuntary Lifetime Transfer of any or all shares of Stock of a Stockholder, said Stockholder shall be deemed to have offered to sell all of his or her shares of the Stock to be Transferred to the other Stockholders in accordance with the terms of this Section 3.4.

3.4.1. Each other Stockholder shall have sixty (60) days from the date of the court order in which to elect to buy all or any of the Offered Stock. The other Stockholders may elect to buy such shares of the Offered Stock in proportion to their respective ownership of the Stock (excluding the Offered Stock), or in such other proportion as they shall agree upon. Any acceptance by a Stockholder must be in writing and must be received by the selling Stockholder within the aforesaid sixty (60) day period.

3.4.2. If the other Stockholders do not agree to buy any portion of the Offered Stock within the sixty (60) day period set forth in Section 3.4.1. herein above, such Involuntary Lifetime Transfer may be completed as to such portion. If an Involuntary Lifetime Transfer of the Offered Stock or any portion thereof is not consummated within thirty (30) days after the expiration of such sixty (60) day period, the provisions of this Agreement will again apply to such Offered Stock as if no such Involuntary Lifetime Transfer had been contemplated and no notice had been given. An involuntary Lifetime Transfer is consummated when the Corporation has been given notice that legal title to the shares of the Stock has been Transferred, subject to recordation on its books.

3.4.3. The price for the Offered Stock shall be the book value of the Offered Stock on the last day of the fiscal year most recently ended prior to the date of any such deemed offer. The book value of the Offered Stock shall be determined in accordance with the regular financial statements prepared by the Corporation and in accordance with generally accepted accounting principles consistently applied. The book value of the shares of the Offered Stock will be determined by the mutual agreement of the Offering Stockholder and the other Stockholder(s) who have elected to purchase all or a portion of the Offered Stock, with the assistance of the independent Accountant regularly employed by the Corporation, if any, within ten (10) days following the expiration of the sixty (60) day period set forth in Section 3.4.1. herein above, or, if such mutual agreement cannot be reached, the book value of the Offered Stock will be determined by one (1) or more Qualified Appraisers, selected as follows:

3.4.3.1.    If the book value of the Offered Stock is to be determined by Qualified Appraisers, the Offering Stockholder and the other Stockholder(s) who have elected to purchase all or a portion of the Offered Stock will each have the opportunity to appoint, at his, her, or their own expense, a Qualified Appraiser, within five (5) days following the expiration of the ten (10)-day period within which the Offering Stockholder and the other Stockholder(s) could not mutually agree on the book value. If either party shall fail to appoint a Qualified Appraiser within this five (5)-day period, the other Qualified Appraiser shall unilaterally establish the book value of the Offered Stock by a written opinion.

3.4.3.2.    If both the Offering Stockholder and the other Stockholder(s) who have elected to purchase all or a portion of the Offered Stock appoint Qualified Appraisers within the aforesaid five (5)-day period, the two (2) Qualified Appraisers shall establish the book value of the Offered Stock in a single written opinion agreed to by both of them.

3.4.3.3.    If the two (2) Qualified Appraisers cannot agree on the book value of the Offered Stock within ten (10) days of the appointment of the latter of them, the two (2) appointed Qualified Appraisers shall together appoint a third Qualified Appraiser whose sole written opinion shall establish the book value of the Offered Stock.

3.4.3.4.    The fees and reimbursed expenses charged by the Qualified Appraisers in the valuation under this Section 3.4. shall be borne equally by the Offering Stockholder and the other Stockholder(s) who have elected to purchase all or a portion of the Offered Stock.

3.4.3.5.    The Corporation will provide such data as any Qualified Appraiser deems necessary or useful to make such determination of the book value of the Offered Stock.

3.4.4.    The price for the Offered Stock shall be paid in twelve (12) equal monthly payments of principal and interest. Such payments shall begin on the date of the closing and shall include interest compounded annually at the applicable federal rate established under Code Section 1274(d) on such closing date added to each installment after the first installment. Each buying Stockholder will prepare and give the selling Stockholder a negotiable promissory note as evidence of this debt. Such note shall permit the buying Stockholder to prepay all or any part of the principal balance of the note at any time without penalty or premium.

3.4.5.    The purchase of the Offered Stock pursuant to this Agreement will take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the purchase price is determined in accordance with the provisions herein above, at the Corporation*s primary place of business, or at any other place to which the parties agree.

3.4.6.    At the closing, the buying Stockholder(s) will pay for the Offered Stock and the selling Stockholder will deliver certificates representing all of the shares of the Offered Stock, duly endorsed, free and clear of all Encumbrances, and with evidence of payment of all necessary transfer taxes and fees.

3.4.7.     Each Stockholder appoints the Corporation, through its Secretary or such other officer as its Board of Directors may designate, as his or her agent and attorney-in-fact to execute and deliver all documents needed to convey his or her shares of the Stock, if such selling Stockholder is not present at the closing. This power of attorney is coupled with an interest and does not terminate on the Stockholders disability or death, and continues for as long as this Agreement is in effect.

3.5.     Transfers at Death. On the death of any Stockholder, the Stock of such deceased Stockholder shall vest in the transferees of the Stockholders estate, who shall automatically become bound by the terms and conditions of this Agreement; provided, however, that if any such transferee is not a Family Member of the deceased Stockholder, the transfer shall be null and void, and the deceased Stockholders Personal Representative shall offer to sell to the other Stockholders, in writing, all of the deceased Stockholder*s shares of the Stock in accordance with the terms of this Section 3.5.

3.5.1.     Each other Stockholder shall have sixty (60) days from the date of the offer in which to elect to buy all or any of the Offered Stock. The other Stockholders may elect to buy such shares of the Offered Stock in proportion to their respective ownership of the Stock (excluding the Offered Stock), or in such other proportion as they shall agree upon. Any acceptance by a Stockholder must be in writing and must be received by the Personal Representative of the Deceased Stockholders estate within the aforesaid sixty (60) day period.

3.5.2.     If the other Stockholders do not agree to buy any portion of the Offered Stock within the sixty (60) day period set forth in Section 3.5.1. herein above, the Personal Representative of the Deceased Stockholders estate shall be free to sell, encumber, or otherwise dispose of the shares of such Stock, in any manner and upon any terms and conditions.

3.5.3.     The price for the Offered Stock shall be the fair market value of the Offered Stock on the last day of the fiscal year most recently ended prior to the date of any such deemed offer. The fair market value of the Offered Stock shall be determined in accordance with the regular financial statements prepared by the Corporation and in accordance with generally accepted accounting principles consistently applied. This valuation shall be determined under the same methods as would be used for determining the estate tax value of the Offered Stock if the Offering Stockholder had died on the date the offer was deemed made, ignoring any alternate valuation date (under Code Section 2032) or special use valuation (under Code Section 2032A). The fair market value of the shares of the Offered Stock will be determined by the mutual agreement of the Personal Representative of the Deceased Stockholder*s estate and the other Stockholder(s) who have elected to purchase all or a portion of the Offered Stock, with the assistance of the independent Accountant regularly employed by the Corporation, if any, within ten (10) days following the expiration of the sixty (60) day period set forth in Section 3.5.1. herein above, or, if such mutual agreement cannot be reached, the fair market value of the Offered Stock will be determined by one (1) or more Qualified Appraisers, selected as follows:

3.5.3.1.     If the fair market value of the Offered Stock is to be determined by Qualified Appraisers, the Personal Representative of the Deceased Stockholders estate and the other Stockholder(s) who have elected to purchase all or a portion of the Offered Stock will each have the opportunity to appoint, at his, her, or their own expense, a Qualified Appraiser, within

five (5) days following the expiration of the ten (10)-day period within which the Personal Representative of the Deceased Stockholders estate and the other Stockholder(s) could not mutually agree on the fair market value. If either party shall fail to appoint a Qualified Appraiser within this five (5)-day period, the other Qualified Appraiser shall unilaterally establish the fair market value of the Offered Stock by a written opinion.

3.5.3.2. If both the Personal Representative of the Deceased Stockholders estate and the other Stockholder(s) who have elected to purchase all or a portion of the Offered Stock appoint Qualified Appraisers within the aforesaid five (5)-day period, the two (2) Qualified Appraisers shall establish the fair market value of the Offered Stock in a single written opinion agreed to by both of them.

3.5.3.3. If the two (2) Qualified Appraisers cannot agree on the fair market value of the Offered Stock within ten (10) days of the appointment of the latter of them, the two (2) appointed Qualified Appraisers shall together appoint a third Qualified Appraiser whose sole written opinion shall establish the fair market value of the Offered Stock.

3.5.3.4. The fees and reimbursed expenses charged by the Qualified Appraisers in the valuation under this Section 3.5. shall be borne equally by the Deceased Stockholder*s estate and the other Stockholder(s) who have elected to purchase all or a portion of the Offered Stock.

3.5.3.5. The Corporation will provide such data as any Qualified Appraiser deems necessary or useful to make such determination of the fair market value of the Offered Stock.

3.5.4. The price for the Offered Stock shall be paid in twelve (12) equal monthly payments of principal and interest. Such payments shall begin on the date of the closing and shall include interest compounded annually at the applicable federal rate established under Code Section 1274(d) on such closing date added to each installment after the first installment. Each buying Stockholder will prepare and give the Personal Representative of the Deceased Stockholder*s estate a negotiable promissory note as evidence of this debt. Such note shall permit the buying Stockholder to prepay all or any part of the principal balance of the note at any time without penalty or premium.

3.5.5. The purchase of the Offered Stock pursuant to this Agreement will take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the purchase price is determined in accordance with the provisions herein above, at the Corporation*s primary place of business, or at any other place to which the parties agree.

3.5.6. At the closing, the buying Stockholder(s) will pay for the Offered Stock and the Personal Representative of the Deceased Stockholders estate will deliver certificates representing all of the shares of the Offered Stock, duly endorsed, free and clear of all Encumbrances, and with evidence of payment of all necessary transfer taxes and fees.

15

3.5.7.  Each Stockholder appoints the Corporation, through its Secretary or such other officer as its Board of Directors may designate, as his or her agent and attorney-in-fact to execute and deliver all documents needed to convey his or her shares of the Stock, if such selling Stockholder is not present at the closing. This power of attorney is coupled with an interest and does not terminate on the Stockholder*s disability or death, and continues for as long as this Agreement is in effect.

3.6.  Special Purchase. In order to prevent the injury that might occur to the Corporation in case of a prolonged deadlock between the Stockholders, in addition to all other restrictions contained in this Agreement, in the event that there shall be a deadlock between the Stockholders with respect any issue concerning the Corporation, any Stockholder may send to any other Stockholder a Special Purchase Notice or a Special Sale Notice.

3.6.1.  A Special Purchase Notice is a written notice by which the Offering Stockholder offers to buy all of the other Stockholders shares of the Stock for the price per share set forth in said Special Purchase Notice (the "Price Per Share") and on the terms set forth herein below. A Special Purchase Notice is valid only if accompanied by the Offering Stockholder*s deposit with an Escrow Agent of certificates representing all of his or her shares of the Stock and his or her good personal check for the entire purchase price.

3.6.1.1.  The other Stockholder shall have thirty (30) days from the Special Purchase Notice either to accept the offer or, at his or her sole option, reject the offer and instead elect to buy all of the Offering Stockholder*s shares of the Stock, for the Price Per Share, and on the terms set forth herein below. Failure to respond to the Special Purchase Notice within thirty (30) days constitutes acceptance of the offer and the other Stockholder*s agreement to sell his or her shares of the Stock to the Offering Stockholder.

3.6.1.2.  The other Stockholder may accept the offer and agree to sell his or her shares of the Stock to the Offering Stockholder by delivering to the Escrow Agent certificates representing all of the other Stockholder*s shares of the Stock, within thirty (30) days from the date of the Special Purchase Notice. Upon acceptance of the offer by the other Stockholder, the Escrow Agent shall do or cause to be done the following:

3.6.1.2.1.  First, transfer the other Stockholders shares of the Stock to the Offering Stockholder or, if the other Stockholder has not yet provided the Escrow Agent with certificates representing such shares of the Stock, direct the Corporation*s Secretary (who shall follow such direction), to cancel the other Stockholders shares of the Stock on the Corporation*s books and to issue an equal number of additional shares to the Offering Stockholder;

3.6.1.2.2.  Second, deliver to the other Stockholder the Offering Stockholders check for the Price Per Share for all of the other Stockholders shares of the Stock;

3.6.1.2.3.  Third, deliver to the Offering Stockholder his or her certificates for his or her own shares of the Stock originally deposited with the Escrow Agent; and

16

3.6.1.2.4.   Fourth, terminate the escrow, at which time the Escrow Agent shall be released from all duties and responsibilities.

3.6.1.3.  The other Stockholder may reject the Special Purchase Offer and evidence his or her decision to buy the Offering Stockholder*s shares of the Stock by delivering to the Escrow Agent a good personal check made payable to the Offering Stockholder for the Price Per Share for all of the Offering Stockholders shares of the Stock within thirty (30) days from the Special Purchase Notice. Upon receipt of such check by the Escrow Agent, the Escrow Agent shall do or cause to be done the following:

3.6.1.3.1.   First, transfer the Offering Stockholder*s shares of the Stock to the other Stockholder;

3.6.1.3.2.   Second, deliver to the Offering Stockholder the other Stockholder*s check for the Price Per Share for all of the Offering Stockholders shares of the Stock, and the Offering Stockholders check originally deposited with the Escrow Agent;

3.6.1.3.3.   Third, terminate the escrow, at which time the Escrow Agent shall be released from all duties and responsibilities.

3.6.2.  A Special Sale Notice is a written notice by which the Offering Stockholder offers to sell all of his or her shares of the Stock for the price per share set forth in said Special Sale Notice (the 'Price Per Share") and on the terms set forth herein below. A Special Sale Notice shall be valid only if accompanied by the Offering Stockholder*s deposit with an Escrow Agent of certificates representing all of the Offering Stockholder*s shares of the Stock, and by his or her good personal check for the entire purchase price.

3.6.2.1.   The other Stockholder shall have thirty (30) days from the Special Sale Notice either to accept the offer or, at his or her sole option, reject it and elect to sell all of his or her own shares of the Stock to the Offering Stockholder, for the Price Per share, and on the terms set forth herein below. Failure to respond to the Special Sale Notice within thirty (30) days constitutes rejection of the offer and the other Stockholder*s election to sell his or her own shares of the Stock.

3.6.2.2.   The other Stockholder shall evidence acceptance of the Special Sale Notice by delivering to the Escrow Agent a good check made payable to the Offering Stockholder for the entire purchase price within thirty (30) days from the date of the Special Sale Notice. Upon receipt of such check by the Escrow Agent, the Escrow Agent shall do or cause to be done the following:

3.6.2.2.1.   First, transfer the Offering Stockholders shares of the Stock to the other Stockholder;

17

3.6.2.2.2.        Second, deliver to the Offering Stockholder the other Stockholder∗s check for the Price Per Share for all of the Offering Stockholder∗s shares of the Stock;

3.6.2.2.3.        Third, return to the Offering Stockholder his or her check originally deposited with the Escrow Agent; and

3.6.2.2.4.        Fourth, terminate the escrow, at which time the Escrow Agent shall be released from all duties and responsibilities.

3.6.2.3.   The other Stockholder may reject the offer made in the Special Sales Notice and elect to sell his or her shares of the Stock to the Offering Stockholder by delivering to the Escrow Agent certificates representing all of the other Stockholder∗s shares of the Stock, within thirty (30) days from the date of the Special Sale Notice. Upon receipt of such certificates by the Escrow Agent, the Escrow Agent shall do or cause to be done the following:

3.6.2.3.1.        First, transfer the other Stockholders shares of the Stock to the Offering Stockholder;

3.6.2.3.2.        Second, deliver to the other Stockholder the Offering Stockholders check for the Price Per Share for all of the other Stockholders shares of the Stock;

3.6.2.3.3.        Third, return to the Offering Stockholder the certificates representing his or her shares of the Stock, originally deposited with the Escrow Agent; and

3.6.2.3.4.        Fourth, terminate the escrow, at which time the Escrow Agent shall be released from all duties and responsibilities.

3.6.3. All fees charged by the Escrow Agent shall be paid by the Corporation, regardless of which Stockholder sells his or her shares of the Stock.

## SECTION 4
## Endorsement of Shares

4.1.   Endorsement. Each Stockholder will deliver to the Corporation∗s Secretary promptly after the date the Stockholder becomes a party to this Agreement, all of his or her certificates of the Stock, and the Corporation∗s Secretary will endorse them as follows:

Sale, assignment, transfer, pledge, or other disposition of the shares of Stock represented by this certificate is restricted by the provisions of an Agreement dated _____ 2003, by and among the Stockholders of MLA CRUISES, INC. and MLA CRUISES, INC., itself.

4.2.   Return of Shares. After this endorsement has been placed on the certificates, the Corporation will return them to the Stockholders.

18

4.3.   New Stock. All certificates for shares of the Stock issued to any Stockholder while this Agreement is in effect must also bear this endorsement.

## SECTION 5
### Terminating the Agreement / Return of Certificates

Upon termination of this Agreement by mutual consent of all parties hereto or pursuant to applicable law, the Stockholders shall return their certificates for shares of the Stock to the Corporation*s Secretary, who will issue new certificates for an equal number of shares, without the restrictive endorsement required by this Agreement.

## SECTION 6
### Continuation of Restrictions

This Agreement shall continue to apply to shares of the Stock Transferred by any Stockholder, and any transferee shall execute, as a condition precedent to the Transfer, an Agreement substantially identical in form to this one (which may be accomplished by a certificate of acceptance and adoption of this Agreement), to which all of the transferee*s shares of the Stock will be subject, and which Agreement will be treated as a pad of this Agreement.

## SECTION 7
### Confidential Information

7.1.   Confidential Information. Each Stockholder hereby acknowledges that, in conjunction with his or her ownership of his or her shares of Stock, he or she will be making use of, acquiring and/or adding to confidential information of a special and unique nature and value affecting and relating to the Corporation and its financial operations, including, but not limited to: the Corporation*s business, the identity of the Corporation*s clients/customers, costing methods, estimating methods, the prices being charged by the Corporation to such clients/customers, the Corporation*s contracts, pricing being paid to vendors and subcontractors, business records and other records, the Corporation*s trade secrets, client/customer lists, billing forms, methods and procedures, trade names, improvements, engineering, data or compilation of information, manuals, photographs, samples, literature, sales aids of every kind, electronic work, software, formulae, patterns, devices, sources of supply, plans for expansion or marketing strategies, any inventions, designs, improvements, discoveries, contracts, sub-contracts, purchase orders, legal forms, experiments, modifications, or enhancements which any Stockholder and/or any officer, director, employee and/or other agent of the Corporation may create, conceive, find or participate in, and/or other similar information relating to the Corporation and the Corporation*s business, and any of the foregoing items not related to the Corporation or the

19

Corporation*s business which are suggested by or result from any task assigned by the Corporation to a particular Stockholder and/or any officer, director, employee and/or other agent of the Corporation, or work performed by a particular Stockholder and/or any officer, director, employee and/or other agent of the Corporation for or on behalf of the Corporation, or which are created on the Corporation*s premises or the premises of any project with which the Corporation is involved, or are created with the Corporation*s equipment (all the foregoing being hereinafter referred to collectively as "Confidential Information"). Each Stockholder hereby further recognizes and acknowledges that all Confidential Information is the exclusive property of the Corporation, is material and confidential, and greatly affects the legitimate business interests, goodwill and effective and successful conduct of the business of the Corporation. Accordingly, each Stockholder hereby covenants and agrees that said Stockholder will use the Confidential Information only for the benefit of the Corporation and shall not at anytime, directly or indirectly, either during the term of this Agreement or afterwards, divulge, reveal or communicate any Confidential Information to any person, firm, corporation or entity whatsoever, or use any Confidential Information for his or her own benefit or for the benefit of others. The provisions of this Section shall survive the termination of this Agreement.

7.2    Remedies. In the event any Stockholder shall violate the covenants contained herein this Section 7, the Corporation shall be entitled to a permanent injunction in order to prevent or restrain any such violation of said covenants by said Stockholder. These remedies shall be in addition to any other remedy available to the Corporation hereunder or available to the Corporation at law or in equity, and each Stockholder agrees that such remedies are fair and reasonable and are reasonably necessary for the protection of the legitimate business interests of the Corporation, its officers, directors, and Stockholders. Each Stockholder agrees that the covenants set forth in this Section 7 do not unreasonably impair the ability of said Stockholder to conduct any unrelated business or to find gainful work in his, her or its field. The parties hereto agree that if a court of competent jurisdiction holds any of the covenants set forth in this Section 7 unenforceable, the court shall substitute an enforceable covenant that preserves, to the maximum lawful extent, the scope, duration and all other aspects of the covenant deemed unenforceable, and that the covenant substituted by the court shall be immediately enforceable against all Stockholders. The foregoing shall not be deemed to affect the right of the parties hereto to appeal any decision by a court concerning this Agreement.

7.3.    Knowledge and Intent. Each Stockholder has carefully read and considered all provisions of this Section 7 and, having done so, agree that the restrictions set forth in said Section are fair and reasonable and are reasonably required for the protection of the interests of the Corporation. It is the belief of the parties that the best protection which can be given to the Corporation which does not infringe on the rights of any Stockholder to conduct any unrelated business is to provide for the restrictions described above. In the event any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute an enforceable restriction in place of any limitation deemed unenforceable and, as so modified, the restrictions shall be as fully enforceable as if they had been set forth herein by the parties. It is the intent of the parties that the court, in so

20

establishing a substitute restriction, recognize that the parties hereto desire that the restrictions herein be imposed and maintained to the maximum lawful extent.

7.4   <u>Survival</u>. This Section 7 and all the provisions hereof shall survive the termination of this Agreement and any Stockholders status as a Stockholder of the Corporation.

**SECTION 8**
**Attorney*s Representations**

The parties all acknowledge that the Corporation*s counsel, DAVID M. GOLDSTEIN, ESQ., prepared this Agreement on behalf of and in the course of its representation of **ARKADY VAYGENSBERG** and **LEONID TATARCHUK**, and that:

(1)   ALL OTHER PARTIES HERETO HAVE BEEN ADVISED BY DAVID M. GOLDSTEIN, ESQ., THAT A CONFLICT EXISTS AMONG THEIR INDIVIDUAL INTERESTS AND THE INTERESTS OF **ARKADY VAYGENSBERG** and **LEONID TATARCHUK**; AND

(2)   ALL OTHER PARTIES HERETO HAVE BEEN ADVISED BY DAVID M. GOLDSTEIN, ESQ., TO SEEK THE ADVICE OF INDEPENDENT COUNSEL;   AND

(3)   ALL OTHER PARTIES HERETO HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT COUNSEL AND HAVE SOUGHT THE ADVICE OF INDEPENDENT COUNSEL OR HAVE WAIVED THEIR RESPECTIVE RIGHTS TO DO SO, TO WIT: Michael Cohen, Esq., 608 5th Avenue, Suite 300, New York, N.Y. 10020, as to **MICHAEL COHEN**.

**SECTION 9**
**S Corporation Issues**

The provisions of this Section <u>only</u> apply whenever the Corporation operates under an S Election.

9.1. <u>Protection of Election</u>. In addition to any other restrictions contained in this Agreement, the Corporation*s bylaws, or elsewhere, the following additional restrictions shall apply in order to protect the Corporation*s S election:

9.1.1.   No Stockholder may Transfer any of his or her shares of the Stock to any person if such Transfer may reasonably be expected to result in a termination of the Corporation*s S Election.

9.1.1.1. Such prohibited Transfers include, but are not limited to:

21

9.1.1.1.1. The Transfer of any such shares to a partnership, corporation (other than another S corporation that will thereupon own all of the stock of the Corporation and that will elect to treat the Corporation as a Qualified Subchapter S Subsidiary), nonresident alien individual, estate (other than the estate of the Stockholder himself or herself) or trust (other than a trust that, under the Code, may indefinitely hold S corporation stock without terminating an S Election); and

9.1.1.1.2. The Transfer of any such shares to a person if such Transfer will increase the number of Stockholders to more than the maximum permissible number of Stockholders of an S corporation (presently, seventy-five (75)).

9.1.1.1.3. The pledge or other Encumbrance of any shares of the Corporation*s stock with respect to any loan from any person or entity if it reasonably could be believed that a Transfer of such shares to such secured lender would violate the restrictions of this Section 9.1.

9.1.1.2. No attempted Transfer or Encumbrance of any shares of the Stock in breach of the provisions of this item be valid or recognized on the Corporation*s books.

9.1.1.3. Any Stockholder who believes that an attempted Transfer or Encumbrance of any shares of the Corporation*s Stock is invalid under this Section 9.1 may request from the Corporation an opinion on the application of this Section. Such request shall be made by a written notice to the Corporation*s President, setting forth the details of the proposed Transfer or Encumbrance and the reasons why the Stockholder believes it to be invalid. The Corporation*s President shall promptly thereafter request a written opinion from the Corporation*s counsel (who may be an employee of the Corporation or independent outside counsel) and such written opinion shall be binding on the Corporation and on all Stockholders.

9.1.1.4. The Corporation may assess against any Stockholder who attempts any such invalid Transfer or Encumbrance a fee to cover its expenses plus two thousand dollars ($2,000.00) in evaluating whether or not a Transfer or Encumbrance is invalid under this Section.

9.1.2. No Stockholder may Transfer any shares of the Stock of the Corporation if that Transfer may reasonably be expected to result in an impermissible (as defined below) number of persons holding the shares of the Stock held by the Transferor immediately prior to the Transfer. A number of persons holding shares of the Stock is "impermissible" if it exceeds that percentage of the maximum permissible number of Stockholders of an S corporation (presently, seventy-five (75)), as the percentage of the Transferors shares of the Stock (determined immediately prior to the Transfer) bears to the total number of issued and outstanding shares of the Stock.

9.1.3. Any Stockholder who takes any action, does anything or fails to take any action or do anything, the result of which would otherwise be to cause the Corporations S Election to be

22

terminated involuntarily, and who can take any action that would cure such defect and preserve the Corporations S Election, shall take such curative action and do such things as may be required to preserve the Corporations S Election. Any Stockholder who believes that an action taken or not taken or a thing done or not done by another Stockholder will cause the Corporations S Election to be terminated involuntarily and further that there may be an action that can be taken to cure such defect and preserve the Corporations S Election, may request from the Corporation an opinion on the application of this item. Such request shall be made to the Corporations President by a notice in writing, setting forth the details of the action or inaction which the Stockholder believes jeopardizes the Corporations S Election and the action that may cure such defect and preserve the Corporations S Election. The Corporations President shall promptly thereafter request a written opinion from the Corporation*s counsel (who may be an employee of the Corporation or independent outside counsel) and such written opinion shall be binding on the Corporation and on all Stockholders. If it is the opinion of the Corporations counsel that the questioned Stockholder action or inaction may indeed jeopardize the Corporations S Election, then the Corporation shall assess against the Stockholder who has  done such act a fee to cover its expenses plus two thousand dollars ($2,000.00) in evaluating whether or not such action jeopardizes the Corporations S Election and what curative steps may be taken. The opinion of the Corporations counsel as to the curative steps that may be taken shall be conclusive on all parties.

       9.1.4.   Every Stockholder agrees to take such actions, as a Stockholder, director officer, or otherwise, to preserve the Corporation*s S Election and to preclude the Corporation from doing anything that could reasonably be expected to result in the termination of its S Election. Any Stockholder who believes that a contemplated action of the directors or officers of the Corporation would jeopardize its S Election may request an opinion on the application of this Section from the Corporation. Such request shall be made to the Corporation*s President in writing, setting forth the details of the proposed action and the reasons why the Stockholder believes such action to jeopardize the Corporation*s S Election. The Corporation*s President shall promptly thereafter request a written opinion from the Corporation*s counsel (who may be an employee of the Corporation or independent outside counsel), and such written opinion shall be binding on the Corporation and on all Stockholders. the Corporation shall pay all costs of obtaining such opinion, unless it can be shown that the person requesting such opinion acted in bad faith, in which case all actual costs of such opinion shall be assessed against the person requesting it.

       9.1.5.   It notwithstanding the provisions of this Section 9, any Stockholder*s Encumbrance, Transfer, vote as a director or officer, or other action results in or contributes to the termination of the Corporation*s S Election, such Stockholder shall be liable to the Corporation for any and all damages resulting therefrom.

       9.2.    <u>Termination</u>. Nothing in this Section shall restrict the right of a majority of all of the Stockholders to terminate the Corporation*s S Election at anytime, and no damages shall be due to the Corporation or to any Stockholder on account of such termination.

**SECTION 10**

## Miscellaneous

10.1.   Binding Agreement. This Agreement is binding on and enforceable by and against the parties, their successors, legal representatives, and assigns.

10.2.   Governing Law. This Agreement will be governed by and construed according to the laws of the State of Florida, and the sole jurisdiction and venue for any action or proceeding based upon, arising from, or related to, the subject matter of this Agreement shall lie in Dade County, Florida. The parties hereto consent to personal jurisdiction in Dade County, Florida.

10.3.   Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not effect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.

10.4.   Notices. All notices required or permitted to be given under this Agreement must be given in writing, and will be deemed given when personally delivered or, if earlier, when received after mailing by U.S. registered or certified mail, postage prepaid, with return receipt requested. Notice to any Stockholder is valid if sent to him at such Stockholder*s address as it appears in the Corporation*s records.

10.5.   Voting. On the date of the closing with respect to the sale of any shares of the Stock, the Stockholder who offered (or who has been deemed automatically to have offered) such shares of the Stock for sale will cease to have the right to vote such shares.

10.6.   Specific Performance. The parties agree that the Stock is unique and that failure to perform the obligations under this Agreement will result in irreparable damage to the other parties and that specific performance of these obligations may be obtained by a suit in equity.

10.7.   Waiver. Any party*s failure to insist on compliance or enforcement of any provision of this Agreement shall not affect its validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Agreement.

10.8.   Copies. More than one (1) copy of this Agreement may be executed, and all parties agree and acknowledge that each executed copy shall be a duplicate original.

10.9.   Gender and Number. Whenever the context of this Agreement requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural and vice versa.

10.10.   Amendment. This Agreement may be modified, amended, discharged or waived only by an agreement in writing signed by all of the parties hereto.

10.11   Attorney Fees. In the event an arbitration, lawsuit, action or other proceeding is brought by any party under this Agreement to enforce any of its terms, or in any appeal therefrom, it is agreed that the prevailing party shall be entitled to reasonable attorneys* fees and costs to be fixed by the arbitrator, trial court, and/or appellate court as the case may be.

IN WITNESS WHEREOF, this Agreement is and has been agreed to by each of the undersigned on the date first noted above.

Signed, sealed and delivered in
the presence of:

**CORPORATION:**

**MLA CRUISES, INC.,** a Delaware corporation

By: _____ President

Attest: _____ . Secretary

Witness

_____
Witness

**MAJESTY ENTERPRISES OF FLORIDA, LLC.,**
a Florida limited liability corporation

By: _____ President

Attest: _____ . Secretary

Witness

_____
Witness

**STOCKHOLDERS:**

By: _____
**ARKADY VAYGENSBERG**

Witness

_____
Witness

By: _____
**LEONID TATARCHUK**

Witness

_____
Witness

By: _____
**MICHAEL COHEN**

_____
Witness

_____
Witness

25

_____          By: _____
Witness                                         **VALENTIN LASKOV**


_____
Witness

26